# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.); JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) SEPARATE ACCOUNT 6A; JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) SEPARATE ACCOUNT 131; JOHN HANCOCK FUNDS II; JOHN HANCOCK VARIABLE INSURANCE TRUST; JOHN HANCOCK SOVEREIGN BOND FUND; JOHN HANCOCK BOND TRUST; JOHN HANCOCK STRATEGIC SERIES; and JOHN HANCOCK INCOME SECURITIES TRUST, | Index No.: 650195/2012 |
| *Plaintiffs*, | **AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK N.A.; J.P. MORGAN MORTGAGE ACQUISITION CORP.; J.P. MORGAN SECURITIES, LLC. f/k/a J.P. MORGAN SECURITIES INC.; J.P. MORGAN ACCEPTANCE CORPORATION I; EMC MORTGAGE LLC f/k/a EMC MORTGAGE CORPORATION; BEAR STEARNS AND CO. INC.; BEAR STEARNS ASSET BACKED SECURITIES I LLC; STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.; WAMU ASSET ACCEPTANCE CORP.; WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.; WAMU CAPITAL CORP.; LONG BEACH SECURITIES CORP.; BANC OF AMERICA SECURITIES LLC; CSE MORTGAGE, LLC; DEUTSCHE BANK SECURITIES INC.; JOHN BARREN; DAVID BECK; SARA BONESTEEL; DOMENIC A. BORRIELLO; RICHARD CAREAGA; JEROME A. CIPPONERI; CHRISTINE E. COLE; CRAIG S. DAVIS; ART DEN-HEYER; MARANGAL I. DOMINGO; DAVID M. DUZYK; KATHERINE GARNIEWSKI; TROY A. GOTSCHALL; PATRICIA A. JEHLE; JULIANA C. JOHNSON; ROLLAND JURGENS; JOSEPH T. | |

JURKOWSKI JR.; MICHAEL D. KATZ;
WILLIAM A. KING; MARC R. KITTNER;
MICHAEL J. KULA; THOMAS G. LEHMANN;
STEPHEN LOBO; RICHARD D. LODGE; KIM
LUTTHANS; MARC K. MALONE; THOMAS F.
MARANO; JEFFREY MAYER; EDWIN F.
MCMICHAEL; SAMUEL L. MOLINARO JR.;
MICHAEL B. NIERENBERG; DIANE NOVAK;
MICHAEL L. PARKER; MATTHEW E.
PERKINS; LOUIS SCHIOPPO, JR.; JEFFREY A.
SORENSEN; JEFFREY L. VERSCHLEISER;
THOMAS L. WIND; DAVID H. ZIELKE;
GREENWICH CAPITAL MARKETS, INC.
A.K.A. RBS GREENWICH CAPITAL;
MERRILL LYNCH & CO., UBS SECURITIES
LLC F.K.A. UBS WARBURG LLC.; BRIAN
BERNARD; MEGAN M. DAVIDSON; ERIC
FERREN; STEPHEN FORTUNATO; and
DONALD WILHELM,

*Defendants*.

GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, New York 10017
Jay W. Eisenhofer, Esq.
Geoffrey C. Jarvis, Esq.
Deborah A. Elman, Esq.
Robert D. Gerson, Esq.
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

SUMMARY OF ALLEGATIONS .......................................................................2

JURISDICTION AND VENUE ...........................................................................8

PARTIES ...............................................................................................................8

    A.    Plaintiffs .........................................................................................8

    B.    Defendants ......................................................................................9

        1.    JPMorgan Corporate Entities ............................................9

        2.    JPMorgan Individual Defendants ....................................11

        3.    Bear Stearns Corporate Entities ......................................14

        4.    Bear Stearns Individual Defendants ................................15

        5.    WaMu Corporate Entities .................................................19

        6.    WaMu Individual Defendants ...........................................20

        7.    Other Corporate Defendants .............................................26

    C.    Relevant Non-Parties ..................................................................28

        1.    Issuing Trusts ...................................................................28

        2.    Third Party Originators .....................................................32

SUBSTANTIVE ALLEGATIONS ......................................................................34

I.      THE SECURITIZATION PROCESS GENERALLY.....................................34

II.    THE SECURITIZATIONS ASSOCIATED WITH THE PLAINTIFFS'
      CERTIFICATES AND THEIR INVESTMENTS IN THE CERTIFICATES.................37

    A.    JPMorgan Trusts .........................................................................37

    B.    Bear Stearns Trusts .....................................................................38

    C.    WaMu and Long Beach Trusts....................................................39

III.   IMPORTANT FACTORS IN THE DECISION OF INVESTORS SUCH AS
      PLAINTIFFS TO INVEST IN THE CERTIFICATES ....................................53

IV.   DEFENDANTS KNEW THAT A LARGE PERCENTAGE OF THE
      MORTGAGE LOANS UNDERLYING PLAINTIFFS' CERTIFICATES WERE
      MADE AS A RESULT OF THE SYSTEMATIC ABANDONMENT OF
      PRUDENT UNDERWRITING GUIDELINES AND APPRAISAL
      STANDARDS.......................................................................................57

    A.    Defendant JPMorgan Chase Abandoned Underwriting Standards
        And Appraisal Guidelines In Its Vertically Integrated
        Securitization Process ..................................................................61

1.      JPMorgan Chase Disregarded Underwriting Guidelines and
        Appraisal Standards In Its Own Mortgage Lending Operations...............62

2.      JPMorgan Chase Management Was Aware That Third Party
        Originators Were Abandoning Their Underwriting Guidelines and
        Appraisal Standards ....................................................................66

3.      JPMorgan Chase Benefited From The Securitization of Defective
        Loans At The Expense of Investors ...........................................68

B.      DEFENDANT BEAR STEARNS ABANDONED ITS UNDERWRITING STANDARDS
        AND APPRAISAL GUIDELINES IN ITS VERTICALLY INTEGRATED
        SECURITIZATION PROCESS ..............................................................71

1.      Bear Stearns Abandoned Underwriting Guidelines and Appraisal
        Standards In Its Own Mortgage Lending Operations ....................72

2.      Bear Stearns Was Aware That Third Party Originators Were
        Abandoning Their Underwriting Guidelines and Appraisal
        Standards.....................................................................................77

3.      Bear Stearns Offloaded Loans That It Had Identified As
        Fraudulent And/Or Likely To Default Onto Unsuspecting Investors........80

C.      WAMU ABANDONED UNDERWRITING STANDARDS AND APPRAISAL
        GUIDELINES IN ITS VERTICALLY INTEGRATED SECURITIZATION PROCESS ............83

1.      WaMu Abandoned Underwriting Guidelines and Appraisal
        Standards In Its Own Mortgage Lending Operations .....................85

2.      WaMu Was Aware That Its Subsidiary Long Beach Was
        Abandoning Its Underwriting Guidelines And Appraisal Standards.........93

3.      WaMu Was Aware That Third Party Originators Were
        Abandoning Their Underwriting Guidelines and Appraisal
        Standards.....................................................................................99

4.      WaMu Offloaded Loans That It Had Identified as Fraudulent
        And/Or Likely To Default Onto Unsuspecting Investors ......................101

D.      THE THIRD PARTY ORIGINATORS OF THE MORTGAGE LOANS UNDERLYING
        THE CERTIFICATES ABANDONED THEIR UNDERWRITING GUIDELINES AND
        APPRAISAL STANDARDS ..................................................................103

1.      Aames ..........................................................................................106

2.      American Home.............................................................................108

3.      BNC .............................................................................................110

4.      Chevy Chase.................................................................................112

5.      CIT Group.....................................................................................114

6.      Countrywide..................................................................................116

7.      First Magnus ................................................................................119

8.      FNBN.................................................................................120

9.      Fremont.............................................................................121

10.     GMAC / RFC.....................................................................124

11.     GreenPoint ........................................................................127

12.     HSBC.................................................................................129

13.     Impac Funding...................................................................131

14.     IndyMac.............................................................................132

15.     MortgageIT.........................................................................136

16.     National City / National City Mortgage.............................137

17.     New Century ......................................................................139

18.     NovaStar ............................................................................142

19.     Option One Mortgage Corporation....................................145

20.     People's Choice .................................................................148

21.     PHH....................................................................................149

22.     ResMae Mortgage Corporation.........................................150

23.     Sebring...............................................................................153

24.     SouthStar...........................................................................153

25.     SunTrust.............................................................................154

26.     Wells Fargo........................................................................156

V.      DEFENDANTS SYSTEMATICALLY MISREPRESENTED THAT
        APPRAISALS FOR THE SECURITIZED MORTGAGES WERE
        CONDUCTED IN ACCORDANCE WITH INDUSTRY STANDARDS ....................158

VI.     A SIGNIFICANT NUMBER OF THE MORTGAGE LOANS WERE MADE TO
        BORROWERS WHO DID NOT OCCUPY THE PROPERTIES IN QUESTION ........165

VII.    DEFENDANTS' "CREDIT ENHANCEMENTS" WERE INTENDED TO
        MANIPULATE CREDIT RATINGS RATHER THAN PROVIDE SECURITY..........167

VIII.   THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES
        MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE
        CERTIFICATES.................................................................................169

IX.     DEFENDANTS FAILED TO ENSURE THAT TITLE TO THE UNDERLYING
        MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED.................................173

X.      DEFENDANTS' SPECIFIC MATERIAL MISSTATEMENTS AND
        OMISSIONS IN THE OFFERING DOCUMENTS.........................................177

        A.      DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING
                UNDERWRITING STANDARDS AND PRACTICES .....................................178

B.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING QUALITY CONTROL PROCEDURES...................................................184

C.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING EXCEPTIONS...................................................191

D.  DEFENDANTS MADE UNTRUE STATEMENTS AND OMISSIONS REGARDING LOAN-TO-VALUE RATIOS AND APPRAISALS ...................................................196

E.  DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES ...................................................211

F.  DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE CREDIT ENHANCEMENTS APPLICABLE TO THE CERTIFICATES ...................................................216

G.  DEFENDANTS MADE UNTRUE STATEMENTS REGARDING OWNER-OCCUPANCY STATISTICS...................................................227

H.  DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE TRANSFER OF TITLE TO THE ISSUING TRUSTS...................................................234

I.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE CHARACTERISTICS OF THE MORTGAGE POOLS ...................................................242

XI.  DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS...................................................248

XII.  THE LIABILITY OF THE CONTROL PERSON DEFENDANTS...................................................250

A.  DEFENDANT JPMORGAN CHASE...................................................250

B.  DEFENDANT JPMM ACQUISITION ...................................................253

C.  JPMORGAN INDIVIDUAL CONTROL PERSON DEFENDANTS ...................................................254

1.  Barren...................................................254

2.  Bernard...................................................254

3.  Cipponeri...................................................254

4.  Cole...................................................255

5.  Duzyk...................................................255

6.  Katz...................................................256

7.  King...................................................256

8.  McMichael ...................................................257

9.  Schioppo ...................................................257

10.  Wind...................................................257

D.  NON-DEFENDANT BSCI ...................................................258

E.  DEFENDANT EMC ...................................................261

F.  BEAR STEARNS INDIVIDUAL CONTROL PERSON DEFENDANTS ...................................................262

|  | 1. | Bonesteel | 262 |
|  | 2. | Garniewski | 262 |
|  | 3. | Jehle | 262 |
|  | 4. | Johnson | 263 |
|  | 5. | Jurkowski, Jr. | 263 |
|  | 6. | Lutthans | 263 |
|  | 7. | Marano | 264 |
|  | 8. | Mayer | 264 |
|  | 9. | Molinaro | 265 |
|  | 10. | Nierenberg | 265 |
|  | 11. | Perkins | 265 |
|  | 12. | Verschleiser | 266 |

G.   DEFENDANT JPMORGAN BANK (AS SUCCESSOR TO WAMU BANK) .................266

H.   DEFENDANT WMMSC ........................................................................269

I.   WAMU INDIVIDUAL CONTROL PERSON DEFENDANTS .............................271

|  | 1. | Beck | 271 |
|  | 2. | Boriello | 271 |
|  | 3. | Careaga | 271 |
|  | 4. | Davidson | 272 |
|  | 5. | Davis | 272 |
|  | 6. | Den-Heyer | 272 |
|  | 7. | Domingo | 273 |
|  | 8. | Ferren | 273 |
|  | 9. | Fortunato | 273 |
|  | 10. | Gotschall | 274 |
|  | 11. | Jurgens | 274 |
|  | 12. | Kittner | 275 |
|  | 13. | Kula | 275 |
|  | 14. | Lehmann | 275 |
|  | 15. | Lobo | 275 |
|  | 16. | Lodge | 276 |
|  | 17. | Malone | 276 |
|  | 18. | Novak | 276 |

19.  Parker ...................................................................................277

20.  Sorensen ..............................................................................277

21.  Wilhelm................................................................................277

22.  Zielke ..................................................................................277

XIII.  PLAINTIFFS RELIED ON DEFENDANTS' MISREPRESENTATIONS TO THEIR DETRIMENT.............................................................................278

XIV.  PLAINTIFFS HAVE SUFFERED LOSSES AS A RESULT OF THEIR PURCHASES OF THE CERTIFICATES.......................................................279

XV.  JPMORGAN CHASE AND JPMORGAN BANK'S LIABILITY AS SUCCESSORS-IN-INTEREST..............................................................300

 A.  JPMORGAN IS LIABLE AS SUCCESSOR-IN-INTEREST TO THE BEAR STEARNS ENTITIES ...............................................................................300

 B.  JPMORGAN IS LIABLE AS SUCCESSOR-IN-INTEREST TO THE WAMU AND LONG BEACH ENTITIES .................................................................302

XVI.  TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS ........................307

 A.  THE JPMORGAN CLASS ACTION .........................................................307

 B.  THE BEAR STEARNS CLASS ACTION .....................................................308

 C.  THE WAMU CLASS ACTION.................................................................308

CAUSES OF ACTION ..................................................................................310

 FIRST CAUSE OF ACTION COMMON LAW FRAUD (AGAINST THE CORPORATE DEFENDANTS AND THE UNDERWRITER DEFENDANTS)........................310

 SECOND CAUSE OF ACTION FRAUDULENT INDUCEMENT (AGAINST THE CORPORATE DEFENDANTS AND THE UNDERWRITER DEFENDANTS) ..................312

 THRID CAUSE OF ACTION AIDING & ABETTING FRAUD (AGAINST JPMORGAN CHASE AND THE JPMORGAN DEFENDANTS) ...........................313

 FOURTH CAUSE OF ACTION AIDING & ABETTING FRAUD (AGAINST THE BEAR STEARNS DEFENDANTS AND BANC OF AMERICA)................................315

 FIFTH CAUSE OF ACTION AIDING & ABETTING FRAUD (AGAINST THE WAMU DEFENDANTS, JPMORGAN BANK, LBSC, BANC OF AMERICA, DEUTSCHE BANK, GCM, MERRILL, AND UBS) .................................................316

 SIXTH CAUSE OF ACTION NEGLIGENT MISREPRESENTATION (AGAINST ALL DEFENDANTS)...............................................................................317

 SEVENTH CAUSE OF ACTION VIOLATION OF SECTION 11 OF THE SECURITIES ACT (AGAINST ALL DEFENDANTS) .......................................................319

 EIGHTH CAUSE OF ACTION VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT (AGAINST THE ISSUING DEFENDANTS AND THE UNDERWRITER DEFENDANTS) ...........................................................322

NINTH CAUSE OF ACTION Violation of Section 15 of the Securities Act (Against JPMorgan Chase, JPMM Acquisition, EMC, WMMSC, JPMorgan Bank, and the Individual Defendants).....................................324

TENTH CAUSE OF ACTION Successor and Vicarious Liability (Against JPMorgan Chase, JPMS, and JPMorgan Bank) ............................................327

PRAYER FOR RELIEF ....................................................................................328

JURY DEMAND ...............................................................................................329

## INTRODUCTION

Plaintiffs John Hancock Life Insurance Company (U.S.A.), John Hancock Life Insurance Company (U.S.A.) Separate Account 6a; John Hancock Life Insurance Company (U.S.A.) Separate Account 131; John Hancock Funds II; John Hancock Variable Insurance Trust; John Hancock Sovereign Bond Fund; John Hancock Bond Trust; John Hancock Strategic Series; and John Hancock Income Securities Trust ("Plaintiffs"), by their attorneys, Grant & Eisenhofer P.A., bring this action pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o; and the common law. This action is brought against Defendants JPMorgan Chase & Co. ("JPMorgan Chase"); J.P. Morgan Chase Bank, N.A. ("JPMorgan Bank"); J.P. Morgan Mortgage Acquisition Corp. ("JPMM Acquisition"); J.P. Morgan Securities, LLC ("JPMS"); J.P. Morgan Acceptance Corporation I ("JPM Acceptance"); Chase Home Finance LLC ("Chase Home Finance"); Chase Mortgage Finance Corporation ("Chase Mortgage Finance")" EMC Mortgage LLC ("EMC"); Bear Stearns & Co. Inc ("Bear Stearns"); Bear Stearns Asset Backed Securities I LLC ("BSABS"); Structured Asset Mortgage Investments II Inc. ("SAMI"); WaMu Asset Acceptance Corp. ("WAAC"); Washington Mutual Mortgage Securities Corp. ("WMMSC"); WaMu Capital Corp. ("WaMu Capital"); Long Beach Securities Corp. ("LBSC"); Banc of America Securities LLC ("Banc of America"); CSE Mortgage, LLC ("CSE Mortgage"); Deutsche Bank Securities Inc. ("Deutsche Bank"); Greenwich Capital Markets, Inc. a.k.a. RBS Greenwich Capital ("GCM"); Merrill Lynch & Co. "Merrill"); UBS Securities LLC f.k.a. UBS Warburg LLC ("UBS"); John Barren; David Beck; Sara Bonesteel; Domenic A. Borriello; Richard Careaga; Jerome A. Cipponeri; Christine E. Cole; Craig S. Davis; Art Den-Heyer; Marangal I. Domingo; David M. Duzyk; Katherine Garniewski; Troy A. Gotschall; Patricia A. Jehle; Juliana C. Johnson; Rolland Jurgens; Joseph T. Jurkowski, Jr.; Michael D. Katz; William A. King; Marc R. Kittner; Michael

J. Kula; Thomas G. Lehmann; Stephen Lobo; Richard D. Lodge; Kim Lutthans; Marc K. Malone; Thomas F. Marano; Jeffrey Mayer; Edwin F. McMichael; Samuel L. Molinaro, Jr.; Michael B. Nierenberg; Diane Novak; Michael L. Parker; Matthew E. Perkins; Louis Schioppo, Jr.; Jeffrey A. Sorensen; Jeffrey L. Verschleiser; Thomas L. Wind; David H. Zielke; Brian Bernard; Megan M. Davidson; Eric Ferren; Stephen Fortunato; and Donald Wilhelm (collectively, the "Defendants").

Plaintiffs make the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiffs and their own acts, and upon information and belief as to all other matters. This information is derived from the investigation by Plaintiffs' counsel, which has included a review and analysis of annual reports and publicly filed documents, reports of governmental investigations by the United States Securities and Exchange Commission (the "SEC"), the Financial Crisis Inquiry Commission (the "FCIC"), the United States Department of Justice (the "DOJ"), the United States Senate Permanent Subcommittee on Investigations (the "PSI"), and numerous investigations by other federal and state governmental units, as well as press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by Defendants. In addition, Plaintiffs' counsel conferred with counsel for other Plaintiffs who have filed other complaints against these Defendants based on the same or similar activities. Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## SUMMARY OF ALLEGATIONS

1.     This action arises out of Plaintiffs' purchases of certain residential mortgage-backed securities ("RMBS"), as evidenced in the form of "Certificates", in reliance on the false and misleading statements that were made by Defendants. Based on these material

misrepresentations and omissions, Plaintiffs purchased securities that were far riskier than had been represented, backed by mortgage loans worth significantly less than had been represented, and that had been made to borrowers who were much less creditworthy than had been represented.

2.      The securities purchased by Plaintiffs were collateralized against mortgages originated and/or acquired by Defendants JPMorgan Bank, EMC, and non-defendants such as Bear Stearns Residential Mortgage Corporation ("BSRMC"); Performance Credit Corp. f/k/a Encore Credit Corp. ("Encore"); Long Beach Mortgage ("Long Beach"); and Washington Mutual Bank ("WaMu Bank"), as well as various other third-party originators defined in ¶107 below (collectively the "Originators").

3.      These Originators did not, however, hold the mortgage loans they originated and/or acquired.  Rather, taking advantage of an unprecedented boom in the securitization industry, these Originators flipped their mortgage loans to investment banks, which then repackaged the loans and sold the loans as RMBS to investors seeking safe investments, such as Plaintiffs.  In the case of the loans underlying Plaintiffs' Certificates, the entities that sold the RMBS were JPMorgan Chase, Bear Stearns, WaMu and Long Beach.  Specifically, each of these entities pooled the mortgage loans made by the Originators; deposited the loans into special purpose entities or "trusts"; and then repackaged the loans for sale to investors in the form of RMBS.  In nearly every case, an affiliate of JPMorgan Chase, Bear Stearns or WaMu was one of the underwriters that prepared the Offering Documents and sold the RMBS to investors such as Plaintiffs.

4.      The Certificates entitled investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the trusts.  The Certificates issued by each trust were divided into several classes (or "tranches") that had different seniority, priorities of

payment, exposure to default, and interest payment provisions.  Rating agencies, such as DBRS, Inc. ("DBRS"), Fitch, Inc. ("Fitch"), Moody's Investors Service, Inc. ("Moody's"), and Standard & Poor's Corporation ("S&P"),[1] and/or rated the investment quality of all tranches of Certificates based upon information provided by the Defendants about the quality of the mortgages in each mortgage pool and the seniority of the Certificate among the various Certificates issued by each trust.  These ratings, in part, determined the price at which these Certificates were offered to investors.

5.      In selling the Certificates, the Defendants prepared and filed with the SEC certain registration statements (the "Registration Statements"), prospectuses (the "Prospectuses"), prospectus supplements (the "Prospectus Supplements", and free writing prospectuses (the "Free Writing Prospectuses", and together with the Registration Statements, Prospectuses, and Prospectus Supplements, the "Offering Documents").  In these Offering Documents, Defendants repeatedly touted the strength of the Originators' underwriting guidelines and standards; the fact that the underwriting guidelines and standards were designed to ensure the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral; and that the mortgages underlying the Certificates were originated in accordance with those stated underwriting guidelines and standards.  In addition, in the Offering Documents, Defendants repeatedly assured investors as to the soundness of the appraisals used to arrive at the value of the underlying properties and specifically represented that the real estate collateralizing the loans had been subjected to objective and independent real estate appraisals that complied with the Uniform Standards of Professional Appraisal Practice ("USPAP") and, in some cases, that they met the even more rigorous appraisal requirements of the Federal National Mortgage

---

[1] DBRS, Fitch, Moody's, and S&P are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings that are used to distinguish among grades of creditworthiness of various securities under the federal securities laws.

Association ("Fannie Mae) and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Defendants emphasized their quality control procedures such as re-underwriting of a random selection of mortgage loans, conducting post-funding audits of origination files, and/or re-verifying information to assure asset quality.

6.      Defendants JPMorgan, Bear Stearns, WaMu, and Long Beach (as defined in ¶¶ 33, 49, 71) were obligated to perform due diligence on the mortgage loans they acquired from third parties.  Defendants represented in the Offering Documents, which Plaintiffs relied on, that they performed such due diligence and undertook certain quality control measures to ensure that shoddily underwritten mortgages were ***not*** included in the Certificates they underwrote and sold. *See*, *e.g.*, Prospectus Supplement for WMALT Series 2006-9 Trust (Form 424B5), at S-29 (Oct. 27, 2006):  "The sponsor's credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers."

7.      As set forth below, the Offering Documents contained material misstatements and omitted material information.   Contrary to Defendants' assurances, the Originators of the underlying loans had not followed their touted underwriting guidelines and standards when originating and/or acquiring the mortgage loans.  To the contrary, the Originators had engaged in a wholesale and systematic abandonment of their underwriting guidelines, thereby granting mortgage loans to borrowers who did not satisfy the eligibility criteria as described in the Offering Documents.  In addition, the mortgages underlying the Certificates had been extended based on collateral appraisals that were not performed in accordance with USPAP or Fannie Mae or Freddie Mac, so that the value of the underlying properties had been overstated, thereby exposing investors such as Plaintiffs to additional losses in the event of foreclosure.  Defendants

did not apply rigorous quality control procedures to uncover these lapses, and when they learned of such lapses, they deliberately overlooked them.

8.     Defendants' conduct with respect to mortgage-backed securities has also been detailed in both the January 27, 2011, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (the "FCIC Report") and the April 13, 2011, report issued by the PSI, chaired by Senator Carl Levin, entitled WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE (the "Levin Report").  Both reports and their supporting testimony and exhibits have shed significant light on the extent to which Defendants intentionally securitized bad mortgage loans and sold them to investors like Plaintiffs.  Numerous other investigations have been launched by the DOJ, the SEC, and various state Attorneys General.

9.     The practices of financial institutions such as JPMorgan, Bear Stearns, WaMu, and Long Beach and their role in inflating the housing bubble have been and continue to be the subject of intense regulatory scrutiny.  On May 21, 2011, the WALL STREET JOURNAL reported that New York State Attorney General Eric Schneiderman had requested informal meetings with executives from several financial firms, including JPMorgan, as part of an investigation by his office into mortgage practices and the packaging and sale of loans to investors.

10.     On October 2, 2011, the NEW YORK TIMES reported that the New York Attorney General rejected a proposed nationwide settlement worth more than $20 billion that would also grant full immunity, from future prosecution, to financial institutions such as JPMorgan, Bear Stearns, WaMu, and Long Beach, and their control persons.  Attorney General Schneiderman stated he believes that the losses caused by investment banks are far greater than the proposed settlement amount and he is unwilling to release these financial institutions from liability resulting from future investigations.  The New York Attorney General's office has since joined

forces with Delaware Attorney General Beau Biden to "pursue a wider-ranging probe into Wall Street's role in the mortgage meltdown," and the attorneys general of Kentucky, Minnesota and Nevada have expressed criticism of the proposed settlement—calling it weak and inappropriately favorable to the banks.

11.     On February 29, 2012, JPMorgan Chase announced that it is under investigation and may face a civil suit by the SEC regarding whether the firm misled investors in offerings of mortgage-backed securities. Specifically, the SEC has requested information relating to JP Morgan's due diligence and disclosures for certain mortgage-backed securities transactions, and settlements of claims against the originators of loans that JPMorgan unit Bear Stearns Cos. Inc. packaged into securities.

12.     As a result of the untrue statements and omissions in the Offering Documents, Plaintiffs purchased Certificates that were far riskier than represented and that were not equivalent to other investments with the same credit ratings. As the truth regarding Defendants' misrepresentations and omissions has come to light, the rating agencies have responded by significantly downgrading the Certificates purchased by Plaintiffs. The Certificates, therefore, are no longer marketable at anywhere near the purchase prices paid by Plaintiffs. As a consequence, Plaintiffs have suffered losses on their purchases of the Certificates.

13.     Defendants JPMorgan, Bear Stearns, WaMu, and Long Beach knew about the poor quality of the loans they securitized and sold to investors like Plaintiffs, because in order to continue to keep their scheme running, they completely vertically integrated their RMBS operations by having affiliated entities at every stage of the process. In addition, Defendants JPMorgan, Bear Stearns, WaMu, and Long Beach were aware of lending abuses on the part of the third party originators they purchased loans from due to, *inter alia*, their financial ties to the third party originators and their reviews of loan documentation and performance.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over all of the Defendants pursuant to New York Civil Practice Law and Rules ("CPLR") §§ 301 and 302.

15.     Venue is proper in this Court pursuant to CPLR § 503.  Many of the acts and transactions alleged herein, including the negotiation, preparation and dissemination of many of the material misstatements and omissions contained in the Offering Documents filed in connection with the Certificates, occurred in substantial part in this State.  Additionally, the Certificates were actively marketed and sold in this State.

## PARTIES

### A.     PLAINTIFFS

16.     Plaintiff John Hancock Life Insurance Company (U.S.A.) ("JHUSA") is a stock life insurance company organized under the laws of the state of Michigan with its principal offices in Boston, Massachusetts.  JHUSA is a wholly-owned subsidiary of Canadian insurance and financial services company Manulife Financial Corporation ("Manulife").

17.     Plaintiff John Hancock Life Insurance Company (U.S.A.) for and on behalf of its insurance company Separate Account 6A, a segregated investment portfolio of JHUSA.

18.     Plaintiff John Hancock Life Insurance Company (U.S.A.) for and on behalf of its insurance company Separate Account 6A Separate Account 131, a segregated investment portfolio of JHUSA.

19.     Plaintiff John Hancock Funds II is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: Global Bond Fund; Strategic Bond Fund; Total Return Fund; Real Return Bond Fund; Core Bond Fund; U.S. Government Securities Fund; Spectrum Income Fund; Active Bond Fund; High Income Fund; and Strategic Income Opportunities Fund.

20.     Plaintiff John Hancock Variable Insurance Trust is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: Lifestyle Balanced Trust; Total Return Trust; Strategic Income Opportunities Trust; Global Bond Trust; American Asset Allocation; Short Term Government Income Trust; High Yield Trust; New Income Trust; Core Bond Trust; Real Return Bond Trust; and Active Bond Trust.

21.     Plaintiff John Hancock Sovereign Bond Fund is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: John Hancock Bond Fund.

22.     Plaintiff John Hancock Bond Trust is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: John Hancock Government Income Fund; John Hancock High Yield Fund; and John Hancock Investment Grade Bond Fund.

23.     Plaintiff John Hancock Strategic Series is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: John Hancock Strategic Income Fund.

24.     Plaintiff John Hancock Income Securities Trust is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts.

25.     Plaintiffs purchased the Certificates from the trusts listed in the table in ¶121, below.

**B.     DEFENDANTS**

**1.     JPMorgan Corporate Entities**

26.     <u>JPMorgan Chase</u>.  Defendant JPMorgan Chase is a Delaware corporation whose principal office is located in New York.  JPMorgan Chase is a global financial services firm and

9

one of the largest banking institutions in the United States.  It is the direct or indirect parent of all of the JPMorgan, Bear Stearns, and WaMu corporate defendants in this action.

27.    <u>JPMorgan Bank</u>.  Defendant JPMorgan Bank is a national banking association, a wholly-owned bank subsidiary of JPMorgan Chase, and a New York corporation.  Its main office is located in Columbus, Ohio.  JPMorgan Bank is also the successor-in-interest to WaMu Bank, as discussed more fully in Section XV.B below.  JPMorgan Bank, either directly or through its affiliates, originated the mortgage loans underlying certain of the Certificates listed in ¶121, below.

28.    <u>The JPMorgan Sponsor Defendants</u>.  Defendant JPMM Acquisition is a Delaware corporation with its principal executive offices located in New York.  JPMM Acquisition engages in the securitization of assets and services loans through its affiliates.  JPMM Acquisition is a direct, wholly-owned subsidiary of Defendant JPMorgan Bank.  JPMM Acquisition acted as the sponsor and seller with regard to each of the JPMorgan Trusts listed in ¶121, below.

29.    Defendant Chase Home Finance is a Delaware limited liability company.  Chase Home Finance is wholly-owned by and an indirect subsidiary of Defendant JPMorgan Bank.  Chase Home Finance served as the sponsor and seller for Chaseflex Trust Series 2006-1.

30.    <u>The JPMorgan Issuing Defendants</u>.  Defendant JPM Acceptance is a Delaware corporation with its principal place of business in New York.  JPM Acceptance is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC which, in turn, is a direct, wholly-owned subsidiary of JPMorgan Chase.  JPM Acceptance acted as the depositor in the securitization of each the JPMorgan Trusts listed in ¶121, below.  As depositor, JPM Acceptance filed relevant Registration Statements with the SEC.

31.     Defendant Chase Mortgage Finance is a Delaware corporation with its principal office located in New Jersey.  Chase Mortgage Finance is a wholly owned, limited-purpose finance subsidiary of JPMorgan Chase.  Chase Mortgage Finance served as depositor in the securitization of the Chaseflex Trust Series 2006-1 Trust.  As depositor, Chase Mortgage Finance filed the relevant Registration Statement with the SEC.

32.     The JPMorgan Underwriter Defendant.     Defendant JPMS is a Delaware corporation with its principal place of business in New York.  JPMS was formerly known as J.P. Morgan Securities, Inc.  JPMS engages in investment banking activities in the United States and is the primary nonbank subsidiary of JPMorgan Chase.  JPMS is also the successor-in-interest to Bear Stearns, as discussed more fully in Section XV.A below.  JPMS acted as the sole underwriter of the Certificates issued by each of the JPMorgan Trusts listed in ¶121, below.  As the sole underwriter of the JPMorgan-issued Certificates, JPMS participated in the drafting and dissemination of the Offering Documents pursuant to which all of the JPMorgan Certificates were sold to Plaintiffs.

33.     Defendants JPMorgan Bank, JPM Acceptance, JPMM Acquisition, JPMS, Chase Home Finance and Chase Mortgage Finance are referred to collectively hereinafter as "JPMorgan."  An organizational chart of JPMorgan is set forth below.

### 2.     JPMorgan Individual Defendants

34.     Defendant John Barren ("Barren") was, at relevant times, Treasurer and Chief Financial Officer of Defendant Chase Mortgage Finance.  Barren signed the Chase Mortgage Finance Corporation Registration Statement dated March 31, 2006, governing certain of the JPMorgan Trusts listed in ¶44, below

35.     Defendant Brian Bernard ("Bernard") was, at relevant times, a President of Defendant JPM Acceptance.  Bernard signed the JPMorgan Registration Statement dated April 23, 2007, governing certain of the JPMorgan Trusts listed in ¶44, below

36.     Defendant Jerome A. Cipponeri ("Cipponeri") was, at relevant times, Director and President of Defendant Chase Mortgage Finance.  Cipponeri signed the Chase Mortgage Finance Corporation Registration Statement dated March 31, 2006, governing certain of the JPMorgan Trusts listed in ¶44, below

37.     Defendant Christine E. Cole ("Cole") was, at relevant times, a Director of Defendant JPM Acceptance.  Cole signed the Registration Statements governing each of the JPMorgan Trusts listed in ¶44, below.

38.     Defendant David M. Duzyk ("Duzyk") was, at relevant times, the President and a Director of Defendant JPM Acceptance.  Duzyk signed the Registration Statements governing each of the JPMorgan Trusts listed in ¶44, below.

39.     Defendant Michael D. Katz ("Katz") was, at relevant times, Director, Senior Vice President, and Assistant Secretary of Defendant Chase Mortgage Finance.  Katz signed the Chase Mortgage Finance Corporation Registration Statement dated March 31, 2006, governing certain of the JPMorgan Trusts listed in ¶44, below.

40.     Defendant William A. King ("King") was, at relevant times, the President and a Director of Defendant JPM Acceptance.  King signed the Registration Statements dated August 15, 2005 and April 23, 2007, governing certain of the JPMorgan Trusts listed in ¶44, below.

41.     Defendant Edwin F. McMichael ("McMichael") was, at relevant times, a Director of Defendant JPM Acceptance.  McMichael signed the Registration Statements governing each of the JPMorgan Trusts listed in ¶44, below.

42. Defendant Louis Schioppo, Jr. ("Schioppo") was, at relevant times, the Controller and Chief Financial Officer of Defendant JPM Acceptance. Schioppo signed the Registration Statements governing each of the JPMorgan Trusts listed in ¶44, below.

43. Defendant Thomas L. Wind ("Wind") was, at relevant times, a Director of Defendant Chase Mortgage Finance. Wind signed the Chase Mortgage Finance Corporation Registration Statement dated March 31, 2006, governing certain of the JPMorgan Trusts listed in ¶44, below.

44. Defendants Barren, Bernard, Cipponeri, Cole, Duzyk, Katz, King, McMichael, Schioppo, and Wind are referred to hereinafter collectively as the "Individual JPMorgan Defendants," and together with JPMorgan are referred to hereinafter collectively as the "JPMorgan Defendants." A summary of the Registration Statements signed by the Individual JPMorgan Defendants is listed in the table below.

| Issuing Trust(s) | Filed Date | Registration Statement / File No. | Signatories |
|---|---|---|---|
| JPMMT 2005-A6<br>JPMMT 2005-A7<br>JPMMT 2005-S3<br>JPMAC 2006-FRE2 | 8/15/2005 | Form S-3/A, Am. 1<br>333-127020 | Christine E. Cole<br>David M. Duzyk<br>William A. King<br>Edwin F. McMichael<br>Louis Schioppo, Jr. |
| CFLX 2006-1 | 3/21/2006 | Form S-3/A, Am. 3<br>333-130223 | John Barren<br>Jerome A. Cipponeri<br>Michael D. Katz<br>Thomas L. Wind |
| JPALT 2006-A4<br>JPALT 2006-A6<br>JPALT 2006-A7<br>JPMAC 2006-CH2<br>JPALT 2006-S3<br>JPMMT 2007-A1 | 4/3/2006 | Form S-3/A, Am. 3<br>333-130192 | Christine E. Cole<br>David M. Duzyk<br>Edwin F. McMichael<br>Louis Schioppo, Jr. |
| JPMAC 2007-HE1 | 04/23/2007 | Form S-3/A, Am. 1<br>333-141607 | Brian Bernard<br>Christine E. Cole<br>David M. Duzyk<br>William King |

13

| | | | Edwin F. McMichael<br>Louis Schioppo Jr. |
|---|---|---|---|

### 3.    Bear Stearns Corporate Entities

45.    <u>The Bear Stearns Sponsor Defendants</u>.    Defendant EMC is a Delaware corporation with its principal place of business in Lewisville, Texas and was established as a mortgage banking company to facilitate the purchase and servicing of whole loan portfolios. EMC was, at all relevant times, a wholly-owned subsidiary of the Bear Stearns Companies Inc. ("BSCI").   EMC acted as the sponsor and seller for the majority of the Bear Stearns Trusts. EMC also originated mortgage loans that were included in Issuing Trusts from which Plaintiffs purchased certain Certificates identified below.   Pursuant to a Merger Agreement effective May 30, 2008, EMC's parent company BSCI merged with Bear Stearns Merger Corporation, a wholly-owned subsidiary of Defendant JPMorgan Chase, making EMC a wholly-owned indirect subsidiary of Defendant JPMorgan Chase.

46.    <u>The Bear Stearns Issuing Defendants</u>.    Defendant BSABS, a Delaware corporation with its principal place of business in New York, was organized for the sole purpose of serving as a private secondary mortgage market conduit.   BSABS was a wholly-owned subsidiary of BSCI, and is now therefore a wholly-owned indirect subsidiary of Defendant JPMorgan Chase.   BSABS acted as the depositor in the securitization of certain Certificates identified in ¶121 below.   As depositor, BSABS filed relevant Registration Statements with the SEC.

47.    Defendant SAMI is a Delaware corporation with its principal place of business in New York.   SAMI was a wholly-owned subsidiary of BSCI, and is now therefore a wholly-owned indirect subsidiary of JPMorgan Chase.   SAMI acted as the depositor in the securitization

of certain Certificates identified in ¶121 below.   As depositor, SAMI filed the relevant Registration Statement with the SEC.

48.   <u>The Bear Stearns Underwriter Defendant</u>.   Defendant Bear Stearns is a Delaware corporation with its principal place of business in New York.   Bear Stearns was a wholly-owned subsidiary of BSCI.   Bear Stearns acted as the underwriter of the Certificates issued by the Bear Stearns Trusts listed in ¶121, below.   Bear Stearns participated in the drafting and dissemination of the Offering Documents pursuant to which all of the Bear Stearns Certificates were sold to Plaintiffs.   Bear Stearns also acted as an underwriter of the Certificates issued by the following WaMu Trusts: WaMu Mortgage Pass-Through Certificates Series 2003-AR1, WaMu Mortgage Pass-Through Certificates, Series 2003-AR3, and WaMu Mortgage Pass-Through Certificates Series 2003-AR9.   Pursuant to a merger agreement, on or about October 1, 2008, Bear Stearns merged with JPMS and is now doing business as JPMS.   All allegations against Bear Stearns are thus made against its successor-in-interest, JPMS.

49.   Defendants BSABS, SAMI, EMC, and Bear Stearns are referred to hereinafter collectively as "Bear Stearns."   An organizational chart of Bear Stearns is set forth below.

### 4.   Bear Stearns Individual Defendants

50.   Defendant Sara Bonesteel ("Bonesteel") was, at relevant times, senior managing director for Defendant Bear Stearns' Financial Analytics and Structured Transactions Group. Bonesteel signed the Registration Statement dated March 31, 2006, governing certain of the Bear Stearns Trusts identified in ¶62, below.

51.   Defendant Katherine Garniewksi ("Garniewski") was, at relevant times, a Director of Defendant BSABS.   Garniewski signed the Registration Statements dated April 21, 2004, June 14, 2005, and March 31, 2006, governing certain of the Bear Stearns Trusts identified in ¶62, below.

52.     Defendant Patricia A. Jehle ("Jehle") was the President, Chief Executive Officer, and a Director of BSABS.  According to an October 27, 2008 BLOOMBERG article, Jehle was the founder of Bear Stearns' asset-backed business.  Jehle signed the Registration Statement dated November 13, 2002, governing certain of the Bear Sterns Trusts identified in ¶62, below.

53.     Defendant Juliana C. Johnson ("Johnson") is an individual residing in North Carolina.  Johnson was a Director of BSABS.  Johnson signed the Registration Statement dated November 13, 2002, governing certain of the Bear Sterns Trusts identified in ¶62, below.

54.     Defendant Joseph T. Jurkowski, Jr. ("Jurkowski") was, at relevant times, the Vice President of Defendant BSABS.  Jurkowski signed the Registration Statements dated November 13, 2002, April 21, 2004, May 11, 2004, December 14, 2004, June 14, 2005, and March 31, 2006, governing certain of the Bear Sterns Trusts identified in ¶62, below.

55.     Defendant Kim Lutthans ("Lutthans") was, at relevant times, an Independent Director of Defendant BSABS.  Lutthans signed the Registration Statements dated April 21, 2004, June 14, 2005, and March 31, 2006, governing certain of the Bear Stearns Trusts identified in ¶62, below.

56.     Defendant Thomas F. Marano ("Marano") was, at relevant times, a Director of Defendants BSABS and SAMI.  Marano signed the Registration Statements dated November 11, 2002, July 11, 2003, May 11, 2004, December 14, 2004, June 14, 2005, March 10, 2006, and March 31, 2006, governing certain of the Bear Sterns Trusts identified in ¶62, below.

57.     Defendant Jeffrey Mayer ("Mayer") was, at relevant times, a Director of Defendants BSABS and SAMI.  Mayer signed the Registration Statements dated November 13, 2002, July 11, 2003, April 21, 2004, May 11, 2004, December 14, 2004, and March 10, 2006, governing certain of the Bear Sterns Trusts identified in ¶62, below.

16

58.     Defendant Samuel L. Molinaro, Jr. ("Molinaro") was, at relevant times, the Treasurer and a Director of Defendant BSABS.  Molinaro signed the Registration Statements dated November 13, 2002, April 21, 2004, June 14, 2005, and March 31, 2006 governing certain of the Bear Stearns Trusts identified in ¶62, below.

59.     Defendant Michael B. Nierenberg ("Nierenberg") was, at relevant times, the Treasurer of Defendant SAMI.  Nierenberg signed the Registration Statements dated July 11, 2003, May 11, 2004, December 14, 2004, and March 10, 2006, governing certain of the Bear Stearns Trusts identified in ¶62, below.

60.     Defendant Matthew E. Perkins ("Perkins") was, at relevant times, the President and a Director of Defendant BSABS.  Perkins signed the Registration Statements dated April 21, 2004, June 14, 2005, and March 31, 2006, governing certain of the Bear Stearns Trusts identified in ¶62, below.

61.     Defendant Jeffrey L. Verschleiser ("Verschleiser") was, at relevant times, the President of Defendant SAMI.  Verschleiser signed the Registration Statements dated July 11, 2003, May 11, 2004, December 14, 2004, and March 10, 2006, governing certain of the Bear Stearns Trusts identified ¶62, below.

62.     Defendants Bonesteel, Garniewski, Jehle, Johnson, Jurkowski, Lutthans, Marano, Mayer, Molinaro, Nierenberg, Perkins, and Verschleiser are referred to collectively hereinafter as the "Individual Bear Stearns Defendants," and together with Bear Stearns are referred to hereinafter collectively as the "Bear Stearns Defendants."  A summary of the Registration Statements signed by the Individual Bear Stearns Defendants is listed in the table below.

| Issuing Trust(s) | Document Date | Registration Statement / File No. | Signatories |
|---|---|---|---|
| BSABS 2003-HE1<br>BSABS 2004-HE1 | 11/13/2002 | Form S-3/A<br>333-91334 | Patricia A. Jehle<br>Juliana C. Johnson<br>Joseph T. Jurkowski, Jr.<br>Thomas F. Marano<br>Jeffrey Mayer<br>Samuel L. Molinaro, Jr. |
| BSARM 2004-2 | 07/11/2003 | Form S-3/A<br>333-106323 | Thomas F. Marano<br>Jeffrey Mayer<br>Michael B. Nierenberg<br>Jeffrey L. Verschleiser |
| BSABS 2004-AC3<br>BSABS 2004-AC5<br>BSABS 2004-SD4<br>BSABS 2005-AC3<br>BALTA 2006-1 | 4/21/2004 | Form S-3/A<br>333-113636 | Katherine Garniewski<br>Joseph T. Jurkowski, Jr.<br>Kim Lutthans<br>Jeffrey Mayer<br>Samuel L. Molinaro, Jr.<br>Matthew E. Perkins |
| BALTA 2004-11<br>BSARM 2004-8<br>BSARM 2004-9<br>BSARM 2004-10 | 5/11/2004 | Form S-3/A<br>333-115122 | Joseph T. Jurkowski, Jr.<br>Jeffrey Mayer<br>Thomas F. Marano<br>Michael B. Nierenberg<br>Jeffrey L. Verschleiser |
| BALTA 2005-3<br>BALTA 2005-7<br>BALTA 2005-9<br>BALTA 2005-10<br>BSARM 2005-1<br>BSARM 2005-2<br>BSARM 2005-5<br>BSARM 2005-12 | 12/14/2004 | Form S-3/A<br>333-120916 | Joseph T. Jurkowski, Jr.<br>Jeffrey Mayer<br>Thomas F. Marano<br>Michael B. Nierenberg<br>Jeffrey L. Verschleiser |
| BSARM 2006-1<br>SACO 2005-10 | 6/14/2005 | Form S-3/A<br>333-125422 | Katherine Garniewski<br>Joseph T. Jurkowski, Jr.<br>Kim Lutthans<br>Thomas F. Marano<br>Samuel L. Molinaro, Jr.<br>Matthew E. Perkins |
| BSMF 2006-AR4<br>BSMF 2006-AR5<br>BALTA 2006-6<br>BALTA 2006-8<br>BSARM 2006-4 | 3/10/2006 | Form S-3/A<br>333-132232 | Sara Bonesteel<br>Thomas F. Marano<br>Jeffrey Mayer<br>Michael B. Nierenberg<br>Jeffrey L. Verschleiser |

| BSABS 2006-HE6<br>BSABS 2006-IM1<br>BSABS 2007-HE2<br>BSABS 2007-HE1<br>BSABS 2007-HE6<br>BSABS 2007-HE7<br>BSABS 2006-HE10<br>BSABS 2007-SD1<br>SACO 2006-5<br>SACO 2006-6<br>SACO 2006-7 | 3/31/2006 | Form S-3/A<br>333-131374 | Katherine Garniewski<br>Joseph T. Jurkowski, Jr.<br>Kim Lutthans<br>Thomas F. Marano<br>Samuel L. Molinaro, Jr.<br>Matthew E. Perkins |

### 5.    WaMu Corporate Entities

63.    The WaMu Sponsor Defendants.    Defendant WMMSC was a wholly-owned subsidiary of WaMu Bank and is now a wholly-owned subsidiary of Defendant JPMorgan Bank, successor-in-interest to WaMu Bank.  WMMSC acted as the sponsor and seller with regard to certain Certificates identified in ¶121, below and at issue herein.

64.    Long Beach Mortgage Company ("LBMC") acted as the sponsor and seller with regard to certain Certificates identified in ¶121, below and at issue herein.  As of July 1, 2006, LBMC also became a division of WaMu Bank.

65.    Defendant JPMorgan Bank is the successor-in-interest to WaMu Bank, which was a federal savings association and an indirect wholly-owned subsidiary of Washington Mutual, Inc. ("WMI").  WaMu Bank acted as the sponsor and seller with regard to WMALT 2007-OA3.

66.    On September 25, 2008, JPMorgan Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including Defendants WaMu Capital, WAAC, WMMSC, LBSC and LBMC.  Therefore, this action is brought against JPMorgan Bank as the successor-in-interest to WaMu Bank.  WaMu Bank and its former parent, WMI, are not defendants in this action.

67.    The WaMu Issuing Defendants.    Defendant WAAC was a wholly-owned subsidiary of WaMu Bank, and is now a wholly-owned subsidiary of JPMorgan Bank, successor-

in-interest to WaMu Bank. WAAC engages in no activities other than securitizing assets. WAAC acted as the depositor in the securitization of certain Certificates identified below. As depositor, WAAC filed relevant Registration Statements with the SEC.

68. In addition to acting as sponsor to certain Certificates identified below, Defendant WMMSC also acted as the depositor in the securitization of certain Certificates identified below. In this capacity, WMMSC filed relevant Registration Statements with the SEC.

69. Defendant LBSC was a wholly-owned subsidiary of LBMC. LBSC is now a subsidiary of JPMorgan Bank. LBSC was organized for the purpose of serving as a private secondary mortgage market conduit, and engages in no activities other than securitizing assets. LBSC acted as the depositor in the securitization of certain Certificates identified below. As depositor, LBSC filed the relevant Registration Statements with the SEC.

70. The WaMu Underwriter Defendants. Defendant WaMu Capital was a wholly owned subsidiary of WaMu Bank and is now a wholly-owned subsidiary of Defendant JPMorgan Bank. WaMu Capital acted as an underwriter of certain Certificates issued by the WaMu Trusts listed in ¶121, below. As an underwriter, WaMu Capital participated in the drafting and dissemination of the Offering Documents pursuant to which many of the WaMu Certificates were sold to Plaintiffs.

71. Defendants WMMSC, WAAC, LBSC, and WaMu Capital, as well as non-defendants WMI and WaMu Bank, are referred to collectively hereinafter as "WaMu." An organizational chart of WaMu is set forth below.

### 6.   WaMu Individual Defendants

72. Defendant David Beck ("Beck") was, at relevant times, the President and a Director of Defendant WAAC. Beck signed the Registration Statements dated June 13, 2005,

January 3, 2006, and April 9, 2007, governing certain of the WaMu Trusts identified in ¶95, below.

73.     Defendant Domenic A. Borriello ("Borriello") was, at relevant times, a Director of Defendant LBSC.  Borriello signed the Registration Statement dated June 25, 2002, governing certain of the WaMu Trusts identified in ¶95, below.

74.     Defendant Richard Careaga ("Careaga") was, at relevant times, the First Vice President of Defendant WAAC.  Careaga signed the Registration Statement dated June 13, 2005 and January 3, 2006, governing certain of the WaMu Trusts identified in ¶95, below.

75.     Defendant Megan M. Davidson ("Davidson") was, at relevant times, a Director and Senior Vice President of Defendant WMMSC.  Davidson signed the Registration Statement dated March 7, 2003, governing certain of the WaMu Trusts identified in ¶95, below.

76.     Defendant Craig S. Davis ("Davis") was, at relevant times, a Director of Defendant WMMSC.  Davis signed the Registration Statements dated February 1, 2002, June 25, 2002, March 7, 2003, and February 10, 2004, governing certain of the WaMu Trusts identified in ¶95, below.

77.     Defendant Art Den-Heyer ("Den-Heyer") was, at relevant times, Controller and Assistant Vice President of Defendant LBSC.  Den-Heyer signed the Registration Statements dated August 22, 2000, June 25, 2002, and February 10, 2004, governing certain of the WaMu Trusts identified in ¶95, below.

78.     Defendant Marangal I. Domingo ("Domingo") was, at relevant times, a Director of Defendant WMMSC.  Domingo signed the Registration Statements dated February 1, 2002, June 25, 2002, March 7, 2003, and February 10, 2004 governing certain of the WaMu Trusts identified in ¶95, below.

79.     Defendant Eric Ferren ("Ferren") was, at relevant times, the Controller of Defendant WAAC.  Ferren was also, at relevant times, the Controller for WaMu's Home Loans Capital Markets business and held several finance roles within its servicing business.  Ferren signed the Registration Statement dated June 13, 2005, governing certain of the WaMu Trusts identified in ¶95, below.

80.     Defendant Stephen Fortunato ("Fortunato") was, at relevant times, the Chief Financial Officer of Defendant LBSC and Defendant WAAC.  Fortunato signed the WaMu Registration Statements dated April 9, 2007, governing certain of the WaMu Trusts identified in ¶95, below.

81.     Defendant Troy A. Gotschall ("Gotschall") was, at relevant times, Chief Operations Officer and Executive Vice President of Defendant LBSC.  Gotschall signed the Registration Statements dated August 22, 2000, June 25, 2002, and February 10, 2004, governing certain of the WaMu Trusts identified in ¶95below.

82.     Defendant Rolland Jurgens ("Jurgens") was, at relevant times, Controller of Defendants WAAC and LBSC.  Jurgens signed the Registration Statement dated January 3, 2006, governing certain of the WaMu Trusts identified in ¶95, below.

83.     Defendant Marc R. Kittner ("Kittner") was, at relevant times, a Director of Defendant LBSC.  Kittner signed the Registration Statement dated June 25, 2002, governing certain of the WaMu Trusts identified in ¶95, below.

84.     Defendant Michael J. Kula ("Kula") was, at relevant times, Senior Vice President, Chief Financial Officer, and a Director of Defendant WMMSC.  Kula signed the Registration Statements dated February 1, 2002 and March 7, 2003, governing certain of the WaMu Trusts identified in ¶95, below.

85.     Defendant Thomas Lehmann ("Lehmann") was, at relevant times, the President and a Director of Defendant WAAC and First Vice President, Director and Senior Counsel of Defendant WMMSC.  Lehmann signed the Registration Statements dated February 1, 2002, June 25, 2002, March 7, 2003, and April 9, 2007, governing certain of the WaMu Trusts identified in ¶95, below.

86.     Defendant Stephen Lobo ("Lobo") was, at relevant times, Treasurer and Senior Vice President of Defendant LBSC.  Lobo signed the Registration Statement dated February 10, 2004, governing certain of the WaMu Trusts identified in ¶95, below.

87.     Defendant Richard D. Lodge ("Lodge") was, at relevant times, Treasurer and Senior Vice President of Defendant LBSC.  Lodge signed the Registration Statement dated June 25, 2002, governing certain of the WaMu Trusts identified in ¶95, below.

88.     Defendant Marc K. Malone ("Malone") was, at relevant times, First Vice President and Controller (Principal Accounting Officer) of Defendant WMMSC.  Malone signed the Registration Statements dated February 1, 2002 and March 7, 2003, governing certain of the WaMu Trusts identified in ¶95, below.

89.     Defendant Diane Novak ("Novak") was, at relevant times, a Director of Defendant WAAC.  Novak signed the WaMu Registration Statements dated June 13, 2005, January 3, 2006 and April 9, 2007, governing certain of the WaMu Trusts identified in ¶95, below.

90.     Defendant Michael L. Parker ("Parker") was, at relevant times, a Director and President of Defendant WMMSC.  Parker signed the Registration Statements dated February 1, 2002 and March 7, 2003, governing certain of the WaMu Trusts identified in ¶95, below.

91.     Defendant Jeffrey A. Sorensen ("Sorensen") was, at relevant times, a Vice President of Defendant LBSC.  Sorenson signed the Registration Statement dated June 25, 2002, governing certain of the WaMu Trusts identified in ¶95, below.

92.     Defendant Donald Wilhelm ("Wilhelm") was, at relevant times, Controller of Defendant WAAC.  Wilhelm signed the WaMu Registration Statement dated April 9, 2007, governing certain of the WaMu Trusts identified in ¶95, below.

93.     Defendant David H. Zielke ("Zielke") was, at relevant times, First Vice President and Assistant General Counsel of Defendant LBSC.  Zielke signed the Registration Statements dated February 10, 2004 and April 9, 2007, governing certain of the WaMu Trusts identified in ¶95, below.

94.     Defendants Beck, Borriello, Careaga, Davidson, Davis, Domingo, Ferren, Fortunato, Gotschall, Den-Heyer, Jurgens, Kittner, Kula, Lehmann, Lobo, Lodge, Malone, Novak, Parker, Sorensen, Wilhelm, and Zielke are referred to collectively hereinafter as the "Individual WaMu Defendants," and together with WaMu  are referred to hereinafter collectively as the "WaMu Defendants."  The Individual JPMorgan Defendants, Individual Bear Stearns Defendants, and Individual WaMu Defendants are referred to collectively hereinafter as the "Individual Defendants."

95.     A summary of the Registration Statements signed by the Individual WaMu Defendants is listed in the table below.

| Issuing Trust(s) | Document Date | Registration Statement / File No. | Signatories |
|---|---|---|---|
| LBMLT 2002-2 | 8/22/2000 | Form S-3/A 333-41712 | Craig J. Chapman Art Den-Heyer Phillip Goodeve Troy Gotschall Elizabeth A. Wood |

| | | | |
|---|---|---|---|
| WAMU 2002-AR17<br>WAMU 2003-AR1<br>WAMU 2003-AR3<br>WAMU 2003-AR9 | 2/01/2002 | Form S-3/A<br>333-77026 | Craig S. Davis<br>Marangal I. Domingo<br>Michael J. Kula<br>Thomas G. Lehmann<br>Marc K. Malone<br>Michael L. Parker |
| LBMLT 2004-1 | 6/25/2002 | Form S-3/A<br>333-90550 | Domenic A. Borriello<br>Craig S. Davis<br>Marangal I. Domingo<br>Troy A. Gotschall<br>Art Den-Heyer<br>Marc R. Kittner<br>Richard D. Lodge<br>Thomas G. Lehmann<br>Jeffrey A. Sorensen |
| WMALT 2005-6<br>WAMU 2005-AR6<br>WAMU 2005-AR8<br>WAMU 2005-AR11 | 3/07/2003 | Form S-3/A<br>333-103345 | Megan M. Davidson<br>Craig S. Davis<br>Marangal I. Domingo<br>Michael J. Kula<br>Thomas G. Lehmann<br>Marc K. Malone<br>Michael L. Parker |
| LBMLT 2004-3<br>LBMLT 2004-4 | 2/10/2004 | Form S-3/A<br>333-109318 | Craig S. Davis<br>Marangal I. Domingo<br>Troy A. Gotschall<br>Art Den-Heyer<br>Stephen Lobo<br>David H. Zielke |
| WAMU 2005-AR13<br>WAMU 2005-AR17<br>WAMU 2005-AR19 | 6/13/2005 | Form S-3/A<br>333-123034 | David Beck<br>Richard Careaga<br>Eric Ferren<br>Thomas Green<br>Diane Novak |

| | | | |
|---|---|---|---|
| WAMU 2006-AR3<br>WAMU 2006-AR4<br>WAMU 2006-AR7<br>WAMU 2006-AR9<br>WAMU 2006-AR12<br>WAMU 2006-AR15<br>WAMU 2006-AR17<br>WAMU 2006-AR19<br>WAMU 2007-HY1<br>WMALT 2006-5<br>WMALT 2006-9<br>WMALT 2006-AR5<br>WMALT 2006-AR8<br>WMALT 2007-1<br>WMALT 2007-OA3 | 1/03/2006 | Form S-3/A<br>333-130795 | David Beck<br>Richard Careaga<br>Rolland Jurgens<br>Diane Novak |
| WAMU 2007-HE3<br>WAMU 2007-HY5 | 04/09/2007 | Form S-3/A<br>333-141255 | David Beck<br>Stephen Fortunato<br>Thomas Lehmann<br>Diane Novak<br>Donald Wilhelm<br>David H. Zielke |

### 7.    Other Corporate Defendants

96.    Defendant Banc of America is an SEC-registered broker-dealer with its principal place of business in New York.  Banc of America acted as an underwriter of the Certificates issued by the following Trusts:  Bear Stearns Asset Backed Securities Trust 2004-HE1 and Long Beach Mortgage Loan Trust 2002-2.  As an underwriter, Banc of America participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

97.    Defendant CSE Mortgage is a Delaware limited liability company, formed in September 2005 and is a wholly owned subsidiary of CapitalSource Inc.  CSE Mortgage acted as the sponsor and seller with regard to BSARM 2006-1.  As a sponsor, CSE Mortgage participated in the drafting and dissemination of the Offering Documents pursuant to which this Certificate was sold to Plaintiffs.

98.     Defendant Deutsche Bank is an SEC registered broker-dealer with its principal place of business in New York.  Deutsche Bank acted as an underwriter of the Certificates issued by the following Trusts:  Long Beach Mortgage Loan Trust 2002-2 and Long Beach Mortgage Loan Trust 2004-3.   As an underwriter, Deutsche Bank participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

99.     Defendant GCM is an SEC registered broker-dealer, with its principal place of business in Connecticut.   GCM acted as an underwriter of the Certificates issued by the following Trusts:   WAMU 2005-AR11;  WAMU 2005-AR13;  WAMU 2005-AR17;  WAMU 2005-AR19; Long Beach Mortgage Loan Trust 2004-4; and Long Beach Mortgage Loan Trust 2002-2.  As an underwriter, GCM participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

100.    Defendant Merrill is a Delaware Corporation with its principal executive offices in New York, New York.  Merrill acted as an underwriter of the Certificates issued by WAMU 2007-HE3.   As an underwriter, Merrill participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

101.    Defendant UBS is a registered broker/dealer and Delaware corporation with its principal executive offices located in Stamford, Connecticut.   UBS Securities is an indirect wholly-owned subsidiary of UBS Americas.  UBS acted as an underwriter of the Certificates issued by the following Trusts:  WAMU 2005-AR6; WAMU 2005-AR8; and LBMLT 2002-2. As an underwriter, UBS participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

102.     Defendants JPMM Acquisition, Chase Home Finance, CSE Mortgage, EMC, WMMSC, and JPMorgan Bank (in its capacity as successor-in-interest to non-defendants LBMC and WaMu Bank), are referred to collectively hereinafter as the "Sponsor Defendants."

103.     Defendants JPM Acceptance, Chase Mortgage Finance, BSABS, SAMI, WAAC, WMMSC and LBSC are referred to collectively hereinafter as the "Issuing Defendants."

104.     Defendants JPMS, Bear Stearns, WaMu Capital, Banc of America, Deutsche Bank, GCM, Merrill, and UBS are referred to collectively hereinafter as the "Underwriter Defendants."

105.     All Defendants identified in ¶¶ 26-32, 45-48, 63, 65, 67-70, 96-101 are hereinafter collectively referred to as the "Corporate Defendants."

C.     RELEVANT NON-PARTIES

1.     Issuing Trusts

106.     Non-parties, the "Issuing Trusts", are common law trusts formed under the laws of the State of New York and/or statutory trusts formed under the laws of the State of Delaware. The Issuing Trusts were created and structured by JPMorgan, Bear Stearns and WaMu to issue billions of dollars worth of RMBS.  The Issuing Trusts issued the Certificates purchased by Plaintiffs.  The non-party Issuing Trusts are:

- ChaseFlex Trust 2006-1

- J.P. Morgan Alternative Loan Trust 2006-A4

- J.P. Morgan Alternative Loan Trust 2006-A6

- J.P. Morgan Alternative Loan Trust 2006-A7

- J.P. Morgan Alternative Loan Trust 2006-S3

- J.P. Morgan Mortgage Acquisition Trust 2006-CH2

- J.P. Morgan Mortgage Acquisition Trust 2006-FRE2

- J.P. Morgan Mortgage Acquisition Trust 2007-HE1

- J.P. Morgan Mortgage Trust 2005-A6

- J.P. Morgan Mortgage Trust 2005-A7

- J.P. Morgan Mortgage Trust 2005-S3

- J.P. Morgan Mortgage Trust 2007-A1

(together, the "**JPMorgan Trusts**")

- Bear Stearns Alt-A Trust 2004-11

- Bear Stearns Alt-A Trust 2005-3

- Bear Stearns Alt-A Trust 2005-7

- Bear Stearns Alt-A Trust 2005-9

- Bear Stearns Alt-A Trust 2005-10

- Bear Stearns Alt-A Trust 2006-1

- Bear Stearns Alt-A Trust 2006-6

- Bear Stearns Alt-A Trust 2006-8

- Bear Stearns ARM Trust 2004-2

- Bear Stearns ARM Trust 2004-8

- Bear Stearns ARM Trust 2004-9

- Bear Stearns ARM Trust 2004-10

- Bear Stearns ARM Trust 2005-1

- Bear Stearns ARM Trust 2005-2

- Bear Stearns ARM Trust 2005-5

- Bear Stearns ARM Trust 2005-12

- Bear Stearns ARM Trust 2006-1

- Bear Stearns ARM Trust 2006-4

- Bear Stearns Asset Backed Securities Trust 2003-HE1

- Bear Stearns Asset Backed Securities I Trust 2004-AC3

- Bear Stearns Asset Backed Securities I Trust 2004-AC5

- Bear Stearns Asset Backed Securities Trust 2004-HE1

- Bear Stearns Asset Backed Securities Trust 2004-SD4

- Bear Stearns Asset Backed Securities I Trust 2005-AC3

- Bear Stearns Asset Backed Securities I Trust 2006-HE6

- Bear Stearns Asset Backed Securities I Trust 2006-HE10

- Bear Stearns Asset Backed Securities I Trust 2006-IM1

- Bear Stearns Asset Backed Securities I Trust 2007-HE1

- Bear Stearns Asset Backed Securities I Trust 2007-HE2

- Bear Stearns Asset Backed Securities I Trust 2007-HE6

- Bear Stearns Asset Backed Securities I Trust 2007-HE7

- Bear Stearns Asset Backed Securities Trust 2007-SD1

- Bear Stearns Mortgage Funding Trust 2006-AR4

- Bear Stearns Mortgage Funding Trust 2006-AR5

- SACO I Trust 2005-10

- SACO I Trust 2006-5

- SACO I Trust 2006-6

- SACO I Trust 2006-7

(together, the "**Bear Stearns Trusts**")

- Long Beach Mortgage Loan Trust 2002-2

- Long Beach Mortgage Loan Trust 2004-1

- Long Beach Mortgage Loan Trust  2004-3

- Long Beach Mortgage Loan Trust 2004-4

- WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust

30

- WaMu Mortgage Pass-Through Certificates 2003-AR1

- WaMu Mortgage Pass-Through  Certificates 2003-AR3

- WaMu Mortgage Pass-Through  Certificates 2003-AR9

- WAMU Mortgage Pass-Through Certificates Series 2002-AR17 Trust

- WAMU Mortgage Pass-Through Certificates Series 2005-AR6 Trust

- WAMU Mortgage Pass-Through Certificates Series 2005-AR8 Trust

- WAMU Mortgage Pass-Through Certificates Series 2005-AR11 Trust

- WAMU Mortgage Pass-Through Certificates Series 2005-AR13 Trust

- WAMU Mortgage Pass-Through Certificates Series 2005-AR17 Trust

- WAMU Mortgage Pass-Through Certificates Series 2005-AR19 Trust

- WaMu Mortgage Pass-Through Certificates, WMALT Series 2006-9

- WAMU Mortgage Pass-Through Certificates Series 2006-AR3 Trust

- WAMU Mortgage Pass-Through Certificates Series 2006-AR4 Trust

- WAMU Mortgage Pass-Through Certificates Series 2006-AR7 Trust

- WAMU Mortgage Pass-Through Certificates Series 2006-AR9 Trust

- WAMU Mortgage Pass-Through Certificates Series 2006-AR12 Trust

- WAMU Mortgage Pass-Through Certificates Series 2006-AR15 Trust

- WAMU Mortgage Pass-Through Certificates Series 2006-AR17 Trust

- WAMU Mortgage Pass-Through Certificates Series 2006-AR19 Trust

- WAMU Mortgage Pass-Through Certificates Series 2007-HY1 Trust

- WAMU Mortgage Pass-Through Certificates Series 2007-HY5 Trust

- Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-6 Trust

- Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-5 Trust

- Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 Trust

- Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Trust

- Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-1 Trust

- WaMu Mortgage Pass-Through Certificates, WMALT Series 2007-OA3

(together, the "**WaMu Trusts**").

## 2. Third Party Originators

107. Many of the loans underlying the Certificates were acquired by the sponsor for each securitization from unaffiliated third-party originators, each of which is discussed in greater detail, *infra*. These third-party originators include the following:

- Aames Capital Corporation (Aames)

- American Home Mortgage Corp. ("American Home")

- BNC Mortgage LLC ("BNC")

- Chevy Chase Bank, FSB ("Chevy Chase")

- CIT Group/ Consumer Finance, Inc. ("CIT Group")

- Countrywide Home Loans, Inc. ("Countrywide")

- EMC Mortgage Corporation ("EMC")

- Encore Credit Corp. ("Encore")

- First Magnus Financial Corporation ("First Magnus")

- First National Bank of Nevada ("FNBN")

- Fremont Investment & Loan ("Fremont")

- GMAC Mortgage Corporation ("GMAC")

- GreenPoint Mortgage Funding, Inc. ("GreenPoint")

- HSBC Mortgage Corporation (USA) ("HSBC")

- Impac Funding Corporation ("Impac")

- IndyMac Bank, F.S.B. ("IndyMac")

- MortgageIT, Inc. ("MortgageIT")

- Mortgage Lenders Network USA, Inc. ("MLN")

- National City Mortgage Company ("National City Mortgage")

- National City Mortgage Corporation ("National City")

- New Century Mortgage Corporation ("New Century")

- NovaStar Mortgage, Inc. ("NovaStar")

- Option One Mortgage Corporation ("Option One")

- People's Choice Home Loan, Inc.  ("People's Choice")

- PHH Mortgage Corporation ("PHH")

- Residential Funding Corporation ("RFC")

- ResMAE Mortgage Corp. ("ResMAE")

- Sebring Capital Partners, LP ("Sebring")

- SouthStar Funding, LLC ("SouthStar")

- SunTrust Mortgage, Inc. ("SunTrust")

- Wells Fargo Bank, N.A. ("Wells Fargo")

(collectively the "**Originators**").[2]

---

[2]  Other non-party originators and/or acquirers of mortgage loans pooled into the Issuing Trusts included Acoustic Home Loans, LLC; Alliance Bancorp; American Mortgage Express Corp.; American Mortgage Network, Inc.; CTX Mortgage Company LLC; First Horizon Home Loan Corporation; Flagstar Bank, FSB; Harris N.A.; HomeBanc Mortgage CorporationHome Loan Corporation d/b/a Expanded Mortgage Credit; Home Loan Corporation Mandalay Mortgage, LLC, Maribella Mortgage, LLC; Mid America Bank; M&T Mortgage Corporation; Mortgage Access Corporation; Netbank; Quick Loan Funding, Inc.; Synovus Mortgage Corporation; Town & Country Credit Corporation; U.S. Bank NA; U.S. Central Credit Union; Waterfield Mortgage Company, Inc.; and Weichert Financial Services.

## SUBSTANTIVE ALLEGATIONS

### I.      THE SECURITIZATION PROCESS GENERALLY

108.    Traditionally, the process for extending mortgage loans to borrowers involved a lending institution (the loan originator) making a loan to a home buyer in exchange for a promise, documented in the form of a promissory note, by the home buyer to repay the principal and interest on the loan.  The loan originator obtained a lien against the home as collateral in the event the home buyer defaulted on its obligation.  Under this simple model, the loan originator held the promissory note until it matured and was exposed to the risk that the borrower might fail to repay the loan.  As such, the loan originator had a financial incentive to ensure that the borrower had the financial wherewithal to repay the loan, and that the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted.

109.    Beginning in the 1990s, however, banks and other mortgage lending institutions increasingly used securitization to finance the extension of mortgage loans to borrowers.  Under the securitization process, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage to a third-party financial institution.  By selling the mortgage, the loan originator not only obtains fees, but receives the proceeds from the sale of the mortgage up front, and thereby has new capital with which to issue more mortgages.  The financial institutions which purchase the mortgages then pool the mortgages together and securitize the mortgages into what are commonly referred to as residential mortgage-backed securities or RMBS.  In this manner, unlike the traditional process for extending mortgage loans, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the RMBS.

110.   The securitization of residential mortgage loans, and the creation of RMBS collateralized against these loans, typically follows the same structure and pattern in each transaction.  First, a loan originator, such as a mortgage lender or bank, originates the underlying residential mortgage loans.  After a loan has been made, a "sponsor" or "seller" (who either originated the loans itself or acquired the loans from other loan originators) sells the mortgage loans to a "depositor."  The depositor pools these loans and deposits them into a special purpose entity or trust created by the depositor.  One trust is established to hold the pool of mortgages for each proposed offering.  In order to facilitate multiple offerings of RMBS, a depositor sets up multiple trusts to hold the different pools of mortgages that are to be securitized.  With respect to each offering, in return for the pool of mortgages acquired from the depositor, the trust issues and distributes RMBS certificates to the depositor.   The depositor then works with an underwriter to price and sell the certificates to investors.  Thereafter, a servicer is appointed to service the mortgage loans held by the trust, *i.e.*, to collect the mortgage payments from the borrower in the form of principal and interest, and to remit them to the trust for administration and distribution to the RMBS investors.  The diagram below illustrates the typical structure of a securitization:

**[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]**



111.    In selling the certificates to investors, the depositor and underwriters disseminate to investors various disclosure or offering documents describing the certificates being sold.  The offering documents comprise: (1) a "shelf" registration statement (under SEC Rule 415, an issuer may file one registration statement covering several offerings of securities made during a period of up to three years after the filing of the registration statement); (2) a "base" prospectus (3) a "prospectus supplement"; and (4) a post-filing free writing prospectus, which may include information the substance of which is not included in the registration statement.  Because a depositor will create a different trust for each offering of RMBS (as described above), the depositor files one shelf registration statement and one base prospectus that apply to multiple trusts that the depositor proposes to establish.  With respect to each specific trust, however, the depositor also files a prospectus supplement that applies only to that particular trust.  Thus, for any given offering of securities, the relevant offering documents will typically be a shared

registration statement and shared base prospectus, as well as an individual, trust-specific prospectus supplement, and sometimes a free-writing prospectus.

112.    Each investor who purchases an RMBS certificate is entitled to receive monthly payments of principal and interest from the trust.  The order of priority of payment to each investor, the interest rate to be paid to each investor, and other payment rights accorded to each investor depend on which class or tranche of certificates the investor purchases.

113.    The highest or senior tranche is the first to receive its share of the mortgage payments and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  Accordingly, these senior tranches receive the highest investment rating by the rating agencies, usually Aaa.  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.  The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages.  All Certificates were also overcollateralized so payments could be made in the event that mortgage borrowers fell behind.

## II.    THE SECURITIZATIONS ASSOCIATED WITH THE PLAINTIFFS' CERTIFICATES AND THEIR INVESTMENTS IN THE CERTIFICATES

### A.    JPMORGAN TRUSTS

114.    The Certificates that Plaintiffs purchased from JPMorgan Trusts were structured and sold by JPMorgan.  The depositors that created the JPMorgan Trusts were JPMorgan entities, Defendants JPM Acceptance and Chase Mortgage Finance.  The sponsor and/or seller for the JPMorgan Trusts were also JPMorgan entities, specifically, Defendants JPMM Acquisition and Chase Home Finance.  In addition, the underwriter was another JPMorgan entity, Defendant JPMS.  As such, the vast majority of the transactions among the sponsor/seller,

depositor, underwriter and the JPMorgan Trusts were not arm's-length transactions, as JPMorgan Chase controlled all the entities.  This vertical integration allowed JPMorgan Chase to control and manipulate the loan level documentation and the value at which properties were appraised, and to ensure that loans would be approved by its loan underwriters.  By virtue of their control over each step in the securitization process, JPMorgan Chase had knowledge of the true characteristics and credit quality of the mortgage loans.

115.    In connection with their role as depositors for the JPMorgan Trusts that are the subject of this action, Defendants JPM Acceptance and Chase Mortgage Finance prepared and filed with the SEC the following shelf registration statements, to which registration statements the Certificates purchased by Plaintiffs are traceable:

### *JPMorgan Trusts*

| Registration Statement | Date Filed | Amount Registered |
|:---:|:---:|:---:|
| 333-127020 | 8/15/2005 | $28,186,564,648 |
| 333-130223 | 3/21/2006 | $16,000,000,000 |
| 333-130192 | 3/31/2006 | $55,957,035,908 |
| 333-141607 | 4/23/2007 | $54,817,583,388 |

**B.    BEAR STEARNS TRUSTS**

116.    The Certificates Plaintiffs purchased from the Bear Stearns Trusts were structured and sold by Bear Stearns.  The depositors that created the Issuing Trusts were Bear Stearns entities: Defendants BSABS and SAMI.  The sponsor and/or seller for the each of the Bear Stearns Trusts except BSARM 2006-1 was also a Bear Stearns entity, specifically, Defendant EMC.  In addition, Bear Stearns was the underwriter for each of the Bear Stearns Trusts.  As such, the vast majority of the transactions among the sponsor/seller, depositor, underwriter, and the Bear Stearns Trusts were not arm's-length transactions, as Bear Stearns controlled all the entities.  This vertical integration allowed Bear Stearns to control and manipulate the loan-level

documentation, to knowingly choose poor quality mortgage loans for securitization as a method of off-loading the loans to investors as soon as possible, and to selectively make repurchase claims of originators while simultaneously denying those of investors.

117.    In connection with their role as the depositors for the Bear Stearns Trusts that are the subject of this action, Defendants BSABS and SAMI prepared and filed with the SEC the following shelf registration statements, to which registration statements the Certificates purchased by Plaintiffs are traceable:

*Bear Stearns Trusts*

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-91334 | 11/13/2002 | $10,000,000,000 |
| 333-106323 | 7/11/2003 | $20,000,000,000 |
| 333-113636 | 4/21/2004 | $25,000,000,000 |
| 333-115122 | 5/11/2004 | $25,000,000,000 |
| 333-120916 | 12/14/2004 | $50,000,000,000 |
| 333-125422 | 6/14/2005 | $35,000,000,000 |
| 333-132232 | 3/10/2006 | $50,000,000,000 |
| 333-131374 | 3/31/2006 | $50,000,000,000 |

C.    WAMU AND LONG BEACH TRUSTS

118.    The Certificates Plaintiffs purchased from the WaMu Trusts were structured and sold by WaMu and Long Beach.  The depositors that created the Issuing Trusts were WaMu entities: Defendants WAAC, WMMSC and LBSC.  The sponsor and/or seller for the Issuing Trusts were also WaMu entities, specifically, Defendant WMMSC or non-defendants LBMC and WaMu Bank.  In addition, another WaMu entity, Defendant WaMu Capital, was an underwriter for nearly all of the Issuing Trusts.  As such, the vast majority of the transactions among the sponsor/seller, depositor and the Issuing Trusts were not arm's-length transactions, as WaMu

controlled all the entities.  Similarly, this vertical integration allowed WaMu to both control and manipulate the loan-level documentation and to ensure that loans would be approved by its in-house loan underwriters so that they could be securitized and off-loaded on to investors as soon as possible.

119.    In connection with their role as the depositors for the WaMu Trusts that are the subject of this action, Defendants WAAC, WMMSC and LBSC prepared and filed with the SEC the following shelf registration statements, to which registration statements the Certificates purchased by Plaintiffs are traceable:

### *WaMu and Long Beach Trusts*

| Registration Statement | Date Filed | Amount Registered |
|:---:|:---:|:---:|
| 333-41712 | 8/22/2000 | $6,001,000,000 |
| 333-77026 | 2/1/2002 | $60,000,000,000 |
| 333-90550 | 6/25/2002 | $13,324,461,000 |
| 333-103345 | 3/7/2003 | $72,000,000,000 |
| 333-109318 | 2/10/2004 | $52,697,201,000 |
| 333-123034 | 6/13/2005 | $20,000,000,000 |
| 333-130795 | 1/3/2006 | $100,000,000,000 |
| 333-141255 | 4/9/2007 | $400,000,000,000 |

120.    At the time of filing, each Registration Statement, identified in ¶¶115, 117, 119 above, contained an illustrative form of a prospectus supplement that would be used in the various offerings of Certificates.  At the effective date of a particular offering of Certificates, the Underwriter Defendants prepared and filed a final Prospectus Supplement with the SEC containing a description of the mortgage pool for that particular offering of Certificates, and the underwriting standards by which the mortgages were purportedly originated.  The Underwriter Defendants then marketed and sold the Certificates pursuant to these Prospectus Supplements.

121.    The following chart summarizes and identifies (1) each Issuing Trust that issued and sold the Certificates purchased by Plaintiffs; (2) the dates of the Registration Statements and Prospectus Supplements pursuant to which Plaintiffs purchased the Certificates; and (3) the identities of the depositor, the issuer, underwriters, and the sponsor/seller for each offering.

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | | | | | |
| 333-41712 (8/22/2000) | Long Beach Mortgage Loan Trust 2002-2 | 05/31/2002 | Long Beach Securities Corp. | Banc of America Securities<br><br>Banc One Capital Markets, Inc.<br><br>Credit Suisse First Boston<br><br>Deutsche Bank Securities, Inc.<br><br>Greenwich Capital Markets, Inc.<br><br>Lehman Brothers Inc.<br><br>Morgan Stanley<br><br>UBS Warburg, LLC | Long Beach Mortgage Company |
| | | | | | |
| 333-77026 (2/01/2002) | WAMU Mortgage Pass-Through Certificates Series 2002-AR17 Trust | 10/23/2002 | Washington Mutual Mortgage Securities Corp. | Bear, Stearns & Co. Inc. | Washington Mutual Bank, FA |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Washington Mutual Pass-Through Certificates, Series 2003-AR1 Trust | 1/27/2003 | Washington Mutual Mortgage Securities Corp. | Bear, Stearns & Co. Inc.<br><br>Lehman Brothers<br><br>RBS Greenwich Capital | Washington Mutual Mortgage Securities Corp. |
| | Washington Mutual Pass-Through Certificates, Series 2003-AR3 Trust | 2/24/2003 | Washington Mutual Mortgage Securities Corp. | Bear, Stearns & Co. Inc.<br><br>Lehman Brothers<br><br>RBS Greenwich Capital | Washington Mutual Mortgage Securities Corp. |
| | Washington Mutual Pass-Through Certificates, Series 2003-AR9 Trust | 8/21/2003 | Washington Mutual Mortgage Securities Corp. | Bear, Stearns & Co. Inc.<br><br>RBS Greenwich Capital<br><br>JPMorgan<br><br>Lehman Brothers<br><br>WaMu Capital Corp. | Washington Mutual Mortgage Securities Corp. |
| | | | | | |
| 333-90550 (6/25/2002) | Long Beach Mortgage Loan Trust 2004-1 | 2/04/2004 | Long Beach Securities Corp. | RBS Greenwich Capital<br><br>WaMu Capital Corp. | Long Beach Mortgage Company |
| | | | | | |
| 333-91334 (11/13/2002) | Bear Stearns Asset Backed Securities Trust 2003-HE1 | 12/30/2003 | Bear Stearns Asset Backed Securities Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Bear Stearns Asset Backed Securities Trust 2004-HE1 | 1/29/2004 | Bear Stearns Asset Backed Securities, Inc | Banc of America Securities LLC  Bear, Stearns, & Co. Inc. | EMC Mortgage Corporation |
| | | | | | |
| 333/103345 (3/7/2003)  333-103345 (3/07/2003) | WAMU Mortgage Pass-Through Certificates Series 2005-AR6 Trust | 04/26/2005 | Washington Mutual Mortgage Securities Corp. | UBS Securities LLC  WaMu Capital Corp. | Washington Mutual Bank |
| | WAMU Mortgage Pass-Through Certificates Series 2005-AR8 Trust | 07/14/2005 | Washington Mutual Mortgage Securities Corp. | UBS Securities LLC  WaMu Capital Corp. | Washington Mutual Bank |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-6 Trust | 07/27/2005 | Washington Mutual Mortgage Securities Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | WAMU Mortgage Pass-Through Certificates Series 2005-AR11 Trust | 08/24/2005 | Washington Mutual Mortgage Securities Corp. | Greenwich Capital Markets, Inc.  WaMu Capital Corp. | Washington Mutual Bank |
| | | | | | |
| 333-106323 (7/11/2003) | Bear Stearns ARM Trust 2004-2 | 03/31/2004 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | | | | | |

43

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| 333-109318 (2/10/2004) | Long Beach Mortgage Loan Trust 2004-3 | 6/04/2004 | Long Beach Securities Corp. | Deutsche Bank Securities<br><br>Morgan Stanley<br><br>RBS Greenwich Capital<br><br>WaMu Capital Corp. | Long Beach Mortgage Company |
| | Long Beach Mortgage Loan Trust 2004-4 | 9/07/2004 | Long Beach Securities Corp. | RBS Greenwich Capital<br><br>WaMu Capital Corp. | Long Beach Mortgage Company |
| | | | | | |
| 333-113636 (4/21/2004) | Bear Stearns Asset Backed Securities I Trust 2004-AC3 | 5/28/2004 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities I Trust 2004-AC5 | 10/01/2004 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities Trust 2004-SD4 | 11/19/2004 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities I Trust 2005-AC3 | 05/31/2005 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns ALT-A Trust 2006-1 | 2/1/2006 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | | | | | |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| 333-115122 (5/11/2004) | Bear Stearns ARM Trust 2004-8 | 09/30/2004 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Alt-A Trust 2004-11 | 10/01/2004 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns ARM Trust 2004-9 | 11/01/2004 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns ARM Trust 2004-10 | 12/01/2004 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | | | | | |
| 333-120916 (12/14/2004) | Bear Stearns ARM Trust 2005-1 | 02/28/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns ARM Trust 2005-2 | 03/02/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Alt-A Trust 2005-3 | 03/31/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns ARM Trust 2005-5 | 07/15/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Bear Stearns Alt-A Trust 2005-7 | 07/29/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Alt-A Trust 2005-9 | 10/03/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Alt-A Trust 2005-10 | 12/29/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns ARM Trust 2005-12 | 12/30/2005 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | | | | | |
| 333-123034 (6/13/2005) | WAMU Mortgage Pass-Through Certificates Series 2005-AR13 Trust | 10/24/2005 | WAMU Asset Acceptance Corp. | RBS Greenwich Capital<br><br>WaMu Capital Corp. | Washington Mutual Bank and Washington Mutual Bank FSB |
| | WAMU Mortgage Pass-Through Certificates Series 2005-AR17 Trust | 12/19/2005 | WaMu Asset Acceptance Corp. | Greenwich Capital Markets, Inc.<br><br>WaMu Capital Corp. | Washington Mutual Bank |
| | WAMU Mortgage Pass-Through Certificates Series 2005-AR19 Trust | 12/22/2005 | WaMu Asset Acceptance Corp. | Greenwich Capital Markets, Inc.<br><br>WaMu Capital Corp. | Washington Mutual Bank |
| | | | | | |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| 333-125422 (6/14/2005) | SACO I Trust 2005-10 | 12/30/2005 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns ARM Trust 2006-1 | 3/17/2006 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | CSE Mortgage LLC |
| | | | | | |
| 333-127020 (8/15/2005) | J.P. Morgan Mortgage Trust 2005-A6 | 8/31/2005 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Mortgage Trust 2005-A7 | 9/29/2005 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Mortgage Trust 2005-S3 | 12/28/2005 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Mortgage Acquisition Corp. 2006-FRE2 | 3/30/2006 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Acquisition Corp. |
| | | | | | |
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR3 Trust | 2/22/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR4 Trust | 4/21/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR7 Trust | 6/26/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 Trust | 6/27/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Mortgage Securities Corp. |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-5 Trust | 6/29/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Mortgage Securities Corp. |
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR9 Trust | 7/25/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR12 Trust | 9/25/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Trust | 9/28/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Mortgage Securities Corp. |
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR15 Trust | 10/24/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-9 Trust | 10/27/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Mortgage Securities Corp. |
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR17 Trust | 11/20/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | WAMU Mortgage Pass-Through Certificates Series 2006-AR19 Trust | 12/20/2006 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | WAMU Mortgage Pass-Through Certificates Series 2007-HY1 Trust | 1/23/2007 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-1 Trust | 1/29/2007 | WaMu Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Mortgage Securities Corp. |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA3 Trust | 3/27/2007 | WaMu Asset Acceptance Corp. | Goldman, Sachs & Co.<br><br>WaMu Capital Corp. | Washington Mutual Mortgage Securities Corp.<br><br>Washington Mutual Bank |
| | | | | | |
| 333-132232 (3/10/2006) | Bear Stearns ARM Trust 2006-4 | 10/02/2006 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Alt-A Trust 2006-6 | 10/03/2006 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Bear Stearns Mortgage Funding Trust 2006-AR4 | 11/30/2006 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Alt-A Trust 2006-8 | 12/29/2006 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Mortgage Funding Trust 2006-AR5 | 12/29/2006 | Structured Asset Mortgage Investments II Inc. | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | | | | | |
| 333-130223 (3/21/2006) | ChaseFlex Trust Series 2006-1 | 5/24/2006 | Chase Mortgage Finance Corporation | J.P. Morgan Securities | Chase Home Finance LLC |
| | | | | | |
| | Bear Stearns Asset Backed Securities I Trust 2006-IM1 | 4/25/2006 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | SACO I Trust 2006-5 | 4/27/2006 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | SACO I Trust 2006-6 | 5/31/2006 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Bear Stearns Asset Backed Securities I Trust 2006-HE6 | 6/27/2006 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | SACO I Trust 2006-7 | 6/30/2006 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities I Trust 2006-HE10 | 1/03/2007 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc.  Societe Generale Corporate & Investment Banking | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities Trust 2007-SD1 | 1/19/2007 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities I Trust 2007-HE1 | 1/31/2007 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities I Trust 2007-HE2 | 2/28/2007 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities I Trust 2007-HE6 | 8/30/2007 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |
| | Bear Stearns Asset Backed Securities I Trust 2007-HE7 | 9/19/2007 | Bear Stearns Asset Backed Securities I LLC | Bear, Stearns & Co. Inc. | EMC Mortgage Corporation |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| 333-130192 (4/03/2006) | J.P. Morgan Alternative Loan Trust 2006-S3 | 6/30/2006 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Alternative Loan Trust 2006-A4 | 7/28/2006 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Alternative Loan Trust 2006-A6 | 10/31/2006 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Alternative Loan Trust 2006-A7 | 11/30/2006 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Mortgage Acquisition Trust 2006-CH2 | 12/13/2006 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | J.P. Morgan Mortgage Trust 2007-A1 | 1/30/2007 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |
| | | | | | |
| 333-141255 (4/09/2007) | WAMU Mortgage Pass-Through Certificates Series 2007-HY5 Trust | 4/24/2007 | WAMU Asset Acceptance Corp. | WaMu Capital Corp. | Washington Mutual Bank |
| | WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust | 5/9/2007 | WAMU Asset Acceptance Corp. | Merrill Lynch & Co. WaMu Capital Corp. | Washington Mutual Bank |

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | | | | | |
| 333-141607 (4/23/2007) | J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 6/15/2007 | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. | J.P. Morgan Mortgage Acquisition Corp. |

## III.   IMPORTANT FACTORS IN THE DECISION OF INVESTORS SUCH AS PLAINTIFFS TO INVEST IN THE CERTIFICATES

122.   In purchasing the Certificates, Plaintiffs, like other investors, attached critical importance to: (a) the underwriting standards used to originate the loans underlying the Certificates; (b) the appraisal methods used to value the properties securing the underlying mortgage loans; (c) the ratings assigned to the Certificates; (d) the ability of the Issuing Trusts to establish legal title to the underlying loans; and (e) the level of credit enhancement applicable to the Certificates.

123.   Sound underwriting was critically important to Plaintiffs because the ability of borrowers to repay principal and interest was the fundamental basis upon which the investments in the Certificates were valued.   Reflecting the importance of the underwriting standards, the Offering Documents contained representations concerning the standards purportedly used to originate the mortgages held by the Issuing Trusts.

124.   For example, the April 3, 2006 Registration Statement issued by Defendant JPM Acceptance stated that: "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral.   In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer

53

pertinent credit information.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses…"

125.    With respect to loans acquired from third-party originators, the Offering Documents represented that stated underwriting guidelines required them to consider, among other things, the mortgagor's credit history, repayment ability, and debt-to-income ratio, as well as the type and use of the mortgaged property.  In addition, the Offering Documents represented that in order to submit loan packages, the loans must have been made in compliance with the terms of a signed mortgage loan purchase agreement.

126.    Independent and accurate real estate appraisals were also critically important to investors such as Plaintiffs because they ensured that the mortgage loans underlying the Certificates were not under-collateralized, thereby protecting RMBS investors in the event a borrower defaulted on a loan.  As such, by allowing RMBS investors to assess the degree to which a mortgage loan was adequately collateralized, accurate appraisals provided investors such as Plaintiffs with a basis for assessing the price and risk of the Certificates.

127.    One measure that uses the appraisal value to assess whether mortgage loans are under-collateralized is the loan-to-value ("LTV") ratio.  The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total value of the property, as obtained from the appraisal.  For example, if a borrower seeks to borrow $900,000 to purchase a house worth $1,000,000, the LTV ratio is $900,000/$1,000,000, or 90%.  If, however, the appraised value of the house is artificially increased to $1,200,000, the LTV ratio misleadingly drops to just 75% ($900,000/$1,200,000).

128.    The Prospectus Supplement for J.P. Morgan Alternative Loan Trust 2006-A7, one of the Certificates purchased by Plaintiffs, made the following representations regarding the underlying assets.

ORIGINAL LOAN-TO-VALUE RATIOS(1)

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS (%) | NUMBER OF POOL 1 MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|
| 10.01 - 20.00................. | 1 | $    453,000.00 | 0.05% |
| 20.01 - 30.00................. | 7 | 1,548,000.00 | 0.18 |
| 30.01 - 40.00................. | 18 | 6,169,760.94 | 0.71 |
| 40.01 - 50.00................. | 55 | 23,542,953.75 | 2.72 |
| 50.01 - 60.00................. | 90 | 35,427,920.75 | 4.09 |
| 60.01 - 70.00................. | 290 | 152,781,580.67 | 17.64 |
| 70.01 - 75.00................. | 295 | 127,451,090.91 | 14.72 |
| 75.01 - 80.00................. | 1,412 | 478,681,349.32 | 55.28 |
| 80.01 - 85.00................. | 20 | 5,710,719.77 | 0.66 |
| 85.01 - 90.00................. | 65 | 16,364,131.96 | 1.89 |
| 90.01 - 95.00................. | 42 | 9,039,234.07 | 1.04 |
| 95.01 - 100.00................ | 37 | 8,828,292.10 | 1.02 |
| Total....................... | 2,332 | $865,998,034.24 | 100.00% |

*Id.* at A-1.

129.    Thus, fewer than 2% of the loans were represented to have an LTV greater than 95% and fewer than 3.5% total had LTV ratios greater than 90%, providing the appearance of a conservative portfolio.

130.    From a lender's perspective, the higher the LTV ratio, the riskier the loan because it indicates the borrower has a lower equity stake, and a borrower with a lower equity position has less to lose if s/he defaults on the loan.  The LTV ratio is a significant measure of credit risk, because both the likelihood of default and the severity of loss are higher when borrowers have less equity to protect in the event of foreclosure.  Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may *exceed* the value of the property.

131.    As stated above, real estate appraisals are governed by USPAP, which are the generally accepted standards for professional appraisal practice in North America promulgated

by the Appraisal Standards Board of the Appraisal Foundation, as authorized by Congress.  With

respect to real estate appraisals, USPAP requires the following:

> *An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.*
>
> *In appraisal practice, an appraiser must not perform as an advocate for any party or issue.*
>
> *An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.*
>
> *\* \* \* \* \**
>
> *It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:*
>
> *1.     the reporting of a predetermined result (e.g., opinion of value);*
>
> *2.     a direction in assignment results that favors the cause of the client;*
>
> *3.     the amount of a value opinion;*
>
> *4.     the attainment of a stipulated result; or*
>
> *5.     the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.*

132.    Reflecting the importance of independent and accurate real estate appraisals to

investors such as Plaintiffs, the Offering Documents contained extensive disclosures concerning

the value of the collateral underlying the mortgages pooled in the Issuing Trusts and the

appraisal methods by which such values were obtained.

133.    For example, the Offering Documents represented that the property securing the

mortgages was to be appraised by a qualified, independent appraiser in conformity with USPAP

or that each appraisal was required to satisfy applicable government regulations and be on forms

acceptable to Fannie Mae and Freddie Mac.

134.    In addition, the Prospectus Supplements represented that the appraisal procedure

guidelines used by the loan originators required an appraisal report that included market data

analyses based on recent sales of comparable homes in the area.  If appropriate, the guidelines required a review appraisal, consisting of an enhanced desk or field review, or automated valuation report confirming or supporting the original appraisal value of the mortgaged property.

135.    The rating assigned to each of the Certificates was another important factor in Plaintiffs' decision to purchase the Certificates.  Plaintiffs and other investors relied on the ratings as an indicator of the safety and likelihood of default of the mortgage loans underlying a particular Certificate.

136.    In purchasing the Certificates, Plaintiffs relied on the ability of each of the Issuing Trusts to demonstrate that it in fact had legal title to the underlying mortgage loans.  Plaintiffs would never have purchased any of the Certificates from Defendants if there was any doubt as to whether the Issuing Trusts had legal title to any of the mortgage loans that were pooled for each offering.

137.    Finally, the Prospectus Supplements contained representations regarding the level of credit enhancement, or loss protection, associated with the Certificates.  Credit enhancements impact the overall credit rating that a Certificate receives.  The amount of credit enhancement built into the Certificates purchased by Plaintiffs was overstated, which exposed Plaintiffs to additional losses.  These levels of credit enhancement were material to Plaintiffs.

IV.    **DEFENDANTS KNEW THAT A LARGE PERCENTAGE OF THE MORTGAGE LOANS UNDERLYING PLAINTIFFS' CERTIFICATES WERE MADE AS A RESULT OF THE SYSTEMATIC ABANDONMENT OF PRUDENT UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS**

138.    Prior to underwriting and selling the Certificates to investors like Plaintiffs, Defendants had identified but failed to disclose the widespread underwriting and appraisal deficiencies by the mortgage originators described below, many of which were, in fact, owned by or affiliated with Defendants.  This was in direct contrast to the representations in the Offering Documents accompanying the Certificates sold to Plaintiffs.

139.    As has now come to light, contrary to the representations in the Offering Documents, Defendants JPMorgan Bank and EMC, non-defendants Encore, Long Beach, and WaMu Bank, and the third-party originators that originated the mortgages underlying the Certificates, knowingly departed from the underwriting standards that were represented in the Offering Documents.

140.    In the late 1990s and early 2000s, an unprecedented boom in the housing market began to unfold.  Between 1994 and 2006, the housing market experienced a dramatic rise in home ownership, as more than 12 million more Americans became homeowners.  Likewise, the subprime market grew dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it.  According to INSIDE MORTGAGE FINANCE, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5% of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

141.    To ride this housing boom, Wall Street financial firms aggressively pushed into the complex, high-margin business of securitization, *i.e.*, packaging mortgages and selling them to investors as RMBS.  This aggressive push created a boom for the mortgage lending industry.  Mortgage originators generated profits primarily through the sale of their loans to investment banks like JPMorgan Chase, Bear Stearns, and Washington Mutual, and the originators were therefore driven to originate and sell as many loans as possible.  Increased demand for mortgages by banks like JPMorgan Chase, Bear Stearns, and Washington Mutual led to increased volume in mortgage originations.  That increased volume, in turn, led to a decrease in the gain-on-sale margins that mortgage originators received from selling pools of loans.  As a result, originators began to borrow money from the same large banks that were buying their mortgages in order to fund the origination of even more mortgages.  By buying and packaging mortgages, Wall Street firms enabled the lenders to extend credit even as the number of creditworthy borrowers sank

and dangers in the housing market grew.  This emphasis on volume over sound underwriting led to predictable results.  The FBI reported that an analysis of more than 3 million loans revealed that between *30 and 70 percent* of early payment defaults ("EPDs"), or defaults which occur within a few months of the loan's origination, were linked to significant misrepresentations in the original loan applications.  When a borrower fails to make payments so soon after taking out a loan, it is a strong sign that the loan should never have been made in the first place and a possible indicia of fraud.

142.    In the instant action, the players that structured the Certificates purchased by Plaintiffs were JPMorgan Chase, Bear Stearns, and Washington Mutual, and their affiliated entities.  Defendants embarked on a scheme to profit from the housing boom by acquiring or partnering with subprime lenders, such as the Originators described in Section IV.D, *infra*, and then directing or encouraging these lenders to originate and purchase large numbers of mortgage loans, regardless of the borrower's ability to pay, so that the loans could then be quickly flipped at a profit on to an unsuspecting secondary market (that is, RMBS investors such as Plaintiffs).

143.    Defendants reaped massive profits from their activities in the RMBS space during the U.S. housing boom.  At nearly every stage in the mortgage securitization process, from pocketing the difference between what they paid for a pool of mortgage loans and what they received from selling those loans into a securitization; to collecting underwriting fees and commissions from selling the RMBS they had securitized to investors; to earning interest and fees from the warehouse lending arrangements they established with subprime originators to facilitate the issuance of new loans, Defendants garnered enormous profits.

144.    As a result of these efforts, between 2000 and 2007, WaMu and Long Beach together securitized approximately $77 billion in subprime loans.  Starting in 2003, the JPMorgan Defendants increased their origination and securitization of mortgage loans

extensively.  During the 2003, 2004, 2005, and 2006 fiscal years, Defendant JPMM Acquisition securitized approximately $545 million, $5 billion, $2.1 billion, and $40.6 billion of residential mortgage loans, respectively.  Moreover,  the securitization of residential mortgage loans by Defendant JPM Acceptance increased by more than five times between 2004 and 2005, from approximately $4.5 billion to $24 billion.  Likewise, from 2003 to 2004, the securitization of mortgage loans by the Bear Stearns Defendants, mainly through Defendant EMC, increased by almost three times from 86,000 loans to 230,000 loans.  This represented an increase from approximately $20 billion to $48 billion.  In 2005, the amount of mortgage loans securitized by EMC increased to 389,000 loans valued at almost $75 billion.  In 2006, more than 345,000 loans were securitized by the EMC, valued at nearly $69 billion.  Overall, from 2003 to 2007, Defendant EMC purchased and securitized more than one million mortgage loans originally valued at over $212 billion.

145.    Defendants had direct insight into the true — very poor — quality of the loans underlying the Certificates they issued to Plaintiffs.  This is evidenced by Defendants' financial relationships with the third-party originators, such as through warehouse lending arrangements, and by their origination of badly defective loans through their own mortgage origination units, including Defendants JPMorgan Bank and EMC, and non-defendants Encore, Long Beach, and WaMu Bank.  Additionally, Defendants were aware of the scope of the poorly underwritten loans in the RMBS they issued through their roles as sponsors of RMBS and their roles as RMBS trustees.

146.    Instead of disclosing the true nature of these loans to investors such as Plaintiffs, however, Defendants routinely placed defective loans into securitizations to be sold to investors in order to reap enormous fees with no perceived risk and, at times, to eliminate loans from their own balance sheets that they knew would decline in value.

A.    DEFENDANT JPMORGAN CHASE ABANDONED UNDERWRITING STANDARDS AND
APPRAISAL GUIDELINES IN ITS VERTICALLY INTEGRATED SECURITIZATION
PROCESS

147.    JPMorgan Chase had ample information about the sorry state of the loans that it

was securitizing.  Its retail operations gave JPMorgan Chase a window into the fraud and abuses

that were prevalent in the mortgage market, and JPMorgan's due diligence vendor told it about

underwriting failures in the loans that it had purchased.   Indeed, the misrepresentations in

JPMorgan's Offering Documents were so pervasive that JPMorgan Chase either knew or

recklessly disregarded such misrepresentations.  JPMorgan Chase executives understood that its

RMBS were deeply unstable investments, but nonetheless continued to market them as

investment-grade securities.

148.    JPMorgan Chase's practices, including the subjects of the false statements,

misrepresentations and omissions in the Offering Documents, have been and continue to be a

part of multiple federal investigations and proceedings.  On May 12, 2010, the WALL STREET

JOURNAL reported that federal prosecutors, working with the SEC, had begun the early stages of

a criminal probe into whether several Wall Street banks, including JPMorgan Chase, "misled

investors about their roles in mortgage-bond deals."  The article also stated that JPMorgan Chase

was among several banks to receive a civil subpoena from the SEC.  On June 21, 2011, the

WALL STREET JOURNAL reported that JPMorgan Chase agreed to pay $153.6 million to settle

charges that it "failed to disclose to investors in a $1.1 billion synthetic collateralized debt

obligation ("CDO") in early 2007 that Illinois-based hedge fund Magnetar Capital LLC helped

pick the assets underpinning the CDO portfolio and stood to profit if they defaulted."  According

to the article, JPMorgan Chase, instead of shutting down the deal and taking a $40 million mark-

to-market loss, initiated an aggressive selling campaign to "move early losses on the deal to other

investors."   When its traditional investors were not interested, the article explains, JPMorgan

Chase rushed to shed $40 million in early losses to outside investors, urging its salespeople to make selling this deal the "top priority from the top of the bank all the way down."  This is further evidence of a pattern and practice of JPMorgan Chase doing whatever it had to do to protect itself, even at the expense of investors.

1.     **JPMorgan Chase Disregarded Underwriting Guidelines and Appraisal Standards In Its Own Mortgage Lending Operations**

149.    To maximize profits and ensure control over each aspect of the securitization process, from origination through securitization and sale to investors, such as Plaintiffs, JPMorgan Chase maintained a vertically integrated operation.  One way JPMorgan Chase kept the securitization machine running was by directing its own affiliated mortgage loan originators to churn out loans as quickly as possible with increasingly less concern for satisfying underwriting guidelines or obtaining independent appraisals.   JPMorgan Bank originated mortgages, either directly or through an affiliate, that were included in Issuing Trusts from which Plaintiffs purchased Certificates.

150.    James Theckston, a former regional vice president for the JPMorgan subsidiary Defendant Chase Home Finance in southern Florida, was interviewed regarding Chase Home Finance's lending and securitization practices for a November 30, 2011 NEW YORK TIMES article, "A Banker Speaks, With Regret."  Theckston's team wrote $2 billion in mortgages in 2007 alone.   According to Theckston, Chase Home Finance engaged in high-risk lending practices such as making no-documentation loans to borrowers with insufficient resources.  "On the application, you don't put down a job; you don't show income; you don't show assets; but you still got a nod," he said.  "If you had some old bag lady walking down the street and she had a decent credit score, she got a loan…   You've got somebody making $20,000 buying a $500,000 home, thinking that she'd flip it.  It was crazy, but the banks put programs together to make those kinds of loans."

151.     These excesses were driven by JPMorgan's vertically integrated securitization business model.  "The bigwigs of the corporations knew [about declining lending standards], but they figured we're going to make billions out of it, so who cares?"  Theckston said.  "The government is going to bail us out.  And the problem loans will be out of here, maybe even overseas."  Because risky loans were securitized and sold to investors such as Plaintiffs, Chase Home Finance created incentive structures that rewarded risky lending.  Theckston said that some Chase Home Finance account executives earned commissions seven times higher from subprime loans rather than prime mortgages.  As a result, those executives looked for unsophisticated borrowers with less education or limited English abilities and convinced them to take out subprime loans.  Theckston's own 2006 performance review indicated that 60% of his evaluation depended on him increasing the production of high-risk loans.

152.     According to the Federal Home Loan Bank of Boston (the "FHLBB") investigation into the origination practices of JPMorgan Bank, a senior underwriter at JPMorgan Bank stated that managers "often overturned the decisions of lower-level underwriters to reject stated-income loans … If the manager felt the income made sense and the underwriter didn't, the manager could overturn it."  The FHLBB has interviewed a number of former loan personnel at Chase Home Finance.  One witness, a loan processor and assistant to the branch manager at a Florida branch of Chase Home Finance from April 2006 until August 2007, noted that many employees inflated borrowers' income on orders from the branch manager to get loans approved, saying, "It was very common to take stuff out of the loan file."  Loan officers would often bring their loans to the branch manager for instructions on what the stated income should be to make a loan close.  Branch managers would also call the regional managers above them for instructions on problem loans.

153.    Another witness, a senior loan underwriter at Chase Home Finance from December 2004 to August 2005, said that Chase Home Finance loan personnel knowingly permitted borrowers to submit false income data, saying that, "[y]ou'd see self-employed people, like a landscaper, who stated they made $10,000 a month."  When borrowers stated unreasonable income levels, management would push the loans through regardless.  The witness said that in addition to being told to accept unreasonable stated incomes, employees were not permitted to question appraisals that appeared to be inflated.  He recalled a subdivision in California in which Chase Home Finance accepted appraisal values that were double the sales prices of identical homes sold just a few months before.

154.    According to an investigation of the origination practices of Chase Home Finance by Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust, a former senior underwriter from March 2002 through January 2008 at Chase Home Finance, said that when processing loans that required verification of assets, "we really were not verifying them, what we would do is look to see if a borrower was making, say $15,000 a month, if that's [what] they were listing.  We would hope to see assets that would compare to or be comparable to that type of income."

155.    Additionally, according to one witness, a former senior processor, junior underwriter, and compliance controller who worked at Chase Home Finance between December 2002 and October 2007, loan processors weren't provided with all of the relevant borrower information: "there was some information that was being withheld from us."

156.    JPMorgan's fraudulent origination and purchasing practices are also evidenced by information obtained from Allstate Insurance Company ("Allstate"), the Federal Housing Finance Agency, acting as conservator for Fannie Mae and Freddie Mac (the "FHFA"), and Massachusetts Mutual Life Insurance Company ("Mass Mutual").  Each of these entities conducted loan-level analyses of JPMorgan-issued RMBS that they had purchased.  As discussed

more fully below, these forensic analyses, which covered thousands of individual mortgage loans, found substantial breaches of the representations and warranties in the relevant prospectus supplements, particularly with respect to LTV ratios and owner-occupancy statistics.   On information and belief, the mortgages that JPMorgan and its subsidiaries sold to Allstate, Fannie Mae/Freddie Mac and Mass Mutual were originated through substantially the same channels and methods as the mortgages underlying Plaintiffs' Certificates.

157.   Additionally, according to documents provided to the FCIC, as of August 31, 2010, Fannie Mae has required JPMorgan to repurchase 6,456 loans originated by its subsidiaries JPMorgan Bank and Chase Home Finance with an unpaid principal balance of $1.359 billion. Fannie Mae has also requested that JPMorgan repurchase an additional 1,561 JPMorgan Bank and Chase Home Finance loans with an outstanding principal balance of $345 million.  Likewise, between 2007 and August 31, 2007, Freddie Mac required JPMorgan to repurchase 5,427 Chase Home Finance loans with an unpaid principal balance of $1.188 billion.

158.   In a March 27, 2008 article, THE OREGONIAN revealed that an internal memorandum circulated at JPMorgan provided employees with information on how to fraudulently game ZiPPy, JPMorgan's in-house automated loan underwriting system.   The memorandum, aptly titled "ZiPPy Cheats & Tricks," cheerfully encouraged loan personnel to inflate borrower incomes and enter false information into the program to "get the findings you need."  It specifically recommended the following three "handy steps" for getting stated-income loans with LTV ratios of up to 100% approved:

1.   Make sure you input all income in base income.  DO NOT break it down by overtime, commissions or bonus.

2.   If your borrower is getting a gift, add it to a bank account along with the rest of the assets.  Be sure to remove any mention of gift funds.

3.      If you do not get [the desired results], try resubmitting with slightly higher income.  Inch it up $500 to see if you can get the findings you want.  Do the same for assets.

159.    The memorandum noted that manipulating JPMorgan's underwriting software was not difficult, stating, "It's super easy!  Give it a try!"

160.    In testimony before the FCIC, JPMorgan Chase CEO Jamie Dimon ("Dimon") admitted that JPMorgan Chase's underwriting standards "should have been higher."  He also testified that before the collapse of the housing bubble, JPMorgan Chase "misjudged the impact of more aggressive underwriting standards" and that JPMorgan Chase "should have acted sooner and more substantially to reduce the loan-to-value ratios."

### 2.      JPMorgan Chase Management Was Aware That Third Party Originators Were Abandoning Their Underwriting Guidelines and Appraisal Standards

161.    During the housing boom, JPMorgan Chase, and other issuers of RMBS hired Clayton Holdings Inc. ("Clayton") to conduct due diligence to review whether the loans to be included in a particular RMBS offering complied with the law and met the lending standards that mortgage companies said that they were using.  Clayton's Form 10-K filed on March 14, 2008, represented that Clayton provides "services to the leading buyers and sellers of, and investors in, residential and commercial loan portfolios and securities … includ[ing] major capital markets firms, banks and lending institutions, including the largest MBS issuers/dealers."

162.    On September 23, 2010, hearings were held by the FCIC in Sacramento, California.  Part of the hearings involved the role that Clayton played in the mortgage securitization process.  Clayton's current Senior Vice President of Transaction Management Vicki Beal ("Beal") suggested that, rather than directing due diligence firms to conduct thorough portfolio reviews that would most likely identify defective loans, the investment banks, such as JPMorgan Chase, pressured loan reviewers to disregard the problematic loans through the use of

exceptions and offsets, even in cases where such practices did not satisfy the applicable underwriting guidelines.

163. Clayton reviewed 911,000 loans for 23 investment or commercial banks, including JPMorgan Chase ("Trending Report"). The Trending Report covered roughly 10% of the total number of mortgages Clayton was contracted to review. Clayton graded each loan for credit and compliance by using the following grading scale: Event 1, loans that meet guidelines; Event 2, loans that do not meet guidelines but have sufficient compensating factors; and Event 3, loans that do not meet guidelines and have insufficient compensating factors.

164. Of the mortgage loans reviewed, only 54% met the lenders' underwriting standards. About 28% of the loans sampled were initially rejected, as they were unable to meet numerous underwriting standards. According to the testimony of Beal and D. Keith Johnson, the former President and Chief Executive Officer of Clayton, however, 39% of these troubled loans were waived back into the mortgage pools and sold to investors such Plaintiffs during the period.

165. Clayton provided a trending report which contained the rejection and waiver rates for the loans that were pooled into RMBS by JPMorgan Chase and sold to investors such as Plaintiffs. Clayton found that of the JPMorgan securitized loans that Clayton reviewed for underwriting compliance, 27% neither met underwriting guidelines nor possessed compensating factors to justify an exception to be included into securitizations (Event 3). However, JPMorgan Chase ignored many of these underwriting failures and waived *51%* of those rejected loans back into its mortgage pools – the highest waiver rate of any of the 23 institutions that Clayton analyzed – and sold RMBS containing these non-compliant loans to investors such as Plaintiffs.

166. In their capacity as the underwriters for all of the Certificates purchased by Plaintiffs, Defendants JPMS, Bear Stearns, WaMu Capital, Banc of America, Deutsche Bank, GCM, and UBS had an obligation to conduct due diligence regarding the accuracy and

completeness of the Offering Documents prior to their dissemination to investors such as Plaintiffs.  In connection with that due diligence process, the Underwriter Defendants had access to various sources of information, including Clayton's findings, which should have alerted them to the various originators' systematic and widespread abandonment of stated underwriting guidelines and appraisal methods.  The Underwriter Defendants were supposed to play a "gatekeeper" role for public investors like Plaintiffs, who did not have access to non-public information through which to test the assertions in the Offering Documents.

167.   It is evident, however, that the Underwriter Defendants did not fulfill their obligation to ensure that investors such as Plaintiffs were provided with Offering Documents containing accurate and complete information.  For example, Ms. Beal told the FCIC in her prepared remarks, "[t]o our knowledge, prospectuses do not refer to Clayton and its due diligence work."  She further stated that "Clayton does not participate in the securities sales process, nor does it have knowledge of our loan exception reports being provided to investors or the rating agencies as part of the securitization process."  Additionally, Mr. Johnson confirmed to investigators that Clayton's findings should have been disclosed to investors.

### 3.   JPMorgan Chase Benefited From The Securitization of Defective Loans At The Expense of Investors

168.   By late 2006, the heads of JPMorgan Chase realized that the deterioration of underwriting standards had reached a critical level.  In a September 2, 2008 article, FORTUNE magazine reported that Dimon received a report from JPMorgan's chief of loan servicing in October 2006, showing that late payments on subprime loans were rising at an alarming rate. Dimon placed a call to Defendant King, JPMorgan's then-chief of securitized products, warning him to "watch out for subprime" and that "[t]his stuff could go up in smoke."  Yet, while warnings were circulated internally on the dangers of subprime mortgage loans, JPMorgan, in order to maximize its fees, continued to originate, securitize and sell them to investors such as

Plaintiffs.  JPMorgan's Chief Risk Officer Barry Zubrow told the FCIC on September 1, 2010, that "there was a tradeoff between certain financial covenants and protections versus a desire to maintain market share."

169.    According to FORTUNE magazine, in October 2006 Dimon suggested to Defendant King that JPMorgan Chase needed to start unloading its subprime-mortgage exposure, stating, "We need to sell a lot of our positions."  JPMorgan subsequently sold more than $12 billion in subprime mortgage debt from its own balance sheet and encouraged select clients to sell securities backed by RMBS.  But when questioned by the FCIC on risk management procedures in place at JPMorgan during this time period, Mr. Dimon's response was simply that "[i]n mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income in home [loans]."

170.    It is apparent that Defendants knew or acted with reckless disregard with respect to the risk that a substantial number of the loans that were included in the securitizations purchased by Plaintiffs were not underwritten in compliance with the originator's underwriting guidelines.

171.    Contrary to the representations in the Offering Documents, the mortgage loans underlying Plaintiffs' Certificates not only did not comply with the underwriting standards as represented, but these standards were knowingly and systemically ignored by Defendants in order to achieve the goal of originating and securitizing as many loans as possible in order to maximize its fees.

172.    As represented in the Offering Documents, Defendants' underwriting guidelines were primarily intended to assess the ability and willingness of the borrower to repay the mortgage loan, apart from the adequacy of the mortgaged property as collateral for the loan.

Accordingly, the underwriting guidelines required the consideration of, among other things, the borrower's assets, liabilities, income, employment history and credit history.

173.    Notwithstanding these explicit requirements in their underwriting guidelines, the originators extended numerous loans even though the borrower's financial and employment information was not provided, or even if it was, where that information was patently false and the originators knew that the borrower was misrepresenting her or his income, occupation and other information, and was engaged in outright mortgage fraud.

174.    Defendants had access to due diligence reports revealing that a significant number of loans underlying the RMBS they issued were flawed.  This did not, however, stop investment banks such as JPMorgan from using the trending reports to their own advantage.  Ms. Beal testified that Clayton's clients used Clayton's due diligence to "negotiate better prices on pools of loans they [we]re considering for purchase, and negotiate expanded representations and warranties in purchase and sale agreements from sellers."

175.    Since JPMorgan Chase was paying a lower price to acquire troubled loans from the various originators, it could have passed these discounts on to investors such as Plaintiffs. Instead, Defendants charged investors such as Plaintiffs the same high prices that were associated with better-quality loans, thereby increasing their own profits on securitizations that *they knew* were problematic.

176.    RMBS investors such as Plaintiffs lacked the ability to review individual loan files, and depended on issuers such as JPMorgan to carry out this function.  Moreover, RMBS investors such as Plaintiffs paid issuers such as JPMorgan significant fees for carrying out due diligence reviews.  By cynically ignoring the results of its due diligence and waiving loans that it knew to be defective into securitization pools, JPMorgan neglected a job that it had been paid to do and abdicated its gatekeeper role.

### B. DEFENDANT BEAR STEARNS ABANDONED ITS UNDERWRITING STANDARDS AND APPRAISAL GUIDELINES IN ITS VERTICALLY INTEGRATED SECURITIZATION PROCESS

177.  Bear Stearns was a pioneer in the "vertically integrated" mortgage model. Through the affiliates and subsidiaries that it controlled, it had a hand in virtually every aspect of mortgage lending and a deep institutional knowledge of the marketplace.  Bear Stearns originated loans, pooled them, packaged them into RMBS, sold the RMBS to investors, and serviced the securitized loans on behalf of the issuing trusts, collecting fees at each step.  Bear Stearns knew that underwriting standards were disintegrating across the mortgage industry and chose to compete in this race to the bottom, weakening its own underwriting so as not to be left behind.  According to INSIDE MORTGAGE FINANCE, Bear Stearns was the underwriter for approximately $130.8 billion and $103.4 billion of mortgage-backed securities in 2005 and 2006, contributing to a 123% jump in the firm's revenue between 2003 and 2006.

178.  Bear Stearns' ultimate goal was to underwrite as many loans as possible by whatever means necessary, even if this meant sacrificing quality.  As Jo-Karen Whitlock, Senior Vice President of Conduit Operations for EMC wrote in an April 4, 2006 email, "[I]f we have 500+ loans in this office we MUST find a way to underwrite them and buy them … I was not happy when I saw the funding numbers and I knew that NY would NOT BE HAPPY.  I expect to see 500+ each day…  I'll do **whatever is necessary** to make sure you're successful in meeting this objective."[3]

179.  Bear Stearns personnel were acutely aware of the effect that its reduced underwriting standards had on asset quality and on the performance of the RMBS that they were selling to investors such as Plaintiffs.  For example, in the summer of 2006, Bear Stearns Vice President Nicholas Smith, the deal manager responsible for a Bear Stearns RMBS, characterized

---

[3] Unless otherwise noted, all emphases are added and internal citations are omitted.

the deal as a "SACK OF SHIT" and a "shitbreather" in internal emails to Managing Director

Keith Lind.  Likewise Bear Stearns mortgage finance analyst Charles Mehl referred to another

such transaction as a "going out of business sale" in an April 5, 2007 email to Lind, and Bear

Stearns Associate Director John Tokarczyk told Jeffrey Maggard, the transaction's deal manager,

that it was a "DOG" in an April 30, 2007 missive.

180.    Bear Stearns also abused the securitization process on the back end by demanding

that third-party originators who sold it defective loans compensate it for their breaches of

representations and warranties without passing these recoveries on to the RMBS investors who

suffered losses from the breaches.  Because it controlled the securitization process from

beginning to end, Bear Stearns was capable of manipulating the system for maximum profit.

### 1.    Bear Stearns Abandoned Underwriting Guidelines and Appraisal Standards In Its Own Mortgage Lending Operations

181.    One of the reasons that Bear Stearns knew that underwriting standards had not

been followed with respect to the loans underlying its RMBS was because it had originated many

of those loans itself.  Bear Stearns originated subprime mortgage loans through subsidiary

entities such as BSRMC.

182.    Bear Stearns created BSRMC in April 2005 as a mortgage originator that would

support Bear Stearns' securitization operations.  In 2006, its first full year of business, it

originated more than $4.3 billion in loans, most of which were Alt-A mortgages.  Alt-A loans

fall into a risk category between prime and subprime, and are generally characterized by less

than full documentation, lower credit scores and higher LTV ratios.

183.    This dramatic one-year rise would not have been possible in a crowded

marketplace had BSRMC applied prudent lending standards.  BSRMC rejected loan applicants at

a rate *less than half the national average*.  According to an article in THE WALL STREET

JOURNAL, BSRMC turned away only about 13% of applications in 2006, compared to a

nationwide rate of 29%.  In 2006 alone, BSRMC originated 19,715 mortgages worth $4.37 billion.

184.    A derivative lawsuit brought by the State Treasurer of Michigan as lead Plaintiffs (the "Michigan litigation") quotes a sales manager who worked at BSRMC until February 2008, as saying that his office was under great pressure to "dig deeper" and originate riskier loans that "cut corners" with respect to credit scores and LTV ratios.  Likewise, a quality control analyst who worked at EMC from April 2006 through August 2007, whose job duties entailed reviewing loan origination and portfolio statistics and creating reports for EMC senior management, said that EMC would buy almost everything, including loans where the borrower's income could not be verified.

185.    This rush to originate mortgages, regardless of quality, resulted in many fraudulent and/or imprudent loans being made.  For example, BSRMC made $6.8 million dollars in mortgage loans to an Atlanta-based fraud ring.  One of those indicted received a $1.8 million mortgage after claiming that he earned more than $600,000 per year as the top officer of a marketing firm and had $3 million in assets, when in fact he was a phone technician earning only $105,000 per year and had assets of $35,000.

186.    Other confidential witnesses quoted in the Michigan litigation confirm that management understood that Bear Stearns' high-volume business model led to risky purchases.  A former collateral analyst who worked for Bear Stearns in the first half of 2007 reported that during late 2006 and early 2007 EMC was "buying everything" without regard for risk due to the profitability of securitization, and that Bear Stearns managers did not enforce basic underwriting standards.  An underwriting supervisor and compliance analyst who worked for EMC from September 2004 until February 2007 reported that the Bear Stearns traders who purchased the

high-risk loans were aware of their weaknesses, and ignored due diligence findings that the borrowers had insufficient income.

187. In 2007, BSRMC further expanded its origination operations with the acquisition of Encore. Encore was a wholly-owned subsidiary of ECC Capital Corporation ("ECC Capital"), a mortgage finance real estate investment trust that originated and invested in residential mortgage loans. On February 9, 2007, after securitizing more than $2.2 billion of Encore-originated loans, BSRMC purchased ECC Capital's subprime mortgage origination business for $26 million, but even prior to that, Bear Stearns possessed material non-public information regarding Encore. As a major business partner and future owner of the firm, Bear Stearns had daily contact with Encore executives, conducted due diligence, and reviewed material, non-public information about Encore's loan origination and underwriting practices, loan quality and performance, and reserve methodologies for nonperforming loans.

188. Encore disregarded its own underwriting guidelines and used inflated appraisals, leading to multiple lawsuits. In May 2009, Encore was listed on the Center for Public Integrity's list of top 25 subprime lenders responsible for the subprime economic meltdown based on the over *$22 billion* in high-risk, high-interest loans originated between 2005 and 2007.

189. In January 2009, a lawsuit was filed in the Eastern District of California against Encore and several other defendants, alleging that it engaged in a scheme to coerce low income borrowers into loans that they could not afford. The complaint alleged that defendants did not assess borrowers' credit risk, debt-to-income ratios, or any other objective factors designed to assess repayment ability. Moreover, the Plaintiffs claimed that Encore encouraged appraisers to overstate and did overstate appraisal values in order to push more loans through the system. Plaintiffs' Truth In Lending Act ("TILA") claims were dismissed on statute of limitations grounds. In July 2009, a similar complaint was filed in the Central District of California against

Encore and several other defendants, alleging that Encore was involved in originating loans based upon false and inflated appraisal values.

190.     Moreover, unlike the Plaintiffs in this action, Ambac Assurance Corporation ("Ambac"), an insurer that provided insurance for Bear Stearns RMBS, had access to complete loan files for certain Bear Stearns securitizations that are part of the same sequence of offerings as some of the Bear Stearns Certificates at issue here.  Ambac made its analyses public for the first time in November 2009, but expanded them in January 2011.  These analyses reveal that Bear Stearns misrepresented key elements of the mortgage loans, including widespread disregard of underwriting guidelines.

191.     Ambac's analysis involved offerings that included the same types of collateral, originated at roughly the same time and by the same entities that originated the mortgage loans underlying Plaintiffs' Bear Stearns Certificates.

192.     Ambac reviewed 1,486 loans from these offerings, and found that **89%** involved breaches of representations and warranties made by EMC in the insurance contracts, including "[t]he most prevalent and troubling of the breaches … (1) rampant misrepresentation about borrower income, employment, assets, and intentions to occupy the purchased properties, and (2) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines."

193.     Based on its investigation, Ambac concluded that "the entire pool of loans that EMC securitized in each Transaction is plagued by rampant fraud and an abdication of sound mortgage-origination and underwriting practice."  As such, these fraudulent practices implicated not only EMC, but the entire "Bear Stearns securitization machine," which Ambac described as "a house of cards, supported not by real value and sound practices but by Bear Stearns's appetite for loans and disregard as to the risks those loans presented."

75

194. Ambac's random sampling of loans produced the following results:

- Of the sample of 372 randomly selected loans in the SACO 2005-10 Transaction, Ambac identified breaches of representations and warranties in 336 loans, or 90%;

- Of the sample of 369 randomly selected loans in the SACO 2006-2 Transaction, Ambac identified breaches of representations and warranties in 337 loans, or 91%;

- Of the sample of 379 randomly selected loans in the SACO 2006-8 Transaction, Ambac identified breaches of representations and warranties in 334 loans, or 88%;

- Of the sample of 366 randomly selected loans in the BSSLT Transaction, Ambac identified breaches of representations and warranties in 325 loans, or 88%; and

- The analysis described above demonstrates with a high degree of certainty that breaches of representations and warranties exist in a comparable percentage of loans in the total loan pool in each Transaction.

*Ambac Assurance Corporation v. EMC Mortgage Corp.*, No. 08 Civ. 9464 (RMB) (THK) (S.D.N.Y.)

195. Assured Guaranty Corp. ("Assured"), another RMBS insurer, made similar discoveries about the fraudulent practices of Bear Stearns Defendants through its analysis of loan files associated with EMC's SACO 2005-GP1 offering. Assured wrote insurance for the offering and had access to some of the complete files for loans that were included in the trust pool.

196. Assured conducted two separate analyses of samples of defaulted loans from the offering, which were made public in July 2010. Assured's first review of a sample of 430 defaulted loans revealed "widespread breaches of EMC's representations and warranties in over 88% of the loans examined." Assured's second review of an additional sample of 476 defaulted loans uncovered "widespread breaches of EMC's representations and warranties in over 92% of the loans examined." These widespread defaults involved the same types of loans during the same time period as those underlying Plaintiffs' Bear Stearns Certificates.

2. **Bear Stearns Was Aware That Third Party Originators Were Abandoning Their Underwriting Guidelines and Appraisal Standards**

197.    In addition to originating loans through entities that it directly controlled, such as BSRMC and Encore, Bear Stearns also purchased loans from third-party originators.  In its Form 10-K Annual Report for the period ending November 30, 2006, BSCI stated that, "EMC, in addition to purchasing loans from [BSRMC] for securitization, purchases loan portfolios from financial institutions and other secondary mortgage-market sellers.  Prior to bidding on a portfolio of loans for purchase, an analysis of the portfolio is undertaken by experienced mortgage-loan underwriters."

198.    Despite these representations, Bear Stearns did not have consistent due diligence practices for analyzing the loans it purchased from third-party originators.  Instead, according to the deposition testimony of Managing Director Baron Silverstein, originators, "typically would stipulate the terms of a portfolio which would include the due diligence strategy.  Bear Stearns would evaluate the due diligence that was being stipulated by the seller in order to determine whether or not we were comfortable to purchase a pool of mortgage loans based upon that strategy…  Bear Stearns' due diligence strategy continually changed based upon the marketplace, transactions and sellers."

199.    Bear Stearns' lack of consistent due diligence practices allowed it to ratchet down its standards so as to compete for loans with other Wall Street securitization firms.  An internal Bear Stearns email sent from Vice President of Due Diligence John Mongelluzzo to Managing Director Mary Haggerty and other Bear Stearns employees on February 11, 2005 reveals that Senior Managing Director Chris Scott ordered the amount of required due diligence to be reduced on a trade by trade basis "in order to make us more competitive on bids with larger subprime sellers."  In a follow-up email to Haggerty, Mongelluzzo, and others sent on February

11, 2005, Exchange employee Biff Rogers noted that as a result of this change, Bear Stearns would no longer have complete due diligence files to rely on.

200.    Bear Stearns executives realized that their due diligence was inadequate but did nothing to remedy the situation.  Like JPMorgan, Bear Stearns made use of Clayton as a third party vendor of due diligence services.  In a March 23, 2006 email chain regarding Clayton, Defendant Verschleiser, the head of Bear Stearns' mortgage and asset-backed securities trading desk, said, "We are waisting [sic] way too much money on Bad Due Diligence."  A year later, in a March 15, 2007 email chain, Verschleiser said, "We are just burning money hiring [Clayton]."

201.    An internal Bear Stearns email chain dated March 24, 2006 reveals that due to Bear Stearns' slipshod procedures, some types of loans were placed into securitizations without *ever* having been cleared through due diligence.  Deal manager Robert Durden wrote to Bear Stearns Managing Director Stephen Golden that, "I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared.  I think the ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish."

202.    When Bear Stearns' due diligence vendors did report underwriting failures, Bear Stearns frequently decided to overlook them.  Clayton's data revealed that of the securitizations sponsored by Defendant EMC, the Sponsor for nearly all Bear Stearns issued Certificates purchased by Plaintiffs, which Clayton reviewed for underwriting compliance, 16% neither met underwriting guidelines nor possessed compensating factors to justify an exception to be included into securitizations (Event 3).  However, EMC ignored many of these underwriting failures, waived *42%* of those rejected loans back into its mortgage pools, and sold RMBS containing these non-compliant loans to investors like Plaintiffs.  An employee of Watterson-Prime, another vendor that Bear Stearns used for due diligence reviews, said in a May 27, 2008

NATIONAL PUBLIC RADIO interview that about 75% of the time, loans that should have been rejected were put into the pool and sold.  Adfitech, Inc. ("Adfitech"), yet another third party firm that EMC hired to "review loans to evaluate if they meet investor quality guidelines, if sound underwriting judgment was used, and if the loan is devoid of all misrepresentation or fraud characteristics," found that *38.8*% of the loans it sampled were defective according to EMC's stated quality control guidelines.

203.    When Bear Stearns' due diligence reviews revealed massive underwriting failures, Bear Stearns made a conscious decision to ignore this information and ***further*** reduce the amount of due diligence it performed.  Around May 2005, due diligence head Mongelluzzo, proposed that Bear Stearns begin tracking the performance of loans that had received exceptions. This would have permitted Bear Stearns to examine the impact that its liberal use of exceptions was having on default rates and the overall riskiness of its RMBS, and ensure that the due diligence managers were making appropriate decisions.  Instead, Bear Stearns chose to grant exceptions blindly.  Not only did it ignore the effects that its exceptions were having, it directed its personnel to purge the daily reports that it received from its due diligence firms so as not to leave an audit trail.

204.    Likewise, in an April 5, 2007 email, an EMC assistant manager for quality control underwriting and vendor management ordered Adfitech to halt certain procedures to verify loan file information, stating that:

- "Effective immediately, in addition to not ordering occupancy inspections and review appraisals, DO NOT PERFORM REVERIFICATIONS OR RETRIEVE CREDIT REPORTS ON THE SECURITIZATION BREACH AUDITS,"

- Do not "make phone calls on employment," and

- "Occupancy misrep is not a securitization breach."

205.    Former EMC mortgage analyst Matthew Van Leeuwen was quoted in a May 2010 article in THE ATLANTIC, as saying that Bear Stearns adopted unreasonably short time frames for its mortgage due diligence analyses, told analysts to make up missing data if mortgage originators did not respond to requests, and accepted loans with weak verification rather than requesting clarification from the originators.  According to the FHFA complaint, Van Leeuwen also told the FHFA in a March 30, 2009 e-mail that "the pressure was pretty great for everybody to just churn the mortgages on through the system," and that analysts were encouraged to "just fill in the holes" when data was missing.  Another EMC analyst told THE ATLANTIC, "[F]rom Bear's perspective, we didn't want to overpay for the loans, but we don't want to waste the resources on deep investigation: that's not how the company makes money.  That's not our competitive advantage – it eats into profits."

### 3.    Bear Stearns Offloaded Loans That It Had Identified As Fraudulent And/Or Likely To Default Onto Unsuspecting Investors

206.    Bear Stearns was aware that third party originators routinely sold it loans that did not comply with representations and warranties, as evidenced by its aggressive pursuit of claims against third party originators for selling it defective loans.  Bear Stearns filed $2.5 billion in claims for representation and warranty violations in 2006, an increase of 78% from the previous year, and resolved $1.7 billion in claims, an increase of over 227% from the previous year, according to a February 26, 2007 audit report addressed to Managing Director Mary Haggerty.

207.    However, although Bear Stearns recognized that thousands of the loans it had securitized involved breaches of the third party originators' stated underwriting standards, it did not remove these flawed assets from the RMBS mortgage pools it securitized and sold to unsuspecting investors such as Plaintiffs, who did not have the same access to loan-level data and instead relied on the representations made by issuers such as Bear Stearns.  Rather than demand that the third-party originators repurchase the defective loans from the RMBS mortgage pools, Bear Stearns offered them alternatives such as price adjustments, cash settlements or credits for future loan purchases, and then pocketed the funds that it received without notice or compensation to the RMBS investors.

208.    An internal audit report from Bear Stearns' external auditor PriceWaterhouseCoopers ("PWC") dated August 31, 2006, noted the impropriety of this practice.  PWC stated that when Bear Stearns identified a clear breach in loan quality standards it should immediately buy back the defective loan from the issuing trust "to match common industry practices, the expectation of investors and to comply with the provisions in the [Pooling and Servicing Agreement]."  PWC also recommended that Bear Stearns promptly bring its repurchase procedures into compliance with SEC regulations.

209.    As one example of Bear Stearns' abuse of the representations and warranties claim process, Bear Stearns entered into a settlement agreement with SouthStar Funding LLC ("SouthStar") dated January 30, 2007, pursuant to which SouthStar agreed to pay $2,604,515 in lieu of repurchasing certain loans that were defective for reasons including misrepresentations concerning owner-occupancy.  On information and belief, this recovery was not passed on to the RMBS investors who had purchased the SouthStar loans.  The FHFA has identified two additional 2007 settlements in which originators agreed to pay a total of $13 million to Bear Stearns in lieu of repurchasing loans.  Bear Stearns deal manager Robert Durden testified in a

December 11, 2009, deposition that he could not identify a single instance in which Bear Stearns disclosed to RMBS investors that it was recovering settlements from originators with regard to securitized loans and not putting the money into the appropriate trusts.  Bear Stearns did not implement a policy to promptly review defective loans for securitization breaches until September 2007, at the earliest.

210.    Bear Stearns' repurchase activities not only provided it with detailed knowledge of the poor quality of the assets in its mortgage pools and further evidence of an epidemic of underwriting failures amongst third party originators, but also incentivized it to securitize loans that were more likely to default.  In such instances, Bear Stearns stood to gain by requiring third party originators to compensate it for representation and warranty breaches, while the RMBS investors who owned the defective loans unknowingly faced all the risk of loss.

211.    The majority of the repurchase claims that Bear Stearns filed against its originators were based on early payment defaults ("EPDs").  EPDs occur when a borrower defaults on a payment within 90 days of taking out of a loan, and are considered a strong indication that the loan was fraudulent or otherwise should never have been made.  Because Bear Stearns had recourse against the originators of loans that experienced an EPD, its initial policy was to keep loans in its inventory and not securitize them until the EPD period ran.  However, by the end of 2005, Bear Stearns dropped this important safeguard.  Not only did it begin placing loans directly into securitizations without any waiting period to ensure that payments were being made, it rushed to securitize newly-acquired loans *before* the EPD period had run.  For example, in a June 13, 2006 email, Defendant Verschleiser wrote to Deal Manager Robert Durden and Managing Director Keith Lind that Bear Stearns needed "*to be certain we can securitize the loans with 1 month epd before the epd period expires*."  On the same day, Verschleiser also demanded an explanation from Managing Director Haggerty as to why some loans "were

dropped from deals and not securitized before their epd period expired."  This revised policy greatly increased risks for RMBS investors, but ensured that Bear Stearns would collect both securitization fees and any EPD repurchase claims that would arise when the loans defaulted, as Bear Stearns anticipated they would.  In a May 5, 2007 email, Lind demanded to know "***why we are taking losses on 2nd lien loans from 2005 when they could have been securitized?????***"

212.    Bear Stearns acquired and securitized so many defective loans that it became unable to process all of its repurchase claims.  A recently discovered internal audit report dated February 28, 2006, identified a backlog consisting of at least 9,000 outstanding claims worth over $720 million.

### C.    WAMU ABANDONED UNDERWRITING STANDARDS AND APPRAISAL GUIDELINES IN ITS VERTICALLY INTEGRATED SECURITIZATION PROCESS

213.    WaMu was aware of the fault lines in its underwriting as early as September 2004, when James Vanasek, who was then WaMu's Chief Risk Officer, circulated an internal memorandum entitled, "Perspective."  The memorandum stated in part:

> In the midst of all this change and stress [in the mortgage area of the bank], patience is growing thin.  We understand that.  We also know that loan originators are pushing very hard for deals.  But we need to put all of this in perspective.
>
> At this point in the mortgage cycle with prices having increased far beyond the rate of increase in personal incomes, there clearly comes a time when prices must slow down or perhaps even decline.  There have been so many warnings of a Housing Bubble that we all tend now to ignore them because thus far it has not happened.  I am not in the business of forecasting, but I have a healthy respect for the underlying data which says ultimately this environment is no longer sustainable.  Therefore I would conclude that now is not the time to be pushing appraisal values.  If anything we should be a bit more conservative across the board....
>
> This is a point where we should be much more careful about exceptions.  It is highly questionable as to how strong this economy may be; there is clearly no consensus on Wall Street.  If the economy stalls, the combinations of low FICOs, high LTVs and inordinate numbers of exceptions will come back to haunt us.

214.    Mr. Vanasek's testimony before the PSI was consistent.  He stated that as early as 2004, circumstances within WaMu and in the broader market made "clear to me that [mortgage lending] practices were fundamentally unsound, and it couldn't go on forever.  We had housing prices increasing much more rapidly than incomes and you knew that ultimately there was a limit to this.  It just practically could not go on ... [T]hat was part of my ... urgent message to management that we needed to drop these practices and become more conservative at that point in time."

215.    This prescient warning conflicted with WaMu's desire for short-term growth and profit and was therefore disregarded.  In January 2005, the WaMu Bank Board of Directors formally adopted a policy document entitled, "Higher Risk Lending Strategy," detailing a plan to shift focus from originating low-risk fixed-rate loans to higher risk subprime, home equity and option adjustable-rate mortgage ("Option ARM") loans, because the more hazardous loans were more profitable to sell for securitization.  According to the Levin Report, at the time, subprime loans were eight times more profitable for WaMu than fixed rate loans.  The plan called upon WaMu to do the opposite of what its most senior risk officer had recommended and originate more loans to borrowers with low FICO scores,[4] more loans with high LTV ratios, and more loans to borrowers who could not verify their incomes.

216.    The FCIC characterized the "Higher Risk Lending Strategy" as "a high risk strategy to issue high risk mortgages."  Vanasek testified before the PSI that by mid-2005, WaMu management had shifted the company's focus in an attempt to transform it into "more of

---

[4] FICO is the most widely accepted measure of creditworthiness in the credit industry, developed by the Fair Isaac Corporation.  Under the FICO scoring system, borrowers are assigned a credit score (the FICO score) ranging from 300 to 850, with 850 being the most creditworthy.  In determining a borrower's overall creditworthiness, the FICO score primarily takes into account the borrower's payment history, current indebtedness, length of credit history, recently established credit and types of credit used.  According to Fitch Ratings, FICO scores are the "best single indicator" of mortgage default risk.  Thus, the lower the FICO score, the greater risk of borrower default.  The FDIC defines a "subprime" loan as one for which the borrower has a FICO score of 660 or below.

a higher risk, sub-prime lender."  Vanasek said that, "Washington Mutual was a reflection of the mortgage industry characterized by very fast growth, rapidly expanding product lines and deteriorating credit underwriting."

217.    Later in his testimony before the PSI, Vanasek summarized the behavior of WaMu and others that resulted in the global financial crisis, stating that the breakdown in subprime mortgage lending, "was both the result of individual failures and systematic failures fueled by self interest, failure to adhere to lending policies, very low interest rates, untested product innovations, weak regulatory oversight, astonishing rating agency lapses, weak oversight by boards of directors, a cavalier environment on Wall Street, and very poorly structured incentive compensation systems that paid for growth rather than quality."

218.    Under the "Higher Risk Lending Strategy," WaMu management purposefully weakened the company's lending standards and ignored known underwriting failures at Long Beach, which was one of WaMu's top originators.  Long Beach was the sole originator of the mortgage loans underlying several securitizations purchased by Plaintiffs that are at issue in this case.  When WaMu's due diligence revealed that many of the loans it was securitizing did not meet underwriting guidelines, WaMu permitted those loans to be securitized anyway.  Indeed, WaMu intentionally securitized loans that it knew were likely to default so that it could get these loans off of its own books.

### 1.    WaMu Abandoned Underwriting Guidelines and Appraisal Standards In Its Own Mortgage Lending Operations

219.    WaMu zealously pursued the "Higher Risk Lending Strategy" adopted by management, almost doubling the percentage of higher risk loans that it originated and purchased from 36% to 67% from 2003 to 2007.  WaMu's subprime securitizations jumped from approximately $4.5 billion in 2003 to $29 billion in 2006.  By 2006, WaMu had increased its securitization business so dramatically, increasing WaMu's market share in the subprime

mortgage market from 4% to 12%, that it became the second ranked RMBS issuer by volume in the country.

220.    The only way that WaMu could originate (and ultimately securitize) so many high risk loans was to willfully disregard loan underwriting standards.  The FCIC identified a host of poor lending practices at WaMu and Long Beach, including offering high risk borrowers large loans, steering borrowers to high risk loans, offering "no income verification" loans, offering loans with deceptively low teaser rates, exercising weak oversight over loan personnel and third-party mortgage brokers, encouraging shoddy underwriting by compensating underwriting personnel based on volume rather than quality, and tolerating, indeed encouraging, mortgage fraud.  The sales department was incentivized to seek out the riskiest loans, since commissions on those were higher than for traditional, conservative products.  For example, according to WaMu documents obtained by THE SEATTLE TIMES, a loan consultant selling a $300,000 Option ARM would earn a $1200 commission — $240 more than for a fixed-rate loan of the same amount.  WaMu also provided compensation incentives to sell loans with prepayment penalties.

221.    WaMu systematically weakened its underwriting and shoved aside personnel and institutions that tried to maintain reasonable standards.  According to an internal WaMu newsletter obtained by THE SEATTLE TIMES, dated October 31, 2005, risk managers were instructed not to be a "regulatory burden" and that they needed to "shift [their] ways of thinking" towards supporting growth plans.  The memorandum also instructed risk managers to rely less on examining borrower documentation and more on automated processes.

222.    In 2004, Vanasek approached WaMu CEO Kerry Killinger and asked him to publicly disavow irresponsible lending practices such as making subprime loans with 100% LTV ratios.  This request was ignored.  Likewise, in early 2005, Vanasek sent a memorandum to WaMu's then President and Chief Operating Officer, Steve Rotella, complaining that attempts to

86

enforce underwriting discipline were "continuously thwarted by an aggressive, and often times abusive group of Sales employees within the organization."

223.    From 2000 to 2007, WaMu's compliance department had nine different leaders. Most of this turnover was caused by compliance officers leaving WaMu or being fired.   In March 2007, an Office of Thrift Supervision ("OTS") examiner noted that "The Board of Directors should commission an evaluation of why smart, successful effective managers can't succeed in this position … (HINT: It has to do with top management not buying into the importance of compliance and turf warfare and [WaMu CEO Kerry Killinger] not liking bad news.)"

224.    One of the ways that WaMu increased its loan origination was by ignoring the credit histories of its borrowers.  Regulatory agencies including the Federal Deposit Insurance Corp. ("FDIC") and OTS have said that "prime" loans should only be offered to borrowers with FICO scores of 660 or higher.  However, according to a WaMu training document entitled, "Specialty Lending [Underwriter Home Loans Credit Authority] Training," WaMu considered borrowers with FICO scores over 619 to be "prime" borrowers.  WaMu told its underwriters that even certain borrowers with bankruptcies within the past four years, or with credit scores as low as 540 were approved for "prime" loans.

225.    WaMu also placed borrowers into exotic loans that it knew were inappropriate for them.  For example, an Option ARM loan is a type of loan under which the borrower had a number of different payment options, including interest-only payments and minimum payments that did not even cover interest and therefore caused the principal of the loan to *increase* over time rather than decrease.  If the principal level rises above a certain threshold the interest rate on the loan automatically increases, in many cases resulting in a "price shock" as the borrower is suddenly forced to make higher payments than he or she can afford.  The nonprofit Center for

Responsible Lending has said that these complicated loans are "ideally suited for misrepresentation."

226.    As the result of its own internal focus group research, WaMu knew that most borrowers did not fully understand Option ARMs, and that only a few focus group participants understood how the interest rates on Option ARMs functioned.  Nonetheless, Option ARMs were a mainstay of WaMu's loan production.  In 2005 alone, WaMu originated $32.3 billion of these high-risk loans.  According to a December 23, 2009 SEATTLE TIMES article, "Reckless Strategies Doomed WaMu," Craig Davis, the executive in charge of WaMu's lending and financial services operations, pushed WaMu to increase Option ARM production.   "[Davis] only wanted production," said former WaMu Executive Vice President Lee Lannoye.  "It was someone else's problem to worry about credit quality, all the details."

227.    WaMu former Chief Legal Officer Fay Chapman has told THE SEATTLE TIMES that, "[ARMs] were just nasty products – just awful for the consumers" and that, "Mortgage brokers put people into the product who shouldn't have been."  WaMu loan officer Renee Larsen was so disturbed by the complaints she received from Option ARM customers that she contacted the Florida Attorney General.  "I feel like [WaMu] perpetuated fraud with my help," Larsen told THE SEATTLE TIMES.

228.    Another way that WaMu increased loan volume at the cost of quality was by making increased use of third party lenders and brokers.  The Office of the Inspector General found that from 2003 to 2007, between 48% and 70% of WaMu's single-family residential loans came through third-party originators.  Loans generated by third-party originators were attractive to WaMu because they were much cheaper to close than loans generated through WaMu's retail operations.  However, the cost of this practice was that WaMu had much less oversight over loan quality.  The Office of the Inspector General of the United States Department of the Treasury

(the "OIG") found consistent weaknesses in WaMu's supervision of the originators it did business with.  In 2007, WaMu had only 14 employees overseeing more than 34,000 third-party brokers.  Predictably, a 2006 internal WaMu analysis discovered that loans issued by third-party brokers had issues including abnormal delinquency rates, delinquency at the time of purchase, failure to meet underwriting standards, and lower credit quality.

229.   WaMu also increased loan volume by vastly expanding its use of "no documentation" loans.  According to the Levin Report, by the end of 2007, WaMu had not verified borrower income for 50% of its subprime loans and 90% of its home equity loans.  Stated income loans were intended to be a product for borrowers who had strong credit but could not provide documentation of their income.  However, WaMu "layered" risk by offering these loans to borrowers with weak credit.  A WaMu agent told THE NEW YORK TIMES that if a borrower's job or income was sketchy, the WaMu agent would instruct brokers to leave parts of applications blank so as to avoid prompting verification.  Nancy Erken, a WaMu loan consultant in Seattle, told THE SEATTLE TIMES that, "The big saying [at WaMu] was, 'a skinny file is a good file'."  According to Erken, when she took files to be processed, WaMu staff would ask her, "Nancy, why do you have all this stuff in here?  We're just going to take this stuff and throw it out."  Chief Legal Officer Chapman said that WaMu made a loan to O.J. Simpson.  When she asked how such a loan could be foreclosed on, given the large civil judgment outstanding against him, she was told that there was a letter in the file from Simpson saying, "The judgment is no good, because I didn't do it."

230.   WaMu also did not take precautions to ensure that borrowers' stated incomes were reasonable.  For example, according to a December 27, 2008 NEW YORK TIMES article, one WaMu borrower who claimed a $12,000 monthly income as a gardener, but could not provide a verifiable business license, only a photograph of his truck emblazoned with the name of his

landscaping business, was approved for a loan.  Steven M. Knobel, the founder of an appraisal company that did business with WaMu until 2007, compared WaMu's lending standards to the Wild West.  He said, "If you were alive, they would give you a loan.  Actually, I think if you were dead, they would still give you a loan."

231.    WaMu's attitude towards mortgage fraud was similarly cavalier.  For example, in 2005 an internal WaMu review discovered substantial evidence of loan fraud at its Downey and Montebello branch loan offices in Southern California.  A full 42% of the loans reviewed contained suspect activity or fraud, primarily involving misrepresentations of income and employment, false credit letters, and appraisal issues.  The loan delinquency rate for Luis Fragoso, the loan officer heading the Montebello office was "289% worse than the delinquency performance for the entire open/active retail channel book of business," and 83% of Fragoso's loans were confirmed as fraudulent.  The loan delinquency rate for Thomas Ramirez, the loan officer heading the Downey loan office, was 157% worse than the average, and 58% of his loans were found to be fraudulent.  The review further noted that this malfeasance could have been prevented with improved processes and controls, and recommended firm action against Ramirez and Fragoso.  However, even when confronted with documented proof of blatant and repeated fraud, WaMu management took no action whatsoever.  Over the next two years, Ramirez and Fragoso continued to issue high volumes of fraudulent loans, and even won luxury Hawaiian vacations as rewards for their "productivity."

232.    Rich compensation incentives for loan origination, combined with lax procedures for preventing or discovering abuses, created an atmosphere in which fraud was prevalent.  In a November 1, 2008 NEW YORK TIMES article entitled, "Was There A Loan It Didn't Like?" former WaMu Senior Mortgage Underwriter Keysha Cooper said that brokers offered her bribes in exchange for approving loans, and that management insisted that even suspicious loans be

approved.  When Cooper rejected a loan file filled with inconsistencies, her supervisor scolded

her, saying, "there is no reason you cannot make this loan work."  Cooper said, "I explained to

her the loan was not good at all, but she said I had to sign it."  Her supervisor even went so far as

to complain to the team manager about the rejection and ask that a formal letter of complaint be

placed in Cooper's personnel file.  Four months later, the borrower had not made a single

payment and the loan was in default.  "I swear 60 percent of the loans I approved I was made to,"

Cooper said.

233.    In Vanasek's prepared statement to the PSI, he said:

> There have been questions about policy and adherence to policy.  This was a
> continuous problem at Washington Mutual where line managers particularly in
> the mortgage area not only authorized but encouraged policy exceptions.  There
> had likewise been issues regarding fraud.  Because of the compensation systems
> rewarding volume vs quality and the independent structure of the loan originators,
> I am confident that at times borrowers were coached to fill out applications with
> overstated incomes or net worth adjusted to meet the minimum underwriting
> policy requirements.  Catching this kind of fraud was difficult at best and required
> the support of line management.  Not surprisingly, Loan originators constantly
> threatened to quit and go to Countrywide or elsewhere if their loan applications
> were not approved.

234.    From 2004 to 2008, WaMu's regulators repeatedly criticized WaMu for failure to

exercise oversight over its loan personnel or abide by its own credit standards.  In August 2005,

WaMu received a Report of Examination from OTS stating that, "the level of deficiencies, if

unchecked, could erode the credit quality of the portfolio."  A June 2008 OTS report identified

multiple longstanding problems with WaMu's fraud detection processes, including:

- Specific WaMu offices were identified as hotbeds of fraud in 2005 and
  2007 reviews, but these concerns were not acted upon in a timely manner;

- WaMu's sales-focused culture stressed production volume more heavily
  than quality, with a limited focus on individual accountability;

- WaMu had no formal process to deal with instances of mortgage fraud
  brought to its attention by third parties; and

- WaMu production personnel were allowed to participate in income, employment and asset verification, presenting a clear conflict of interest.

235.    The report noted that these issues had been brought to the attention of WaMu management in previous reports, but that management had not adequately addressed them.

236.    In 2008, a review of underwriting quality and compliance by Radian Guaranty Inc., one of WaMu's insurers, gave WaMu Bank an overall rating of "Unacceptable."  Of 133 loans reviewed, it found 11 or 8% had "insufficient documents to support the income used to qualify the borrower and exceptions to approved guidelines."  Of the 10 delinquent loans it reviewed, it found that half had "questionable property values, occupancy and possible strawbuyers [sic]."

237.    An internal September 2008 review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan … confirmed to contain suspicious activity from being sold to an investor."  In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors.  The 2008 review found that of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time."  This review was sent to WaMu's new CEO, Alan Fishman, as well as its President, Chief Financial Officer, Chief Enterprise Risk Officer, and General Auditor.

238.    On March 16, 2011, the FDIC filed a complaint against WaMu CEO Killinger, COO Rotella, and Schneider, president of WaMu's home loans division.  *Fed. Deposit Ins. Corp. v. Killinger*, No. 11-cv-00459 (W. Dist. Wash. filed March 16, 2011).  The suit seeks to recover $900 million from the executives, and accuses them of "[leading] the bank on a 'lending spree' knowing that the housing market was in a bubble and fail[ing] to put in place the proper risk management systems and internal controls."  According to the complaint, Killinger, Rotella and

Schneider focused on high-risk loans that would create short term gains and increase defendants'
compensation, which totaled some $95 million over 2005 to 2008, all the while ignoring internal
and external warning signs about problems in the subprime mortgage markets, and ultimately
causing WaMu to lose billions of dollars.  This lawsuit was settled in December 2011 for $64
million to be distributed amongst WaMu's creditors.

239.    The FDIC's complaint cites a 2005 memorandum sent to Defendant Rotella from
WaMu's Chief Credit Officer, stating that "The organization is at significant risk in its Option
ARM … portfolio of payment shock created by abnormally low Start – or teaser – rates, and
aggressively low underwriting rates…   It is our contention that in the upwardly sloping rate
environment and expected flattening of housing appreciation, we are putting borrowers in homes
they simply cannot afford."   The complaint alleges that in June 2005, WaMu's Chief Credit
Officer met personally with Killinger and expressed the same concerns.

### 2.    WaMu Was Aware That Its Subsidiary Long Beach Was Abandoning Its Underwriting Guidelines And Appraisal Standards

240.    In addition to its existing mortgage origination arms, WaMu sought to expand its
capacity for mortgage loan production.  In 1999, WaMu's parent company WMI purchased Long
Beach's parent company.  Long Beach made loans for the express purpose of securitizing them.
It did not have its own loan officers and relied entirely on third party mortgage brokers to
generate loans.   After WaMu acquired Long Beach, loan originations and securitizations
increased more than tenfold between 2000 to 2006, from $2.5 billion to $30 billion.

241.    Long Beach was one of the worst performing originators in the mortgage market.
Its loans repeatedly experienced early payment defaults, high delinquency rates and losses due to
its failure to apply basic underwriting standards.  According to the Levin Report, every one of
the 75 Long Beach mortgage backed securities tranches rated AAA by S&P in 2006 have since
been downgraded to junk status, defaulted or been withdrawn, and most of the 2006 Long Beach

securitizations have delinquency rates of 50% or higher.  The Certificates purchased by Plaintiffs have likewise experienced the same downgrades to junk status and high delinquency rates.  *See infra*, ¶747.

242.    Diane Kosch, a Long Beach underwriter, told THE HUFFINGTON POST that she was only given 15 minutes per loan file to review for evidence of fraud, and that when she noticed matters such as suspicious incomes, questionable appraisals, or missing documentations, the loans were usually approved nevertheless.  "Most of the time everything that we wanted to stop the loan for went above our heads to upper management," Kosch said.  "We were basically the black sheep of the company, and we knew it."  Furthermore, in some instances, pages were removed from loan files.  Suspicions of fraud led some members of her quality control team to make their own copies of problematic files so as to protect themselves.  In some instances, account executives would offer loan reviewers bribes so as to overlook loan deficiencies. "They'd offer kickbacks of money," said Antoinette Hendryx, a former Long Beach underwriter, "Or I'll buy you a bottle of Dom Perignon.  It was just crazy."

243.    Karan Weaver, another former Long Beach underwriter, told THE HUFFINGTON POST that "A lot of brokers were forging [loan documentation]," and Pam Tellinger, a former Long Beach account executive said, "I knew brokers who were doing fraudulent documents all day long."  According to a former account executive, in some cases Long Beach sales team members would coach brokers in creating false loan documents.

244.    WaMu was keenly aware of Long Beach's many failings as an originator.  In 2003, a WaMu internal analysis of Long Beach's first quarter lending found that 40% of the loans reviewed were unacceptable, and WaMu's legal department froze all Long Beach securitizations until the company improved its performance.  A corporate credit review confirmed that "credit management and portfolio oversight practices were unsatisfactory."  In an

August 2007 email chain, WaMu President Steven Rotella described Long Beach as "a business with no financial management … manual underwriting, no P&Ls, a wholly inadequate servicing shop, no credit staff and a culture that was totally sales driven."

245.    The securitization freeze forced Long Beach to hold loans on its warehouse balance sheet, straining the company's liquidity and viability.   WaMu's General Counsel, Chapman, initiated a review that included an evaluation of the loans that had accumulated during the freeze.  Her team deemed that out of 4,000 loans reviewed, fewer than a quarter could be sold to investors, that another 800 could not be sold, and that the rest possessed significant deficiencies.  A WaMu risk officer describing the results of a Long Beach audit said, "We found a total mess."

246.    WaMu permitted Long Beach to resume securitizations in 2004, but WaMu personnel recognized that Long Beach's loans were still too dangerous to hold.  Instead, WaMu offloaded them onto unsuspecting investors such as Plaintiffs.  For example, in November 2004, a WaMu risk officer noted that a number of Long Beach loans representing "our favorite toxic combo of low FICO borrower and [high LTV] loan" were "of such dubious credit quality that they can't possibly be sold for anything close to their 'value' if we held on to them[.]"  Another WaMu risk officer forwarded these comments to the head of Long Beach, saying, "I think it would be prudent for us to just sell all of these loans."

247.    In early 2005, a wave of EPDs on Long Beach loans forced Long Beach to repurchase loans totaling nearly $837 million in unpaid principal.  According to a WaMu report, EPDs are preventable and/or detectable in nearly all cases.  WaMu conducted yet another review of Long Beach's lending practices, analyzing the files of 213 Long Beach loans that experienced EPDs, and found evidence of widespread fraud that should have been easily detected, including variations in borrower signatures and White-Out on loan documents.  WaMu concluded that a

relaxation of underwriting guidelines, combined with breakdowns in manual underwriting processes, inexperienced personnel, a push to increase loan volume, and the lack of automated fraud monitoring tools had all contributed to the deterioration in loan quality.

248. By 2005, WaMu leadership recognized the challenges they faced in order to keep the company's well-oiled securitization scheme running. In an internal e-mail, WaMu Bank's former CEO Killinger explained to Vanasek, "I suspect the toughest thing for us will be to navigate through a period of high home prices, increased competitive conditions for reduced underwriting standards, and our need to grow the balance sheet."

249. Partly in response to this concern, WaMu purchased Long Beach on March 1, 2006, ostensibly to obtain greater control over the lender. However, Long Beach continued to be swamped by EPDs resulting from poorly underwritten loans. In 2006, more than 5,200 Long Beach loans were repurchased at a cost of $857 million. An astounding 43% of these repurchases involved borrowers who did not make even the first payments on their loans. In January 2007, an internal WaMu review of the quality of Long Beach loans found:

- Appraisal deficiencies that could impact value and were not addressed;

- Material misrepresentations relating to credit evaluation;

- Legal documents were missing or contained errors or discrepancies;

- Credit evaluation or loan decision errors; and

- Missing or insufficient credit documentation.

250. In addition to the information that WaMu received from its internal reviews, regulators continually brought Long Beach's shortcomings to WaMu's attention. At each annual review, regulators from the OTS formally requested that the WaMu Board take action to resolve the deficiencies in Long Beach's lending.

251.    The many problems associated with Long Beach were well known by WaMu's leadership.  In September 2006, Rotella informed Killinger that Long Beach Mortgage was "terrible" due, among other things to, "repurchases, EPDs, manual underwriting, very weak servicing/collections practices and a weak staff."

252.    In 2007, Rotella wrote a reflective e-mail to Killinger, titled "Looking back."  Mr. Rotella noted his early apprehension about Long Beach, stating, "I began to express my concerns about Long Beach...mid 2005.  *The business approach was solely market share driven*."  He continued, "I said the other day that HLs [Washington Mutual's home-loan division] was the worst managed business I had seen in my career.  (That is, until we got below the hood of Long Beach)."

253.    Thus, beginning in 1999, WaMu received countless indications that Long Beach was ignoring underwriting guidelines and churning out toxic loans.  Yet instead of ensuring that its subsidiary implemented common-sense procedures to ensure underwriting quality, WaMu pressed Long Beach to further increase its lending and permitted its problems to fester.  Vanasek testified that Long Beach did not have effective risk management procedures when he arrived at WaMu in 1999, and that it had not developed effective risk management procedures when he retired at the end of 2005.  He also testified that it was a "fair characterization" to say that WaMu did not worry about the risk associated with Long Beach subprime mortgages because those loans were sold and passed on to investors.

254.    A January 2007 report by WaMu's Corporate Credit Review team noted that Long Beach's deterioration had only accelerated under WaMu's stewardship, with each year's loans since 2002 having performed worse than the previous year's.  As late as August 2007, WaMu internal auditors *still* found that Long Beach had multiple, critical failures in its origination and underwriting processes, that Long Beach personnel did not always follow

underwriting guidelines, and that Long Beach did not even track and report its underwriting exceptions.

255.    In a February, 2008 internal e-mail, WaMu Bank's outgoing Chief Enterprise Risk Officer Ronald Cathcart told John McMurray, his successor as Chief Enterprise Risk Officer of WaMu Bank, "[P]oor underwriting quality … in some cases causes our origination data to be suspect particularly with respect to DTI [debt-to-income ratios].  Long Beach was a chronic problem."

256.    Cathcart, WaMu's Chief Enterprise Risk Officer from 2006 to 2008, testified before the PSI in April 2010.  According to his testimony, a WaMu review of first payment defaults at Long Beach he oversaw found that of 132 sampled loans that suffered first payment defaults, 115 had confirmed instances of fraud, 80 had unreasonably high incomes, and 133 had evaluation or loan decision errors.

257.    In describing WaMu's lending criteria during his tenure, Cathcart illustrated how WaMu's poor underwriting practices doomed its aggressive mortgage lending strategy to failure:

> The source of repayment for each mortgage shifted away from the individual and their credit profile to the value of the home.  This approach of focusing on the asset rather than on the customer ignores the reality that portfolio performance is ultimately determined by customer selection and credit evaluation.  Even the most rigorous efforts to measure, monitor and control risk cannot overcome poor product design and weak underwriting and organization practices.

258.    In his testimony before the PSI, Cathcart also explained that banks were even extending loans to borrowers with very low FICO credit scores of 550 and below, and that such "loan[s] will default with high probability."  Despite being aware of this high likelihood that the loan would default, banks were able, according to Cathcart's testimony, to mix these loans in with other higher-quality loans through securitization such that the average FICO score was not affected, and thus the credit rating of the security was not affected.  Cathcart agreed with Senator Kaufman's response that "If we did this in any other business and then sold it to somebody like

we sold the mortgage-backed securities, *that would be fraud*. I mean, essentially, if you did this, if a car company did it, they got five cars, junkers and good ones, and put them together and sold them at the auction market, they would be called back and say, you can't do that."

259. Cathcart also testified to the "significant part [that] the rating agencies played in the outsized nature of the securitization market. The ratings - - first of all, the incentives, I think, are inappropriate where the issuers pay for the rating … [It is] inappropriate that the issuer should pay the rating agency to rate the issuer's paper. It seems to me the investor should be paying for it if they are looking for third-party verification."

260. Similarly, Randy Melby, former General Auditor of WaMu, testified before the PSI that "relaxed credit guidelines, breakdowns in manual underwriting processes, inexperienced subprime personnel, … coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool exacerbated the deterioration in loan quality." He further testified as to his belief that line managers at WaMu were often aware that loan originators were knowingly sponsoring mortgage applications that contained misstatements, and that several independent investigation in which he participated supported this conclusion.

### 3.   WaMu Was Aware That Third Party Originators Were Abandoning Their Underwriting Guidelines and Appraisal Standards

261. In addition to originating loans through its own vertically integrated operations, WaMu management made a conscious decision to acquire risky loans through the conduit program via which it made bulk purchases of subprime loans from the third-party originators discussed below. An April 18, 2006 PowerPoint presentation to the WaMu Board of Directors notes that the goal of the conduit program was to "Focus exclusively on high-margin products," including subprime and Alt-A loans. Indeed, an excerpt from WaMu's lender closing instructions shows that third party originators who sold risky loans were eligible for yield premium spreads.

262.    These bulk purchases of high-risk loans were important to WaMu's emergence as a major RMBS issuer.  A PowerPoint presentation by Defendant Beck dated June 11, 2007 states, "We can opportunistically acquire products and strategically distribute them through the most profitable channels.  By managing the distribution process we have access to information that allows us to refine our origination efforts and improve execution," and "[i]n just three years, we've become the #2 ranked Non-Agency MBS issuer in 2006.  Our rapid rise in the rankings is fueled by our Conduit Program (2004), which focuses on high margin products."

263.    According to WaMu's 10-K filing, at the end of 2006, WaMu's investment portfolio included $4 billion in subprime loans from Long Beach and about $16 billion in subprime loans from other parties.  According to an OIG report on regulatory oversight of WaMu, loan purchases from third party lenders and brokers represented between 48 and 70% of WaMu's single family residential loan production from 2003 to 2007.

264.    WaMu maintained even lower underwriting standards in its conduit program than it did in its own lending operations.  A May 16, 2007 email chain from the OTS, WaMu's regulator, discusses the documentation standards that WaMu imposed on loans purchased from third parties.  In response to a query, "Does WAMU have any plans to amend its policies per no doc loans?"  OTS employee Benjamin Franklin wrote, "I have checked for this in the past and found that they didn't do true NINAs (no income or assets collected or verified) and the current team also indicated that they still don't do any.  I replied as such to Magrini; however, at a recent meeting, I double checked on this and found out that the Bank began doing NINA's in 2006 through their conduit program.  As such, all these loans are held for sale."

265.    By acquiring these loans from third parties rather than through its own operations, WaMu hoped to dodge regulatory scrutiny.  An April 27, 2006 email from WaMu CEO Killinger states, "The Long Beach problems will no doubt be fodder for the OTS to caution us from

ramping up sub prime loans in portfolio.  This may lead us to focus on the conduit and SMF

program to increase these assets for awhile."

266.    WaMu's loan portfolio eventually suffered from rising defaults, which it passed

on to investors such as Plaintiffs.  The minutes to the December 12, 2006 meeting of the WaMu

Market Risk Committee note that:

> Mr. Lehmann then alerted the Committee to an analysis in-process whose
> preliminary results show an abnormally high number of delinquencies in a
> number of the 2006 Conduit Program securitizations.  Mr. Lehmann noted that
> delinquency behavior was flagged in October for further review and analysis
> when recent securitization deals appeared to have more severe delinquency
> behavior than experienced in past deals.  The primary factors contributing to
> increased delinquency appear to be caused by process issues including the sale
> and securitization of delinquent loans, loans not underwritten to standards, lower
> credit quality loans and seller servicers reporting false delinquent payment status.

267.    WaMu was also notified of poor underwriting on the part of third party

originators through the efforts of its due diligence vendor.  Like JPMorgan and Bear Stearns,

WaMu contracted with Clayton to perform due diligence on loans that it had pooled for

securitization.  Between the first quarter of 2006 and the second quarter of 2007, Clayton

reviewed 35,008 WaMu loans for underwriting compliance.  Clayton determined that 27% of

these loans neither met underwriting guidelines nor possessed compensating factors sufficient to

justify making exceptions to the underwriting guidelines (Event 3).  WaMu ignored many of

these underwriting failures, waiving *29%* of those rejected loans back into its mortgage pools,

and sold RMBS containing these non-compliant loans to investors like Plaintiffs.

### 4.    WaMu Offloaded Loans That It Had Identified as Fraudulent And/Or Likely To Default Onto Unsuspecting Investors

268.    Even though WaMu's deficient lending and securitization practices were

repeatedly criticized by the OTS and FDIC, as well as WaMu's own internal auditors and

reviewers, WaMu and Long Beach securitized loans that they had flagged as being especially

likely to default or containing fraudulent information.  Defendant Beck testified before the PSI

that he did not check to see if loans "with identified fraud or underwriting defects" were removed from securitization pools.

269.     In September 2008, WaMu's Corporate Credit Review team reported that, "The controls that are intended to prevent the sale of loans that have been confirmed by Risk Mitigation to contain misrepresentations or fraud are not currently effective.   There is not a systematic process to prevent a loan in the Risk Mitigation inventory and/or confirmed to contain suspicious activity from being sold to an investor," and that, "Exposure is considerable and immediate corrective action is essential."   The report also noted that the resources devoted to fraud prevention were insufficient and that there was a lack of training focused on fraud awareness and prevention.   WaMu's increased "strong reliance" on low documentation and stated income loans was explicitly named as a driver of fraud.

270.     Indeed, WaMu was not only employing inadequate safeguards with respect to poorly performing loans, it was actively offloading the lowest quality loans to investors and keeping the best for itself.   Unbeknownst to investors like Plaintiffs, WaMu filled the loan pools for some RMBS by picking out toxic loans that it wanted to remove from its own inventory, since it considered them especially likely to default.   For example, a recently released email from John Drastal, Managing Director of trading for WaMu Capital, to Defendant Beck, dated September 14, 2006, notes that after an investor conference in which equity investors expressed concerns about the housing market, Thomas W. Casey, Chief Financial Officer of WMI, "asked about the ability to offload some Long Beach production."

271.     Likewise, an October 17, 2006 PowerPoint presentation to the WaMu Bank Board of Directors by WaMu Home Loans President David Schneider, a document recently released by the PSI, discusses how WaMu Bank dealt with the risks relating to Option ARMs.   Teaser rates,

increasing principal balances and higher loss rates are all listed as "concerns," and "periodic non performing asset sales to manage credit risk," is listed as a "mitigating procedure."

272.    Internal WaMu emails and memoranda obtained by the PSI show that on February 14, 2007, Defendant Beck, the head of WaMu's Capital Markets Division, identified certain recently-issued ARM loans as performing poorly and wanted to sell them "as soon as we can before we loose [sic] the oppty."  In a later email, the Chief Risk Officer Cheryl Feltgen noted that this would help address the problem of rising delinquencies in WaMu's portfolio, stating, "Gain on sale is attractive and this could be a way to address California concentration, rising delinquencies, falling house prices in California with a favorable arbitrage given that the markets seems not yet to be discounting a lot for these factors."  Likewise, in a February 20, 2007 email forwarding data on the largest contributors to delinquency, Feltgen wrote, "I know that this is mostly an exercise about gain on sale, but we might be able to accomplish the other purpose of reducing risk and delinquency at the same time."  Having identified loans that were particularly prone to default, WaMu proceeded to securitize as many of them as possible, retaining for its own portfolio only those that were completely unsalable.  WaMu securitized more than $1 billion of these adversely selected Option ARM loans.  As of February 2010, more than half of them were in default.

### D.    THE THIRD PARTY ORIGINATORS OF THE MORTGAGE LOANS UNDERLYING THE CERTIFICATES ABANDONED THEIR UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS

273.    During the real estate boom, JPMorgan, Bear Stearns and WaMu collectively purchased hundreds of billions of dollars in loans from third party originators.  JPMorgan securitized more than $63.8 billion in mortgage loans between 2005 and 2007, and WaMu securitized more than $323.5 billion.  Bear Stearns generated more than $333.9 billion in asset-backed securities between 2005 and 2007, the majority of which were mortgage-backed

securities.  Due to the massive sizes of their purchases and their status as repeat players in the

mortgage market, JPMorgan, Bear Stearns and WaMu had special access to and leverage over

the senior management of the third-party originators that they bought loans from.

274.    JPMorgan, Bear Stearns and WaMu were not merely major customers of the third

party originators.   In addition to purchasing huge quantities of loans, they also performed

finance-related functions for originators including acting as underwriters in bond issuances,

establishing revolving credit facilities, and providing originators with the warehouse credit lines

that enabled them to do business.  By providing financial services and extending credit to many

of the originators that they purchased loans from, JPMorgan, Bear Stearns and WaMu gained

access to material, non-public information, including information on underwriting practices and

loan quality.  For example:

- Between 2005 and 2007, Bear Stearns securitized nearly *$15 billion* of loans originated by Countrywide.  During the same time, JPMorgan securitized nearly *$10 billion* of Countrywide-originated loans.  JPMorgan also acted as a lead underwriter in Countrywide's bond issuances, and served as managing administrative agent to material credit agreements for Countrywide, including a 364-day revolving credit facility in excess of $2.6 billion.  In these capacities and in fulfilling related due diligence obligations, Bear Stearns and JPMorgan obtained unique access to material, non-public information about Countrywide's operations, including its loan origination and loan underwriting practices, loan quality and performance, and reserve methodologies for nonperforming loans.

- JPMorgan securitized more than *$1.5 billion* worth of GreenPoint-originated loans, and Bear Stearns was one of GreenPoint's two largest sources of funding, according to former GreenPoint executive vice-president, Kevin Hughes.  Hughes further testified that GreenPoint executives were in daily contact with large investors such as Defendants to provide them with extensive loan-level data on the mortgages that GreenPoint was originating.

- Bear Stearns was also among Fremont's key business partners, securitizing approximately *$1 billion* worth of Fremont-originated loans between 2005 and 2007.

- Bear Stearns also had a very close business relationship with Impac Mortgage, and American Home.  Between 2005 and 2007, Bear Stearns securitized nearly *$1.5 billion* of Impac-originated loans and more than $350 million of American Home-originated loans.  In addition, between 2005 and 2007, Bear Stearns

provided a *$2.5 billion* credit facility to American Home and approximately $300 million in loans to Impac Mortgage, thereby allowing these mortgage originators to originate and fund new mortgages that Bear Stearns could securitize and sell to investors.  In these capacities, and to protect its own interests, Bear Stearns conducted due diligence and reviewed material, non-public information about American Home's and Impac's loan origination and underwriting practices, loan quality and performance, and reserve methodologies for nonperforming loans.  As a major creditor of American Home and Impac, Bear Stearns had the power to cut off hundreds of millions of dollars of operational funding, thereby ensuring that Bear Stearns had continuing access to material non-public information at all relevant times.

- Bear Stearns also had a close connection to SouthStar Funding.  Bear Stearns provided SouthStar Funding with millions of dollars in credit that SouthStar Funding used to originate mortgages for Bear Stearns securitizations.  Bear Stearns securitized mortgages that were originated by SouthStar Funding during the period from May 2002 and April 2007 at a rate of nearly one securitization per month, according to SEC filings.  Bear Stearns would not have provided SouthStar Funding with a substantial line of credit without having conducted a thorough due diligence audit.  SouthStar Funding depended on Bear Stearns' credit facility for its corporate survival, thereby ensuring Bear Stearns' access to senior management and non-public information about SouthStar Funding's mortgage origination and underwriting practices.  SouthStar Funding filed for bankruptcy in April 2007 when Bear Stearns revoked the credit facility.

275.    As discussed above, many of the underlying mortgage loans that the Defendants packaged into securities and sold to Plaintiffs were originated by third-party institutions and then sold en masse to JPMorgan, Bear Stearns, WaMu, or Long Beach.  The Offering Documents associated with each of Plaintiffs' Certificates purported to describe each of the specific originators' underwriting guidelines.

276.    Defendants were aware of a collapse in underwriting standards on the part of the Originators with whom they did business, including widespread failure to abide by stated underwriting guidelines, permitting sales personnel and management to routinely override underwriting decisions, pressuring appraisers to artificially inflate the values of mortgaged properties, and making no efforts to verify the income of borrowers.  Defendants were also aware that, as a result of the Originators' fraudulent appraisal practices, which made the borrowers appear to have more collateral than they actually did, the LTV values of the loans

were inflated.  However, rather than putting an end to these corrupt practices or refusing to purchase these defective loans, Defendants urged the Originators to make more and riskier loans.

277.   The Offering Documents represented that the underlying mortgage loans were originated in compliance with the underwriting and appraisal standards of the originators. Several of the relevant originators involved in these transactions are now known to have, among other things, ignored their own underwriting guidelines and used inflated appraisals during loan generation.  The questionable practices that were employed by many of these originators have led to numerous allegations and investigations into their operations.  In fact, as noted below, faulty underwriting has led to the downfall of several of the originators whose loans JPMorgan, Bear Stearns, WaMu and Long Beach bundled in these offerings.

278.   The third party originators of the mortgage loans underlying the Certificates that departed from stated underwriting guidelines with respect to the mortgages underlying Plaintiffs' Certificates included, but are not limited to the following:

### 1.   Aames

279.   Aames Capital Corporation, based in Los Angeles, California, and its affiliates originated, sold and serviced subprime residential mortgages under the name "Aames Home Loans."  In 2006, Aames was purchased by Accredited Home Lenders Holding Company, creating the nation's sixth largest retail originator and twelfth largest overall originator, holding the ninth largest subprime mortgage portfolio.  Accredited Home Lenders to Acquire Aames Investment, NATIONAL MORTGAGE PROFESSIONAL MAGAZINE, June 21, 2006.  Aames was heavily focused on subprime mortgage lending – by 2005, 90% of its loans were made to subprime borrowers.

280.   Violations of underwriting and appraisal standards were commonplace at Aames in an effort to reach monthly mortgage origination targets.  Aames' routinely extended loans to

low-income borrowers without regard to their ability to repay the loans, as long as the potential borrower purportedly had substantial equity in the property.  For example, a mailer targeted to elderly low-income borrowers stated that "Even if you have credit problems, we can probably still help you out.  That's because it's your equity, not your income or credit that matters most." In order to create the appearance that borrowers had substantial equity in their homes, Aames manipulated the appraisal process in its favor, threatening appraisers with loss of Aames' business if they did not return the property valuations Aames desired.

281.    A 2003 review of predatory lending practices in southeastern Pennsylvania conducted by ACORN, a collection of non-profit groups focusing on affordable housing issues, identified Aames as one of the subprime lenders whose mortgages suffered the highest rates of foreclosures in the region.

282.    An April 2006 investigation into mortgage fraud by the CLEVELAND PLAIN DEALER revealed that Aames, along with two other mortgage originators, granted mortgages on six rental properties to a single mother with no verifiable income, ignoring significant red flags in her loan applications.  A Houseful of Problems Probe: Firms Tied to Shaky Loans Made in Struggling Mom's Name, CLEVELAND PLAIN DEALER, April 23, 2006.  Aames wrote mortgages on three of the six properties, according to the report.  The investigation revealed that Aames had relied on inflated appraisals and that "there were multiple clues [in the applications] that the lenders either missed or ignored."

283.    Red flags in the loan applications included: certain of the applications stated that the borrower made $5,000 per month working for a property management company, while others stated that she earned $9,000 per month by providing "nursing child care;" the borrower's applications stated that she continued to pay monthly rent and listed her rent payment, despite also stating that she owned several apartment building and two single-family homes, and; the

sections requesting information on how much income the borrower's purported investment properties produced were left blank.  Regarding these red flags, according to the article an experienced mortgage broker interviewed by the CLEVELAND PLAIN DEALER concluded that "[f]or a lender to plead ignorance just doesn't meet the standards of common sense."

### 2.    American Home

284.    American Home originated mortgage loans purchased by Plaintiffs, including WMALT 2006-5.  American Home was ranked the eleventh largest residential mortgage lender in the United States by National Mortgage News for the fourth quarter of 2005, originating over $45.3 billion in loans.

285.    The company advertised itself as a provider of safe, high-quality, "near-prime" loans, but later shocked the market in July 2007 when it announced that it would have to sell its assets following a 90% plummet of the company's stock.  American Home's financial troubles only worsened when its credit facilities refused to provide any more funding for servicing mortgages, and on August 6, 2007, American Home filed for Chapter 11 bankruptcy protection. Shortly thereafter, the State of New Jersey Department of Banking and Insurance, issued an order demanding that American Home cease doing business in the state and began proceedings to revoke the company's mortgage lender license.  The Department's press release stated that American Home had committed numerous violations of the New Jersey's Licensed Lenders Act, including accepting mortgage loan applications after the company's credit facilities refused to provide money for servicing the mortgages in July 2007 and knowing that the loans could not be funded.

286.    After the bankruptcy, the real quality of the loans that American Home was providing to borrowers was revealed when Fitch Ratings downgraded $16.2 million of American Home's bonds to Alt-A and subprime quality in September 2007.  Shortly thereafter, a securities

class action lawsuit was filed in December 2007 against AHM Investment in the Eastern District of New York also bringing to light American Home's questionable lending practices.  *In re American Home Mortgage Securities Litigation*, No. 2:07-md-01898-TCP-ETB (E.D.N.Y. Filed Dec. 19, 2007).  The complaint alleged, among other things, that AHM Investment abandoned its underwriting guidelines in an effort to facilitate business growth by issuing risky loans to borrowers with bad credit, basing a borrower's ability to repay on whether they could afford to pay low introductory "teaser" rates, and by basing employees' compensation on the quantity, rather than the quality, of loans generated.

287.    State and federal regulatory agencies also targeted American Home for its subpar lending activities.  In April 2009, the SEC charged two former AHM Investment executives with fraud for making false and misleading disclosures regarding the company's worsening financial condition as the subprime market collapsed.  The SEC's press release reported that former chairman and CEO Michael Strauss and former CFO Stephen Hozie were alleged to have fraudulently understated the company's 2007 loan loss reserves, converting losses into profits, and misled investors regarding "the riskiness of the mortgages originated and held by American Home Mortgage."  Strauss agreed to a settlement of more than $2.45 million.  *SEC Press Release, SEC Sues Two Former American Home Mortgage Executives For Fraud* (April 28, 2009).  On June 6, 2010, the court issued a final judgment against Hozie for $225,000.

288.    On November 5, 2009, the Ohio Attorney General Richard Cordray filed a lawsuit against AHM Servicing in Cuyahoga County Common Pleas Court.  The lawsuit alleged numerous violations of the Ohio Consumer Sales Practices Act, "including but not limited to: incompetent and inadequate customer service, failure to respond to requests for assistance, failure to offer timely or affordable loss-mitigation options to borrowers, and unfair and

deceptive loan-modification terms." *Ohio AG files second suit against a mortgage servicer*, MORTGAGE BANKING, Pg. 10, Vol. 70. No. 3 (December 2009).

289.    American Home and its related entities was also the subject of several consumer lawsuits alleging Truth in Lending Act ("TILA") and other violations.  For example, one case filed in February 2008 claimed that American Home failed to accurately disclose the payment terms on a borrower's refinance. *Cauthorne v. American Home Mortgage Corp. et al.*, No. 3:08-cv-00084-DWD (E.D. Vir. Filed Feb. 1, 2008).  Another case filed in the Southern District of California in July 2009 claimed that, among other things, American Home provided the borrower with a mortgage she could not afford, and that the company based her qualification for the loan off of a stated income that was significantly greater than the actual amount provided in her tax returns.  *Garibay v. American Home Mortgage Corp. et al.*, No. 3:09-cv-01460-WQH-CAB (S.D. Cal. Filed July 7, 2009).

### 3.    BNC

290.    BNC was a California-based subprime home mortgage lender based out of Irvine, California.  BNC originated mortgages that were packaged into the BSABS 2006-HE6 Trust purchased by Plaintiffs.  BNC was purchased by Lehman Brothers in 2004.

291.    By 2006, BNC was among the top-20 subprime mortgage lenders, with 23 offices across the country.  It originated over $14 billion worth of home loans in 2006 alone, according to an August 22, 2007, MARKETWATCH article, entitled *Lehman Shuts BNC Mortgage Unit, Cuts 1,200 Jobs.*

292.    This remarkable volume was the product of endemic fraud on the part of BNC employees.  A June 27, 2007, WALL STREET JOURNAL article entitled *How Wall Street Stoked the Mortgage Meltdown* reported that interviews of 25 former BNC employees revealed that the

company regularly falsified tax forms, pay stubs, and other information in order to help borrowers secure mortgages.

293.    By early 2007, the fraud was beginning to take its toll.  The loans BNC had been originating, like the loans packaged into the Trust purchased by Plaintiffs, were toxic.  In the first quarter of 2007, BNC originations were down 40% from first quarter 2006.

294.    In November 2008, the Office of the Comptroller of the Currency ("OCC"), part of the United States Department of the Treasury, issued a report identifying the ten mortgage originators with the highest rate of foreclosures in the ten U.S. metropolitan areas with the highest foreclosure rates, known as the "Worst Ten in the Worst Ten" report.  The report concluded that 21 companies, in various combinations, occupied the "worst ten slots in the worst ten metro areas."  BNC was named in this report as one of the "Worst Ten in the Worst Ten." By the first half of 2008, according to this report, 1,769 mortgages issued by BNC between 2005 to 2007 in the ten metropolitan areas with the highest foreclosure rates were already in foreclosure.

295.    According to a December 22, 2008, article in THE GLOBE AND MAIL, BNC and other subprime mortgage lenders used low "teaser" rates, with no down payment required, to attract borrowers.  Although payments would rise, often by 40%, within two years, borrowers were counseled that they would easily be able to refinance or sell the property if they could not afford the higher payment.

296.    The March 11, 2010, report issued by Anton R. Valukas, Lehman's court-appointed bankruptcy examiner, highlighted risky mortgage lending practices employed by BNC.  In testimony before the House Committee on Financial Services, the bankruptcy examiner stated that the public was unaware that "risk controls were being ignored."  One of BNC's most aggressive and most popular lending programs was known as "80/20."  Under this program,

BNC extended two separate mortgage loans to a borrower in order to bring the borrower's LTV ratio to 100%, and based the loans only on the borrower's self-reported (*i.e.* unverified) income data.

### 4.    Chevy Chase

297.    Chevy Chase originated mortgage loans that were included in Issuing Trusts from which Plaintiff purchased Certificates, including BSARM 2004-9.

298.    Chevy Chase, a federally chartered savings and loan association doing business primarily in the District of Columbia, Maryland, and Virginia, was purchased by Capital One Financial Corporation ("Capital One") in February of 2009, in a transaction valued at approximately $520 million.   As part of the purchase, Capital One was required to write off approximately "$1.75 billion in anticipated losses from Chevy Chase's big portfolio of toxic mortgage loans."   *Capital One Buys a Rival Bank for $520 Million*, THE NEW YORK TIMES, December 3, 2008.

299.    According to a December 4, 2008, article in THE WASHINGTON POST titled *Capital One to Buy Chevy Chase*, Chevy Chase encountered financial trouble as a result of the subprime mortgage crisis due to its heavy emphasis on originating particularly risky "option adjustable-rate mortgages."   These loans allowed borrowers to defer part of the monthly payment for an established term.   During 2007 and 2008, Chevy Chase's financial performance suffered as the deferred payments came due and significant numbers of borrowers defaulted on their mortgages.   Chevy Chase's non-performing mortgage assets "more than tripled to $490 million between September 2007 and June 2008."   As of December 2008, Chevy Chase still held approximately $4 billion in option ARM mortgage loans.

300.     According to another WASHINGTON POST article the next day, Chevy Chase "continued making loans even as the market was getting worse in 2007 and held more of these risky [option-ARM] mortgages than many other banks, according to Capitol One executives."

301.     On April 20, 2011, the Federal Home Loan Bank of Boston ("FHLBB") initiated an action alleging that subprime mortgage originators, including Chevy Chase, disregarded credit risk and quality controls, exerted pressure on appraisers to inflate their appraisals, and engaged in predatory lending in order to generate higher subprime loan volumes.  *See Fed. Home Loan Bank of Boston v Ally Fin., Inc.*, Civ. A. No. 11-1533 (Mass. Sup. Ct. Apr, 20, 2011).  The complaint similarly alleges that Chevy Chase effectively abandoned its underwriting standards in connection with originating subprime mortgages by, *inter alia*, allowing systematic exceptions to their stated underwriting standards without adequate justification.

302.     After abandoning originating standards, Chevy Chase engaged in a campaign of deception to ensure securitization of the originated mortgages and the profits that followed, misrepresenting the LTVs of the collateralized mortgages, deceiving ratings agencies, and lying about confirming clean chain of title.

303.     The failure of Chevy Chase to apply their stated underwriting guidelines and the success of their campaign of deception is evident in the high rates of delinquency and foreclosure in mortgage pools held by the FHLBB.  As of May 26, 2011, fully 29.57% of the loans securitized by Chevy Chase and sold to the FHLBB were at least 90 days delinquent, had foreclosure proceedings pending, or the mortgage holder had recovered title from the borrower.

304.     On January 16, 2007, a federal district court in Wisconsin found that Chevy Chase violated the Truth In Lending Act ("TILA") by failing to disclose salient features of a mortgage.  The plaintiffs alleged Chevy Chase offered them a "cashflow payment option" loan, a type of "option ARM" mortgage, whereby Plaintiffs made fixed low minimum monthly

payments based on a static interest rate, but the interest rate charged actually adjusted monthly so that while the payment amount stayed fixed, the outstanding balance of the loan increased through negative amortization (capped at 110% of the original loan).  Plaintiffs alleged that Chevy Chase's disclosures were misleading and that they believed the initial interest rate was fixed.  The stamp used by Chevy Chase on its disclosure forms stated "WS Cashflow 5-Year Fixed Note Interest Rate 1.950%."  The district court granted summary judgment in favor of Plaintiffs, authorizing rescission of the mortgage contract and awarding attorney's fees to Plaintiffs.

### 5.    CIT Group

305.    CIT Group originated mortgage loans that were included in Issuing Trusts from which Plaintiffs purchased Certificates, including BSABS 2006-HE6.  CIT Group originally began its operations as a commercial lender, but after Jeffrey M. Peek joined the company as CEO in 2003, CIT Group got more involved in the consumer finance arena and ramped up its home mortgage loan portfolio.  By 2005, the company had originated or acquired more than $4.3 billion in subprime loans.

306.    CIT Group practiced unscrupulous subprime lending and underwriting practices, such as providing loans to borrowers with poor credit ratings, funding loans with little or no supporting financial documentation and offering mortgages with high loan-to-value ratios, all in an effort to increase the amount of CIT Group's loan originations even further.  By the third quarter of 2006, the company's subprime loan assets soared to $9.8 billion.

307.    On July 25, 2008, a securities class action lawsuit was filed in the United States District Court for the Southern District of New York against CIT Group and its officers.  *See In re CIT Group Inc. Sec. Litig.*, No. 1:08-cv-06613 (S.D.N.Y. filed July 25, 2008).  The complaint alleged, *inter alia*, that the company made false statements and omissions regarding its subprime

home lending business and financial results.  Specifically, the complaint claimed that CIT Group and its officers did not disclose that: (i) the company was observing reduced credit standards in an effort to boost loan originations; (ii) by the end of 2006, CIT Group had "substantially reduced the amount of documentation necessary, as well as the minimum FICO score, for subprime loan approval"; (iii) the company had been engaging in increasingly risky home loans, "including no documentation, stated income loans…"; and (iv) the company was using adjustable rate mortgages ("ARMs") and "very loose" lending standards to drive loan origination.

308.   CIT Group and the other defendants thereafter filed a motion to dismiss the complaint.  On June 10, 2010, the court denied defendants' motion to dismiss in its entirety, specifically finding that plaintiffs had adequately alleged that CIT Group had made false statements, including claims that the defendants: (1) "failed to disclose the lowering of CIT's credit standards…"; (2) "misrepresented the performance of CIT's subprime home lending and student loan portfolios"; (3) made "several changes in CIT's lending standards that effectively loosened requirements for a subprime home loan, and [that the defendants] were aware of and approved these changes"; and (4) "made written and oral statements indicating that CIT had 'disciplined lending standards' …[,] was 'much more conservative' than other lenders …and that CIT had 'tightened home lending underwriting, … [and] raised minimum FICA requirements.'" A motion for class certification is currently pending. *In re CIT Group Inc. Secs. Litig.*, No. 1:08-cv-06613 (S.D.N.Y., Opinion and Order dated June 10, 2010).

309.   CIT Group announced in August 2007 that it was shutting down its home lending business as a result of weak investor demand and heavy losses.  On July 1, 2008, the company sold its home lending business to Lone Star Funds for $1.5 billion in cash, plus $4.4 billion of assumed debt.  In December 2008, the federal government agreed to award CIT Group "bank

holding company" status and gave the company $2.33 billion in Troubled Asset Relief Program ("TARP") funds.  The funds did not, however, resolve CIT Group's financial struggles, and by the end of 2009, the company had filed for Chapter 11 bankruptcy reorganization.

### 6.    Countrywide

310.    Countrywide originated loans packaged into RMBS purchased by Plaintiffs, including BALTA 2004-11, BALTA 2005-7, BALTA 2005-9, BALTA 2006-6, BSARM 2004-2, BSARM 2004-9, BSARM 2004-10, BSARM 2005-1, BSARM 2005-12, BSARM 2006-4, JPALT 2006-S3, JPALT 2006-A4, JPALT 2006-A6, JPALT 2006-A7, JPMAC 06-CW1, JPMMT 2005-A6, JPMMT 2005-S3, and WMALT 2006 AR8.  As is now widely known, Countrywide was one of the principal loan originators that helped precipitate the housing boom and bust.  Until its collapse, Countrywide was one of the largest mortgage lenders in the United States, responsible for originating and/or servicing more than 18% of residential mortgages nationally.  In 2005 and 2006 alone, Countrywide originated in excess of $850 billion in home loans throughout the country.

311.    Countrywide was one of the principal loan originators that helped precipitate the housing boom and bust.  Until its collapse, Countrywide was one of the largest mortgage lenders in the United States, responsible for originating and/or servicing more than 18% of all residential mortgages nationally.  In 2005 and 2006 alone, Countrywide originated in excess of $850 billion in home loans nationwide.  After the collapse of the subprime market in 2008, Countrywide entered into a liquidity crisis because it could no longer sell or securitize its subprime loans.  On the brink of bankruptcy, Countrywide was bought by Bank of America for $2.8 billion in 2008.

312.    In the Prospectus Supplements, Countrywide represented that it evaluated a "prospective borrower's credit standing and repayment ability" by requiring the borrower to demonstrate that the ratio of his "monthly housing expenses" to his "monthly gross income and

the ratio of total monthly debt to the monthly gross income" were within an acceptable range. However, Countrywide's practice was to ignore its underwriting standards in order to originate as many mortgage loans as possible, completely disregarding a borrower's ability to repay the mortgage.  Countrywide's abandonment of its underwriting guidelines was so widespread that a former manager has been quoted as saying, "if you had a pulse, we gave you a loan," suggesting that Countrywide's only concern was generating new loans.

313.    Countrywide not only willfully ignored its own underwriting standards, but when caught trying to pass off defective loans as acceptable collateral, Countrywide was known to put those same loans back into different mortgage pools, hoping the defective loans would not be in the small percentage tested for quality during the next securitization.

314.    Countrywide departed from its underwriting guidelines by: (i) disregarding and/or affirmatively manipulating the income, assets and employment status of borrowers seeking mortgage loans or encouraging ineligible borrowers to resort to no documentation loans and stated income loans in order to mask the borrowers' deficiencies and therefore secure approval; (ii) approving loans based on false affordability metrics, for example, the borrower's ability to make loan repayments based on low, introductory "teaser" interest rates; and (iii) permitting employees to liberally make "exceptions" and issue loans even though the loans did not pass muster under Countrywide's underwriting guidelines.

315.    In addition, Countrywide underwriters failed to obtain independent appraisals. For example, beginning at least as early as 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan qualifications, and (iii) substitute more favorable appraisals by replacing appraisers when necessary to obtain a more favorable LTV so as to qualify a loan for approval.

117

316.    Countrywide's practices have been and continue to be the target of multiple state and federal investigations and proceedings.  In June 2009, the SEC filed a civil suit against three former top Countrywide executives: Angelo Mozilo, former chairman of the board and CEO; David Sambol, COO and president; and Eric Sieracki, CFO.  According to the SEC, these three individuals defrauded investors by falsely claiming that Countrywide underwrote low-risk mortgages at a time when the company was getting into increasingly risky parts of the lending business, including subprime mortgages.  The SEC further asserted that Mozilo engaged in insider trading of Countrywide stock.

317.    In October 2010, Mozilo agreed to pay $22.5 million to settle the disclosure fraud allegations and $45 million to settle the insider trading allegations, a record settlement of $67.5 million.  In June 2010, Countrywide agreed to pay $108 million in penalties in a case brought by the Federal Trade Commission alleging that Countrywide was charging delinquent homeowners with inflated mortgage servicing fees.  The U.S. Attorney's Office also began investigations against Countrywide for criminal violations and, according to an April 2010 article in THE WALL STREET JOURNAL, has stepped up the pace of its investigation, calling witnesses before a grand jury.

318.    Various state attorneys general, including those from California, Connecticut, Florida, Illinois, and Indiana, brought lawsuits and/or initiated investigations against Countrywide based on its lending, underwriting and appraisal practices for mortgage loans.  One such lawsuit filed in June 2008 by the Illinois Attorney General Lisa Madigan involved claims that Countrywide engaged in unfair and deceptive business practices in creating, originating, marketing and servicing "unnecessary and risky loans" after witnessing a 42 percent increase in foreclosures from the year before.  The EDWARDSVILLE INTELLIGENCER, in an interview with Madigan, reported that Countrywide "lur[ed] Illinois homeowners into unfair and unaffordable

loans" and "loosened underwriting standards in order place more subprime borrowers into 'reduced document loan products,' which were faster and easier to sell but came with higher borrower costs and higher delinquency rates."  The lawsuit also claimed that Countrywide "enticed borrowers with promises of best loan terms, low monthly payments, low interest rates and no closing costs without divulging the loan's true costs, affordability and risks."  On October 6, 2008, Countrywide announced that it had settled the fraud claims brought by 11 states, including California and Illinois, for an estimated *$8.5 billion*.

### 7.    First Magnus

319.    First Magnus originated mortgage loans pooled into securitizations purchased by Plaintiffs including WMALT 2006-5 and WMALT 2006-AR5.  First Magnus, based in Tucson, Arizona, was a mortgage originator that closed its mortgage lending operations on May 1, 2008. It was once the nation's 16th largest mortgage originator, originating over $30 billion of home loans in 2006 alone, according to Inside Mortgage Finance.

320.    According to a complaint filed against UBS Americas Inc. arising out of its sale of RMBS, some of which contained loans originated by First Magnus, one confidential witness, a senior underwriter from August 2005 to August 2006, stated that First Magnus regularly made use of inflated appraisals and that many loans offered by First Magnus should not have been approved.  According to this witness, First Magnus's priority was on generating higher loan volume and thus on getting loans approved, rather than accurately assessing the borrower's ability to repay.  This witness also stated that management at First Magnus directed the witness to approve loans despite highly questionable borrower information (e.g. where the borrower appeared to be falsely inflating his or her income), justifying such decisions by noting that the loans would not be on First Magnus's books if problems later became apparent.  Other

confidential witnesses in this action have stated that First Magnus misused "stated-income" loans and that it did not abide by its underwriting guidelines.

321.    According to an article in USA Today, First Magnus stopped funding mortgage loans in August 2007 after being unable to meet margin calls (requests from lenders to provide additional collateral) from banks who had provided it with loans to fund mortgage originations. *First Magnus Mortgage Stops Lending*, USA Today, August 16, 2007.

### 8.    FNBN

322.    FNBN originated loans that were packaged into RMBS and purchased by Plaintiffs, including BSABS 2004-AC5.   FNBN was established in 1987 under the name Laughlin National Bank, but later changed its name to First National Bank of Nevada in 1998. The company garnered success in the industry by offering low-quality, "Alt-A" mortgages to borrowers, accumulating assets of over $4.3 billion in 2006.   FNBN merged with First National Bank of Arizona on June 30, 2008.

323.    FNBN was no stranger to the subprime lending business and soon became the subject of regulatory scrutiny.   According to a June 16, 2009 USA TODAY article entitled *Where were regulators when banks were failing?*, the OCC had identified problems with FNBN as early as 2002, finding that it was "adversely impacted by the significant concentration in high-risk mortgage products and weak risk management controls."   On July 25, 2008, the OCC closed FNBN, naming the FDIC as receiver.   Mutual of Omaha Bank entered into a purchase and assumption agreement with the FDIC, agreeing to take over all deposits and certain assets of FNBN.

324.    FNBN was also the target of numerous consumer lawsuits.   The complaints primarily alleged that it engaged in predatory lending practices by originating risky loans to borrowers that were sold into securitized mortgage pools, all while knowing that the terms of the

loans were such that the borrowers would likely default.  Other lending institutions also filed lawsuits against FNBN.  In early 2007, FNBN was sued by a Lehman Brothers investment trust in New York and Aurora Loan Services in Denver, seeking repurchase of over 38 home mortgage loans.  Lehman and Aurora claimed that FNBN misrepresented the income, debt and employment information of borrowers, as well as the appraisal values of the properties underlying the loans.

### 9.   Fremont

325.    Fremont originated loans that were pooled into RMBS and purchased by Plaintiffs, including JPMAC 06-FRE2.  Fremont was a wholly-owned subsidiary of Fremont General Corporation and, as one of the country's five largest subprime lenders, originated subprime residential real estate loans nationwide on a wholesale basis through independent loan brokers in nearly all 50 states.

326.    In November 2008, the OCC released a report identifying the "Worst Ten" mortgage originators operating in large cities.  The worst originators were those with the largest number of subprime mortgage foreclosures for 2005-2007 originations.  Fremont was on that list. It declared bankruptcy in 2008 and reorganized under the name Signature Group Holdings, Inc.

327.    Fremont garnered success by originating high-risk, poor quality subprime loans. The company's financial success, however, came to a halt on March 7, 2007, when the FDIC announced the issuance of a cease and desist order against Fremont related to its unsound subprime mortgage and commercial lending practices.  "The FDIC determined, among other things, that the bank had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank."

328.    Shortly thereafter, on October 5, 2007, the Massachusetts Attorney General (the "Massachusetts AG") filed suit against Fremont and its parent company in Suffolk County Superior Court.  The complaint alleged that the company "was selling risky loan products that it knew [were] designed to fail, such as 100% financing loans and 'no documentation' loans" and that Fremont failed to "supervise, monitor, or otherwise take reasonable measures" to monitor its mortgage brokers who were selling loans by not verifying the information provided in loan documentation.   The complaint further stated that Fremont made loans based on false or inaccurate information, including "borrowers' income, property appraisals, and credit scores."

329.    The Massachusetts Superior Court granted a preliminary injunction against Fremont in February 2008 that was later affirmed by the Supreme Judicial Court of Massachusetts, the commonwealth's highest court, on December 9, 2008.  In upholding the injunction, the court determined that Fremont's loans featured the following combination of characteristics necessitating an injunction:

> (1) the loans were ARM loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had Fremont measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty … or a prepayment penalty that extended beyond the introductory rate period.

330.    The record also suggested that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan'" and that the confusing and misleading way Fremont structured its loans was "unreasonable."   Fremont, therefore, "knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow…."

331.     On June 9, 2009, the Massachusetts AG's Office announced that it had reached a $10 million settlement with Fremont.  The funds received were to be used "to redress the negative impact of mortgage foreclosures, predatory lending practices, and to provide relief to Massachusetts borrowers."  The effect of the settlement also made permanent the provisions of the injunction issued by the Superior Court in February 2008.  These proceedings, in conjunction with the FDIC's March 7, 2007, cease and desist order, effectively put Fremont out of the subprime mortgage lending business.

332.     The maelstrom of publicity regarding Fremont's lending practices and increase in defaults resulted in a number of lawsuits based on Fremont's failure to repurchase bad loans. For example, in October 2007, Morgan Stanley Mortgage Capital Holding LLC ("Morgan Stanley") sued Fremont for $10 million, alleging that it breached agreements relating to the residential mortgage loans that Morgan Stanley purchased from Fremont between May 1, 2005 and December 28, 2006.  Morgan Stanley claimed that Fremont made certain representations and warranties regarding the quality of the loans that Fremont originated and that "hundreds" of the loans breached those representations and warranties.  Specifically, Morgan Stanley claimed that Fremont made (i) "misrepresentations of the income or employment of the borrower in the loan documents," (ii) "misrepresentations concerning appraisal values," (iii) "misrepresentations of the occupancy of the residence," (iv) "misrepresentations of the assets of the borrower," and that there were (v) "loans failing to meet Fremont's underwriting guidelines, such as a failure to verify assets prior to closing, defective verification of rent, failure to obtain the minimum credit history information, and loans made to borrowers that did not have the requisite credit score…."

333.     Similarly, after the FDIC's cease and desist order became public, Lehman Brothers Bank, FSB and Lehman Brothers Holding, Inc. (collectively, "Lehman Brothers") filed

suit against Fremont on June 18, 2007.  Lehman Brothers sought repurchase of a large number of "questionable" loans purchased beginning in March of 2004.

334.   The Lehman Brothers' complaint alleged that many of the mortgage loans "proved ineligible for deposit, sale, assignment and/or transfer to mortgage-backed securitizations" due to Fremont's breach of warranties and representations made concerning (i) the "validity of all Mortgage Loan documentation," (ii) "[t]he accuracy and integrity of all information and documentation regarding borrower identity, income, employment, credit, assets, and liabilities used to originate the Mortgage Loans," (iii) "[b]orrower occupancy of the property securing the Mortgage Loans," (iv) "[t]he ownership, nature, condition, and value of the real property securing the respective Mortgage Loans," and (v) "[t]he conformance of the Mortgage Loans with applicable underwriting guidelines and loan program requirements."  Lehman Brothers also claimed that Fremont assured them that "no error, omission, misrepresentation, negligence, fraud, or similar occurrence took place" and that "no predatory or deceptive lending practices were used in the origination of the Mortgage Loans."  The parties reached a settlement agreement in January 2009.

335.   In March 2008, as a result of having insufficient capital, the FDIC ordered Fremont to either recapitalize the bank or sell it, and the company later sold its $5 billion in deposits along with 22 Fremont branches to investment company CapitalSource Inc.  That year, Fremont made the OCC's "Worst Ten in the Worst Ten" list as one of the lenders with the most foreclosed loans in the ten metropolitan areas with the highest loan foreclosure rates.

### 10.   GMAC / RFC

336.   GMAC and RFC were originators of mortgage loans pooled into RMBS purchased by Plaintiffs, including BALTA 2005-3, BSARM 2004-9 BSARM 2004-10, WMALT 2006-AR5.  GMAC was founded in 1985 by the finance subsidiary of General Motors Corp. and

grew to be the fourth largest U.S. mortgage loan originator by 2010, originating tens of billions of dollars in mortgages every year.  In addition to selling loans to financial institutions, GMAC also used some of the loans it originated to issue its own RMBS.

337.    RFC was created by GMAC RFC specifically as a conduit for the securitization and sale of loans.  A former RFC trader quoted in a complaint against RFC, who worked at RFC from 1998 to March 2007, stated that beginning in 2005 RFC began to purchase higher risk loans and allow more frequent exceptions to underwriting guidelines, especially if the third party originators selling the loans were good clients.  *West Virginia Inv. Mgmt. Bd. v. Residential Accredited Loans, Inc., et al.*, No. 10-C-412, (W. Va. Cir. Ct. filed Mar. 4, 2010).  At about that time, the third party originators that RFC dealt with began restricting RFC's reviews of the loans it acquired in bulk.  This employee also stated that RFC's sales force was paid commissions based on the volume of the loans acquired and not the creditworthiness of those loans

338.    The quality of the loans in these securitizations illustrated the lax underwriting standards used by GMAC.  MBIA Insurance Corporation ("MBIA"), pursuant to a securities fraud lawsuit against GMAC, analyzed the loan files for 4,804 of the delinquent loans in three GMAC RMBS and found that 89% of the loans reviewed contained one or more breaches of the representations and warranties contained in the mortgage loan offering documents.  These included routine breaches of underwriting standards, unreasonable stated incomes in loan applications, failure to verify borrower employment or prior mortgage payment history, approval of loans to borrowers with ineligible collateral or credit scores, incomplete documentation and missing title instruments, and breaches of state predatory lending laws.

339.    Former GMAC personnel were interviewed by Thrivent Financial ("Thrivent") in connection with another securities fraud lawsuit, and the interviews confirmed that GMAC management was aware of and encouraged the abandonment of underwriting standards in order

to ramp up loan originations.  A senior wholesale underwriter stated that her supervisors frequently overrode her underwriting decisions and closed loans that they knew were unlikely to be repaid.  Her supervisors' bonuses depended on the volume of loans closed, therefore motivating them to push even more questionable loans through and waiving faulty appraisal values and unreasonable stated incomes.  The witness also stated that GMAC did many no-income-verification loans, which were referred to by GMAC employees as "liar loans, because we knew damn well they were lying.  You can't tell me a manicurist in L.A. was making $12,000 a month."  The witness linked the inappropriate lending to GMAC's securitization business, noting that the trading desk would grant exceptions merely to fill loan pools and trading personnel with no underwriting experience were permitted to sign off on loans.

340.    GMAC used a desktop underwriting program that had very loose guidelines.  Ninety percent of loans were sent through the desktop underwriting program, which did not require documentation, and the program rarely turned down a loan.  A senior underwriter interviewed by Thrivent said that most of GMAC's loans were processed through the desktop underwriting system, and that loan processors (who were not underwriters) were able to approve those loans.  As such, few loans were ever reviewed by actual underwriters.  A GMAC securities trading analyst said that because the underwriting system was so heavily automated, mortgage brokers would submit false information and inflated appraisal values based on criteria that they knew the computer system applied.

341.    According to another former RFC analyst quoted in the *West Virginia Investment Management Board* Complaint, Bruce Paradis, the President and CEO of RFC, would directly intervene with traders who balked at buying low-quality mortgages, especially when the sellers were favored vendors.  The analyst stated that "it was not uncommon for Paradis to go down to the desk, put his arm around the trader, and say, 'come on, why not.'"

### 11.     GreenPoint

342.     GreenPoint originated mortgage loans that were included in Issuing Trusts from which Plaintiffs purchased Certificates, including BALTA 2004-11, BALTA 2005-7 BSABS 2004-AC5, BSABS 2004-SD4, JPALT 2006-S3, JPMMT 2005-S3, and WMALT 2006-5. GreenPoint specialized in non-conforming and Alt-A mortgages which generated higher origination fees than standard loans.  At one time, GreenPoint originated $25 billion of mortgage loans a year nationwide and was one of the nation's largest originators of Alt-A loans.

343.     Like the other third-party originators, GreenPoint's apparent business success was built upon the abandonment of its stated underwriting guidelines.  For example, according to GreenPoint's origination guidelines, the loans it originated were supposed to be based on borrower creditworthiness and the value of the collateral underlying the mortgage loan. Although stated income or no documentation loans were based on a borrower's representations about his or her ability to repay, with little or no documentation to substantiate those representations, GreenPoint's underwriting guidelines generally required the highest level credit scores and low LTV ratios for these loans.  GreenPoint's employees, however, routinely extended these loans to borrowers with weak credit.

344.     According to a November 13, 2008, BUSINESSWEEK article entitled, *Sex, Lies and Subprime Mortgages*, GreenPoint's employees and independent mortgage brokers targeted more and more borrowers who had no realistic ability to repay the loans being offered to them.  In addition, GreenPoint created a system for overriding loan rejections.  If underwriters denied an application based upon creditworthiness, managers could override their decisions and approve the loans anyway.  GreenPoint employees used this system to increase their own commissions at the expense of their underwriting guidelines.

345.    In 2006, Capital One acquired GreenPoint as part of the acquisition of North Fork Bancorp.  In October 2007, GreenPoint ceased accepting new loan applications.  GreenPoint was eventually liquidated by Capital One in December 2008.  As stated by the WASHINGTON BUSINESS JOURNAL in an August 21, 2007, article entitled *Capital One to shutter mortgage-banking unit, cut 1,900 jobs*, Capital One took an $860 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

346.    GreenPoint's business model depended on others' acceptance of its representations regarding the quality of its products and its commitment to cover any losses resulting from breaches of those representations.  GreenPoint, however, assured its investors that its "no-doc" or "low-doc" loan originations were amply supported by borrowers' ability to repay loans in a timely fashion.  GreenPoint also maintained that it conducted a quality control review of the loans that it acquired from approved correspondent lenders.

347.    As a result of these misrepresentations, GreenPoint has been the subject of lawsuits relating to its loan origination practices and lax underwriting standards.  In February 2009, U.S. Bank filed a breach of contract action against GreenPoint in the Supreme Court of New York for failure to repurchase $1.83 billion in loans that GreenPoint originated between September 2005 and July 2006.  *See U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.*, No. 09-600352 (Sup. Ct. NY Co. filed Feb. 5, 2009).  The complaint alleged that the company violated numerous representations and warranties, including:

- pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower;

- misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property;

- inflated and fraudulent appraisal values; and

- pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers

128

(i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimums, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships….

348.    U.S. Bank hired a consultant to review the loan documentation for compliance with GreenPoint's representations and warranties regarding the sales.  The consultant found that an overwhelming 93%, or 963 out of a sample of 1,030 loans sold, with a total principal balance of $91.8 million, did not comply with GreenPoint's representations and warranties contained in the sale agreements.  Defendants filed a motion to dismiss the complaint, and on March 3, 2010, the court denied the motion in part, allowing all of the claims against GreenPoint to proceed. *U.S. Bank Nat'l Ass'n. v. GreenPoint Mortgage Funding, Inc.*, No. 09-600352 (Sup. Ct. NY Co. Order dated Mar. 3, 2010).

### 12.    HSBC

349.    HSBC was another originator of mortgage loans pooled into RMBS purchased by Plaintiffs, including BSARM 2005-12.  HSBC is the mortgage banking subsidiary of HSBC Bank USA.

350.    HSBC has had a history of trouble resulting from its practices of originating mortgages and targeting low-income borrowers.  In 2005, HSBC began securitizing residential mortgage loans.  By the end of that year, it had issued over half a billion dollars of subprime, residential mortgage-backed securities.  In 2006 and 2007, HSBC issued $9.6 billion and $6.7 billion, respectively, of residential mortgage-backed securities.  The financial incentive to complete as many offerings as quickly as possible was great, and this pressure contributed to the absence of controls necessary to prevent the inclusion of materially false or misleading statements in Registration Statements.

351. Clayton was retained by HSBC to analyze the loans it was considering placing in its securitizations. Clayton recommended a number of loans for exclusion, but HSBC ignored these recommendations and **included 62 percent of the loans recommended for exclusion** without taking adequate steps to guarantee that they had been underwritten in accordance with applicable guidelines.

352. On January 27, 2008, THE NEW YORK TIMES reported that Clayton revealed that it had entered into an agreement with the New York Attorney General ("NYAG") to help investigate whether investment banks failed to include material information in disclosures accompanying securitized loans. Clayton agreed to provide the NYAG with evidence of "significant deterioration" in lending standards and "a parallel jump in lending expectations." According to Raymond W. McDaniel Jr., the chief executive of Moody's Investors Service, "[b]oth the completeness and veracity" of Registration Statements received by his company had deteriorated.

353. In November 2008, due to extremely high delinquency rates on its mortgages, HSBC announced that it would be closing its wholesale origination operations and would stop funding all loans after January 21, 2009.

354. In addition, the SEC has also scrutinized HSBC's practices. HSBC received three subpoenas from the SEC seeking production of documents and information relating to HSBC's involvement in specified private-label residential mortgage-backed securities transactions as an issuer, sponsor, underwriter, depositor, trustee, custodian or servicer.

355. On September 2, 2011, a complaint was filed in the Southern District of New York alleging that HSBC sold to Fannie Mae and Freddie Mac certain mortgage-backed securities based on Registration Statements containing materially false or misleading statements

and omissions.  The complaint also alleged that HSBC falsely represented that certain mortgage loans complied with underwriting guidelines and standards.

### 13.    Impac Funding

356.    Impac Funding originated mortgage loans that were included in Issuing Trusts from which Plaintiffs purchased Certificates, including BSABS 2003-HE1 and BSABS 2006-IM1.

357.    Impac Funding was a wholly-owned subsidiary of Impac Mortgage Holdings, Inc. ("Impac Mortgage"), a real estate investment trust specializing in non-conforming and subprime mortgages.  On May 21, 2007, Impac Funding acquired Pinnacle Financial Corporation ("PFC"), a prime and Alt-A residential mortgage lender.

358.    In January 2006, numerous securities class action cases were filed in the Central District of California against Impac Mortgage and its officers and directors.  The complaints alleged that Impac Mortgage made false or misleading statements relating to the company's financial condition, internal controls and future prospects and artificially inflated stock prices so that company insiders could sell their personally-held shares to reap millions in profits.  Two more securities class action cases followed in 2007 making similar allegations.

359.    Impac Mortgage was also involved in several derivative class action lawsuits. One complaint was filed in January 2006 in the Central District of California against the company's directors and officers, alleging breach of fiduciary duties, insider trading, misappropriation of information and unjust enrichment.  The case later settled in April 2007. Another derivative complaint was filed in October 2007 in the Superior Court of California, Orange County, alleging breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and violations of the California Civil Code.

360.    Consumer lawsuits soon followed, and on October 4, 2007, a class action was filed in the Central District of California against Impac Funding and Impac Mortgage alleging TILA violations.   The complaint alleged that Impac Funding and Impac Mortgage failed to disclose pertinent information about the loans and, as a result, misled borrowers regarding the terms of their mortgages.

361.    The FDIC, as successor in interest to IndyMac Bank, also filed a lawsuit against Impac Funding on September 24, 2009, in the Central District of California alleging breach of contract due to Impac Funding's failure to repurchase $4.5 million in loans sold to IndyMac Bank.  The complaint claimed that Impac's fraudulent mortgage lending practices resulted in the breach of numerous representations and warranties contained in the purchase agreement, triggering a duty by Impac to repurchase the loans.  The parties agreed to a settlement in June 2010.

362.    Impac was one of the few companies to survive the subprime meltdown without declaring bankruptcy, but did not make it out completely unscathed.  Impac Mortgage suspended its Alt-A mortgage operations in August 2007 and, a month later, announced that it was closing down its mortgage lending business completely.

### 14.    IndyMac

363.    IndyMac originated mortgage loans that were packaged into RMBS and purchased by Plaintiffs, including BSABS 2004-HE1 and BSARM 2004-2.   IndyMac was founded as Countrywide Mortgage Investment in 1985, and eventually became the seventh largest mortgage originator in the United States.  On July 11, 2008, federal regulators seized IndyMac, making it the third largest bank failure in US history.  IndyMac filed for Chapter 7 bankruptcy protection on July 31, 2008.

364.    Like many of the other originators, IndyMac achieved financial success in the subprime market by engaging in questionable lending practices.   These actions have made IndyMac the target of governmental investigations and lawsuits.

365.    In June 2008, before federal regulators seized IndyMac, the Center for Responsible Lending ("CRL") published a report titled, *IndyMac: What Went Wrong? How an "Alt-A" Leader Fueled its Growth with Unsound and Abusive Mortgage Lending* (June 30, 2008) (the "CRL Report").   The CRL found that IndyMac engaged in "unsound and abusive lending during the mortgage boom, routinely making loans without regard to the borrowers' ability to repay." CRL Report at 2.

366.    In compiling its report, the CRL conducted interviews with former IndyMac employees and reviewed court documents containing testimony by former IndyMac employees. These former employees described IndyMac as a place where originating loans took precedence over anything else.   They said that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id.* at 2.   In a conversation about IndyMac's underwriting policies, Audrey Streater, a former underwriter stated, "I would reject a loan and the insanity would begin.   It would go to upper management and the next thing you know its going to closing…I'm like, What the Sam Hill? There's nothing in there to support this loan."  *Id.* at 3.

367.    Additionally, the CRL Report noted that IndyMac lowered its underwriting standards in a push for more loan origination until the very idea of IndyMac's underwriting guidelines and "the quality of loans [it originated] became a running joke among its employees." The punch line of this joke was a mortgage loan issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year—IndyMac failed to verify this suspicious income.  *Id.*

368.    According to the CRL Report, IndyMac pressured its loan underwriters to approve risky loans and managers often overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals.  *Id.* at 9.  Scott Montilla, an IndyMac mortgage loan underwriter in Arizona from 2005 to 2007, told the CRL that IndyMac management would override his decision to reject a loan application about 50% of the time.  *Id.* Montilla revealed that managers would often inflate the stated income of borrowers to ensure that the applications would get approved.   Many borrowers did not know that their stated incomes were being inflated.  *Id.* at 14.

369.    On February 26, 2009, the OIG issued Audit Report No. OIG-09-032, entitled "Safety and Soundness: Material Loss Review of IndyMac (the "IndyMac OIG Report").  In this report, the OIG revealed that IndyMac's failure was due to its business strategy of originating as many loans as possible, regardless of the borrower's ability to repay his debt.

370.    According to the IndyMac OIG Report, "IndyMac often made loans without verification of the borrower's income or assets, to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." IndyMac OIG Report at 2.  In addition, the OIG's investigation revealed that IndyMac's business mode was to "produce as many loans as possible and sell them on the secondary market."  *Id*. at 21.  In order to do so, IndyMac engaged in "unsound underwriting practices" and "did not perform adequate underwriting."  *Id* at 11, 21.  Despite the fact that borrowers were unable to make their payments, IndyMac knew it would be profitable because it was only concerned with selling the "loans in the secondary mortgage market."  *Id.* at 2-3.

371.    As a result of the downturn in the mortgage market, IndyMac was saddled with "$10.7 billion of loans it could not sell in the secondary market."  *Id.* at 3.  Ultimately, this burden proved too great, causing IndyMac to go out of business.

372.    In May 2009, MBIA filed a breach of contract claim against IndyMac, in the District Court for the District of Columbia, alleging that IndyMac made contractual misrepresentations concerning its adherence to its underwriting standards in processing mortgage loans.  *See MBIA Ins. Corp. v. IndyMac Bank, FSB,* No. 1:09-cv-01011-CKK (D.D.C. filed May 29, 2009).  On October 23, 2009, MBIA filed a similar claim in California Superior Court.  *See MBIA Ins. Corp. v. IndyMac ABS, Inc.*, No BC422358 (Super Ct. Los Angeles County filed Sept. 22, 2009).  As a result of these lawsuits, MBIA found that 99% of the delinquent loans it reviewed did not comply with IndyMac's underwriting standards.

373.    On July 2, 2010, some former officers of IndyMac's Homebuilder Division were sued by the FDIC.  The complaint alleged that IndyMac abandoned its underwriting standards and approved loans to borrowers who were not creditworthy and for projects that were not properly collateralized.  *See FDIC v. Van Dellen,* No. 2:10-cv-04915-DSF (C.D. Cal. July 2, 2010).  IndyMac is also facing a class action lawsuit alleging that the abandonment of its underwriting guidelines adversely affected the value of RMBS backed by IndyMac loans.  *See In re IndyMac Mortgage-Backed Sec. Litig.,* No. 09-4583 (S.D.N.Y. filed May 14, 2009).  On June 21, 2010, the court denied in part IndyMac's motion to dismiss.

374.    On February 11, 2011, the SEC charged three former senior-level IndyMac executives with securities fraud.  The SEC's complaint alleges that IndyMac received internal reports that 12% to 18% of a random sample of loans in the mortgage pools contained misrepresentations of owner-occupancy rates and LTV ratios.  Despite having this information, the ex-IndyMac executives participated in the filing of false and misleading disclosures.  One of the executives has since settled with the SEC for $125,000.

375.    Due to its systematic disregard of its underwriting standards, the OCC included IndyMac in the 2008 "Worst Ten in the Worst Ten" Report.

### 15.    MortgageIT

376.    MortgageIT originated mortgage loans that were pooled in securitizations and purchased by Plaintiffs, including WMALT 2007-OA3.  The company, founded in 1988, was a residential mortgage banking company that was acquired as a wholly-owned subsidiary of MortgageIT Holdings, a self-registered real estate investment trust, and skyrocketed to become one of the top mortgage lenders in the nation.

377.    In June 2007, MortgageIT entered into a settlement agreement with the Connecticut Department of Banking after an investigation into the company's business revealed that MortgageIT had violated Connecticut law by employing at least 48 originators without first obtaining proper registrations.   As part of the settlement, MortgageIT made a $48,000 contribution to support the Nationwide Mortgage Licensing System.

378.    MortgageIT was further scrutinized for its predatory lending practices, and was named as a defendant in a number of consumer lawsuits.  For example, in September 2010, a TILA action was filed in the Northern District of California, claiming that the company had engaged in fraudulent mortgage lending practices.  The complaint alleged, among other things, that MortgageIT participated in a scheme to obtain mortgages that "grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values…."  Another lawsuit, filed in October 2009 in the Central District of California, claimed that MortgageIT misrepresented mortgage terms to the borrower and extended an ARM to the borrower based on stated income, rather than verified income, which ultimately resulted in the borrower's default on the loan.

379.    Most recently, the United States government has also homed in on MortgageIT and its questionable lending practices.  On May 3, 2011, the Department of Justice announced that it had filed a civil mortgage fraud lawsuit against MortgageIT, seeking damages and

penalties under the False Claims Act for allegations that MortgageIT made false compliance certifications to the Department of Housing and Urban Development ("HUD") in order to obtain approval of Federal Housing Administration ("FHA") mortgages that were not, in fact, eligible for FHA insurance under HUD rules.  The complaint also claimed that MortgageIT engaged in reckless lending practices and disregarded sound underwriting guidelines by ignoring "red flags," failing to conduct due diligence and extending mortgage loans to unqualified borrowers.

### 16.     National City / National City Mortgage

380.     National City and its subsidiary National City Mortgage were Originators of mortgage loans purchased by Plaintiffs, including BSARM 2004-2, JPMMT 2005-S3.  National City was a subsidiary of National City Corporation, one of the ten largest banks in America.  In 1999, National City Corp. purchased First Franklin Financial Co. ("First Franklin"), an originator of subprime and non-conforming mortgages.

381.     Subsequent to the First Franklin acquisition, National City increased its subprime portfolio at an alarming rate, reaping the benefits from retaining over $3.8 billion, or 60%, of First Franklin's subprime mortgage loans.  In 2002, the company "express[ed] pride in the progress of its initiative to improve its net interest income" and was "continuing to bet big on its strategy of holding the majority of its subprime loans."  The company soared to become the nation's sixth-largest mortgage lender, generating $130 billion in mortgages in 2003 alone.

382.     National City's success, however, was the result of reckless and imprudent lending and underwriting practices, including providing high-risk mortgages to non-creditworthy borrowers with little or no documentation regarding the borrower's ability to repay the loans.  In late 2006, National City sold First Franklin to Merrill Lynch & Co., but it still remained in the subprime mortgage lending business despite the looming market downturn.  National City utilized third-party brokers across the country to originate loans, observed "loose [underwriting]

guidelines" and offered "piggyback loans" to borrowers that provided them with the luxury of no down payment but left the borrower with little or no equity in the property.  Moreover, by January 2007, National City still held over $10 billion in subprime loans that Merrill Lynch refused to acquire in its purchase of First Franklin.

383.    The company's persistently risky lending practices and the subsequent crash of the subprime market left National City facing serious financial trouble, and it eventually became the target of regulatory scrutiny.  In May 2008, the United States Department of Justice ("DOJ") announced that it had agreed to a settlement of $4.6 million in order to resolve charges that it brought against National City for allegations relating to mortgage fraud under the False Claims Act.  The DOJ claimed that National City improperly submitted 58 late endorsement loans for FHA insurance coverage that were not current, in violation of FHA regulations.

384.    A month later, National City's parent corporation entered into a confidential Memorandum of Understanding with the Office of the Comptroller of the Currency, essentially placing the company on probation and signaling that regulators had "concerns" about National City regarding its capital management, risk management, asset quality and liquidity management.  In August 2008, the Wall Street Journal reported in the article *National City Faces Probe* that the SEC opened an informal investigation into National City and had requested "certain documents concerning its loan underwriting experience, dividends, bank regulatory matters and the sale of First Franklin Financial Corporation."

385.    National City was later involved in a securities class action lawsuit, filed in the Northern District of Ohio on December 23, 2008.  *Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. v. National City Corp. et al.*, No. 1:08-nc-70016-SO (N.D. Ohio Filed Dec. 23, 2008).  The complaint alleged that National City made statements regarding its underwriting

standards, capitalization and liquidity and provision for loan losses that were materially false in that:

> (i) … National City's residential real estate loan portfolio was dominated by toxic loans provided to borrowers without regard to the borrowers' creditworthiness or ability to repay the loans;" (ii) an overwhelming majority of loans the Company classified as "prime" quality were made to borrowers with subprime credit scores, well below the widely-accepted industry definition of "prime" quality; (iii) National City's allowance and related provisions for loan losses were grossly deficient; (iv) the Company was not "well-capitalized" and, in reality, had insufficient liquidity to absorb the massive losses lingering in its residential real estate loan portfolio; and (v) National City's inability to absorb losses from the inherently risky loans held on its balance sheet … subjected the Company to a debilitating financial crisis.

386. National City agreed to settle the class action claims in November 2010 for $22.5 million.

387. As a result of the increasing number of actions and investigations into National City's fraudulent lending practices, National City was denied federal bailout money by the federal government, making them the only bank out of the top twenty-five in the country to not receive such funds.  PNC Financial Services ("PNC") subsequently purchased National City on October 24, 2008 for approximately $5.2 billion.

### 17.    New Century

388. New Century originated mortgage loans that were pooled in securitizations and purchased by Plaintiffs, including BSABS 2004-HE1 and WMLAT 2007-1.  Formed in 1996, New Century was a leader in the mortgage lending boom, growing rapidly from only $357 million in loan originations in 1996 to over $56 billion in 2005.

389. In order to effectuate such a drastic increase in loan originations, the company began taking on riskier loans, relaxed its underwriting standards, and granted numerous exceptions, accepting loans for 100% of the value of the property and utilizing flawed or fraudulent appraisals.  Maggie Hardiman, a former appraiser for New Century, described the

demands she faced when reviewing loan applications in a May 7, 2007, WASHINGTON POST article.  She recalled how "all hell would break loose" if she turned away a loan, and that when she did reject an application, "her bosses often overruled her and found another appraiser to sign off on it."

390.    On February 7, 2007, New Century announced that it would be restating its 2006 financials due to material weaknesses in internal controls.  On March 2, 2007, the company revealed that it was the subject of two criminal probes and later announced that it would no longer be accepting applications for subprime mortgages.  By March 12, most of its creditors had cut off financing or planned to do so.  On April 2, 2007, New Century collapsed and filed for bankruptcy.

391.    Following the bankruptcy, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a 581-page report on February 9, 2008, detailing the various deficiencies at New Century, including lax mortgage origination standards.  "The theme of the report is how easily the loans were originated, how exceptions were made, how they used bad appraisals" and how "[t]here were no appropriate internal controls…."  Missal also described how New Century "engaged in a number of significant[ly] improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."  According to a March 26, 2008, BLOOMBERG article, "New Century Bankruptcy Examiner Says KPMG Aided Fraud," New Century's loan originations increased dramatically, primarily as a result of the increased exceptions made to its underwriting guidelines and the practice of lending money to homeowners who could not afford the initial "teaser rates."  Missal explained that these practices eventually created "a ticking time bomb that detonated in 2007."

392.    During the course of his investigation, the Examiner conducted 110 interviews of 85 witnesses and reviewed documents from New Century, its outside auditors, and others.  In his Final Report, the Examiner concluded that:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy.  Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.'  Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." (Examiner's Report at 3).

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007.  Subprime loans can be appropriate for a large number of borrowers.  New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id.*

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan.  A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.'  Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies.  Of the New Century loans rejected by investors, issues with appraisals were the cause of more than 25% of these 'kick-outs.'" *Id.* at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks…." *Id.* at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004.  The surge in real estate prices slowed and then began to decrease, and interest rates started to rise.  The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans.  Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages." *Id.* at 4.

393.    The restatement of New Century's financials also prompted the filing of securities class action lawsuits beginning in February 2007.  One complaint filed in the Central District of California alleged that New Century's officers and directors issued materially false and

misleading statements regarding the company's business and financial results. On December 3, 2008, the district court denied the defendants' motion to dismiss, finding actionable certain statements regarding the credit quality of New Century's loans. The court wrote:

> The allegations suggest New Century's repeated assurances of strong credit quality and strict underwriting practices. Even in the sub-prime world, there must be a basis for distinction between loans to at-risk borrowers that met basic standards of good lending practice and loans that plainly do not. Those standards may provide the measure for evaluating Defendants' statements. Here, Plaintiffs offer New Century's statement that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards.

The court also noted that

> [t]he Examiner's Report found knowledge within high-levels of the company of its declining loan quality and underwriting as early as 2004. The Report mentions the internal reports by New Century's Senior Management and negative internal audits that acknowledged serious problems with loan quality and underwriting, as well as the poor performance of the company's high-risk products, and concludes that [ ] New Century failed to respond to "red flags.

New Century agreed to pay more than $90 million to settle these claims in July 2010.

394.    The SEC also charged three former top officers of New Century with securities fraud for misleading investors as New Century's subprime mortgage business was collapsing in 2006. December 7, 2009 complaint alleged that defendants Brad A. Morrice (former CEO), Patti M. Dodge (former CFO), and David N. Kenneally (former Controller), failed to disclose dramatic increases in loan defaults, loan repurchases and pending loan repurchase requests and described the company's business as "anything but 'good' and it soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster." The SEC accepted settlement offers from all three defendants in August 2010.

### 18.    NovaStar

395.    NovaStar originated mortgage loans that were included in Issuing Trusts from which Plaintiff purchased Certificates, including JPMAC 2007-HE1. NovaStar was one of the

top twenty mortgage originators in 2007.   Like the other Originators described herein, NovaStar's rise was accompanied by material departures from its stated underwriting guidelines.

396.   According to a federal securities class action lawsuit filed on October 19, 2007 in the United States District Court for the Western District of Missouri, from at least January 2006 onwards, NovaStar routinely deviated from its underwriting guidelines so that more and more loans could be approved and  then securitized, earning NovaStar large profits.  For example, NovaStar began granting numerous exceptions, such as LTV exceptions, credit score exceptions, and also inflated property value appraisals.  According to a former underwriter at NovaStar's Independence, Ohio office, the Company maintained a phone-in "help desk," referred to as "NovaStar Solutions," that aided the account executives in pre-clearing exceptions for loans that were unusual and that would not be approved in the normal underwriting process.  In fact, the "NovaStar Solutions" help desk had more authority to grant exceptions for loans prior to closing than the underwriters who examined the loans.  In March 2006, NovaStar weakened its underwriting standards further when it lowered the minimum required credit score for individuals seeking a 100% LTV loan to 580.

397.   According to another former underwriter, NovaStar advocated "transactional thinking," whereby, underwriters were told to approve or deny a loan application by assessing whether a particular loan "made sense," regardless of NovaStar's guidelines.  Essentially, underwriters could be creative with the underwriting guidelines and use their personal judgment in applying them, except for the credit score.  For example, the guidelines provided that a borrower needed "time on job" of at least two years.  However, if a borrower had an employment gap of six months but had not missed a credit payment during that time, then the underwriter could make an exception.  In this sense, the guidelines were just parameters and the "unspoken law" was to make loans.

398.    A further way by which NovaStar departed from its underwriting guidelines was to allow for loans to be *re-written*, even during the underwriting process, to ensure approval.  For example, according to one witness, loans that were presented to the underwriters as complete, full documentation loans often were in fact incomplete, lacking proof of salary information or clearly showing that a proposed borrower's bank statements contradicted the information they had affirmed on the application.  In many such cases, rather than rejecting the loan because of the defects, the underwriters and account executives would merely discard the contradicting information and approve it as a low documentation or no documentation loan.

399.    At the same time that it was facilitating the abandonment of its underwriting guidelines, NovaStar began to dismantle the internal checks that had previously been installed to monitor deviations from underwriting guidelines.  PFQC was created to periodically report to the NovaStar's Credit Committee about trends in the underwriting process.  Beginning in late 2005, PFQC saw a massive increase in deviations from the policies and practices that underwriters and account executives were supposed to follow in the loan funding process.  Where loans in the past were granted one exception in the underwriting process, the PFQC auditors were routinely seeing three and four exceptions in loans.

400.    As the number of loans deviating from NovaStar's underwriting guidelines increased, NovaStar took steps to reduce the number of PFQC auditors, as well as other auditors, thus preventing the performance of many audits on the loans NovaStar was funding.  According to a former quality control auditor who worked in the Post-Closing department in Kansas City, the result of this was that fewer funded loans were audited for quality; of those loans that were audited and reviewed, many variances from and exceptions to the underwriting guidelines that previously were flagged and recorded as "high risk" were overlooked in the audit process and removed from the company's system; and it became much more difficult to address and resolve

questions raised by outside investors concerning the specific loans in the pools they were considering purchasing.  By March 2006, two of the managers of the PFQC group, including the Company's Chief Credit Officer, departed from the company.

401.    In February 2007, NovaStar disclosed that loans made in 2006 were defaulting at a "torrid" rate.  According to an April 1, 2007 NEW YORK TIMES article authored by Gretchen Morgenson and Julie Creswell, entitled *Borrowing Trouble*, 53% of the loans underwritten by NovaStar in 2006 did not have full borrower documentation attached to them, and NovaStar's early payment default rate for loans underwritten in 2006 was 8.19%.

402.    NovaStar's complete abandonment of its underwriting guidelines brought about its eventual collapse.  In early 2008, NovaStar completely discontinued its mortgage lending operations and sold its mortgage servicing rights to Saxon Mortgage Services, Inc.   On September 12, 2008, an involuntary petition for liquidation under Chapter 7 was filed against it in the U.S. Bankruptcy Court for the District of Delaware.

### 19.    Option One Mortgage Corporation

403.    Option One was also an originator of mortgage loans purchased by Plaintiffs, including JPMAC 2007-HE1.  Option One was a national mortgage lender formerly owned by H&R Block, Inc., whose assets have now been sold to American Home Mortgage Servicing, Inc. According to the Comptroller of the Currency's "Ten Worst in the Ten Worst" list, Option One was the sixth worst mortgage originator, by number of foreclosures, as of March 22, 2010.

404.    Like the other Originators, Option One was motivated to violate its underwriting and appraisal standards in order to increase the volume of loans that it could sell to Wall Street investment banks for securitization.  Numerous former employees with first-hand knowledge have confirmed that Option One violated its stated standards for underwriting and appraisals.

405.    According to a former underwriter at Option One in Atlanta, Georgia from 2005 to 2006, if an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter.  For a top-producing account executive, whatever red flags existed would be overlooked, and invariably the loan would be pushed through.  The former underwriter estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner.  This witness also stated that a loan applicant could lie about her/his income, but the untrue information would be overlooked and the loan would be approved, even if the former underwriter initially rejected the loan application.

406.    Another witness, an underwriter at Option One's Marietta, Georgia office in 2005, reported that Option One approved stated income loans even though Option One knew the stated income was manifestly implausible.  Another Option One underwriter employed in Hawaii from November 2004 to January 2006 stated that the overwhelming majority of stated income loans were "crafted," meaning that the borrowers were not earning anywhere near what they claimed.  However, this witness stated that he felt pressured to push loans through because every loan generated income and "[i]f you applied any level of rational thought, you were frowned upon."

407.    With respect to property appraisals, a witness stated that Option One routinely inflated appraisal values and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file.  Similarly, a staff review appraiser for Option One working throughout the western United States from January 2004 to May 2007 described the appraisals as bordering on fraudulent but was unable to prevent loans based on the flawed appraisals.  Whenever this witness objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisal Department at Option One's headquarters

146

in Irvine, California. In this manner, loan rejections would be continually escalated until someone high enough in the Underwriting and Sales Department said to go forward with the loan.

408. On June 3, 2008, the Massachusetts AG filed an action against Option One and its past and present parent companies for their unfair and deceptive origination and servicing of mortgage loans. According to the Massachusetts AG, beginning in 2004, Option One "increasingly disregarded underwriting standards, created incentives for loan officers and brokers to disregard the interests of the borrowers and steer them into high-cost loans, and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." The Massachusetts AG alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home", and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." As a result, Option One's "origination policies … employed from 2004 through 2007 have resulted in an explosion of foreclosures."

409. Many consumer lawsuits have also been filed against Option One as a result of its questionable lending practices. *See, e.g., Wade v. Option One Mortgage Corp.*, et al., No. 1:09-cv-11587 (D. Mass. Filed Sept. 23, 2009); *Kanyagui v. First Call Mortgage Co., Inc. et al.,* No. 1:08-cv-11446 (D. Mass. Filed Aug. 20, 2008); *McCarthy v. Option One Mortgage Corp.,* No. 1:08-cv-10980 (D. Mass. Filed June 10, 2008). In April 2009, a consumer lawsuit was filed in the District of Massachusetts claiming that Option One violated TILA and the Real Estate Settlement Procedures Act ("RESPA") by failing to disclose the true cost and interest rates

associated with the borrower's mortgage. *Braun v. Fremont Investment and Loan, et al.*, No. 1:09-cv-10568 (D. Mass. Filed April 14, 2009).  Another complaint filed in November 2009 alleged that Option One had intentionally inflated the borrower's income on loan documentation in order to get the loan approved. *Mantz v. Wells Fargo Bank, N.A., et al.* No. 1:09-cv-12010 (D. Mass. filed Nov. 17, 2009).

### 20.   People's Choice

410.   People's Choice originated mortgage loans that were pooled in securitizations and purchased by Plaintiffs, including the BSABS 2003-HE1 and BSABS 2004-HE1.  People's Choice, founded in 1999, operated as a subsidiary of People's Choice Financial Corporation and marketed itself as a subprime lender of wholesale and retail mortgages through the Internet, issuing over $4.5 billion in mortgage-backed securities in 2005.

411.   People's Choice garnered most of its financial success by targeting and extending subprime loans to borrowers with poor credit histories and by using unscrupulously loose underwriting and lending guidelines in its business practice.  People's Choice also came to possess a reputation in the industry for being a "fraud factory," requiring little or no supporting financial documentation for loans, using inaccurate appraisal values and doctoring loan documents to get borrowers approved.

412.   James LaLiberte, former Chief Operating Officer at People's Choice, stated in a March 22, 2009, interview with DATELINE NBC that the company "got where [they] are" in the business because "[f]raud is what we do."  LaLiberte described how it was his job to set underwriting guidelines but that he was met with "resistance" in his attempts to improve the company's internal procedures.  LaLiberte emphasized how borrowers were not required to document their financial capacity to repay in order to receive a loan and recounted how People's Choice once issued two loans, totaling $640,000, to a massage therapist whose loan

documentation claimed that she made $15,000 per month.  A similar loan was made to a house cleaner whose documentation claimed she made $11,500 per month.

413.    In 2004, a mortgage broker named Heidi Weppelman assisted the FBI in a mortgage fraud investigation in northeast Florida.   Weppelman recorded a telephone conversation with People's Choice employee Jennifer Grosslight that was later used as evidence at the trial of a man, who sold rental homes and referred customers to Weppelman for mortgages. During that conversation, the two women discussed how People's Choice employees would falsify loan documentation, including appraisal values, signatures on contracts and leases and bank account information, in order to process more loans.  Grosslight described these practices as being "totally fine" and that they were "the furthest from any issue."

414.    In September 2005, a class action lawsuit was filed against People's Choice in the United States District Court for the Northern District of Illinois, alleging that People's Choice used "prescreening" mailers in order to identify "persons who [had] poor credit or [had] recently obtained bankruptcy discharges, for the purpose of targeting them for subprime credit." On February 5, 2008, the court granted plaintiffs' motion for a default judgment against defendants for $2 million.

### 21.    PHH

415.    PHH originated mortgage loans that were packaged into RMBS and purchased by Plaintiffs, including JPALT 2006-S3, JPALT 2006-A4, JPALT 2006-A6, JPALT 2006-A7, JPMMT 2005-A6, JPMMT 2005-A7, and JPMMT 2005-S3.   PHH is the wholly-owned subsidiary of PHH Corporation, a Maryland corporation.

416.    According to Inside Mortgage Finance, PHH was the seventh largest overall mortgage loan originator with 3.1% of the market share, and the seventh largest mortgage loan servicer controlling a 1.6% market share.

417.    PHH is facing several lawsuits alleging that it failed to comply with applicable representations and warranties provisions in securitization agreement.  The PHH Corporation 10-K Annual Report, filed on February 28, 2011 for the period ending December 31, 2010, acknowledged that PHH could experience an increase in loan repurchases and indemnifications as a result of the pending lawsuits.

### 22.    ResMae Mortgage Corporation

418.    ResMAE originated mortgage loans that were included in Issuing Trusts from which Plaintiff purchased Certificates, including JPMAC 2007-HE1.  ResMAE Mortgage Corporation was a nationwide mortgage banking company which, originated, sold, and serviced subprime mortgages.  By 2006, ResMAE was one of the fastest growing subprime lenders in the United States.

419.    Because ResMAE lacked the finances to fund loans, it would enter into agreements with financial institutions like JPMorgan Chase to provide a line of credit.  Shortly after originating the loan, ResMAE would sell it to repay its line of credit to the financial institution.

420.    According to BLOOMBERG, ResMAE made $7.7 billion in loans during 2006, up 11% from 2005, placing it twenty-first among U.S. subprime lenders.  Unfortunately, ResMAE's loans proved to be poorly underwritten due to ResMAE's abandonment of its underwriting standards.  DataQuick, a national database of real estate information, reported that approximately two-thirds of the loans that ResMAE made in 2006 are now in default.  On February 12, 2007, ResMAE filed for Chapter 11 bankruptcy.

421.    The Offering Documents for the loans ResMAE originated contained the following statements regarding ResMAE's underwriting guidelines:

> The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrowers to repay the debt and to evaluate the

adequacy of the mortgaged property as collateral for the mortgage loan. ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to income ratio (referred to herein as the "Debt Ratio"), as well as the value, type and use of the mortgaged property.

*        *        *

On a case by case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment, and time in residence at applicant's current address.

J.P. Morgan Acquisition Trust JPMAC 2007-HE1 Prospectus Supplement at S-53.

422.    In reference to the loans that ResMAE originated, the Offering Materials represented that the property underlying the loan was properly appraised and subject to adequate quality control procedures:

The underwriting guidelines of ResMAE are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards, and if appropriate, a review appraisal… Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home

J.P. Morgan Acquisition Trust 2007-HE1 Prospectus Supplement at S-53-54.

423.    The statements in the Offering Documents regarding ResMAE's underwriting standards were materially false and misleading because ResMAE systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors, and with no concern as to the borrower's ability to repay the loan.

424.    Former ResMae personnel interviewed in connection with a separate lawsuit, confirm that employees were to disregard underwriting standards in order to generate more loans. *See Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust et al. v. J.P. Morgan*

*Acceptance Corp. I et al.*, 2:08-cv-01713-ERK-WDW (E.D.N.Y. filed Mar. 26, 2008).  A former credit manager at ResMAE from 2004 through 2005, stated that exceptions to ResMAE's underwriting guidelines accounted for "50 percent" of all underwritten loans.  A former Senior Vice President of ResMAE from 2003 through 2006 confirmed that "exceptions were not uncommon, there were [a] significant [amount of] exceptions…as much as 50%."  Exceptions depended on "the quality of the individual doing [the loan], everybody was incentivized by commissions to [generate a high loan] volume.

425.   According to the former credit manager at ResMAE, the sales department "push[ed]…through" stated income loans that listed incomes that were obviously false. "[T]hat's where things got ridiculous, because as underwriters you were told that things have to make sense, you can't have somebody that is a waitress that is making $5,000 a month and we would say we want to go 'full documentation' and sales would say 'no' and push it through."

426.   A former regional credit manager at ResMAE from March 2004 through March 2007 also noticed problems with stated income loans and appraisals, especially in 2005 and 2006.  She saw "fraud from appraisers, title companies, and…borrowers.  Yeah, they were altering documents and that kind of stuff; that was very big in 2005 and 2006.  Especially the stated income, they would state that they made this income and they didn't, it was [a] misrepresentation."  During the last six months of her employment at ResMAE, she saw a large percentage of exceptions as a result of "an effort to increase [loan] production."

427.   In addition, the former ResMae credit manager noted that she witnessed a lot of borrowers that would list the property as "owner occupied" on their loan applications when in fact the property was not.  In those situations, underwriters were told not to "dig [too] deep" when they suspected that the buyer had made a misrepresentation.  There were even several

instances where the property "didn't even exists, it was like a vacant lot, but yet we had an address and pictures, but when the review appraiser went out there was no property."

ResMAE's reckless origination practices and disregard for appropriate underwriting procedures led to devastating downgrades of the Certificates for which ResMAE acted as an originator

### 23. Sebring

428.    Sebring was an originator of mortgage loans packaged into securitizations purchased by Plaintiffs, including BSABS 2006-HE6.  Sebring, founded in May 1996, was a wholesale residential mortgage lender specializing in subprime and Alt-A products.

429.    Sebring was sued by a borrower in the United States District Court for the District of Nevada on February 25, 2009.  The lawsuit alleged that Sebring had engaged in unfair lending practices in conjunction with the origination of the borrower's mortgage.  The complaint claimed that Sebring had not accurately disclosed the terms of the loan, used inflated property values and subjected the borrower to unnecessary and inflated fees for processing the loan.

430.    Sebring's unsound lending practices eventually led to the company's demise. Rising default rates forced Sebring to buy back many of its loans from investors.  On December 4, 2006, Sebring announced that it was shutting down its lending operation after a major investor cut off funding and a potential sale of the company fell through.  The Illinois Department of Financial and Professional Regulation and the California Corporations Commissioner both revoked Sebring's lending licenses in 2007.

### 24. SouthStar

431.    SouthStar was also an originator of mortgage loans purchased by Plaintiffs, including SACO 2005-10 and SACO 2006-5.  SouthStar was a subprime mortgage lender founded in 1998, and based in Atlanta Georgia.  In 2004, the company generated $4.25 billion in wholesale production and was ranked "Best Company to Work For" by the Atlanta Business

Chronicle.  Despite its relatively positive reputation in the industry, SouthStar closed its doors in early April of 2007 when its investment partners cut off financing due to payment defaults.  In late April of 2007, SouthStar filed for Chapter 7 bankruptcy protection.

432.   In December 2009, a SouthStar customer filed suit in California against SouthStar and others, alleging violations of TILA among other claims.  *Gonzalez v. EJ Mortg., Inc.*, No. 09-cv-2812 BTM (S.D. Cal. filed December 15, 2009).  The plaintiffs claimed that SouthStar failed to verify the income on the loan application to make sure that they could afford the loan payments.  The complaint alleged that SouthStar created their "no document" loan program to make sure that as many borrowers as possible qualified for loans, and claimed that the plaintiffs did not receive required TILA disclosures in connection with their loan.

433.   Another suit was filed in April 2009, making similar claims.  *Michael Kravich v. Wells Fargo Home Mortg.*, No. 09-cv-01061 (E.D. Cal. filed  April 17, 2009).  The customer accused SouthStar of instructing mortgage brokers to lure borrowers into high-interest loans with the knowledge that the borrowers could not afford the payments.  The complaint also alleges that SouthStar failed to make the proper disclosures, failed to maintain the original mortgage notes, and did not follow the proper procedures to assign those notes.

### 25.   SunTrust

434.   SunTrust originated mortgage loans that were packaged into RMBS and purchased by Plaintiffs, including BSABS 2007-SD1.  SunTrust is a Virginia Corporation and a direct wholly-owned subsidiary of SunTrust Bank, a Georgia chartered bank.  According to a January 2009 report by the United States Department of the Treasury entitled *Treasury Department January Monthly Lending and Intermediation Report,* which examined the mortgage origination volumes of the top twenty-one recipients of funds under the Troubled Asset Relief Program ("TARP"), SunTrust originated $3.5 billion in mortgages in January 2009.  SunTrust is

one of the largest residential lenders in the United States, and according to *Mortgage Daily*, SunTrust ranked fifth in residential lending, originating $13.4 billion in loans in 2009.

435.   Like many other originators, SunTrust's success is due largely to high loan volumes as a result of an abandonment of its underwriting standards.   On April 14, 2010, SunTrust's Executive Vice President for Capital Markets, Anthony T. Reed, addressed the House Financial Services Committee of the United States House of Representatives.   Mr. Reed admitted that the "recent crisis in our financial system" resulted from "[l]enders and securitizers relax[ing] underwriting standards and risk management practices."   SunTrust's loan origination tactics fell in line with Mr. Reed's observations.

436.   An investigation by the NECA-IBEW Health & Welfare Fund (the "NECA-IBEW") revealed that SunTrust did not apply its underwriting standards to evaluate a prospective borrower's credit standing and repayment ability.   Instead, SunTrust applied a more lax set of standards.   A former Senior Underwriter, who worked with SunTrust from 2001 until November 2007, stated that in 2004, SunTrust began using Automatic Underwriting Systems ("AUS") to underwrite 75% of the loans that the Senior Underwriter saw.   The AUS approved loan applications as long as they met minimum requirements that were well below SunTrust's stated underwriting guidelines.

437.   The Senior Underwriter estimated that each month, she refused to approve approximately 10% of the loan applications that the AUS approved because they did not meet SunTrust's underwriting standards.   Typically, the Senior Underwriter's rejection of the loan application would be overruled by a supervisor because SunTrust did not care about the risk associated with these loans as long as an investor purchased them.   The unwritten rule at SunTrust was, "make the loan so we can sell it, so we can make more money."

438.   In order to increase loan volume, SunTrust also approved a high level of stated income and low documentation mortgage loans which attracted mortgage brokers and borrowers who would provide false information in order to secure loans.  SunTrust fostered an environment where these individuals could perpetrate fraud by requiring only minimal data to approve new loans.   In addition, SunTrust emphasized speeding up the loan origination process, deemphasizing the quality control and due diligence necessary to reduce the risk associated with loan origination.  Finally, SunTrust paid loan officers based on the number of loans they approved, further discouraging due diligence and increasing the number of high-risk loans that were later packaged into RMBS and sold to investors like Plaintiffs.

439.   SunTrust's consistent deviation from its underwriting standards eventually took its toll.  On January 22, 2009, *Mortgage Daily* reported that SunTrust's fourth quarter earnings report for 2008 contained statements by SunTrust Chairman and CEO, James M. Wells, III, explaining that continued declines in home values increased loan delinquencies and resulted in higher than expected credit losses.  That same month, the parent company of SunTrust and SunTrust Bank, announced that it was ceasing all business activities in FHA loan originations. According to *Mortgage Servicing News*, Fitch downgraded SunTrust's RMBS servicer rating in June 2011.

### 26.   Wells Fargo

440.   Wells Fargo originated mortgage loans that were included the BSABS 2004-SD4 and BSARM 2006-1 Issuing Trusts from which Plaintiffs purchased Certificates.  Wells Fargo originated both prime and subprime, high-cost residential mortgage loans and was one of the nation's largest and most successful mortgage finance companies until the subprime mortgage industry collapsed.

441.    Beginning in 2005, Wells Fargo began abandoning its previously stable lending practices in favor of more profitable "discretionary underwriting," whereby the company encouraged its employees to lend more aggressively.  Between 2005 and 2007, Wells Fargo vigorously loosened its underwriting standards and engaged in the systematic practices of steering borrowers with poor credit into mortgages with fraudulently inflated property values, introducing borrowers to high-risk mortgage products, such as adjustable-rate, interest-only loans and "stated income" loans, and utilizing a compensation structure that rewarded employees for placing borrowers into high-cost mortgages.  By the end of 2008, Wells Fargo's corrupt lending practices forced the company to take significant write-downs as a result of its massive subprime market exposure and, in October 2008, the company received a $25 billion subsidy from the federal government as part of the Federal Emergency Economic Stabilization Act.  In 2010, Wells Fargo was identified by the OCC as the thirteenth worst subprime lender in the country.

442.    As a result, Wells Fargo became the target of several lawsuits and government investigations relating to its lending practices.  As reported by an August 18, 2008 article in the WASHINGTON BUSINESS JOURNAL, "Woman Sues Over Subprime Loan, Wins," one borrower filed a complaint against Wells Fargo in Montgomery County Circuit Court in Maryland after being locked into a subprime loan that she could not afford and subsequently defaulted.  The borrower was awarded $1.25 million in damages after a jury convicted Wells Fargo of fraud, negligence and other charges as a result of the company's practice of intentionally inflating the plaintiff's income and assets in her mortgage application.

443.    On March 27, 2009, a securities class action was filed against Wells Fargo and others in the Northern District of California, alleging that the company violated the Securities Act by engaging in a systematic practice of ignoring stated underwriting guidelines in favor of increased loan generation.  *General Ret. Sys. of the City of Detroit v. The Wells Fargo Mortg.*

*Backed Secs. Trust 2006-AR18 Trust, et al.,* No. 09-cv-1376-LHK (N.D. Cal. filed Mar. 27, 2009).  Specifically, the plaintiffs alleged that Wells Fargo engaged in substandard lending practices, such as providing loans to borrowers with poor credit, allowing stated income loans and no documentation loans to be offered to unqualified borrowers, and originating loans based on fraudulently inflated appraisal values resulting in investment ratings that were inherently flawed.

444.    Witnesses have described Wells Fargo's practice of placing "intense pressure" on loan officers to close loans using fraudulent and deceptive means.  Loan officers were instructed to coerce borrowers into submitting inflated income statements and would use that information to qualify loans without conducting any investigation into the borrower, and would ignore situations where the information provided was false or blatantly implausible.  The complaint also alleged that the appraisals acquired for the properties underlying the loans were fraudulently inflated in order to hide the fact that the value of the mortgages often exceeded the true value of the properties.

## V.    DEFENDANTS SYSTEMATICALLY MISREPRESENTED THAT APPRAISALS FOR THE SECURITIZED MORTGAGES WERE CONDUCTED IN ACCORDANCE WITH INDUSTRY STANDARDS

445.    As stated above, with the emergence of the RMBS market, mortgage lenders, including the Originators found that they could reap the benefits of unrestrained lending while offloading the risks onto investors such as Plaintiffs.  As a result, the Originators had little to no financial interest in whether the mortgaged properties would provide sufficient collateral in case of default, as long as they were able to sell their mortgage loans into securitizations.

446.    The Originators responded to these perverse incentives in part by disregarding USPAP uniform appraisal standards and systematically inflating appraisal values, in many instances lending more than the mortgaged properties were really worth.

447.    Some appraisers were openly instructed to alter their valuations for the benefit of the mortgage lenders.  On June 26, 2007, Alan Hummel, the chair of the Appraisal Institute's Government Relations Committee,[5] testified before the House Committee on Financial Services on "Legislative Proposals on Reforming Mortgage Practices" as follows:  "Unfortunately, these parties with a vested interest in the transaction are often the same people managing the appraisal process within many financial institutions, and therein is a terrible conflict of interest… [I]t is common for a client to ask an appraiser to remove details about the material condition of the property to avoid problems in the underwriting process."  A 2007 study conducted by the October Research Corporation[6] reported that 90% of appraisers had been pressured to raise property valuations so that deals could go through, and that 75% of appraisers reported "negative ramifications" if they did not alter their appraisals accordingly.

448.    According to one witness, a former Senior Processor, Junior Underwriter, and Compliance Controller who worked at Chase Home Finance between December 2002 and October 2007, underwriters at JPMorgan Bank and Chase Home Finance received bonuses "not based on the length of the loan or the delinquency rate.  The bonus was based just on putting through the loan."  In order to have these loans approved and bonuses increased these employees would pressure appraisers to appraise properties at artificially high levels or they would not be hired again, resulting in appraisals being done on a "drive-by" basis where appraisers issued their appraisals without reasonable bases for doing so.  This former employee regularly saw managers at Chase Home Finance "brow beating" appraisers to get their prices up.

---

[5] The Appraisal Institute is a global membership association of professional real estate appraisers, with more than 24,000 members and 91 chapters throughout the world.

[6] The October Research Corporation is a provider of market intelligence, industry news and regulatory information for professionals in the real estate, settlement services and mortgage industries.

449.    According to a former loan officer for Chase Home Finance, through at least 2004 and potentially later, loan officers would state the actual target price on the appraisal request in order for the mortgage to be approved.  If the desired price was not obtained, the loan officers would call the appraiser again and "see what they could do to get the price changed and get the loan approved."  It was in the appraiser's interest to obtain the desired value in order to continue to work with Chase Home Finance.  Additionally, the loan officer stated that Chase Home Finance changed the policy around 2005, so loan officers could only select appraisal firms from an approved list which Chase Home Finance provided.

450.    Even absent explicit coercion or collusion, mortgage originators could inflate apparent home values simply by offering work only to compliant appraisers.  According to the April 7, 2010 testimony of Richard Bitner ("Bitner"), a former executive of a subprime mortgage originator, before the FCIC, "[B]rokers didn't need to exert direct influence.  Instead they picked another appraiser until someone consistently delivered the results they needed."

451.    Widespread and systematic overvaluations by mortgage originators set into motion a snowball effect that inflated housing prices all across the country and further distorted the RMBS market.  As Bitner testified,

> If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals.  The process then repeats itself.  We saw it on several occasions.  We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later.  Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more… ***In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country.***

452.    Reflecting the importance of independent and accurate real estate appraisals to investors such as Plaintiffs, the Offering Documents contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts and the

appraisal methods by which such values were obtained.  Each Prospectus Supplement also reported the average LTV ratios of the mortgage loans pooled in the Issuing Trusts.

453.    Because investors such as Plaintiffs would not have invested in the Certificates had they known of Originators' abandonment of prudent appraisal methods, Defendants falsely claimed in the Offering Documents that the mortgaged properties securing the Certificates had been appraised by qualified independent appraisers in conformance with USPAP.  Defendants further claimed in the Offering Documents that their appraisal values were based on market data analyses of recent sales of comparable properties.

454.    Defendants' claims regarding LTV ratios were also false and misleading.  Due to the Originators' systematic abuse of the appraisal process and disregard for USPAP appraisal standards, the reported value of the properties securing the mortgage loans was substantially overstated.  This distorted the loan-to-value ratio, making the Certificates appear to be safer investments than they actually were.

455.    As discussed in Section III *supra*, the LTV ratio is one of the most important measures of the riskiness of a loan.  In the Offering Documents, Defendants acknowledge that loans with high LTV ratios are more likely to default.  For example, the Prospectus Supplement (Form 4245B) for J.P. Morgan Alternative Loan Trust, 2006-S3, filed on June 30, 2006**,** states that, "Loans with higher loan-to-value ratios may present a greater risk of loss than loans with loan-to-value ratios of 80% or below."  Furthermore, if a borrower does default and the property enters foreclosure, the Issuing Trust is much more likely to recover the outstanding balance on the loan through a foreclosure sale if the LTV ratio is low.

456.    Mortgage loans that are "underwater"— that is to say, those where the LTV ratio is greater than 100% because the value of the outstanding loan exceeds the value of the collateral – are extremely risky investments.  In these cases, the borrower has a strong incentive to default,

the possibility that the borrower will be capable of refinancing are virtually nil, and if the mortgage enters foreclosure the Issuing Trust will definitely incur a loss.

457.    Appraisals that do not conform to USPAP standards can artificially lower LTV ratios by overstating the value of the mortgaged properties.  In instances where LTV values have been distorted by faulty appraisals, RMBS investors are unaware of the true value of their collateral until default and foreclosure occur.    The FCIC Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States discussed this problem.

> As the housing market expanded, another problem emerged, in subprime and prime mortgages alike: inflated appraisals.  For the lender, inflated appraisals meant greater losses if a borrower defaulted.  But for the borrower or for the broker or loan officer who hired the appraiser, an inflated value could make the difference between closing and losing the deal.  Imagine a home selling for $200,000 that an appraiser says is actually worth only $175,000.  In this case, a bank won't lend a borrower, say, $180,000 to buy the home. The deal dies.  Sure enough, appraisers began feeling pressure.  One 2003 survey found that 55% of appraisers had felt pressed to inflate the value of homes; by 2006, this had climbed to 90%.

458.    Defendants had a responsibility to ensure that the LTV figures they presented in the Offering Documents were not the product of fraudulent appraisals.  As the PSI stated in its staff report, 'Wall Street and the Financial Crisis: Anatomy of a Financial Collapse,' "Whether appraisals are conducted internally by the bank or through a vendor, the bank must take responsibility for establishing a standard process to ensure accurate, unbiased home appraisal values."

459.    Mass Mutual and the FHFA's reviews of the loans underlying 34 JPMorgan-issued RMBS, 44 Bear Stearns-issued RMBS, 27 WaMu-issued RMBS, and 16 Long Beach-issued RMBS – which included loans from the same series and time period as offerings in which Plaintiffs invested – revealed that, in addition to consistently misrepresenting owner-occupancy rates, as discussed more fully below, Defendants also consistently misrepresented the LTV ratios

of the underlying mortgages and the number of properties with high LTV ratios.  For each loan they examined, Mass Mutual and the FHFA used an industry standard automated valuation model ("AVM") to calculate the value of the mortgaged property at the time of origination. AVMs are commonly used in the real estate industry and rely upon similar data as appraisers, including county records, tax records, and data on comparable properties.

460.    The FHFA's review of 31 JPMorgan RMBS revealed that in each case, the Offering Documents overstated the percentage of loans with low LTV ratios (defined as LTV ratios less than 80%) by between 14.24% and 44.79%.  The Offering Documents understated the percentage of underwater loans (loans with LTV ratios greater than 100%) by between 5.81% and 23.87%.

461.    The FHFA's review of 31 Bear Stearns RMBS revealed that in each case, the Offering Documents overstated the percentage of loans with low LTV ratios (*i.e.*, less than 80%) by as much as 55.02%.  The Offering Documents understated the percentage of underwater loans by between 5.89% and 60.70%.  Only two of the RMBS examined did not misrepresent the percentage of loans with high LTV ratios.

462.    The FHFA's review of 22 WaMu RMBS revealed that in each case, the offering documents overstated the percentage of loans with low LTV ratios (*i.e.*, less than 80%) by between 6.48% and 42.23%.  The offering documents understated the percentage of underwater loans by between 3.72% and 26.24%.  Only three of the RMBS examined did not misrepresent the percentage of loans with high LTV ratios.

463.    The FHFA's review of 16 Long Beach RMBS revealed that in each case, the offering documents overstated the percentage of loans with low LTV ratios (defined as LTV ratios less than 80%) by between 22.77% and 43.87%.  The offering documents understated the percentage of underwater loans (loans with LTV ratios greater than 100%) by between 6.45%

and 21.35%.  Only four of the RMBS examined did not misrepresent the percentage of loans

with high LTV ratios.

464.    Specifically, with respect to the eleven JPMorgan, Bear Stearns, and WaMu

reviewed by the FHFA and also purchased by Plaintiffs, the misrepresentations are:

| Issuing Trust | Overstated Percentage with Low LTV's | Understated Percentage of Underwater Loans |
|---|---|---|
| JPMAC 2006-CH2 | 26.60% | 15.05% |
| JPMAC 2006-FRE2 | 18.70% | 16.16% |
| BALTA 2005-10 | 41.94% | 8.44% |
| BSABS 2006-HE10 | 20.68 | 23.03 |
| BSABS 2007-HE1 | 21.08% | 22.71% |
| BSABS 2007-HE2 | 18.09% | 29.92% |
| BSABS 2007-HE6 | 22.69% | 26.95% |
| BSABS 2007-HE7 | 28.60% | 20.46% |
| WMALT 2006-AR5 | 18.99% | 8.84% |
| WMALT 2006-AR8 | 24.05% | 9.87% |
| WMALT 2007-OA3 | 24.44% | 16.25% |

465.    Although Mass Mutual presented its data differently than the FHFA did, its

review also revealed significant misrepresentations of LTV data.  Mass Mutual found that for all

four of the JPMorgan RMBS it analyzed, the offering documents had understated the weighted

average LTV ratio by between 6.09 and 10.41% and understated the percentage of loans with

high LTV ratios (defined as LTV ratios greater than 90%) by between 11.7 % and 24.78%.

Likewise, for each of the 13 Bear Stearns RMBS that Mass Mutual reviewed, the offering

documents had understated the weighted average LTV ratio by between 8.97% and 15.04% and

understated the percentage of loans with high LTV ratios (*i.e.*, greater than 90%) by between

7.68% and 32.99%.  Finally, for each of the five WaMu RMBS that Mass Mutual reviewed, the offering documents had understated the weighted average LTV ratio by between 9.76% and 14.57% and understated the percentage of loans with high LTV ratios (*i.e.*, greater than 90% ) by between 16.2 and 30.38%.

466.    On information and belief, the mortgage loans underlying all of the Certificates purchased by Plaintiffs – which included loans from the same series and time period as offerings in which Plaintiffs invested – suffer from similar deficiencies as the mortgage loans underlying the Certificates purchased by Mass Mutual and Freddie Mac.   The loan-level analyses demonstrate that Defendants have engaged in a systematic practice of understating LTV ratios and the number of underwater properties.

## VI.    A SIGNIFICANT NUMBER OF THE MORTGAGE LOANS WERE MADE TO BORROWERS WHO DID NOT OCCUPY THE PROPERTIES IN QUESTION

467.    The Offering Documents contained information regarding the purported occupancy status of the mortgaged properties, including whether they were primary homes, investment property, or second homes.  These representations were material to investors such as Plaintiffs because loans for owner-occupied properties are much less likely to default than loans for second homes or investment properties.  Owner-occupancy rates are an important metric for judging the safety of a mortgage pool.

468.    Allstate, the FHFA, and Mass Mutual each conducted loan-level analyses of JPMorgan related RMBS that they had purchased.  These forensic analyses covered thousands of individual mortgage loans.  To determine whether a given borrower actually occupied the property, Allstate, the FHFA, and Mass Mutual investigated tax information for the sampled loans.  Additionally, credit records, property records and lien records were reviewed in an effort to determine whether the borrowers were in fact residing at the mortgaged property.

469.    Allstate found that for each of the six JPMorgan RMBS that it reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by between 8.7% and 13.8%.  Likewise, for each of the six Bear Stearns RMBS that Allstate reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by between 7.44% and 11.96%.  For each of the five WaMu RMBS that Allstate reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by between 14% and 16.8%.

470.    The FHFA's analysis revealed that for the 31 JPMorgan RMBS that it reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by an average of 11.14%.  Likewise, for each of the 31 Bear Stearns RMBS that the FHFA reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by an average of 9.77%.  For each of the 22 WaMu RMBS that the FHFA reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by an average of 11.95%.  Finally, for each of the 16 Long Beach RMBS reviewed by the FHFA, the Offering Documents had overstated the percentage of borrowers occupying the mortgaged properties by an average of 10.22%.

471.    Finally, Mass Mutual's analysis found that for the four JPMorgan RMBS that it reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by between 8.74% and 11.32%.  Likewise, for each of the 13 Bear Stearns RMBS that Mass Mutual reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by between 5.95% and 13.53%.  For each of the five WaMu RMBS that Mass Mutual reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by between 8.11% and 15.16%.

472.     On information and belief, the mortgage loans underlying all of the Certificates purchased by Plaintiffs – which included loans from the same series and time period as offerings in which Plaintiffs invested – suffer from similar deficiencies as the mortgage loans underlying the Certificates purchased by Allstate, Mass Mutual, and Fannie Mae/Freddie Mac.  Three separate analyses covering a total of 41 JPMorgan, 50 Bear Stearns, 32 WaMu, and 16 Long Beach RMBS offerings have uncovered material overstatements of the owner-occupancy ratio in every single offering.   There is no reason to believe that the systematic and pervasive misrepresentation of owner-occupancy rates identified by Allstate, Mass Mutual, and the FHFA were confined to the RMBS they examined.

## VII.     DEFENDANTS' "CREDIT ENHANCEMENTS" WERE INTENDED TO MANIPULATE CREDIT RATINGS RATHER THAN PROVIDE SECURITY

473.     Defendants used a variety of credit enhancements.  Credit enhancement represents the amount of "cushion" or protection from loss exhibited by a given security.  This cushion is intended to improve the likelihood that holders of investment grade rated certificates receive the interest and principal they expect based on the Offering Documents.   The level of credit enhancement offered is based on the makeup of the loans in the underlying collateral pool. Riskier pools necessarily need higher levels of credit enhancement to ensure payment to senior certificate holders.  Credit enhancements for a given trust also impact the overall credit rating that a given tranche of certificates receives.  The level of credit enhancement for the Certificates was material to Plaintiffs because it represented the protection purportedly afforded from loss.

474.     The most common was "subordination" in which the Defendants created a hierarchy of loss absorption among the tranche securities.  To create that hierarchy, Defendants placed the pool's tranches in an order, with the lowest tranche required to absorb any losses first, before the next highest tranche.  Losses might occur, for example, if borrowers defaulted on their mortgages and stopped making payments into the pool.  Lower level tranches most at

risk of having to absorb losses typically received non-investment grade ratings from the credit rating agencies, while the higher level tranches that were supposed to be protected from loss typically received investment grade ratings.  One key task for both Defendants and the credit rating agencies was to calculate the amount of subordination required to ensure that the higher tranches in a pool were protected from loss and could be given investment grade ratings.

475.    A second common form of credit enhancement was "over-collateralization."  In this credit enhancement, the Defendants ensured that the revenues expected to be produced by the assets in a pool exceeded the revenues designated to be paid out to each of the tranches.  That excess amount provided a financial cushion for the pool and was used to create an "equity" tranche, which was the first tranche in the pool to absorb losses if the expected payments into the pool were reduced.  This equity tranche was subordinate to all the other tranches in the pool and did not receive any credit rating.  The larger the excess, the larger the equity tranche, and the larger the cushion created to absorb losses and protect the more senior tranches in the pool.  In some pools, the equity tranche was also designed to pay a relatively higher rate of return to the party or parties who held that tranche due to its higher risk.

476.    Still another common form of credit enhancement was the creation of "excess spread," which involved designating an amount of revenue to pay the pool's monthly expenses and other liabilities, but ensuring that the amount was slightly more than what was likely needed for that purpose.  Any funds not actually spent on expenses would provide an additional financial cushion to absorb losses, if necessary.

477.    Former ratings agency analysts and managers told the PSI that investment banks pressured them to get their deals done quickly, increase the size of the tranches that received high credit ratings and reduce the credit enhancements protecting the higher rated tranches from loss.  In an October 2007 memorandum, Moody's Chief Credit Officer Andrew Kimball wrote,

"The real problem is not that the market does underweights [sic] ratings quality but rather that in some sectors, it actually penalizes quality by awarding rating mandates based on the lowest credit enhancement needed for the highest rating."

478.   As set forth below, representations regarding the inclusion and scope of these credit enhancements were made in all of the Offering Documents.  These representations were false and misleading because all of the purported "enhancements" depended on or derived from inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.

## VIII.   THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES

479.   The credit ratings of the Certificates were an important factor in Plaintiffs' decision to purchase the Certificates.

480.   Investment grade securities are understood by investors to be stable, secure and safe.  A rating of AAA denotes high credit quality, and is the same rating as those typically assigned to bonds backed by the full faith and credit of the United States Government, such as treasury bills.   Historically, before 2007, investments with AAA ratings had an expected cumulative loss rate of less than 0.5 percent, with an annual loss rate of close to zero.  According to S&P, the default rate on all investment grade corporate bonds (including AA, A and BBB) from 1981 to 2007, for example, averaged about .094% per year and was not higher than 0.41% in any year.

481.   The Defendants well understood (and banked on) the importance that purchasers of mortgage-backed securities attached to credit ratings.  In most cases, the purchasers were institutional investors such as Plaintiffs who did not have the knowledge, means, or wherewithal to independently analyze the mortgage pools underlying any particular offering to verify for themselves that the ratings were accurately determined.

482.     Accordingly, Defendants featured the ratings prominently in the Offering Documents and discussed at length the ratings assigned to the Certificates, and the bases for the ratings.  Each Prospectus Supplement stated that the issuance of each tranche of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in a chart.  All the Certificates purchased by Plaintiffs were at least investment grade when issued and purchased.

483.     Unbeknownst to Plaintiffs, at all relevant times, Defendants knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by Defendants to the rating agencies.  In fact, Defendants manipulated the rating agencies to obtain the desired ratings for the Certificates.

484.     Specifically, the ratings of the Certificates were significantly compromised by the misinformation provided by Defendants to the rating agencies.   Among other matters, Defendants did not disclose to the rating agencies that the Originators had abandoned their underwriting standards by, among other things, manipulating the assets, liabilities, income and other important information concerning borrowers, using false metrics to qualify borrowers, and aggressively using exceptions to qualify borrowers.  Defendants did not disclose their knowledge that, in obtaining appraisals to value the underlying collateral, the Originators used inflated appraisals that departed from industry approved standards.   Defendants did not otherwise disclose their knowledge of the pervasive fraud that affected the mortgages underlying the Certificates.

485.     Apart from supplying incomplete and false information to the rating agencies, Defendants also manipulated their relationships with the rating agencies in order to achieve the desired ratings.  The rating agencies received enormous revenues from the issuers who paid them for rating their securities.  Because the desired rating of a securitized product was the starting

point for any securities offering, the rating agencies were actively involved in helping Defendants structure the products to achieve the requested rating.  As a result, the rating agencies essentially worked backwards, starting with Defendants' target rating and then working toward a structure that would yield the desired rating.  Among other things, the rating agencies instructed Defendants on how much "credit enhancement" to provide to each tranche of the Certificates, in order to secure the desired ratings.

486.    When the rating agencies did exercise independent judgment, Defendants were quick to retaliate.  For example, by October 2007, the rating agencies had become increasingly concerned with rising mortgage default rates and as a result, S&P and Moody's downgraded certain RMBS issued by Bear Stearns.  Defendant Marano responded with a furious attempt to bully them into compliance, using fees as a club.  According to a complaint filed by Ambac Assurance Corp. against EMC, in an October 17, 2007, email, Marano instructed his staff to suspend payment to the rating agencies, writing, "My intention is to contact my peer at each firm as well as the investors who bought the deals.  From there, we are going to demand a waiver of fees.  In the interim, ***do not pay a single fee to either rating agency.  Hold every fee up***." *Ambac Assurance Corp. v. EMC Mortgage, Corp.*, No. 08-9464 (S.D.N.Y. filed Jan. 20, 2011) (emphasis added in complaint).

487.    In this manner, Defendants were able to manipulate the rating agencies to achieve the inflated ratings they desired.  Through repeated communications with the rating agencies, Defendants were effectively able to reverse engineer aspects of the ratings models and then modify the structures of their offerings to improve the ratings without actually improving the underlying credit quality.

488.    In a 2008 Report entitled "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies", the SEC confirms that the

issuers and the rating agencies worked together so that securities would receive the highest ratings:

> Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche -- as the highest rated tranche -- pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

489.    The rating process was further compromised by the practice of "rating shopping." Defendants did not pay for the credit rating agencies' services until after the agencies submitted a preliminary rating. Essentially, this practice created bidding wars in which the issuers would hire the agency that was providing the highest rating for the lowest price. The credit rating agencies were only paid if they delivered the desired investment grade ratings, and only in the event that the transaction closed with those ratings. "Ratings shopping" jeopardized both the integrity and independence of the rating process.

490.    As a result, the Certificates were not worthy of the investment grade ratings given to them, as evidenced most clearly by the fact that many of the Certificates have now been downgraded to junk, a vast number of the underlying loans have been foreclosed upon, and the remaining underlying loans are suffering from crippling deficiencies and face serious risks of default. The collective downgrade of the Certificates indicates that the ratings set forth in the Offering Documents were false, unreliable and inflated. As JPMorgan Chase CEO Jamie Dimon admitted, "[t]here was a large failure of common sense" because "[v]ery complex securities shouldn't have been rated as if they were easy-to-value bonds." Roger Lowenstein, *"Triple-A Failure,"* THE NEW YORK TIMES (Apr. 27, 2008).

491.    By including and endorsing the investment grade ratings contained in the Offering Documents, Defendants falsely represented that they actually believed that the ratings were an accurate reflection of the credit quality of the Certificates.

## IX.    DEFENDANTS FAILED TO ENSURE THAT TITLE TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED

492.    A fundamental aspect of the mortgage securitization process is that the issuing trust for each offering must obtain good title to the mortgage loans comprising the pool for that offering.  This is necessary in order for the holders of the RMBS to be legally entitled to enforce the mortgage loans in the event of default.  Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

493.    The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law).  In general, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale.  In addition, state laws generally require that the trustee of the issuing trust have physical possession of the original, manually signed promissory note in order for the loan to be enforceable by the trustee against the borrower in the event of a default by the borrower.

494.    In order to preserve the bankruptcy-remote status of the issuing trusts in RMBS transactions, the notes and security instruments are generally not directly transferred from the mortgage loan originator to the trust.  Rather, the notes and security instruments are initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities.  After this initial transfer to the depositor, the depositor transfers the notes and security

interests to the issuing trust for the particular securitization.  Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

495.    To ensure that the trust qualifies as a tax-free real estate mortgage investment conduit, the PSA generally requires the transfers to the trust to be completed within a strict time limit after formation of the trust.  Furthermore, the applicable trust law in each state generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.  Adam Levitin, a professor of law at Georgetown University, testified before the United States House Subcommittee on Housing and Community Opportunity, that, "If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact *non-mortgage backed securities*."

496.    On November 18, 2010, Professor Levitin testified about the importance of the chain of title to investors and the consequences of faulty transfers before a hearing of the House Financial Services Committee:

> Concerns about securitization chain of title also go to the standing question; if the mortgages were not properly transferred in the securitization process (including through the use of MERS to record the mortgages), then the party bringing the foreclosure does not in fact own the mortgage and therefore lacks standing to foreclose.  If the mortgage was not properly transferred, there are profound implications too for investors, as the mortgage-backed securities they believed they had purchased would, in fact be non-mortgage-backed securities, which would almost assuredly lead investors to demand that their investment contracts be rescinded[.]

> *        *        *

> Securitization is the legal apotheosis of form over substance, and if securitization is to work it must adhere to its proper, prescribed form punctiliously.  The rules of the game with securitization, as with real property law and secured credit are, and always have been, that dotting "i's" and crossing "t's" matter, in part to ensure the

fairness of the system and avoid confusions about conflicting claims to property. Close enough doesn't do it in securitization; if you don't do it right, you cannot ensure that securitized assets are bankruptcy remote and thus you cannot get the ratings and opinion letters necessary for securitization to work.   Thus, it is important not to dismiss securitization problems as merely "technical;" these issues are no more technicalities than the borrower's signature on a mortgage. Cutting corners may improve securitization's economic efficiency, but it undermines its legal viability.

497.    On October 27, 2010, Katherine Porter, then a visiting a professor at Harvard Law School specializing in consumer credit, consumer protection regulation, and mortgage servicing, provided similar testimony before the Congressional Oversight Panel:

The implications of problems with transfer are serious.  If the [securitization] trust does not have the loan, homeowners may have been making payments to the wrong party.  If the trust does not have the note or mortgage, it may not have standing to foreclose or legal authority to negotiate a loan modification.  To the extent that these transfers are being completed retroactively, it raises issues about honesty in creating and dating the assignments/transfers and about what parties can do, if anything, if an entity in the securitization chain, such as Lehman Brothers or New Century, is no longer in existence.   Moreover, retroactive transfers may violate the terms of the trust, which often prohibit the addition of new assets, or may cause the trust to lose its REMIC status, a favorable treatment under the Internal Revenue Code.  Chain of title problems have the potential to expose the banks to investor lawsuits and to hinder their legal authority to foreclose or even to do loss mitigation.

*        *        *

I want to share with the Panel that the lawyers that I have met over years of my research on mortgage servicing both creditor lawyers and debtor lawyers have nearly universally expressed that they believe a very large number (perhaps virtually all) securitized loans made in the boom period in the mid-2000s contain serious paperwork flaws, did not meet underwriting or other requirements of the trust, and have not been serviced properly as to default and foreclosure.

498.    It is now clear that Defendants did not transfer securitized loans to the Issuing Trusts in a timely fashion, if they did so at all.  According to a Federal Reserve press release, banking organizations including JPMorgan Chase & Co. engaged in "a pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and

175

foreclosure processing.   These deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at these institutions."

499.   In April 2011, Defendant JPMorgan Chase entered into a consent order (the "Consent Order") with the Federal Reserve regarding JPMorgan Chase's mortgage loan servicing business, including its servicing of loans pooled in securitization trusts.   The Consent Order noted that entities controlled by JPMorgan Chase had allegedly engaged in unsound servicing practices including initiating foreclosures "without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party."   Under the terms of this Consent Order, JPMorgan Chase was required to take steps to remedy deficiencies in its servicing and foreclosure activities, including retaining independent consultants to determine whether foreclosures initiated by JPMorgan entities had been based upon proper documentation, devising a plan to remediate foreclosure errors, and submitting to the Federal Reserve an acceptable written plan to strengthen oversight of risk management, internal audit and legal compliance programs.

500.   The Offering Documents for the Certificates represented in substance that the Issuing Trust for each respective offering had obtained good title to the mortgage loans comprising the pool underlying the offering.   However, in actual fact, Originators and Defendants routinely and systematically failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments.

501.   MERS, the electronic mortgage registry used by the banking industry a unit of Merscorp Inc of Reston, Virginia, has faced multiple investigations for its role in thousands of problematic U.S. foreclosure cases.   MERS tracks servicing rights and ownership interests in

mortgage loans on its electronic registry, allowing banks to buy and sell loans without recording transfers with individual counties.

502.    Most recently, MERS has been the subject of a joint Delaware-New York probe. The registry has been sued by the Delaware Attorney General, which accuses MERS of deceptive practices that led to unlawful shortcuts in dealing with the foreclosure crisis.  *See State of Del v. MERSCORP Inc.*, C.A. No. 6987 (Del. Ch. Oct. 27, 2011).  The Delaware complaint alleges that "MERS engaged and continues to engage in a range of deceptive trade practices that sow confusion among consumers, investors and other stakeholders in the mortgage finance system, damage the integrity of Delaware's land records, and lead to unlawful foreclosure practices."

503.    New York's attorney general has also taken action against MERS, subpoenaing the registry for information about how it is used by major banks, including JPMorgan Chase, and a foreclosure law firm.

504.    On September 29, 2010, JPMorgan announced that it was freezing foreclosure proceedings in 23 states due to defects in its loan files and foreclosure documents.  According to an October 13, 2010 BLOOMBERG article, all 50 state attorneys general have launched a coordinated investigation into whether banks including JPMorgan used false documents to justify foreclosing on mortgages for which they did not possess legal title.

## X.    DEFENDANTS' SPECIFIC MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

505.    In light of the numerous departures from underwriting guidelines and appraisal standards by the Originators described above, as well as Defendants' own manipulation of the rating process and disregard of prudent title transfer and documentation practices, the Offering Documents (Registration Statements and Prospectus Supplements) disseminated by Defendants

in the course of selling the Certificates contained numerous misstatements and omissions, as set forth below.

### A. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING STANDARDS AND PRACTICES

506. Defendants issued Offering Documents that contained the following misrepresentations concerning the underwriting guidelines and practices of JPMorgan, Bear Stearns, WaMu and Long Beach:

> (a) ***Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral.*** In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents: Registration Statement (333-127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A, Am.1), at 164 (Aug. 15, 2006); Prospectus Supplement for ChaseFlex Trust 2006-1 (Form 424B5), at 33 (May 24, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-S3 (Form 424B5), at S-19 (Jun. 30, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A7 (Form 424B5), at S-24 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-FRE2 (Form 424B5), at 143 (Mar. 30, 2006); Registration Statement (333-130223) filed by Chase Finance Mortgage Corp. (Form S-3/A, Am. 3), at S-35 (Mar. 21, 2006); Registration Statement (333-130192) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 3), at 86 (Apr. 3, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A4 (Form 424B5), at S-20 (Jul. 28, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-CH2 (Form 424B5), at

22 (Dec. 13, 2006); Prospectus Supplement for J.P. Morgan MAC 2007-HE1 (Form 424B5), at

20 (Jun. 15, 2007); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A6 (Form 424B5), at

S-26 (Aug. 31, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A7 (Form 424B5),

at S-23 (Sep. 29, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-S3 (Form

424B5), at S-30 – S-31 (Dec. 28, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2007-

A1 (Form 424B5), at 22 (Jan. 30, 2007); Registration Statement (333-141607) filed by

JPMorgan Acceptance Corp. I (Form S-3/A, Am. 1), at 102 (Apr. 23, 2007).

> (b)      The ***underwriting guidelines are primarily intended to assess the
> borrower's ability to repay the mortgage loan, to assess the value
> of the mortgaged property and to evaluate the adequacy of the
> property as collateral for the mortgage loan***.   While the
> originator's primary consideration in underwriting a mortgage loan
> is the value of the mortgaged property, the originator also
> considers, among other things, a mortgagor's credit history,
> repayment ability and debt service to income ratio as well as the
> type and use of the mortgaged property.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Bear Stearns ABS I Trust 2004-HE1

(Form 424B5), at S-29  (Jan. 29, 2004); Prospectus Supplement for Bear Stearns ABS I Trust

2003-HE1 (Form 424B5), at S-29  (Dec. 30, 2003); Prospectus Supplement for Bear Stearns

ABS I Trust 2004-AC3 (Form 424B5), at S-28  (May 28, 2004); Prospectus Supplement for Bear

Stearns ABS I Trust 2004-AC5 (Form 424B5), at S-31  (Oct. 1, 2004); Prospectus Supplement

for Bear Stearns ABS I Trust 2006-HE6 (Form 424B5), at 35 (Jun. 27, 2006); Prospectus

Supplement for Bear Stearns Mortgage Funding Trust 2006-AR4 (Form 424B5), at 81 (Nov. 30,

2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR5 (Form

424B5), at 22 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS Trust 2004-SD4

(Form 424B5), at S-37  (Nov. 19, 2004); Prospectus Supplement for Bear Stearns ABS I Trust

2006-IM1 (Form 424B5), at 34  (Apr. 25, 2004); Registration Statement (333-113636) filed by

Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at S-24 (Apr. 21, 2004); Registration Statement (333-91334) filed by Bear Stearns Asset Backed Securities, Inc. (Form S-3/A, Am. 1), at S-24 (Nov. 13, 2002); Registration Statement (333-132232) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 17 (Mar. 10, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 38 (Feb. 27, 2007); Registration Statement (333-125422) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at 90 (Jun. 14, 2005); Registration Statement (333-131374) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 5), at S-42 (Mar. 31, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-7 (Form 424B5), at 12 (Jul. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-9 (Form 424B5), at 12 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-10 (Form 424B5), at 12 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE10 (Form 424B5), at 40 (Jan. 3, 2007); Prospectus Supplement for Bear Stearns ABS Trust 2007-SD1 (Form 424B5), at S-63 (Jan. 19, 2007); Prospectus Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at 11 (Mar. 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at 14 (Sep. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form 424B5), at 14 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at 14 (Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2005-1 (Form 424B5), at 12 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-2 (Form 424B5), at 11 (Mar. 2, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-5 (Form 424B5), at 12 (Jul. 15, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-12 (Form 424B5), at 213 (Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 25 (May 31, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 29 (Jun. 30, 2006);Registration Statement (333-120916) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 11 (Dec. 14,

2004); Registration Statement (333-106323) filed by Structured Asset Mortgage Investments II

Inc. (Form S-3/A, Am. 1), at 14 (Jul. 11, 2003); Prospectus Supplement for Bear Stearns ABS I

Trust 2007-HE1 (Form 424B5), at 39 (Jan. 31, 2007); Registration Statement (333-115122) filed

by Structured Asset Mort. Investments II Inc. (Form S-3/A, Am. 1), at 14 (May 11, 2004);

Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at S-61 (Feb. 1, 2006).

> (c)     [The originator's] underwriting standards are applied by or on
> behalf of [the originator] to evaluate the applicant's credit standing
> and ability to repay the loan, as well as the value and adequacy of
> the mortgaged property as collateral.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Document:  Prospectus Supplement for Bear Stearns ARM Trust 2006-1

(Form 424B5), at 21 (Mar. 17, 2006) ; Prospectus Supplement for Bear Stearns Alt-A Tr. 2004-

11 (Form 424B5), at 14 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-

3 (Form 424B5), at S-31 (Mar. 31, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr.

2006-6 (Form 424B5), at 16 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr.

2006-8 (Form 424B5), at 17 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS I

Trust 2005-AC3 (Form 424B5), at S-40 (May 31, 2005); Prospectus Supplement for Bear

Stearns ABS I Trust 2007-HE6 (Form 424B5), at 29 (Aug. 30, 2007); Prospectus Supplement for

Bear Stearns ABS I Trust 2007-HE7 (Form 424B5), at 30 (Sep. 19, 2007); Prospectus

Supplement for Bear Stearns ARM Trust 2006-4 (Form 424B5), at 146 (Oct. 2, 2006);

Prospectus Supplement for Bear Stearns Structured Products Inc. Tr. 2007-R6 (Form 424B5), at

405 (Sep. 4, 2007); Prospectus Supplement for SACO I Trust 2005-10 (Form 424B5), at S-30

(Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at 32-33 (Apr.

27, 2006).

> (d)     All of the mortgage loans owned by the Trust have been originated
> in accordance with the underwriting standards of the sponsor or the

underwriting guidelines of Washington Mutual Bank as described in this section.

The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WMALT Series 2006-9 (Form 424B5), at S-26 (Oct. 27, 2006); Prospectus Supplement for WaMu Series 2003-AR1 (Form 424B5), at 18 (Jan. 27, 2003); Prospectus Supplement for WaMu Series 2003-AR3 (Form 424B5), at 18 (Feb. 24, 2003); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-63 (Mar. 27, 2007); Registration Statement (333-77026) filed by WaMu Mort. Sec. Corp. (Form S-3/A, Am. 1), at 18 (Feb. 1, 2002); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-28 (Jan. 3, 2006); Registration Statement (333-103345) filed by WaMu Mortgage Sec. Corp. (Form S-3/A, Am. 1), at 18 (Mar. 7, 2003); Registration Statement (333-123034) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at 29 (Jun. 13, 2005); Prospectus Supplement for WaMu Series 2002-AR17 (Form 424B5), at 17-18 (Oct. 23, 2002); Prospectus Supplement for WaMu Series 2005-AR6 (Form 424B5), at 19 (Apr. 26, 2005); Prospectus Supplement for WaMu Series 2005-AR8 (Form 424B5), at 17-18 (Jul. 14, 2005); Prospectus Supplement for WaMu Series 2005-AR11 (Form 424B5), at 17-18 (Aug. 24, 2005); Prospectus Supplement for WaMu Series 2005-AR13 (Form 424B5), at 28 (Oct. 24, 2005); Prospectus Supplement for WaMu Series 2005-AR17 (Form 424B5), at 28 (Dec. 19, 2005); Prospectus Supplement for WaMu Series 2005-AR19 (Form 424B5), at 28 (Dec. 22, 2005); Prospectus Supplement for WaMu Series 2006-AR3 (Form 424B5), at S-25 (Feb. 22, 2006); Prospectus Supplement for WaMu Series 2006-AR4 (Form 424B5), at S-35 (Apr. 21, 2006); Prospectus Supplement for WaMu Series 2006-AR7 (Form

424B5), at S-38 (Jun. 26, 2006); Prospectus Supplement for WaMu Series 2006-AR9 (Form

424B5), at S-34 (Jul. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR12 (Form

424B5), at S-26 (Sep. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR15 (Form

424B5), at S-36 (Oct. 24, 2006); Prospectus Supplement for WaMu Series 2006-AR17 (Form

424B5), at S-37 (Nov. 20, 2006); Prospectus Supplement for WaMu Series 2006-AR19 (Form

424B5), at S-39 (Dec. 20, 2006); Prospectus Supplement for WaMu Series 2007-HE3 (Form

424B5), at 29 (May 9, 2007); Prospectus Supplement for WaMu Series 2007-HY1 (Form

424B5), at S-25 (Jan. 23, 2007); Prospectus Supplement for WaMu Series 2007-HY5 (Form

424B5), at S-28 (Apr. 24, 2007); Prospectus Supplement for WMALT Series 2005-6 (Form

424B5), at 19 (Jul. 27, 2005); Prospectus Supplement for WMALT Series 2006-5 (Form 424B5),

at S-38 (Jun. 29, 2006); Prospectus Supplement for WMALT Series 2006-AR5 (Form 424B5), at

S-47 (Jun. 27, 2006); Prospectus Supplement for WMALT Series 2006-AR8 (Form 424B5), at

S-50 (Sep. 28, 2006); Prospectus Supplement for WMALT Series 2007-1 (Form 424B5), at S-29

(Jan. 29, 2007); Registration Statement (333-141255) filed by WaMu Asset Acceptance Corp.

(Form S-3/A, Am. 1), at S-30 (Apr. 9, 2007).

(e) ***All mortgage loans to be included in a trust fund will have been subject to underwriting standards acceptable to the depositor and applied as described in the following paragraph. Each mortgage loan seller, or another party on its behalf, will represent and warrant that mortgage loans purchased by or on behalf of the depositor from it have been originated by the related originators in accordance with these underwriting guidelines.***

The underwriting standards are applied by the originators to evaluate the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents: Prospectus Supplement for Long Beach MLT 2004-3 (Form

424B5), at 21-22 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form

424B5), at 21 (Feb. 4, 2004); Registration Statement (333-109318) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at 21-22 (Feb. 10, 2004); Registration Statement (333-90550) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at 21 (Jun. 25, 2002); Registration Statement (333-41712) filed by Long Beach Sec. Corp. (Form S-3/A, Am.2), at 28-29 (Jan. 3, 2006); Prospectus Supplement for Long Beach MLT 2002-2 (Form 424B5), at 28-29 (May 31, 2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form 424B5), at 21-22 (Sep. 7, 2004).

507.   The above statements of material fact were untrue when made because they represented that the Originators applied underwriting guidelines to assess the value of the mortgaged properties, evaluate the adequacy of such properties as collateral for the mortgage loans, and assess the applicants' abilities to repay their mortgage loans, when in fact the Originators had actually abandoned these standards so that they could increase the volume of loan origination and the resulting fees that they earned.  For further discussion of Originators' disregard of their stated underwriting guidelines, see Section IV, *supra*.

### B.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING QUALITY CONTROL PROCEDURES

508.   The Offering Documents represented that numerous quality control procedures were conducted with respect to the loans underlying the Certificates.  For example, the Offering Documents contained, in sum or substance, the following representations:

> (a)   Performing loans acquired by the sponsor are subject to varying levels of due diligence prior to purchase.  Portfolios may be reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws. Performing loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents: Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 42 (Feb. 28, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2006-

HE6 (Form 424B5), at 37 (Jun. 27, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR4 (Form 424B5), at 18 (Nov. 30, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR5 (Form 424B5), at 19 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2006-IM1 (Form 424B5), at 42-43 (Apr. 25, 2004); Registration Statement (333-132232) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 61 (Mar. 10, 2006) ; Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE1 (Form 424B5), at 43-44 (Jan. 31, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE10 (Form 424B5), at 263 (Jan. 3, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE6 (Form 424B5), at 32 (Aug. 30, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE7 (Form 424B5), at 32 (Sep. 19, 2007); Prospectus Supplement for Bear Stearns ABS Trust 2007-SD1 (Form 424B5), at S-65 (Jan. 19, 2007); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at S-46 (Dec. 1, 2004); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at S-43 (Apr. 27, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 27 (May 31, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 31 (Jun. 30, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at S-47 (Feb. 1, 2006).

> (b) All mortgage loans are subject to a sampling by the applicable Washington Mutual Seller's internal quality assurance department, which reviews and verifies a statistical sampling of loans on a regular basis.

The above misstatement was contained in the following Offering Document: Prospectus Supplement for Bear Stearns ABS Trust 2004-SD4 (Form 424B5), at S-42 (Nov. 19, 2004).

> (c) Mortgage loans to be included in a mortgage pool will be purchased on the closing date by the depositor either directly or indirectly from Affiliated Sellers or Unaffiliated Sellers. *The depositor will acquire mortgage loans utilizing re-underwriting criteria which it believes are appropriate*, depending to some extent on the depositor's or its affiliates' prior experience with the Seller and the servicer, as well as the depositor's prior experience

185

> with a particular type of mortgage loan or with mortgage loans
> relating to mortgaged properties in a particular geographical
> region.  A standard approach to re-underwriting is to compare loan
> file information and information that is represented to the depositor
> on a tape with respect to a percentage of the mortgage loans the
> depositor deems appropriate in the circumstances.  The depositor
> will not undertake any independent investigations of the
> creditworthiness of particular obligors.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Document: Registration Statement (333-120916) filed by Structured Asset

Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 10 (Dec. 14, 2004); Registration

Statement (333-106323) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A,

Am. 1), at 13 (Jul. 11, 2003); Prospectus Supplement for Bear Stearns Alt-A Tr. 2004-11 (Form

424B5), at 13 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-7 (Form

424B5), at 12 (Jul. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-9 (Form

424B5), at 12 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-10 (Form

424B5), at 12 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-6 (Form

424B5), at 16 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-8 (Form

424B5), at 17 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ARM Trust 2004-2

(Form 424B5), at 11 (Mar. 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-

8 (Form 424B5), at 13 (Sep. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust

2004-9 (Form 424B5), at 13 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust

2005-1 (Form 424B5), at 12 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM

Trust 2005-2 (Form 424B5), at 10-11 (Mar. 2, 2005); Prospectus Supplement for Bear Stearns

ARM Trust 2005-5 (Form 424B5), at 12 (Jul. 15, 2005); Prospectus Supplement for Bear Stearns

ARM Trust 2005-12 (Form 424B5), at 213 (Dec. 30, 2005); Prospectus Supplement for Bear

Stearns ARM Trust 2006-4 (Form 424B5), at 146 (Oct. 2, 2006); Prospectus Supplement for

Bear Stearns Structured Products Inc. Tr. 2007-R6 (Form 424B5), at 404 (Sep. 4, 2007).

(d)     ***Quality Control Review***

> As part of its quality control system, the sponsor re-verifies information that has been provided by the mortgage brokerage company prior to funding a loan and the sponsor conducts a post-funding audit of every origination file.  ***In addition, Washington Mutual Bank periodically audits files based on a statistical sample of closed loans.***  In the course of its pre-funding review, the sponsor re-verifies the income of each prospective borrower or, for a self-employed prospective borrower, reviews the income documentation obtained under the full documentation and limited documentation residential loan programs.  The sponsor generally requires evidence of funds to close on the mortgage loan.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Registration Statement (333-141255) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-32 (Apr. 9, 2007); Registration Statement (333-123034) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-20 (Jun. 13, 2005); Prospectus Supplement for WaMu Series 2006-AR3 (Form 424B5), at S-28 (Feb. 22, 2006); Prospectus Supplement for WaMu Series 2006-AR4 (Form 424B5), at S-37 (Apr. 21, 2006); Prospectus Supplement for WaMu Series 2006-AR7 (Form 424B5), at S-40 (Jun. 26, 2006); Prospectus Supplement for WaMu Series 2006-AR9 (Form 424B5), at S-37 (Jul. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR12 (Form 424B5), at S-28 (Sep. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR15 (Form 424B5), at S-38 (Oct. 24, 2006); Prospectus Supplement for WaMu Series 2006-AR17 (Form 424B5), at S-39 (Nov. 20, 2006); Prospectus Supplement for WaMu Series 2006-AR19 (Form 424B5), at S-41 (Dec. 20, 2006); Prospectus Supplement for WaMu Series 2007-HE3 (Form 424B5), at 30-31 (May 9, 2007); Prospectus Supplement for WaMu Series 2007-HY1 (Form 424B5), at S-27 (Jan. 23, 2007); Prospectus Supplement for WaMu Series 2007-HY5 (Form 424B5), at S-30 (Apr. 24, 2007); Prospectus Supplement for WMALT Series 2006-5 (Form 424B5), at S-41 (Jun. 29, 2006); Prospectus Supplement for WMALT Series 2006-AR5 (Form 424B5), at S-50 (Jun. 27, 2006);

Prospectus Supplement for WMALT Series 2006-AR8 (Form 424B5), at S-53 (Sep. 28, 2006);

Prospectus Supplement for WMALT Series 2007-1 (Form 424B5), at S-32 (Jan. 29, 2007).

(e)     *Quality Control Review*

As part of its quality control system, ***Long Beach re-verifies information with respect to the foregoing matters that has been provided by the mortgage brokerage company prior to funding a loan and WMBFA, as subservicer, periodically audits files based on a statistical sample of closed loans. In the course of its pre-funding audit, Long Beach re-verifies the income of each mortgagor or, for a self-employed individual, reviews the income documentation obtained*** (only under the Full Doc residential loan program).  Long Beach generally requires the evidence of funds available for the down payment.  In the course of its re-underwriting of the WAMU Loans, Long Beach reviews the mortgagor's application completed in connection with the origination of the mortgage loan but does not re-verify any of the information included in such application.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-3 (Form 424B5), at S-49 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form 424B5), at S-49 (Feb. 4, 2004); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-30 (Jan. 3, 2006); Prospectus Supplement for Long Beach MLT 2002-2 (Form 424B5), at S-54 (May 31, 2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form 424B5), at S-47 (Sep. 7, 2004).

509.    WaMu and Long Beach also made the following misrepresentations:

***Strong Compliance Culture***

✓     Compliance reporting lines are independent of business units

✓     LBM compliance officers dedicated to loan fulfillment centers

✓     High cost calculations automated in the loan origination system and prohibit approval of high cost loans

  ✓   *100% of loans are reviewed for, among other things, compliance with key consumer regulations prior to funding*

  ✓   100% of refinance loans must pass a net tangible benefits test

  ✓   *Corporate Compliance Risk reviews a sample of closed loans every month for compliance by loan fulfillment center and the grades are part of the loan fulfillment center's Key Performance Indicators*

The above misstatements were contained in the following Offering Documents:  Free Writing Prospectus filed by Long Beach Sec. Corp. (Form FWP), at 26 (Nov. 17, 2006); Free Writing Prospectus filed by WaMu Asset Acceptance Corp. (Form FWP), at 29 (Jan. 26, 2007).

510.   WaMu and Long Beach also made the following misrepresentations:

**Risk Management – Sellers**
▪ Seller due diligence focused on developing a long-term profitable relationship

  –   Thorough *review of business and lending practices, underwriting philosophy and guidelines*

    •   Comparison to industry standards

    •   *Focus on prudent risk management of seller*

The above misstatements, in identical or substantially similar language, were contained in the following Offering Documents:  Free Writing Prospectus filed by Long Beach Sec. Corp. (Form FWP), at 29 (Nov. 17, 2006); Free Writing Prospectus filed by WaMu Asset Acceptance Corp. (Form FWP), at 32 (Jan. 26, 2007).

511.   WaMu and Long Beach also made the following misrepresentations:

**Risk Management – Mortgages**

▪ Extensive use of models drives performance expectations
  – Models are constantly re-calibrated to incorporate recent performance history
▪ Clearly established minimum standards

189

- Credit standards reviewed and approved by Washington Mutual Credit Policy Committee
- Seller pools are filtered to so that loans meet minimum standards prior to due diligence
- NO FICO < 500
- MAX LTV/CLTV 100
- NO High-risk property types: MH, 5+ units, condotels, coops, time shares

- **Significant level of loan level due diligence by third-party due diligence firms**
  - **100% complete re-underwrite on pools purchased from new sellers**
  - **25% - 100% complete re-underwrite for repeat sellers**
  - **100% - validation of appraisal using third-party appraisal valuation product**
  - **20% - 100% appraisals reviewed using appraiser drive-by review**
  - **100% collateral file review by custodian**
  - 100% review for consumer compliance
  - 100% review for predatory practices: flipping, equity stripping, fraud

- **Washington Mutual management reviews all due diligence decisions by third-parties**

The above misstatements, in identical or substantially similar language, were contained in the following Offering Documents: Free Writing Prospectus filed by Long Beach Sec. Corp. (Form FWP), at 30 (Nov. 17, 2006); Free Writing Prospectus filed by WaMu Asset Acceptance Corp. (Form FWP), at 33 (Jan. 26, 2007).

512.    The above statements of material facts were untrue when made because they failed to disclose that the Sponsors and Originators did not, in fact, apply quality control measures to assess the value of the mortgaged properties, evaluate the adequacy of such properties as collateral for the mortgage loans, or assess the applicants' ability to repay their mortgage loans.

### C.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING EXCEPTIONS

513.   Defendants issued Offering Documents that contained the following misrepresentations concerning the  policy with respect to underwriting exceptions:

(a)   ***From time to time, exceptions to a lender's underwriting policies may be made.  Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter.  Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.***

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Registration Statement (333-130192) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 3), at 86 (Mar. 31, 2006); Registration Statement (333-127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A, Am.1), at 164 (Aug. 15, 2006); Prospectus Supplement for ChaseFlex Trust 2006-1 (Form 424B5), at S-49 (May 24, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-S3 (Form 424B5), at S-20 (Jun. 30, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A7 (Form 424B5), at S-25 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-FRE2 (Form 424B5), at 143-44 (Mar. 30, 2006); Registration Statement (333-130223) filed by Chase Finance Mortgage Corp.  (Form S-3/A, Am. 3), at S-36 (Mar. 21, 2006); Registration Statement (333-141607) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 1), at 102 (Apr. 23, 2007); Prospectus Supplement for J.P. Morgan ALT 2006-A4 (Form 424B5), at S-21 (Jul. 28, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-CH2 (Form 424B5), at 22 (Dec. 13, 2006); Prospectus Supplement for J.P. Morgan MAC 2007-HE1 (Form 424B5), at 20 (Jun. 15, 2007); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A6 (Form 424B5), at S-27 (Aug. 31, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A7 (Form 424B5), at S-23 (Sep. 29, 2005); Prospectus Supplement

for J.P. Morgan Mort. Tr. 2005-S3 (Form 424B5), at S-31 (Dec. 28, 2005); Prospectus

Supplement for J.P. Morgan Mort. Tr. 2007-A1 (Form 424B5), at 23 (Jan. 30, 2007).

> (b) ***Any exceptions to the underwriting policies must be approved by the manager of the underwriting department. The factors considered when determining if an exception to the general underwriting standards should be made include the quality of the property, how long the borrower has owned the property, the amount of disposable income, the type and length of employment, the credit history, the current and pending debt obligations, the payment habits and the status of past and currently existing mortgages.***

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Registration Statement (333-125422) filed by Bear Stearns ABS

I LLC (Form S-3/A, Am. 1), at 91 (Jun. 14, 2005); Prospectus Supplement for Bear Stearns ABS

I Trust 2007-HE2 (Form 424B5), at 38 (Feb. 27, 2007); Registration Statement (333-131374)

filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 5), at S-42 (Mar. 31, 2006); Prospectus

Supplement for Bear Stearns ABS I Trust 2004-HE1 (Form 424B5), at S-29  (Jan. 29, 2004);

Prospectus Supplement for Bear Stearns ABS I Trust 2003-HE1 (Form 424B5), at S-29  (Dec.

30, 2003); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC3 (Form 424B5), at S-

28  (May 28, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC5 (Form

424B5), at S-31 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE6

(Form 424B5), at 35 (Jun. 27, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding

Trust 2006-AR4 (Form 424B5), at 21 (Nov. 30, 2006); Prospectus Supplement for Bear Stearns

Mortgage Funding Trust 2006-AR5 (Form 424B5), at 22 (Dec. 29, 2006); Prospectus

Supplement for Bear Stearns ABS Trust 2004-SD4 (Form 424B5), at S-40 (Nov. 19, 2004);

Prospectus Supplement for Bear Stearns ABS I Trust 2006-IM1 (Form 424B5), at 37 (Apr. 25,

2004); Registration Statement (333-113636) filed by Bear Stearns ABS I LLC (Form S-3/A, Am.

1), at S-25 (Apr. 21, 2004); Registration Statement (333-91334) filed by Bear Stearns Asset

Backed Securities, Inc. (Form S-3/A, Am. 1), at S-25 (Nov. 13, 2002) ; Prospectus Supplement

for Bear Stearns ABS I Trust 2007-HE1 (Form 424B5), at 39 (Jan. 31, 2007); Prospectus

Supplement for Bear Stearns ABS I Trust 2007-HE6 (Form 424B5), at 29-30 (Aug. 30, 2007);

Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE7 (Form 424B5), at 30 (Sep. 19,

2007); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at 33 (Apr. 27, 2006);

Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at S-57 (Feb. 1, 2006).

(c)   ***Exceptions to the underwriting standards are permitted where
compensating factors are present***.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Bear Stearns Alt-A Tr. 2004-11

(Form 424B5), at S-37 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-3

(Form 424B5), at S-31 (Mar. 31, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-

7 (Form 424B5), at S-53 (Jul. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr.

2005-9 (Form 424B5), at S-53 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr.

2005-10 (Form 424B5), at S-40 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A

Tr. 2006-6 (Form 424B5), at S-55 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A

Tr. 2006-8 (Form 424B5), at S-53 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS

I Trust 2005-AC3 (Form 424B5), at S-40 (May 31, 2005); Prospectus Supplement for Bear

Stearns ABS I Trust 2006-HE10 (Form 424B5), at 40 (Jan. 3, 2007); Prospectus Supplement for

Bear Stearns ABS Trust 2007-SD1 (Form 424B5), at S-62 – S-63 (Jan. 19, 2007); Prospectus

Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at S-44 (Mar. 31, 2004);

Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at S-34 (Sep. 30,

2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form 424B5), at S-41 (Nov.

1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at S-42

(Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2005-1 (Form 424B5), at S-

33 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-2 (Form 424B5),

at S-24 (Mar. 2, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-5 (Form

424B5), at S-26 (Jul. 15, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-12

(Form 424B5), at 39 (Dec. 30, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2006-

4 (Form 424B5), at 36 (Oct. 2, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form

424B5), at 25 (May 31, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5),

at 29 (Jun. 30, 2006).

> (d)     ***Exceptions to the sponsor's loan program parameters may be
> made on a case-by-case basis if compensating factors are present.***
> In those cases, the basis for the exception is documented, and in
> some cases the approval of a senior underwriter is required.
> Compensating factors may include, but are not limited to, low
> loan-to-value ratio, low debt-to-income ratio, good credit standing,
> the availability of other liquid assets, stable employment and time
> in residence at the prospective borrower's current address.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Registration Statement (333-130795) filed by WaMu Asset

Acceptance Corp. (Form S-3/A, Am. 1), at S-30 (Jan. 3, 2006); Prospectus Supplement for

WaMu Series 2003-AR1 (Form 424B5), at 18 (Jan. 27, 2003); Prospectus Supplement for WaMu

Series 2003-AR3 (Form 424B5), at 18 (Feb. 24, 2003); Prospectus Supplement for WMALT

Series 2006-9 (Form 424B5), at S-27 (Oct. 27, 2006); Prospectus Supplement for WMALT

Series 2007-OA3 (Form 424B5), at S-64 (Mar. 27, 2007); Registration Statement (333-77026)

filed by WaMu Mort. Sec. Corp. (Form S-3/A, Am. 1), at 18 (Feb. 1, 2002) ; Registration

Statement (333-123034) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-19

(Jun. 13, 2005); Registration Statement (333-141255) filed by WaMu Asset Acceptance Corp.

(Form S-3/A, Am. 1), at S-32 (Apr. 9, 2007); Prospectus Supplement for WaMu Series 2006-

AR3 (Form 424B5), at S-27 (Feb. 22, 2006); Prospectus Supplement for WaMu Series 2006-

AR4 (Form 424B5), at S-37 (Apr. 21, 2006); Prospectus Supplement for WaMu Series 2006-

AR7 (Form 424B5), at S-40 (Jun. 26, 2006); Prospectus Supplement for WaMu Series 2006-

AR9 (Form 424B5), at S-36 (Jul. 25, 2006); Prospectus Supplement for WaMu Series 2006-

AR12 (Form 424B5), at S-28 (Sep. 25, 2006); Prospectus Supplement for WaMu Series 2006-

AR15 (Form 424B5), at S-38 (Oct. 24, 2006); Prospectus Supplement for WaMu Series 2006-

AR17 (Form 424B5), at S-39 (Nov. 20, 2006); Prospectus Supplement for WaMu Series 2006-

AR19 (Form 424B5), at S-41 (Dec. 20, 2006); Prospectus Supplement for WaMu Series 2007-

HE3 (Form 424B5), at 30 (May 9, 2007); Prospectus Supplement for WaMu Series 2007-HY1

(Form 424B5), at S-27 (Jan. 23, 2007); Prospectus Supplement for WaMu Series 2007-HY5

(Form 424B5), at S-30 (Apr. 24, 2007); Prospectus Supplement for WMALT Series 2006-5

(Form 424B5), at S-40 (Jun. 29, 2006); Prospectus Supplement for WMALT Series 2006-AR5

(Form 424B5), at S-49 (Jun. 27, 2006); Prospectus Supplement for WMALT Series 2006-AR8

(Form 424B5), at S-52 (Sep. 28, 2006); Prospectus Supplement for WMALT Series 2007-1

(Form 424B5), at S-31 (Jan. 29, 2007).

> (e)     ***On a case-by-case basis and only with the approval of a lending officer with appropriate risk level authority, Long Beach may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under its underwriting risk category guidelines warrants an underwriting exception***. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the Mortgage Loans to be included in the Mortgage Pool will represent exceptions to the underwriting guidelines.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-3 (Form

424B5), at S-48 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form

424B5), at S-48 (Feb. 4, 2004); Registration Statement (333-109318) filed by Long Beach Sec.

Corp. (Form S-3/A, Am.1), at S-24 (Feb. 10, 2004); Registration Statement (333-90550) filed by

Long Beach Sec. Corp. (Form S-3/A, Am.1), at S-24 (Jun. 25, 2002); Registration Statement (333-41712) filed by Long Beach Sec. Corp. (Form S-3/A, Am.2), at S-22 (Jan. 3, 2006); Prospectus Supplement for Long Beach MLT 2002-2 (Form 424B5), at S-53 (May 31, 2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form 424B5), at S-46 (Sep. 7, 2004).

514.     The above statements of material facts were untrue when made because they failed to disclose that, in order to generate increased loan volume for securitizations, and in contravention of Defendants' and the third party originators' underwriting guidelines, Defendants and the third party originators allowed non-qualifying borrowers to be approved for loans under "exceptions" to their underwriting standards, even though there were no "compensating factors" that could possibly justify such exceptions.

### D. DEFENDANTS MADE UNTRUE STATEMENTS AND OMISSIONS REGARDING LOAN-TO-VALUE RATIOS AND APPRAISALS

515.     The Offering Documents represented that independent appraisals were prepared for each mortgaged property and that reports were prepared to substantiate these appraisals.  For example, the Offering Documents contained, in sum or substance, the following representations:

> (a)     The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  ***All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.***  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  ***The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties*** and, when deemed applicable, an analysis based on income generated from

> the property or a replacement cost analysis based on the current
> cost of constructing or purchasing a similar property.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for J.P. Morgan ALT 2006-S3 (Form

424B5), at S-20 (Jun. 30, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A7 (Form

424B5), at S-25 (Nov. 30, 2006); Registration Statement (333-130223) filed by Chase Finance

Mortgage Corp.  (Form S-3/A, Am. 3), at 31 (Mar. 21, 2006); Prospectus Supplement for J.P.

Morgan ALT 2006-A4 (Form 424B5), at S-21 (Jul. 28, 2006); Prospectus Supplement for J.P.

Morgan MAC 2007-HE1 (Form 424B5), at 57 (Jun. 15, 2007); Prospectus Supplement for J.P.

Morgan Mort. Tr. 2005-A6 (Form 424B5), at S-28 (Aug. 31, 2005); Prospectus Supplement for

J.P. Morgan Mort. Tr. 2005-A7 (Form 424B5), at S-24 (Sep. 29, 2005); Prospectus Supplement

for J.P. Morgan Mort. Tr. 2005-S3 (Form 424B5), at S-31 (Dec. 28, 2005); Prospectus

Supplement for J.P. Morgan Mort. Tr. 2007-A1 (Form 424B5), at S-29 (Jan. 30, 2007).

> (b) ***Mortgaged properties that are to secure home loans generally are
> appraised by qualified independent appraisers.  These appraisers
> inspect and appraise the subject property and verify that the
> property is in acceptable condition.  Following each appraisal,
> the appraiser prepares a report that includes a market value
> analysis based on recent sales of comparable homes in the area*** and, replacement cost analysis based on the current cost of
> constructing a similar home and, when deemed appropriate, market
> rent analysis based on the rental of comparable homes in the area.
> ***All appraisals are required to conform to the Uniform Standard
> of Professional Appraisal Practice adopted by the Appraisal
> Standards Board of the Appraisal Foundation and are generally
> on forms acceptable to Fannie Mae and Freddie Mac***.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Registration Statement (333-131374) filed by Bear Stearns ABS

I LLC (Form S-3/A, Am. 5), at S-27 (Mar. 31, 2006); Registration Statement (333-125422) filed

by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at 90 (Jun. 14, 2005); Prospectus Supplement

for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 36 (Feb. 28, 2007); Prospectus

Supplement for Bear Stearns ARM Trust 2006-1 (Form 424B5), at 50 (Mar. 17, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2004-HE1 (Form 424B5), at S-29 (Jan. 29, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2003-HE1 (Form 424B5), at S-29 (Dec. 30, 2003); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC3 (Form 424B5), at S-30 (May 28, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC5 (Form 424B5), at S-33 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE6 (Form 424B5), at 35 (Jun. 27, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR4 (Form 424B5), at 23 (Nov. 30, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR5 (Form 424B5), at 23 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS Trust 2004-SD4 (Form 424B5), at S-41 (Nov. 19, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2006-IM1 (Form 424B5), at 34 (Apr. 25, 2004); Registration Statement (333-113636) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at S-25 (Apr. 21, 2004); Registration Statement (333-132232) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 18 (Mar. 10, 2006); Registration Statement (333-115122) filed by Structured Asset Mort. Investments II Inc. (Form S-3/A, Am. 1), at 15 (May 11, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE1 (Form 424B5), at 35-36 (Jan. 31, 2007); Registration Statement (333-120916) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 12 (Dec. 14, 2004); Registration Statement (333-106323) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 15 (Jul. 11, 2003); Prospectus Supplement for Bear Stearns Alt-A Tr. 2004-11 (Form 424B5), at S-40 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-3 (Form 424B5), at S-33 (Mar. 31, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-7 (Form 424B5), at S-48 (Jul. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-9 (Form 424B5), at S-47 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-

10 (Form 424B5), at 13 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-6 (Form 424B5), at 35 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-8 (Form 424B5), at 201 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2005-AC3 (Form 424B5), at S-42 (May 31, 2005); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE10 (Form 424B5), at 40 (Jan. 3, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE6 (Form 424B5), at 30 (Aug. 30, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE7 (Form 424B5), at 31 (Sep. 19, 2007); Prospectus Supplement for Bear Stearns ABS Trust 2007-SD1 (Form 424B5), at S-63 (Jan. 19, 2007); Prospectus Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at S-46 (Mar. 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at 15 (Sep. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form 424B5), at 15 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at 15 (Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2005-1 (Form 424B5), at 13 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-2 (Form 424B5), at 12 (Mar. 2, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-5 (Form 424B5), at 13 (Jul. 15, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-12 (Form 424B5), at 214 (Dec. 30, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2006-4 (Form 424B5), at 147 (Oct. 2, 2006); Prospectus Supplement for Bear Stearns Structured Products Inc. Tr. 2007-R6 (Form 424B5), at 405 (Sep. 4, 2007); Prospectus Supplement for SACO I Trust 2005-10 (Form 424B5), at S-31 (Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at 32 (Apr. 27, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 25 (May 31, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 29 (Jun. 30, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at S-59-60 (Feb. 1, 2006).

(c)     *Evaluation of the Adequacy of Collateral*

*The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines.  At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac.* Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines. *Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed.* However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties.  In either case, *the appraisal normally is based upon a market data analysis of recent sales of comparable properties* and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.  For mortgage loans underwritten under the sponsor's streamline documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing mortgage loan to be used.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-29 (Jan. 3, 2006); Prospectus Supplement for WMALT Series 2006-9 (Form 424B5), at S-27 (Oct. 27, 2006); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-64 (Mar. 27, 2007); Registration Statement (333-141255) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-31 (Apr. 9, 2007); Prospectus Supplement for WaMu Series 2006-AR3 (Form 424B5), at S- 26(Feb. 22, 2006); Prospectus Supplement for WaMu Series 2006-AR4 (Form 424B5), at S-36 (Apr. 21, 2006); Prospectus Supplement for WaMu Series 2006-AR7 (Form 424B5), at S-39 (Jun. 26, 2006); Prospectus Supplement for WaMu Series 2006-AR9 (Form 424B5), at S-35 (Jul. 25,

2006); Prospectus Supplement for WaMu Series 2006-AR12 (Form 424B5), at S-37 (Sep. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR15 (Form 424B5), at S-37 (Oct. 24, 2006); Prospectus Supplement for WaMu Series 2006-AR17 (Form 424B5), at S-38 (Nov. 20, 2006); Prospectus Supplement for WaMu Series 2006-AR19 (Form 424B5), at S-40 (Dec. 20, 2006); Prospectus Supplement for WaMu Series 2007-HY1 (Form 424B5), at S-26 (Jan. 23, 2007); Prospectus Supplement for WaMu Series 2007-HY5 (Form 424B5), at S-29 (Apr. 24, 2007); Prospectus Supplement for WMALT Series 2006-5 (Form 424B5), at S-39 (Jun. 29, 2006); Prospectus Supplement for WMALT Series 2006-AR5 (Form 424B5), at S-48 (Jun. 27, 2006); Prospectus Supplement for WMALT Series 2006-AR8 (Form 424B5), at S-51 (Sep. 28, 2006); Prospectus Supplement for WMALT Series 2007-1 (Form 424B5), at S-30 (Jan. 29, 2007).

> (d)   ***The Company's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac.  In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed.  The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property.***

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WaMu Series 2003-AR1 (Form 424B5), at 18 (Jan. 27, 2003); Prospectus Supplement for WaMu Series 2003-AR3 (Form 424B5), at 18 (Feb. 24, 2003); Registration Statement (333-77026) filed by WaMu Mort. Sec. Corp. (Form S-3/A, Am. 1), at 18 (Feb. 1, 2002); Registration Statement (333-103345) filed by WaMu Mortgage Sec. Corp. (Form S-3/A, Am. 1), at 18 (Mar. 7, 2003); Prospectus Supplement for WaMu Series 2002-AR17 (Form 424B5), at 18 (Oct. 23, 2002); Prospectus Supplement for WaMu Series 2005-AR6 (Form 424B5), at 20 (Apr. 26, 2005); Prospectus Supplement for

WaMu Series 2005-AR8 (Form 424B5), at 18 (Jul. 14, 2005); Prospectus Supplement for WaMu

Series 2005-AR11 (Form 424B5), at 18 (Aug. 24, 2005); Prospectus Supplement for WaMu

Series 2005-AR13 (Form 424B5), at 29 (Oct. 24, 2005); Prospectus Supplement for WaMu

Series 2005-AR17 (Form 424B5), at 29 (Dec. 19, 2005); Prospectus Supplement for WaMu

Series 2005-AR19 (Form 424B5), at 29 (Dec. 22, 2005); Prospectus Supplement for WaMu

Series 2007-HE3 (Form 424B5), at 30 (May 9, 2007); Prospectus Supplement for WMALT

Series 2005-6 (Form 424B5), at 142 (Jul. 27, 2005).

> (e) **_Evaluation of the Adequacy of Collateral_**
>
> > **_The adequacy of the mortgaged property as collateral is generally
> > determined by an appraisal of the mortgaged property that
> > generally conforms to Fannie Mae and Freddie Mac appraisal
> > standards and a review of that appraisal_**.  The mortgaged
> > properties are appraised by licensed independent appraisers who
> > have satisfied the servicer's appraiser screening process. … **_Each
> > appraisal includes a market data analysis based on recent sales
> > of comparable homes in the area_** and, where deemed appropriate,
> > replacement cost analysis based on the current cost of constructing
> > a similar home.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-3 (Form

424B5), at S-48-49 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form

424B5), at S-49 (Feb. 4, 2004); Registration Statement (333-109318) filed by Long Beach Sec.

Corp. (Form S-3/A, Am.1), at S-24-25 (Feb. 10, 2004); Registration Statement (333-90550) filed

by Long Beach Sec. Corp. (Form S-3/A, Am.1), at S-24-25 (Jun. 25, 2002) ; Registration

Statement (333-41712) filed by Long Beach Sec. Corp. (Form S-3/A, Am.2), at 29 (Jan. 3,

2006); Prospectus Supplement for Long Beach MLT 2002-2 (Form 424B5), at 30 (May 31,

2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form 424B5), at 23 (Sep. 7, 2004).

516.    WaMu and Long Beach misrepresented that in March 2006 they lowered the

maximum loan-to-value ratio for Full Doc "C" borrowers and that they "[i]mplemented DISSCO

["data integrity search and score system"] screening for all loan submissions to minimize fraud related to incorrect applicant information and property overvaluation."   These misstatements were contained in the following Offering Documents: Free Writing Prospectus filed by Long Beach Sec. Corp. (Form FWP), at 13 (Nov. 17, 2006); Free Writing Prospectus filed by WaMu Asset Acceptance Corp. (Form FWP), at 13 (Jan. 26, 2007); Free Writing Prospectus filed by WaMu Asset Acceptance Corp. (Form FWP), at 14 (Jun. 8, 2007).

517.    WaMu and Long Beach also made the following misrepresentations:

> ### Risk Management – Appraisal Review
> - 100   appraisal   review   by   Long   Beach   Mortgage underwriters
> - 100% appraisal review to Washington Mutual standards

The above misstatements were contained in the following Offering Documents:  Free Writing Prospectus filed by Long Beach Sec. Corp. (Form FWP), at 24 (Nov. 17, 2006); Free Writing Prospectus filed by WaMu Asset Acceptance Corp. (Form FWP), at 28 (Jan. 26, 2007).

518.    The above representations were materially false and misleading in that they omitted to state that: (i) Defendants violated their stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties used to collateralize the Certificates; (ii) the appraisers were not independent, and Defendants in fact exerted pressure on appraisers to come back with pre-determined, inflated and false appraisal values; (iii) the inflated appraisals obtained by Defendants did not conform to USPAP, Fannie Mae or Freddie Mac standards and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home; and (iv) the forms of credit enhancement applicable to certain tranches of the Certificates were affected by the total value of the underlying properties, and thus were inaccurate as stated.  Defendants omitted to disclose that

they subordinated proper appraisals to the goal of originating and securitizing as many mortgage loans as they could.

519.    The supposedly independent appraisals discussed above were used in part to calculate LTV ratios.  The Offering Documents included detailed and extensive breakdowns of LTV data for the loans underlying the Certificates, such as that presented in the table below.

```
                       ORIGINAL LOAN-TO-VALUE RATIOS(1)

<TABLE>
<CAPTION>
         RANGE OF                                                     PERCENT OF AGGREGATE
    ORIGINAL LOAN-TO-VALUE        NUMBER OF POOL 2   AGGREGATE PRINCIPAL BALANCE    PRINCIPAL BALANCE
         RATIOS (%)               MORTGAGE LOANS            OUTSTANDING               OUTSTANDING
    -------------------------     ----------------   ---------------------------  --------------------
<S>                               <C>                <C>                          <C>
00.01 - 10.00.................          1            $      37,417.20                    0.01%
10.01 - 20.00.................          2                  534,899.42                    0.17
20.01 - 30.00.................          7                4,691,216.06                    1.53
30.01 - 40.00.................          8                5,784,798.37                    1.89
40.01 - 50.00.................         26               15,348,877.82                    5.01
50.01 - 60.00.................         38               33,024,041.72                   10.77
60.01 - 70.00.................         85               62,475,175.23                   20.38
70.01 - 75.00.................         62               41,952,962.91                   13.69
75.01 - 80.00.................        240              119,495,664.59                   38.98
80.01 - 85.00.................          8                2,652,348.82                    0.87
85.01 - 90.00.................         31               12,654,478.03                    4.13
90.01 - 95.00.................         10                4,401,164.93                    1.44
95.01 - 100.00................          8                3,491,717.84                    1.14
                                      ---               ---------------                 ------
Total........................         526            $306,544,762.94                  100.00%
                                      ===               ===============                 ======
```

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for J.P. Morgan Alternative Loan Trust 2006-A7 (Form 424B5), at A-4 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan Alternative Loan Trust 2006-S3 (Form 424B5), at A-2 (June 30, 2006); Prospectus Supplement for J.P. Mortgage Acquisition Trust 2006-FRE2 (Form 424B5), at S-33 (Mar. 30, 2006); Prospectus Supplement for J.P. Morgan Alternative Loan Trust 2006-A4 (Form 424B5), at A-1 (July 28, 2006); Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust 2006-CH2 (Form 424B5), at S-26 (Dec. 13, 2006); Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust. 2007-HE1 (Form 424B5), at S-29 (June 15, 2007); Prospectus Supplement for J.P. Morgan Mortgage Trust 2005-A6 (Form 424B5), at A-3 (Aug. 31, 2005); Prospectus Supplement for J.P. Morgan Mortgage Trust 2005-A7 (Form 424B5), at A-2 (Sept. 29, 2005);

Prospectus Supplement for J.P. Morgan Mortgage Trust 2005-S3 (Form 424B5), at A-1 (Dec. 28, 2005); Prospectus Supplement for J.P. Morgan Mortgage Trust 2007-A1 (Form 424B5), at A-2 (Jan. 30, 2007).

| Original Loan-to-Value Ratios* of the Mortgage Loans | | | |
|---|---|---|---|
| Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-off Date | % of Mortgage Loans |
| 0.00 - 30.00 | 16 | $6,179,741 | 0.63 % |
| 30.01 - 40.00 | 32 | 17,269,362 | 1.76 |
| 40.01 - 50.00 | 49 | 28,809,459 | 2.94 |
| 50.01 - 55.00 | 48 | 27,598,807 | 2.81 |
| 55.01 - 60.00 | 62 | 37,388,301 | 3.81 |
| 60.01 - 65.00 | 111 | 66,161,589 | 6.74 |
| 65.01 - 70.00 | 129 | 70,905,934 | 7.23 |
| 70.01 - 75.00 | 188 | 102,969,580 | 10.49 |
| 75.01 - 80.00 | 1,487 | 604,867,667 | 61.65 |
| 80.01 - 85.00 | 8 | 2,733,891 | 0.28 |
| 85.01 - 90.00 | 23 | 8,879,269 | 0.91 |
| 90.01 - 95.00 | 24 | 7,367,274 | 0.75 |
| Total | 2,177 | $ 981,130,873 | 100.00 % |

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for Bear Stearns ARM Trust 2006-1 (Form 424B5), at 72 (Mar. 17, 2006); Prospectus Supplement for Bear Stearns ABS Trust 2003-HE1 (Form 424B5), at A-2 (Dec. 30, 2003); Prospectus Supplement for Bear Stearns ABS Trust 2004-AC3 (Form 424B5), at A-2 (May 28, 2004); Prospectus Supplement for Bear Stearns ABS Trust 2004-AC5 (Form 424B5), at A-2 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns ABS Trust 2004-HE1 (Form 424B5), at A-2 (Jan. 29, 2004); Prospectus Supplement Bear Stearns ABS 2004-SD4 (Form 424B5), at A-2 (Nov. 19, 2004); Prospectus Supplement for Bear Stearns ABS Trust 2006-HE6 (Form 424B5), at 125 (June 27, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2006-IM1 (Form 424B5), at 132-133 (Apr. 25, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 143 (Feb. 28, 2007); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR4 (Form 424B5), 69 (Nov. 30, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR5 (Form 424B5), at 86 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns Alt-A Trust 2004-11 (Form 424B5), at A-3 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Trust

2005-7 (Form 424B5), at A-15 (July 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Trust 2005-9 (Form 424B5), at A-3 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Trust 2005-10 (Form 424B5), at A-3 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Trust 2006-6 (Form 424B5), at 94 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A Trust 2006-8 (Form 424B5), at 84 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at A-3 (Feb. 1, 2006); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2005-AC3 (Form 424B5), at A-2 (May 31, 2005); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2006-HE10 (Form 424B5), at 155 (Jan. 3, 2007); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2007-HE1 (Form 424B5), at 139 (Jan. 31, 2007); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2007-HE6 (Form 424B5), at 96 (Aug. 30, 2007); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2007-HE7 (Form 424B5), at 100 (Sept. 19, 2007); Prospectus Supplement for Bear Stearns Asset Backed Securities Trust 2007-SD1 (Form 424B5), at A-1 (Jan. 19, 2007); Prospectus Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at A-3 (Mar. 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at A-3 (Sept. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form 424B5), at A-3 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at A-3 (Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2005-1 (Form 424B5), at A-3 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-2 (Form 424B5), at A-3 (March 2, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-5 (Form 424B5), at A-3 (July 15, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-12 (Form 424B5), at 118 (Dec. 30, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2006-4 (Form 424B5), at 93 (Oct. 2, 2006); Prospectus Supplement for Bear Stearns Structured Products Inc. Trust 2007-EMX1

(Form 424B5), at  (Oct. 1, 2007); Prospectus Supplement for Bear Stearns Structured Products Inc. Trust 2007-R6 (Form 424B5), at 31 (Sept. 4, 2007); Prospectus Supplement for SACO I Trust 2005-10 (Form 424B5), at A-5 (Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at 141 (April 27, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 90 (May 31, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 113 (June 30, 2006).

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1.00 - 50.00 | 9 | $ 1,194,470.71 | 1.71% |
| 50.01 - 55.00 | 2 | 135,983.53 | 0.19 |
| 55.01 - 60.00 | 14 | 2,386,975.05 | 3.41 |
| 60.01 - 65.00 | 14 | 2,178,814.81 | 3.12 |
| 65.01 - 70.00 | 15 | 2,279,537.16 | 3.26 |
| 70.01 - 75.00 | 24 | 4,428,537.92 | 6.33 |
| 75.01 - 80.00 | 178 | 29,244,618.42 | 41.82 |
| 80.01 - 85.00 | 34 | 6,988,526.25 | 9.99 |
| 85.01 - 90.00 | 91 | 15,824,846.98 | 22.63 |
| 90.01 - 95.00 | 22 | 4,722,243.93 | 6.75 |
| 95.01 - 100.00 | 6 | 550,018.21 | 0.79 |
| Total | 409 | $69,934,572.97 | 100.00% |

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2003-AR1 Trust (Form 424B5), at S-62 (Jan. 27, 2003); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2003-AR3 Trust (Form 424B5), at S-62 (Feb. 24, 2003); Prospectus Supplement for WMALT Series 2006-9 Series Trust (Form 424B5), at S-91 (Oct. 27, 2006); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-208 (March 27, 2007); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2002-AR17 Trust (Form 424B5), at S-61 (Oct. 23, 2002); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR11 Trust (Form 424B5), at S-83 (Aug. 25, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through

Certificates Series 2005-AR13 Trust (Form 424B5), at S-83 (Oct. 24, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR17 Trust (Form 424B5), at S-80 (Dec. 19, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR19 Trust (Form 424B5), at S-79 (Dec. 22, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR6 Trust (Form 424B5), at S-93 (April 26, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR8 Trust (Form 424B5), at S-92 (July 14, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR12 Trust (Form 424B5), at S-113 (Sept. 25, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR15 Trust (Form 424B5), at S-116 (Oct. 24, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR17 Trust (Form 424B5), at S-119 (Nov. 20, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR19 Trust (Form 424B5), at S-123 (Dec. 20, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR3 Trust (Form 424B5), at S-88 (Feb. 22, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR4 Trust (Form 424B5), at S-122 (April 21, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR7 Trust (Form 424B5), at S-126 (June 26, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR9 Trust (Form 424B5), at S-115 (July 25, 2006); Prospectus Supplement for WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust (Form 424B5), at 102 (April 26, 2007); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2007-HY1 Trust (Form 424B5), at S-105 (Jan. 23, 2007); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2007-HY5 Trust (Form 424B5), at S-104 (April 24, 2007); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series

2007-OA4 Trust (Form 424B5), at S-119 (April 25, 2007); Prospectus Supplement for WAMU

Mortgage Pass-Through Certificates Series 2007-OA5 Trust (Form 424B5), at S-122 (May 23,

2007); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2007-

OA6 Trust (Form 424B5), at S-122 (June 25, 2007); Prospectus Supplement for Washington

Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-6 Trust (Form 424B5), at S-

80 (July 27, 2006); Prospectus Supplement for Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-5 Trust (Form 424B5), at S-146 (June 29, 2006); Prospectus

Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-

AR5 Trust (Form 424B5), at S-166 (June 27, 2006); Prospectus Supplement for Washington

Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Trust (Form 424B5), at

S-178 (Sept. 27, 2006); Prospectus Supplement for Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-1 Trust (Form 424B5), at S-110 (Jan. 29, 2007).

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 0.01 - 49.99 | 126 | $ 19,284,720.41 | 2.99% |
| 50.00 - 54.99 | 54 | 9,561,955.99 | 1.48 |
| 55.00 - 59.99 | 62 | 12,774,179.91 | 1.98 |
| 60.00 - 64.99 | 113 | 22,540,232.25 | 3.49 |
| 65.00 - 69.99 | 163 | 31,718,683.37 | 4.91 |
| 70.00 - 74.99 | 209 | 43,316,546.55 | 6.71 |
| 75.00 - 79.99 | 297 | 58,773,392.02 | 9.10 |
| 80.00 | 1,699 | 292,050,428.53 | 45.21 |
| 80.01 - 84.99 | 47 | 9,543,676.78 | 1.48 |
| 85.00 - 89.99 | 210 | 33,594,461.32 | 5.20 |
| 90.00 - 94.99 | 346 | 51,277,917.28 | 7.94 |
| 95.00 - 99.99 | 194 | 23,953,886.41 | 3.71 |
| 100.00 | 599 | 37,619,605.68 | 5.82 |
| Total | 4,119 | $ 646,009,686.50 | 100.00% |

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Long Beach Mortgage Loan Trust

2002-2 (Form 424B5), at S-31 (May 31, 2002); Prospectus Supplement for Long Beach

Mortgage Loan Trust 2004-1 (Form 424B5), at S-26 (Feb. 4, 2004); Prospectus Supplement for

Long Beach Mortgage Loan Trust 2004-3 (Form 424B5), at S-27 (June 4, 2004); Prospectus

Supplement for Long Beach Mortgage Loan Trust 2004-4 (Form 424B5), at S-27 (Sept. 7, 2004).

(g)    *No Mortgage Loan had a Loan-to-Value Ratio at origination of*
       *more than 100.00%.*

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for J.P. Morgan ALT 2006-S3 (Form

424B5), at S-15 (Jun. 30, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A7 (Form

424B5), at S-18 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-FRE2

(Form 424B5), at 28 (Mar. 30, 2006); Prospectus Supplement for ChaseFlex Trust 2006-1 (Form

424B5), at S-8 (May 24, 2006) ; Prospectus Supplement for J.P. Morgan MAC 2006-CH2 (Form

424B5), at 28 (Dec. 13, 2006); Prospectus Supplement for J.P. Morgan MAC 2007-HE1 (Form

424B5), at 34 (Jun. 15, 2007).

(h)    *No mortgage loan had a loan-to-value ratio at origination in*
       *excess of 100%….*

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-3 (Form

424B5), at S-23 (Jun. 4, 2004); Prospectus Supplement for WaMu Series 2003-AR1 (Form

424B5), at S-62 (Jan. 27, 2003); Prospectus Supplement for WaMu Series 2003-AR3 (Form

424B5), at S-62 (Feb. 24, 2003); Prospectus Supplement for WMALT Series 2006-9 (Form

424B5), at S-91 (Oct. 27, 2006); Prospectus Supplement for WMALT Series 2007-OA3 (Form

424B5), at S-245 (Mar. 27, 2007); Prospectus Supplement for Long Beach MLT 2004-1 (Form

424B5), at S-22 (Feb. 4, 2004) ; Prospectus Supplement for Long Beach MLT 2002-2 (Form

424B5), at S-21 (May 31, 2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form

424B5), at S-16 (Sep. 7, 2004); Prospectus Supplement for WaMu Series 2007-HE3 (Form 424B5), at 24 (May 9, 2007).

520.    All of the representations regarding LTV ratios, described above, were materially false and misleading because the underlying appraisals used to determine the LTVs were improperly performed.   The actual LTV ratios for numerous mortgage loans underlying the Certificates would have exceeded 100% if the underlying properties had been appraised by an independent appraiser according to USPAP, Freddie Mac or Fannie Mae as represented in the Offering Documents.

### E.    DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES

521.    Defendants represented in the Offering Documents that the all of the Certificates purchased by Plaintiffs were rated at least investment grade signifying that the risk of loss was virtually non-existent.

> (a)    It is a condition to the issuance of any class of offered securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by at least one Rating Agency.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:   Registration Statement (333-127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A, Am.1), at 255 (Aug. 15, 2006); Registration Statement (333-113636) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at 125 (Apr. 21, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2006-1 (Form 424B5), at 12 (Mar. 17, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2004-HE1 (Form 424B5), at S-93 (Jan. 29, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2003-HE1 (Form 424B5), at S-90  (Dec. 30, 2003); Registration Statement (333-91334) filed by Bear Stearns Asset Backed Securities, Inc. (Form S-3/A, Am. 1), at 122 (Nov. 13, 2002); Prospectus Supplement for Bear

Stearns ABS I Trust 2004-AC3 (Form 424B5), at 125 (May 28, 2004); Prospectus Supplement

for Bear Stearns ABS I Trust 2004-AC5 (Form 424B5), at 125 (Oct. 1, 2004); Prospectus

Supplement for Bear Stearns ABS I Trust 2006-HE6 (Form 424B5), at 15-16, 214 (Jun. 27,

2006); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 276

(Feb. 28, 2007); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR4

(Form 424B5), at 9, 137 (Nov. 30, 2006); Registration Statement (333-131374) filed by Bear

Stearns ABS I LLC (Form S-3/A, Am. 5), at 137 (Mar. 31, 2006); Registration Statement (333-

132232) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 8 (Mar.

10, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR5 (Form

424B5), at 9-10, 157 (Dec. 29, 2006); Prospectus Supplement for ChaseFlex Trust 2006-1 (Form

424B5), at S-5 (May 24, 2006); Registration Statement (333-130223) filed by Chase Finance

Mortgage Corp.  (Form S-3/A, Am. 3), at 255 (Mar. 21, 2006); Registration Statement (333-

130192) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 3), at 158 (Apr. 3, 2006);

Registration Statement (333-127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A,

Am.1), at 255 (Aug. 15, 2006); Registration Statement (333-109318) filed by Long Beach Sec.

Corp. (Form S-3/A, Am.1), at 115 (Feb. 10, 2004); Registration Statement (333-90550) filed by

Long Beach Sec. Corp. (Form S-3/A, Am.1), at 113 (Jun. 25, 2002); Registration Statement

(333-90550) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at 113 (Jun. 25, 2002);

Registration Statement (333-77026) filed by WaMu Mort. Sec. Corp. (Form S-3/A, Am. 1), at S-

26 (Feb. 1, 2002); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp.

(Form S-3/A, Am. 1), at 140 (Jan. 3, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-

S3 (Form 424B5), at 122 (Jun. 30, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A7

(Form 424B5), at 121 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-

FRE2 (Form 424B5), at 224 (Mar. 30, 2006); Prospectus Supplement for Long Beach MLT

2004-3 (Form 424B5), at 115 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form 424B5), at 113 (Feb. 4, 2004); Prospectus Supplement for WaMu Series 2003-AR1 (Form 424B5), at S-59 (Jan. 27, 2003); Prospectus Supplement for WaMu Series 2003-AR3 (Form 424B5), at S-58 (Feb. 24, 2003); Prospectus Supplement for WMALT Series 2006-9 (Form 424B5), at 140 (Oct. 27, 2006); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at 137 (Mar. 27, 2007); Registration Statement (333-141607) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 1), at 177 (Apr. 23, 2007); Prospectus Supplement for J.P. Morgan ALT 2006-A4 (Form 424B5), at 122 (Jul. 28, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-CH2 (Form 424B5), at 246 (Dec. 13, 2006); Prospectus Supplement for J.P. Morgan MAC 2007-HE1 (Form 424B5), at 246 (Jun. 15, 2007); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A6 (Form 424B5), at 140 (Aug. 31, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A7 (Form 424B5), at 140 (Sep. 29, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-S3 (Form 424B5), at 140 (Dec. 28, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2007-A1 (Form 424B5), at 122 (Jan. 30, 2007); Registration Statement (333-115122) filed by Structured Asset Mort. Investments II Inc. (Form S-3/A, Am. 1), at 158 (May 11, 2004); Registration Statement (333-120916) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 116 (Dec. 14, 2004); Registration Statement (333-106323) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 158 (Jul. 11, 2003); Prospectus Supplement for Bear Stearns Alt-A Tr. 2004-11 (Form 424B5), at S-15 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-3 (Form 424B5), at S-12 (Mar. 31, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-7 (Form 424B5), at 121 (Jul. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-9 (Form 424B5), at 121 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-10 (Form 424B5), at 121 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-6

(Form 424B5), at S-2 – S-5 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-8 (Form 424B5), at S-2 – S-4 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2005-AC3 (Form 424B5), at S-121 – S-122 (May 31, 2005); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE10 (Form 424B5), at 295 (Jan. 3, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE1 (Form 424B5), at 444 (Jan. 31, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE6 (Form 424B5), at 88-89 (Aug. 30, 2007); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE7 (Form 424B5), at 95 (Sep. 19, 2007); Prospectus Supplement for Bear Stearns ABS Trust 2007-SD1 (Form 424B5), at 141 (Jan. 19, 2007); Prospectus Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at 118 (Mar. 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at 160 (Sep. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form 424B5), at 160 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at 160 (Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2005-1 (Form 424B5), at 121 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-2 (Form 424B5), at 118 (Mar. 2, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-5 (Form 424B5), at 121 (Jul. 15, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-12 (Form 424B5), at 320 (Dec. 30, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2006-4 (Form 424B5), at 17 (Oct. 2, 2006); Prospectus Supplement for Bear Stearns Structured Products Inc. Tr. 2007-R6 (Form 424B5), at 400 (Sep. 4, 2007); Prospectus Supplement for SACO I Trust 2005-10 (Form 424B5), at S-119 (Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at S-158 (Apr. 27, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 185 (May 31, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 215 (Jun. 30, 2006); Registration Statement (333-103345) filed by WaMu Mortgage Sec. Corp. (Form S-3/A, Am. 1),

at S-43 (Mar. 7, 2003); Registration Statement (333-123034) filed by WaMu Asset Acceptance

Corp. (Form S-3/A, Am. 1), at 125 (Jun. 13, 2005); Registration Statement (333-141255) filed by

WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at 141 (Apr. 9, 2007); Prospectus

Supplement for WaMu Series 2002-AR17 (Form 424B5), at S-57 (Oct. 23, 2002); Prospectus

Supplement for WaMu Series 2005-AR6 (Form 424B5), at S-89 (Apr. 26, 2005); Prospectus

Supplement for WaMu Series 2005-AR8 (Form 424B5), at S-88 (Jul. 14, 2005); Prospectus

Supplement for WaMu Series 2005-AR11 (Form 424B5), at S-78 (Aug. 24, 2005); Prospectus

Supplement for WaMu Series 2005-AR13 (Form 424B5), at 123 (Oct. 24, 2005); Prospectus

Supplement for WaMu Series 2005-AR17 (Form 424B5), at 123 (Dec. 19, 2005); Prospectus

Supplement for WaMu Series 2005-AR19 (Form 424B5), at 123 (Dec. 22, 2005); Prospectus

Supplement for WaMu Series 2006-AR3 (Form 424B5), at 140 (Feb. 22, 2006); Prospectus

Supplement for WaMu Series 2006-AR4 (Form 424B5), at 140 (Apr. 21, 2006); Prospectus

Supplement for WaMu Series 2006-AR7 (Form 424B5), at 140 (Jun. 26, 2006); Prospectus

Supplement for WaMu Series 2006-AR9 (Form 424B5), at 140 (Jul. 25, 2006); Prospectus

Supplement for WaMu Series 2006-AR12 (Form 424B5), at 140 (Sep. 25, 2006); Prospectus

Supplement for WaMu Series 2006-AR15 (Form 424B5), at 140 (Oct. 24, 2006); Prospectus

Supplement for WaMu Series 2006-AR17 (Form 424B5), at 137 (Nov. 20, 2006); Prospectus

Supplement for WaMu Series 2006-AR19 (Form 424B5), at 137 (Dec. 20, 2006); Prospectus

Supplement for WaMu Series 2007-HE3 (Form 424B5), at 243-244 (May 9, 2007); Prospectus

Supplement for WaMu Series 2007-HY1 (Form 424B5), at 137 (Jan. 23, 2007); Prospectus

Supplement for WaMu Series 2007-HY5 (Form 424B5), at 141 (Apr. 24, 2007); Prospectus

Supplement for WMALT Series 2005-6 (Form 424B5), at S-76 (Jul. 27, 2005); Prospectus

Supplement for WMALT Series 2006-5 (Form 424B5), at 140 (Jun. 29, 2006); Prospectus

Supplement for WMALT Series 2006-AR5 (Form 424B5), at 140 (Jun. 27, 2006); Prospectus

Supplement for WMALT Series 2006-AR8 (Form 424B5), at 140 (Sep. 28, 2006); Prospectus

Supplement for WMALT Series 2007-1 (Form 424B5), at 137 (Jan. 29, 2007); Registration

Statement (333-41712) filed by Long Beach Sec. Corp. (Form S-3/A, Am.2), at 153 (Jan. 3,

2006); Prospectus Supplement for Long Beach MLT 2002-2 (Form 424B5), at 150 (May 31,

2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form 424B5), at 115 (Sep. 7,

2004); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at 129 (Feb. 1,

2006).

522.    By touting the ratings of the Certificates, and in making the above statements in

the Offering Documents, Defendants represented that they believed that the information provided

to the rating agencies to support these ratings accurately reflected the guidelines and practices of

Defendants JPMorgan Bank and EMC, as well as those of BSRMC, Encore, Long Beach, WaMu

Bank and the third party originators, and the specific qualities of the underlying loans.  These

representations were false because Defendants did not disclose to the rating agencies the extent

of their and the third party originators' improper underwriting and appraisals, and because

Defendants otherwise gamed the rating agencies to ensure that they obtained the highest ratings

even when those ratings were not warranted.  The falsity of these representations is further

evidenced by the rapid downgrades of all of the Certificates within a few years of issuance.

## F.    DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE CREDIT ENHANCEMENTS APPLICABLE TO THE CERTIFICATES

523.    Each Prospectus Supplement sets forth a particular amount by which the

aggregate stated principal balance of the mortgage loans is greater than the aggregate class

principal of the Certificates:

> (a)     SUBORDINATION. The mezzanine and subordinate classes of
> certificates will provide credit enhancement for the senior
> certificates. In addition, (a) each class of mezzanine certificates
> will have a payment priority over each other class of mezzanine
> certificates with a higher alpha-numerical class designation and the

subordinate certificates and (b) each class of subordinate certificates will have a payment priority over each other class of subordinate certificates with a higher alpha-numerical class designation.

Subordination is intended to enhance the likelihood of regular distributions of interest and principal on the more senior certificates and to afford those certificates protection against realized losses on the mortgage loans as described below.

\*       \*       \*

OVERCOLLATERALIZATION. As of the closing date, the aggregate principal balance of the mortgage loans as of the cut-off date will exceed the aggregate outstanding principal balance of the certificates in an amount equal to approximately 1.15% of the aggregate outstanding principal balance of the mortgage loans as of the cut-off date. This feature is referred to as overcollateralization. As described herein, the targeted level of overcollateralization may decrease over time.

\*       \*       \*

EXCESS INTEREST. The mortgage loans bear interest each month in an amount that is expected to exceed the amount needed to pay monthly interest on the certificates and to pay the fees and expenses of the issuing entity. The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans and to maintain the targeted level of overcollateralization. We cannot assure you that sufficient excess interest will be generated by the mortgage loans to absorb realized losses on the mortgage loans and to maintain the targeted level of overcollateralization.

The above misstatements, in identical or substantially similar language, were contained in the following Offering Documents:  Prospectus Supplement for J.P. Morgan ALT 2006-S3 (Form 424B5), at S-6-7 (Jun. 30, 2006); Registration Statement (333-127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A, Am.1), at 44-45 (Aug. 15, 2006); Prospectus Supplement for ChaseFlex Trust 2006-1 (Form 424B5), at S-10-11 (May 24, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A7 (Form 424B5), at S-6-7 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-FRE2 (Form 424B5), at 11-13 (Mar. 30, 2006); Registration Statement

(333-130223) filed by Chase Finance Mortgage Corp.  (Form S-3/A, Am. 3), at S-7-8 (Mar. 21, 2006); Registration Statement (333-130192) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 3), at 8 (Apr. 3, 2006); Registration Statement (333-141607) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 1), at 125-126  (Apr. 23, 2007); Prospectus Supplement for J.P. Morgan ALT 2006-A4 (Form 424B5), at S-6 – S-7 (Jul. 28, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-CH2 (Form 424B5), at 11-12 (Dec. 13, 2006); Prospectus Supplement for J.P. Morgan MAC 2007-HE1 (Form 424B5), at 13-15 (Jun. 15, 2007); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A6 (Form 424B5), at 49-51 (Aug. 31, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A7 (Form 424B5), at 49-51 (Sep. 29, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-S3 (Form 424B5), at 49-51 (Dec. 28, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2007-A1 (Form 424B5), at 53-55 (Jan. 30, 2007).

(b)     CREDIT ENHANCEMENT. Credit enhancements provide limited protection to holders of specified certificates against shortfalls in payments received on the mortgage loans. This transaction employs the following forms of credit enhancement.

*     *     *

SUBORDINATION. By issuing senior certificates and subordinated certificates, the trust has increased the likelihood that senior certificateholders will receive regular payments of interest and principal. The Class I-A-1, Class I-A-2, Class II-A-1, Class II-A-2 and Class III-A Certificates constitute the senior certificates, and the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5 and Class M-6 Certificates constitute the subordinated certificates.

The certificates designated as senior certificates will have a payment priority over the certificates designated as subordinated certificates...

Subordination provides the holders of certificates having a higher payment priority with protection against losses realized when the remaining unpaid principal balance on a mortgage loan exceeds the amount of proceeds recovered upon the liquidation of that mortgage loan. In general, we accomplish this loss protection by

allocating any realized losses first to reduce the amount of excess spread, second to reduce the overcollateralization amount, and third among the certificates, beginning with the subordinated certificates with the lowest payment priority, until the principal amount of that subordinated class has been reduced to zero. We then allocate realized losses to the next most junior class of subordinated certificates, until the principal balance of each class of subordinated certificates is reduced to zero. If none of the Class M Certificates are outstanding, all such losses will be allocated to the Class A Certificates as described in this prospectus supplement.

\*   \*   \*

EXCESS SPREAD AND OVERCOLLATERALIZATION. We expect the mortgage loans to generate more interest than is needed to pay interest on the offered certificates because we expect the weighted average net interest rate of the mortgage loans to be higher than the weighted average pass- through rate on the related offered certificates and, as overcollateralization increases, such higher interest rate is paid on a principal balance of mortgage loans that is larger than the principal balance of the certificates. Interest payments received in respect of the mortgage loans in excess of the amount that is needed to pay interest on the offered certificates and related trust expenses will be used to reduce the total principal balance of such certificates until a required level of overcollateralization has been achieved. As of the closing date, the required level of overcollateralization will be met.

\*   \*   \*

CROSS-COLLATERALIZATION. The payment rules require that after the senior certificates relating to a loan group receive certain payments on each distribution date, available funds from that loan group otherwise allocable to such senior certificates will be allocated to the senior certificates relating to the other loan group or groups as described in this prospectus supplement. This feature is called "cross-collateralization."

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for Bear Stearns ABS I Trust 2004-HE1 (Form 424B5), at S-10  (Jan. 29, 2004); Prospectus Supplement for Bear Stearns ABS Trust 2004-SD4 (Form 424B5), at S-10 (Nov. 19, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2006-1 (Form 424B5), at 6 (Mar. 17, 2006); Prospectus Supplement for Bear Stearns

ABS I Trust 2003-HE1 (Form 424B5), at S-9-10  (Dec. 30, 2003); Prospectus Supplement for

Bear Stearns ABS I Trust 2004-AC3 (Form 424B5), at S-8-10  (May 28, 2004); Prospectus

Supplement for Bear Stearns ABS I Trust 2004-AC5 (Form 424B5), at S-8-9  (Oct. 1, 2004);

Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE6 (Form 424B5), at 12-13 (Jun.

27, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2006-IM1 (Form 424B5), at 11-

12 (Apr. 25, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR4

(Form 424B5), at 8 (Nov. 30, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding

Trust 2006-AR5 (Form 424B5), at 9 (Dec. 29, 2006); Registration Statement (333-113636) filed

by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at S-30-31 (Apr. 21, 2004); Registration

Statement (333-91334) filed by Bear Stearns Asset Backed Securities, Inc. (Form S-3/A, Am. 1),

at S-30-31 (Nov. 13, 2002); Registration Statement (333-132232) filed by Structured Asset

Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 1 (Mar. 10, 2006); Prospectus Supplement

for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 16-18 (Feb. 28, 2007); Registration

Statement (333-125422) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at 138-39 (Jun.

14, 2005); Registration Statement (333-131374) filed by Bear Stearns ABS I LLC (Form S-3/A,

Am. 5), at S-12 (Mar. 31, 2006) ); Registration Statement (333-115122) filed by Structured Asset

Mort. Investments II Inc. (Form S-3/A, Am. 1), at S-32 – S-33 (May 11, 2004); Registration

Statement (333-120916) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A,

Am. 1), at 57-65 (Dec. 14, 2004); Registration Statement (333-106323) filed by Structured Asset

Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 58-68 (Jul. 11, 2003); Prospectus

Supplement for Bear Stearns Alt-A Tr. 2004-11 (Form 424B5), at 57-65 (Oct. 1, 2004);

Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-3 (Form 424B5), at S-10 – S-12 (Mar.

31, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-7 (Form 424B5), at 45-50

(Jul. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-9 (Form 424B5), at 45-

50 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-10 (Form 424B5), at

45-50 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-6 (Form 424B5),

at 48-53 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-8 (Form

424B5), at 49-54 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2005-

AC3 (Form 424B5), at 40-45 (May 31, 2005); Prospectus Supplement for Bear Stearns ABS I

Trust 2006-HE10 (Form 424B5), at 236-240 (Jan. 3, 2007); Prospectus Supplement for Bear

Stearns ABS I Trust 2007-HE1 (Form 424B5), at 16-18 (Jan. 31, 2007); Prospectus Supplement

for Bear Stearns ABS I Trust 2007-HE6 (Form 424B5), at 141-148 (Aug. 30, 2007); Prospectus

Supplement for Bear Stearns ABS I Trust 2007-HE7 (Form 424B5), at 162-165 (Sep. 19, 2007);

Prospectus Supplement for Bear Stearns ABS Trust 2007-SD1 (Form 424B5), at 47-53 (Jan. 19,

2007); Prospectus Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at 43-49

(Mar. 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at

57-65 (Sep. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form

424B5), at 57-65 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10

(Form 424B5), at 57-65 (Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust

2005-1 (Form 424B5), at 45-50 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM

Trust 2005-2 (Form 424B5), at 57-65 (Mar. 2, 2005); Prospectus Supplement for Bear Stearns

ARM Trust 2005-5 (Form 424B5), at 45-50 (Jul. 15, 2005); Prospectus Supplement for Bear

Stearns ARM Trust 2005-12 (Form 424B5), at 245-250 (Dec. 30, 2005); Prospectus Supplement

for Bear Stearns ARM Trust 2006-4 (Form 424B5), at 171-175 (Oct. 2, 2006); Prospectus

Supplement for Bear Stearns Structured Products Inc. Tr. 2007-R6 (Form 424B5), at 421-424

(Sep. 4, 2007); Prospectus Supplement for SACO I Trust 2005-10 (Form 424B5), at S-11 – S-12

(Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at 11-13 (Apr.

27, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 10-11 (May 31,

2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 9-10 (Jun. 30, 2006);

Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at S-18 -20 (Feb. 1, 2006).

(c)     CREDIT ENHANCEMENTS

Overcollateralization

The initial principal balance of the mortgage loans is expected to exceed the aggregate class principal balance of the certificates (other than the Class PPP and Class C Certificates) by approximately 1.00% of the initial principal balance of the mortgage loans. This overcollateralization will be available to absorb losses on the mortgage loans. The level of overcollateralization may increase or decrease over time. We cannot assure you that sufficient interest will be generated by the mortgage loans to create and maintain the required level of overcollateralization.

*       *       *

Excess Spread

The mortgage loans bear interest each month in an amount that in the aggregate, and after deducting related servicing fees, is expected to exceed the amount needed to pay monthly interest on the certificates. This excess interest will be applied to pay principal on the certificates entitled to principal in order to, among other things, create and maintain the required level of overcollateralization.

*       *       *

Subordination

The senior certificates will have a payment priority over the subordinate certificates. Each class of subordinate certificates will be subordinate to each other class of subordinate certificates with a higher payment priority.

*       *       *

Allocation of Losses

A loss is realized on a mortgage loan when the servicer determines that it has received all amounts it expects to recover for that mortgage loan and the amounts are less than the outstanding principal balance of the mortgage loan and its accrued and unpaid

interest. **Losses will be allocated to the subordinate certificates by deducting the losses from the principal balance of these certificates without making any principal payments to the related certificateholders.**

The above misstatements, in identical or substantially similar language, were contained in the following Offering Documents:  Prospectus Supplement for WMALT Series 2006-9 (Form 424B5), at S-11 (Oct. 27, 2006); Prospectus Supplement for WaMu Series 2003-AR1 (Form 424B5), at S-50-51 (Jan. 27, 2003); Prospectus Supplement for WaMu Series 2003-AR3 (Form 424B5), at S-49-50 (Feb. 24, 2003); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-29-30 (Mar. 27, 2007); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at 2 (Jan. 3, 2006) ); Registration Statement (333-103345) filed by WaMu Mortgage Sec. Corp. (Form S-3/A, Am. 1), at S-38 − S-39 (Mar. 7, 2003); Registration Statement (333-123034) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-33 − S-34 (Jun. 13, 2005); Registration Statement (333-141255) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-87 (Apr. 9, 2007); Prospectus Supplement for WaMu Series 2002-AR17 (Form 424B5), at S-52 (Oct. 23, 2002); Prospectus Supplement for WaMu Series 2005-AR6 (Form 424B5), at S-78 (Apr. 26, 2005); Prospectus Supplement for WaMu Series 2005-AR8 (Form 424B5), at S-78 − S-79 (Jul. 14, 2005); Prospectus Supplement for WaMu Series 2005-AR11 (Form 424B5), at S-69 (Aug. 24, 2005); Prospectus Supplement for WaMu Series 2005-AR13 (Form 424B5), at S-70 (Oct. 24, 2005); Prospectus Supplement for WaMu Series 2005-AR17 (Form 424B5), at S-65 (Dec. 19, 2005); Prospectus Supplement for WaMu Series 2005-AR19 (Form 424B5), at S-64 − S-65 (Dec. 22, 2005); Prospectus Supplement for WaMu Series 2006-AR3 (Form 424B5), at S-77 (Feb. 22, 2006); Prospectus Supplement for WaMu Series 2006-AR4 (Form 424B5), at S-106 (Apr. 21, 2006); Prospectus Supplement for WaMu Series 2006-AR7 (Form 424B5), at S-111 − S-112 (Jun. 26, 2006); Prospectus Supplement for WaMu Series 2006-AR9 (Form 424B5), at S-100 −

S-101 (Jul. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR12 (Form 424B5), at S-86 – S-87 (Sep. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR15 (Form 424B5), at S-103 (Oct. 24, 2006); Prospectus Supplement for WaMu Series 2006-AR17 (Form 424B5), at S-104 – S-105 (Nov. 20, 2006); Prospectus Supplement for WaMu Series 2006-AR19 (Form 424B5), at S-109 – S-110 (Dec. 20, 2006); Prospectus Supplement for WaMu Series 2007-HE3 (Form 424B5), at 58-62 (May 9, 2007); Prospectus Supplement for WaMu Series 2007-HY1 (Form 424B5), at S-93 – S-94 (Jan. 23, 2007); Prospectus Supplement for WaMu Series 2007-HY5 (Form 424B5), at S-94 – S-95 (Apr. 24, 2007); Prospectus Supplement for WMALT Series 2005-6 (Form 424B5), at S-68 – S-69 (Jul. 27, 2005); Prospectus Supplement for WMALT Series 2006-5 (Form 424B5), at S-15 – S-16 (Jun. 29, 2006); Prospectus Supplement for WMALT Series 2006-AR5 (Form 424B5), at 73-74 (Jun. 27, 2006); Prospectus Supplement for WMALT Series 2006-AR8 (Form 424B5), at 73-74 (Sep. 28, 2006); Prospectus Supplement for WMALT Series 2007-1 (Form 424B5), at S-95 (Jan. 29, 2007).

(d)     CREDIT ENHANCEMENT

**Subordination**

the rights of the Mezzanine Certificates, the Class B Certificates and the Class C Certificates to receive distributions will be subordinated to the rights of the Class A Certificates;

the rights of the Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the Mezzanine Certificates with lower numerical class designations;

the rights of Class B Certificates and the Class C Certificates to receive distributions will be subordinated to the rights of the Mezzanine Certificates;

in each case to the extent described in this prospectus supplement.

Subordination is intended to enhance the likelihood of regular distributions on the more senior classes of certificates in respect of

224

interest and principal and to afford such certificates protection against realized losses on the Mortgage Loans.

\*      \*      \*

**Excess Interest**

The mortgage loans bear interest each month in an amount that in the aggregate is expected to exceed the amount needed to pay monthly interest on the certificates and to pay fees and expense of the trust.  The excess interest from the Mortgage Loans each month will be available to absorb realized losses on the Mortgage Loans and to maintain overcollateralization at required levels described in the pooling agreement.

\*      \*      \*

**Overcollateralization**

As of the Closing Date, the aggregate principal balance of the Mortgage Loans as of the Cut-off Date will exceed the aggregate certificate principal balance of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates, and the Class P Certificates on the Closing date by approximately $67,494,342, which is equal to the original certificate principal balance of the Class C Certificates.   Such amount represents approximately 1.50% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, and is approximately equal to the initial amount of overcollateralization that will be required to be provided under the pooling agreement.  Excess interest generated by the Mortgage Loans will be distributed as a payment of principal to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates then entitled to distributions of principal to the extent necessary to maintain the required level of overcollateralization. The required level of overcollateralization may be permitted to step down as provided in the pooling agreement.  We cannot assure you that sufficient interest will be generated by the Mortgage Loans to maintain the required level of overcollateralization.

\*      \*      \*

**Allocation of Losses**

If, on any distribution date, excess interest, overcollateralization are not sufficient to absorb realized losses on the Mortgage Loans as described…in this prospectus supplement, then realized losses on such mortgage loans will be allocated to [certain tranches in order of seniority].

225

\*       \*       \*

**Cross-Collateralization**

The trust provides for limited cross-collateralization of the Group I
Senior Certificates and the Group II Senior Certificates through the
application of interest generated by one loan group to fund interest
shortfalls on the Class A Certificates primarily supported by the
other loan group and through the application of principal generated
by one loan group to fund certain distributions of principal on the
Class A Certificates primarily supported by the other loan group.

The above misstatements, in identical or substantially similar language, were contained in the

following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-1 (Form

424B5), at S-6-7 (Feb. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-3 (Form

424B5), at S-6-7 (Jun. 4, 2004); Registration Statement (333-109318) filed by Long Beach Sec.

Corp. (Form S-3/A, Am.1), at S-8-9 (Feb. 10, 2004); Registration Statement (333-90550) filed

by Long Beach Sec. Corp. (Form S-3/A, Am.1), at S-8-9 (Jun. 25, 2002) ; Registration Statement

(333-41712) filed by Long Beach Sec. Corp. (Form S-3/A, Am.2), at S-61 – S-65 (Jan. 3, 2006);

Prospectus Supplement for Long Beach MLT 2002-2 (Form 424B5), at S-77 – S-81 (May 31,

2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form 424B5), at S-66 – S-70 (Sep.

7, 2004).

524.    The above statements were materially false and misleading when made because

they failed to disclose that, because the loan originators systematically ignored their underwriting

standards and abandoned their property appraisal standards, borrowers would not be able to

repay their loans, foreclosure sales would not recoup the full value of the loans, and the

aggregate expected principal payments would not, nor could they be expected to, exceed the

aggregate class principal of the Certificates.  As such, the Certificates were not protected with

the level of credit enhancement and overcollateralization represented to investors in the

Prospectus Supplements.

### G.   DEFENDANTS MADE UNTRUE STATEMENTS REGARDING OWNER-OCCUPANCY STATISTICS

525.   Each of the Prospectus Supplements disseminated by Defendants in the course of selling the Certificates contained tables substantially similar to that below, purporting to provide data on the owner occupancy rates of mortgage loans underlying the Certificates.  However, the figures contained in these tables were materially false and misleading because the Issuing Defendants systematically overstated the owner occupancy rates.

526.   For example, the following table appears in the Prospectus Supplement for Prospectus Supplement for J.P. Mortgage Acquisition Trust 2006-FRE2 (Form 424B5), at S-35 (Mar. 30, 2006), which was purchased in the offering by Plaintiffs:

| Occupancy Status | # of Loans | Current Principal Balance | Pct by Curr Prin Bal |
|---|---|---|---|
| Owner | 4,163 | $885,704,150.08 | 92.41% |
| Non-Owner | 370 | 64,578,428.39 | 6.74 |
| Second Home | 36 | 8,199,334.76 | 0.86 |
| Total | 4,569 | $958,481,913.23 | 100.00% |

527.   However, an analysis by Allstate of this same Certificate found that the true owner occupancy rate for the loans included in this particular mortgage pool was only 78.78%, not 91.11% for the loans as represented above.  *See* Section VI, *supra*.[7]

528.   Allstate also conducted a forensic analysis of the loans underlying several other Certificates purchased by Plaintiffs.  This analysis exposed Defendants' tendency to overstate the owner-occupancy statistics of the loans underlying their RMBS.  Particularly, Allstate revealed the following regarding Certificates purchased by Plaintiffs:

---

[7]  Allstate calculated the percentage of the number of mortgage loans identified as owner-occupied (*i.e.*, 100*2984/3558 = 83.87%) rather than the percent aggregate principal balance of the loans identified as owner-occupied in the prospectus supplement.

| Certificate | Owner-Occupancy Rate as Represented in Relevant Prospectus Supplement | Actual Owner-Occupancy Rate | Owner-Occupancy Rate Overstatement by Percentage |
|---|---|---|---|
| JPMAC 2006-CH2 | 94.50% | 80.70% | 13.80% |
| JPMAC 2006-FRE2 | 91.11% | 78.78% | 12.33% |
| SACO 2006-6 | 60.60% | 51.70% | 8.95% |
| WaMu 2006-AR9 | 92.50% | 77.90% | 14.60% |

*See* Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust 2006-CH2 (Form 424B5), at S-26 (Dec. 13, 2006); Prospectus Supplement for J.P. Mortgage Acquisition Trust 2006-FRE2 (Form 424B5), at S-35 (Mar. 30, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 92 (May 31, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR9 Trust (Form 424B5), at S-116 (July 25, 2006).

529.   In addition, FHFA's review of owner-occupancy rates revealed that Defendants' Prospectus Supplements consistently overstated the owner-occupancy statistics for the loans underlying many of the securities purchased by Plaintiffs.   The following chart illustrates the extent of the misrepresentations made in the Offering Documents governing Certificates purchased by Plaintiffs:

| Certificate | Supporting Loan Group | Reported Percentage of Non-Owner-Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner-Occupied Properties |
|---|---|---|---|---|---|
| JPMAC 2006-CH2 | Group 2-A | 5.42 | 11.87 | 16.65 | 11.23 |
| JPMAC 2006-FRE2 | Group 1 | 16.87 | 13.18 | 27.83 | 10.96 |
| BALTA 2005-10 | Group II-2 | 55.47 | 14.34 | 61.86 | 6.39 |
| BALTA 2005-10 | Group II-3 | 34.44 | 12.18 | 42.42 | 7.98 |
| BSABS 2006-HE10 | Group II-2 | 5.75 | 11.56 | 16.65 | 10.89 |
| BSABS 2006-HE10 | Group II-3 | 8.85 | 12.47 | 20.22 | 11.37 |
| BSABS 2007-HE1 | Group II-2 | 5.25 | 11.28 | 15.94 | 10.68 |
| BSABS 2007-HE1 | Group II-3 | 10.76 | 9.89 | 19.59 | 8.83 |

| BSABS 2007-HE2 | Group II2A | 6.27 | 7.02 | 12.85 | 6.58 |
|---|---|---|---|---|---|
| BSABS 2007-HE2 | Group II3A | 11.06 | 7.14 | 17.41 | 6.35 |
| BSABS 2007-HE6 | Group II | 0.00 | 10.91 | 10.91 | 10.91 |
| BSABS 2007-HE7 | Group II | 8.04 | 10.82 | 17.99 | 9.95 |
| BSABS 2007-HE7 | Group III | 5.37 | 10.39 | 15.20 | 9.83 |
| WMALT 2006-AR5 | Group 2 | 31.67 | 17.20 | 43.42 | 11.75 |
| WMALT 2006-AR8 | Group 1 | 19.45 | 13.27 | 30.14 | 10.69 |
| WMALT 2007-OA3 | Group 1 | 17.11 | 14.14 | 28.83 | 11.72 |
| WMALT 2007-OA3 | Group 3 | 39.96 | 17.57 | 50.51 | 10.55 |

*See* Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust 2006-CH2 (Form 424B5), at S-26 (Dec. 13, 2006); Prospectus Supplement for J.P. Mortgage Acquisition Trust 2006-FRE2 (Form 424B5), at S-35 (Mar. 30, 2006); Prospectus Supplement for Bear Stearns Alt-A Trust 2005-10 (Form 424B5), at A-5 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2006-HE10 (Form 424B5), at 159 (Jan. 3, 2007); Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust 2007-HE1 (Form 424B5), at S-26 (June 15, 2007); Prospectus Supplement for Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 167 (Feb. 28, 2007); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2007-HE6 (Form 424B5), at 99 (Aug. 30, 2007); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2007-HE7 (Form 424B5), at 103 (Sept. 19, 2007); Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 Trust (Form 424B5), at S-167 (June 27, 2006); Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Trust (Form 424B5), at S-88 (Sept. 27, 2006); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-209 (March 27, 2007).

530. A loan level analysis conducted by Mass Mutual revealed more of the same. With respect to the owner-occupancy rates of Certificates purchased by Plaintiff, Mass Mutual's investigation uncovered the following:

| Certificate | Owner-Occupancy Rate as Represented in Relevant Prospectus Supplement | Actual Owner-Occupancy Rate | Owner-Occupancy Rate Overstatement by Percentage |
|---|---|---|---|
| BALTA 2006-6 | 71.29% | 60.09% | 11.20% |
| JPMAC 2006-CH2 | 94.53% | 83.21% | 11.32% |
| WMALT 2006-AR5 | 84.12% | 70.26% | 13.86% |
| WaMu 2006-AR7 | 79.81% | 66.21% | 13.60% |

*See* Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust 2006-CH2 (Form 424B5), at S-26 (Dec. 13, 2006); Prospectus Supplement for Bear Stearns Alt-A Trust 2006-6 (Form 424B5), at 95 (Oct. 3, 2006); Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 Trust (Form 424B5), at S-167 (June 27, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR7 Trust (Form 424B5), at S-127 (June 26, 2006).

531.    Similar misrepresentations can be found in the following Offering Documents: Prospectus Supplement for J.P. Morgan Alternative Loan Trust 2006-S3 (Form 424B5), at A-2 (June 30, 2006); Prospectus Supplement for J.P. Morgan Alternative Loan Trust 2006-A7 (Form 424B5), at A-2 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan Alternative Loan Trust 2006-A4 (Form 424B5), at A-2 (July 28, 2006); Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust 2007-HE1 (Form 424B5), at S-26 (June 15, 2007); Prospectus Supplement for J.P. Morgan Mortgage Trust 2005-A6 (Form 424B5), at A-6 (Aug. 31, 2005); Prospectus Supplement for J.P. Morgan Mortgage Trust 2005-A7 (Form 424B5), at A-2 (Sept. 29, 2005); Prospectus Supplement for J.P. Morgan Mortgage Trust 2005-S3 (Form 424B5), at A-2 (Dec. 28, 2005); Prospectus Supplement for J.P. Morgan Mortgage Trust 2007-A1 (Form 424B5), at A-4 (Jan. 30, 2007); Prospectus Supplement for Bear Stearns Alt-A Trust 2004-11

(Form 424B5), at A-5 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Trust 2005-7 (Form 424B5), at A-6 (July 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Trust 2005-9 (Form 424B5), at A-5 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Trust 2006-1 (Form 424B5), at A-5 (Feb. 1, 2006); Prospectus Supplement for Bear Stearns Alt-A Trust 2006-8 (Form 424B5), at 85 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2005-AC3 (Form 424B5), at A-4 (May 31, 2005); Prospectus Supplement for Bear Stearns Asset Backed Securities Trust 2007-SD1 (Form 424B5), at A-4 (Jan. 19, 2007); Prospectus Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at A-5 (March 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at A-5 (Sept. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form 424B5), at A-4 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at A-5 (Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2005-1 (Form 424B5), at A-4 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-2 (Form 424B5), at A-6 (March 2, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-5 (Form 424B5), at A-6 (July 15, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-12 (Form 424B5), at 121 (Dec. 30, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2006-4 (Form 424B5), at 95 (Oct. 2, 2006); Prospectus Supplement for Bear Stearns ABS Trust 2003-HE1 (Form 424B5), at A-4 (Dec. 30, 2003); Prospectus Supplement for Bear Stearns ABS Trust 2004-AC3 (Form 424B5), at A-5 (May 28, 2004); Prospectus Supplement for Bear Stearns ABS Trust 2004-AC5 (Form 424B5), at A-5 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns ABS Trust 2004-HE1 (Form 424B5), at A-4 (Jan. 29, 2004); Prospectus Supplement for Bear Stearns ABS Trust 2006-HE6 (Form 424B5), at 128 (June 27, 2006); Prospectus Supplement for Bear Stearns ARM Trust 2006-1 (Form 424B5), at 75 (Mar. 17, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-

AR4 (Form 424B5), at 70 (Nov. 30, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR5 (Form 424B5), at 97 (Dec. 29, 2006); Prospectus Supplement for SACO I Trust 2005-10 (Form 424B5), at A-7 (Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at 143 (April 27, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 115 (June 30, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2002-AR17 Trust (Form 424B5), at S-63 (Oct. 23, 2002); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR6 Trust (Form 424B5), at S-94 (April 26, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR8 Trust (Form 424B5), at S-93 (July 14, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR11 Trust (Form 424B5), at S-85 (Aug. 25, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR13 Trust (Form 424B5), at S-85 (Oct. 24, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR17 Trust (Form 424B5), at S-82 (Dec. 19, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2005-AR19 Trust (Form 424B5), at S-81 (Dec. 22, 2005); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR3 Trust (Form 424B5), at S-90 (Feb. 22, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR4 Trust (Form 424B5), at S-123 (April 21, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR12 Trust (Form 424B5), at S-101 (Sept. 25, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR15 Trust (Form 424B5), at S-117 (Oct. 24, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR17 Trust (Form 424B5), at S-120 (Nov. 20, 2006); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2006-AR19 Trust (Form 424B5), at S-124 (Dec. 20, 2006); Prospectus

Supplement for WAMU Asset-Backed Certificates WAMU Series 2007-HE3 Trust (Form 424B5), at 112 (April 26, 2007); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2007-HY1 Trust (Form 424B5), at S-106 (Jan. 23, 2007); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2007-HY5 Trust (Form 424B5), at S-105 (April 24, 2007); Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-6 Trust (Form 424B5), at S-81 (July 27, 2006); Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-5 Trust (Form 424B5), at S-147 (June 29, 2006); Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-1 Trust (Form 424B5), at S-110; Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2003-AR1 Trust (Form 424B5), at S-63 (Jan. 27, 2003); Prospectus Supplement for WAMU Mortgage Pass-Through Certificates Series 2003-AR3 Trust (Form 424B5), at S-63 (Feb. 24, 2003); Prospectus Supplement for WMALT Series 2006-9 Series Trust (Form 424B5), at S-92 (Oct. 27, 2006); Prospectus Supplement for Long Beach Mortgage Loan Trust 2002-2 (Form 424B5), at S-30 (May 31, 2002); Prospectus Supplement for Long Beach Mortgage Loan Trust 2004-4 (Form 424B5), at S-26 (Sept. 7, 2004).

532.   The results of these loan-level reviews establish that, contrary to Defendants' representations, a far lower percentage of borrowers did, in fact, occupy the mortgaged properties than was represented to investors such as Plaintiffs in the Offering Documents.

533.   On information and belief, the mortgage loans underlying all of the Certificates purchased by Plaintiffs suffer from similar deficiencies as the mortgage loans underlying the Certificates reviewed by Mass Mutual, Allstate and the FHFA.  Three separate analyses covering dozens of separate offerings and tens of thousands of underlying mortgage loans have revealed that Defendants consistently overstated the owner-occupancy rates in the offering documents for

their RMBS.  There is no reason to believe that the systematic and pervasive misrepresentations of owner-occupancy rates identified by Mass Mutual, Allstate and the FHFA were confined to only the securities listed in the tables above.

H.   DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE TRANSFER OF TITLE TO THE ISSUING TRUSTS

534.   Defendants stated in each of the Offering Documents, using identical or substantially similar language, that:

> (a)   Each seller or originator of loans that are included in a trust fund for a series of securities will have made representations and warranties in respect of the loans sold by that seller or originated by that originator.  Unless otherwise specified in the related prospectus supplement, the representations and warranties typically include the following: …
>
> -   The seller or originator had good title to each loan and that loan was subject to no offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement may forgive some indebtedness of a borrower….

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Registration Statement (333-130192) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 3), at 90 (Apr. 3, 2006); Registration Statement (333-127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A, Am.1), at 210 (Aug. 15, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-S3 (Form 424B5), at 30 (Jun. 30, 2006); Prospectus Supplement for J.P. Morgan ALT 2006-A7 (Form 424B5), at 30 (Nov. 30, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-FRE2 (Form 424B5), at 150 (Mar. 30, 2006); Registration Statement (333-141607) filed by JPMorgan Acceptance Corp. I (Form S-3/A, Am. 1), at 108 (Apr. 23, 2007); Prospectus Supplement for J.P. Morgan ALT 2006-A4 (Form 424B5), at 30 (Jul. 28, 2006); Prospectus Supplement for J.P. Morgan MAC 2006-CH2 (Form 424B5), at 177 (Dec. 13, 2006); Prospectus Supplement for J.P. Morgan MAC 2007-HE1

(Form 424B5), at 172 (Jun. 15, 2007); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A6 (Form 424B5), at 28 (Aug. 31, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-A7 (Form 424B5), at 28 (Sep. 29, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2005-S3 (Form 424B5), at 28 (Dec. 28, 2005); Prospectus Supplement for J.P. Morgan Mort. Tr. 2007-A1 (Form 424B5), at 30 (Jan. 30, 2007).

> (b)    Unless otherwise specified in the related Prospectus Supplement or in the Agreement, the Depositor will represent and warrant to the Trustee, among other things, that the information contained in the Underlying Securities Schedule is true and correct and that immediately prior to the transfer of the Underlying Securities to the Trustee, the Depositor had good title to, and was the sole owner of, each Underlying Security and there had been no other sale or assignment thereof.

The above misstatement was contained in the following Offering Documents:   Prospectus Supplement for ChaseFlex Trust 2006-1 (Form 424B5), at 12 (May 24, 2006); Registration Statement (333-130223) filed by Chase Finance Mortgage Corp.   (Form S-3/A, Am. 3), at 11 (Mar. 21, 2006).

> (c)    Assignment of Agency and Private Label Securities.  The depositor will cause the Agency and Private Label Securities to be registered in the name of the trustee (or its nominee or correspondent).  The trustee (or its nominee or correspondent) will take possession of any certificated Agency or Private Label Securities.  The trustee will not typically be in possession of, or be assignee of record of, any loans underlying the Agency or Private Label Securities.  See "The Trust Funds—Private Label Securities" in this prospectus. Each Agency and Private Label Security will be identified in a schedule appearing as an exhibit to the related agreement, which will specify the original principal amount, principal balance as of the cut-off date, annual pass-through rate or interest rate and maturity date for each Agency and Private Label Security conveyed to the related trust fund.  In the agreement, the depositor will represent and warrant to the trustee that: ...
>
> -   ***immediately prior to the conveyance of the Agency or Private Label Securities, the depositor had good title and was the sole owner of the Agency or Private Label Securities…***

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Registration Statement (333-131374) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 5), at 63 (Mar. 31, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE2 (Form 424B5), at 233-34 (Feb. 28, 2007); Registration Statement (333-125422) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at 36 (Jun. 14, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2006-1 (Form 424B5), at 140-41 (Mar. 17, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2004-HE1 (Form 424B5), at 55 (Jan. 29, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2003-HE1 (Form 424B5), at 55  (Dec. 30, 2003); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC3 (Form 424B5), at 55-56  (May 28, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC5 (Form 424B5), at 55-56  (Oct. 1, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE6 (Form 424B5), at 177 (Jun. 27, 2006); Prospectus Supplement for Bear Stearns ABS Trust 2004-SD4 (Form 424B5), at 55-56 (Nov. 19, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2006-IM1 (Form 424B5), at 193 (Apr. 25, 2004); Registration Statement (333-113636) filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 1), at 55 (Apr. 21, 2004); Registration Statement (333-91334) filed by Bear Stearns Asset Backed Securities, Inc. (Form S-3/A, Am. 1), at 54 (Nov. 13, 2002) ; Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE1 (Form 424B5), at 226 (Jan. 31, 2007); Prospectus Supplement for SACO I Trust 2005-10 (Form 424B5), at 277-78 (Dec. 30, 2005); Prospectus Supplement for SACO I Trust 2006-5 (Form 424B5), at 198 (Apr. 27, 2006); Prospectus Supplement for SACO I Trust 2006-6 (Form 424B5), at 146 (May 31, 2006); Prospectus Supplement for SACO I Trust 2006-7 (Form 424B5), at 164 (Jun. 30, 2006); Prospectus Supplement for Bear Stearns ABS I Trust 2005-AC3 (Form 424B5), at 55-56 (May 31, 2005); Prospectus Supplement for Bear Stearns ABS I Trust 2006-HE10 (Form 424B5), at 247 (Jan. 3, 2007); Prospectus Supplement for Bear Stearns ABS I Trust

2007-HE6 (Form 424B5), at 153-154 (Aug. 30, 2007); Prospectus Supplement for Bear Stearns

ABS I Trust 2007-HE7 (Form 424B5), at 171 (Sep. 19, 2007); Prospectus Supplement for Bear

Stearns ABS Trust 2007-SD1 (Form 424B5), at 63 (Jan. 19, 2007); Prospectus Supplement for

Bear Stearns Alt-A Tr. 2006-1 (Form 424B5), at 61-62 (Feb. 1, 2006).

> (d) In the case of mortgage securities, representations and warranties
> will generally include, among other things, that as to each
> mortgage security, the Seller has good title to the mortgage
> security free of any liens.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Bear Stearns Mortgage Funding

Trust 2006-AR5 (Form 424B5), at 104 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns

Mortgage Funding Trust 2006-AR4 (Form 424B5), at 83 (Nov. 30, 2006); Registration

Statement (333-132232) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A,

Am. 1), at 19-20 (Mar. 10, 2006) ); Prospectus Supplement for Bear Stearns ARM Trust 2006-4

(Form 424B5), at 149 (Oct. 2, 2006); Prospectus Supplement for Bear Stearns Structured

Products Inc. Tr. 2007-R6 (Form 424B5), at 406 (Sep. 4, 2007).

> (e) Each Seller will have made representations and warranties in
> respect of the mortgage loans and/or mortgage securities sold by
> the Seller and evidenced by a series of securities.  In the case of
> mortgage loans, representations and warranties will generally
> include, among other things, that as to each mortgage loan: …
>
> • *the Seller has good title to the mortgage loan* and the
> mortgage loan was subject to no offsets, defenses or
> counterclaims except as maybe provided under the Relief
> Act and except to the extent that any buydown agreement
> exists for a buydown mortgage loan;
> - there are no mechanics' liens or claims for work, labor
> or material affecting the related mortgaged property
> which are, or may be a lien prior to, or equal with, the
> lien of the related mortgage (subject only to permissible
> title insurance exceptions)….

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Registration Statement (333-115122) filed by Structured Asset Mort. Investments II Inc. (Form S-3/A, Am. 1), at 16-17 (May 11, 2004); Registration Statement (333-120916) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 13 (Dec. 14, 2004); Registration Statement (333-106323) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at 16-17 (Jul. 11, 2003); Prospectus Supplement for Bear Stearns Alt-A Tr. 2004-11 (Form 424B5), at 16-17 (Oct. 1, 2004); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-7 (Form 424B5), at 14 (Jul. 29, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-9 (Form 424B5), at 14 (Oct. 3, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-10 (Form 424B5), at 14 (Dec. 29, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2004-2 (Form 424B5), at 13 (Mar. 31, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-8 (Form 424B5), at 16-17 (Sep. 30, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-9 (Form 424B5), at 16-17 (Nov. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2004-10 (Form 424B5), at 16-17 (Dec. 1, 2004); Prospectus Supplement for Bear Stearns ARM Trust 2005-1 (Form 424B5), at 14 (Feb. 28, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-2 (Form 424B5), at 13 (Mar. 2, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-5 (Form 424B5), at 14 (Jul. 15, 2005); Prospectus Supplement for Bear Stearns ARM Trust 2005-12 (Form 424B5), at 215 (Dec. 30, 2005); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-6 (Form 424B5), at 158 (Oct. 3, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2006-8 (Form 424B5), at 202 (Dec. 29, 2006); Prospectus Supplement for Bear Stearns Alt-A Tr. 2005-3 (Form 424B5), at S-69 (Mar. 31, 2005).

> (f)     [I]mmediately upon the transfer and assignment of the Mortgage Loans to the Trust, the Trust will have good title to the Mortgage Loans….

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WaMu Series 2003-AR1 (Form 424B5), at 22 (Jan. 27, 2003); Prospectus Supplement for WaMu Series 2003-AR3 (Form 424B5), at 22 (Feb. 24, 2003); Registration Statement (333-77026) filed by WaMu Mort. Sec. Corp. (Form S-3/A, Am. 1), at 22 (Feb. 1, 2002); ); Registration Statement (333-103345) filed by WaMu Mortgage Sec. Corp. (Form S-3/A, Am. 1), at 22 (Mar. 7, 2003); Prospectus Supplement for WaMu Series 2002-AR17 (Form 424B5), at 22 (Oct. 23, 2002); Prospectus Supplement for WaMu Series 2005-AR6 (Form 424B5), at 24 (Apr. 26, 2005); Prospectus Supplement for WaMu Series 2005-AR8 (Form 424B5), at 22 (Jul. 14, 2005); Prospectus Supplement for WaMu Series 2005-AR11 (Form 424B5), at 22 (Aug. 24, 2005); Prospectus Supplement for WaMu Series 2007-HE3 (Form 424B5), at 50 (May 9, 2007); Prospectus Supplement for WMALT Series 2005-6 (Form 424B5), at 24 (Jul. 27, 2005).

> (g)   Under the mortgage loan sale agreement pursuant to which the sponsor will sell the mortgage loans to the depositor, the sponsor will make representations and warranties in respect of the mortgage loans, which representations and warranties the depositor will assign to the Trust pursuant to the pooling agreement.  Among those representations and warranties are the following:
>
> -   ***Each mortgage is a valid and enforceable first lien*** on an unencumbered estate in fee simple or leasehold estate in the related mortgaged property, except as such enforcement may be limited by laws affecting the enforcement of creditors' rights generally and principles of equity, and except as provided in the mortgage loan sale agreement;
>
> -   ***The depositor will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien*** (other than any lien under the mortgage loan sale agreement)….

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WMALT Series 2006-9 (Form

424B5), at S-46 (Oct. 27, 2006); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-101 (Mar. 27, 2007); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at 52 (Jan. 3, 2006) ; Prospectus Supplement for WaMu Series 2005-AR13 (Form 424B5), at S-36 (Oct. 24, 2005); Prospectus Supplement for WaMu Series 2005-AR17 (Form 424B5), at S-33 (Dec. 19, 2005); Prospectus Supplement for WaMu Series 2005-AR19 (Form 424B5), at S-33 (Dec. 22, 2005); Prospectus Supplement for WaMu Series 2006-AR3 (Form 424B5), at S-45 (Feb. 22, 2006); Prospectus Supplement for WaMu Series 2006-AR4 (Form 424B5), at S-56 (Apr. 21, 2006); Prospectus Supplement for WaMu Series 2006-AR7 (Form 424B5), at S-59 (Jun. 26, 2006); Prospectus Supplement for WaMu Series 2006-AR9 (Form 424B5), at S-57 (Jul. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR12 (Form 424B5), at S-46 (Sep. 25, 2006); Prospectus Supplement for WaMu Series 2006-AR15 (Form 424B5), at S-58 (Oct. 24, 2006); Prospectus Supplement for WaMu Series 2006-AR17 (Form 424B5), at S-59 (Nov. 20, 2006); Prospectus Supplement for WaMu Series 2006-AR19 (Form 424B5), at S-62 (Dec. 20, 2006); Prospectus Supplement for WaMu Series 2007-HY1 (Form 424B5), at S-45 (Jan. 23, 2007); Prospectus Supplement for WaMu Series 2007-HY5 (Form 424B5), at S-47 (Apr. 24, 2007); Prospectus Supplement for WMALT Series 2006-5 (Form 424B5), at S-61 (Jun. 29, 2006); Prospectus Supplement for WMALT Series 2006-AR5 (Form 424B5), at S-80 (Jun. 27, 2006); Prospectus Supplement for WMALT Series 2006-AR8 (Form 424B5), at S-88 (Sep. 28, 2006); Prospectus Supplement for WMALT Series 2007-1 (Form 424B5), at S-51 (Jan. 29, 2007).

> (h)   Each mortgage loan seller, or a party on its behalf, will have made representations and warranties in respect of the mortgage loans sold by that mortgage loan seller. The following material representations and warranties as to the mortgage loans will be made by or on behalf of each mortgage loan seller:…
>
> -   that the mortgage loan seller had good title to each mortgage loan and each mortgage loan was subject to

> no valid offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement described in this prospectus may forgive some indebtedness of a borrower;

> - that each Mortgage constituted a valid lien on, or security interest in, the mortgaged property, subject only to permissible title insurance exceptions and senior liens, if any, and that the mortgaged property was free from material damage and was in good repair….

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-3 (Form 424B5), at 24 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form 424B5), at 23 (Feb. 4, 2004); Registration Statement (333-109318) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at 24 (Feb. 10, 2004); Registration Statement (333-90550) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at 23 (Jun. 25, 2002) ); Registration Statement (333-41712) filed by Long Beach Sec. Corp. (Form S-3/A, Am.2), at 30 (Jan. 3, 2006); Prospectus Supplement for Long Beach MLT 2002-2 (Form 424B5), at 31-32 (May 31, 2002); Prospectus Supplement for Long Beach MLT 2004-4 (Form 424B5), at 24 (Sep. 7, 2004); Registration Statement (333-123034) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at 38 (Jun. 13, 2005).

535.   These representations were false because Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs.  These representations were also false because Defendants routinely failed to execute valid endorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs.  The Issuing Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in the event of default.

I.   **DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE
CHARACTERISTICS OF THE MORTGAGE POOLS**

536.   Defendants issued Offering Documents that contained the following
misrepresentations concerning the characteristics of the mortgage pools issued by JPMorgan,
Bear Stearns, WaMu and Long Beach:

> (a)   Certain general information with respect to the Mortgage Loans is
> set forth below.  Prior to the Closing Date, Mortgage Loans may be
> removed from the Trust Fund and other mortgage loans may be
> substituted therefor.  *The Depositor believes that the information
> set forth herein with respect to the Mortgage Loans as presently
> constituted is representative of the characteristics of the
> Mortgage Loans as they will be constituted at the Closing Date,
> although the numerical data and certain other characteristics of
> the Mortgage Loans described herein may vary within a range of
> plus or minus 5%.*

The above misstatements, in identical or substantially similar language, were contained in the
following Offering Documents:   Registration Statement (333-130192) filed by JPMorgan
Acceptance Corp. I (Form S-3/A, Am. 3), at 13 (Apr. 3, 2006); Prospectus Supplement for J.P.
Morgan ALT 2006-S3 (Form 424B5), at S-16 (Jun. 30, 2006); Prospectus Supplement for J.P.
Morgan ALT 2006-A7 (Form 424B5), at S-17 (Nov. 30, 2006); Prospectus Supplement for J.P.
Morgan MAC 2006-FRE2 (Form 424B5), at 28 (Mar. 30, 2006); Registration Statement (333-
127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A, Am.1), at 140 (Aug. 15, 2006).

> (b)   If so specified in the related prospectus supplement, the actual
> statistical characteristics of a pool as of the closing date may differ
> from those set forth in the prospectus supplement.  *However, in no
> event will more than five percent of the assets as a percentage of
> the cut-off date pool principal balance vary from the
> characteristics described in the related prospectus supplement.*

The above misstatements, in identical or substantially similar language, were contained in the
following Offering Documents:   Registration Statement (333-130192) filed by JPMorgan
Acceptance Corp. I (Form S-3/A, Am. 3), at 82 (Apr. 3, 2006); Prospectus Supplement for
ChaseFlex Trust 2006-1 (Form 424B5), at S-22-23 (May 24, 2006); Prospectus Supplement for

J.P. Morgan ALT 2006-S3 (Form 424B5), at 17 (Jun. 30, 2006); Prospectus Supplement for J.P.

Morgan ALT 2006-A7 (Form 424B5), at 17 (Nov. 30, 2006); Prospectus Supplement for J.P.

Morgan MAC 2006-FRE2 (Form 424B5), at 139 (Mar. 30, 2006); Registration Statement (333-

127020) filed by J.P. Morgan Acceptance Corp. I (Form S-3/A, Am.1), at 204 (Aug. 15, 2006);

Registration Statement (333-130223) filed by Chase Finance Mortgage Corp.  (Form S-3/A, Am.

3), at S-21 (Mar. 21, 2006).

> (c)     The depositor believes that the information set forth herein will be representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary.  ***The actual mortgage loans included in the trust fund as of the closing date may vary from the mortgage loans as described in this prospectus supplement by up to plus or minus 5% as to any of the material characteristics described herein.  If, as of the closing date, any material pool characteristics differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement to this prospectus supplement, or in a current report on Form 8-K.***  Unless we have otherwise indicated, the information we present below and in Schedule A is expressed as of the cut-off date….  The mortgage loan principal balances that are transferred to the trust will be the aggregate principal balance as of the cut-off date….
>
> ***The mortgage loans will be selected for inclusion in the mortgage pool based on rating agency criteria, compliance with representations and warranties, and conformity to criteria relating to the characterization of securities for tax, ERISA, SMMEA, Form S-3 eligibility and other legal purposes***.

The above misstatement, in identical or substantially similar language, was contained in the

following Offering Documents:  Prospectus Supplement for Bear Stearns ABS I Trust 2007-HE2

(Form 424B5), at 31 (Feb. 28, 2007); Registration Statement (333-125422) filed by Bear Stearns

ABS I LLC (Form S-3/A, Am. 1), at 132 (Jun. 14, 2005); Registration Statement (333-131374)

filed by Bear Stearns ABS I LLC (Form S-3/A, Am. 5), at S-33 (Mar. 31, 2006); Prospectus

Supplement for Bear Stearns ABS I Trust 2006-HE6 (Form 424B5), at 27 (Jun. 27, 2006);

Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR4 (Form 424B5), at 15 (Nov. 30, 2006); Prospectus Supplement for Bear Stearns Mortgage Funding Trust 2006-AR5 (Form 424B5), at 16 (Dec. 29, 2006); Registration Statement (333-132232) filed by Structured Asset Mortgage Investments II Inc. (Form S-3/A, Am. 1), at S-37-38, 11 (Mar. 10, 2006); Prospectus Supplement for Bear Stearns ARM Trust 2006-1 (Form 424B5), at 24 (Mar. 17, 2006).

> (d)    We have provided below and in Schedule A to this prospectus supplement information with respect to the mortgage loans that we expect to include in the pool of mortgage loans in the trust fund. Prior to the closing date [], we may remove mortgage loans from the mortgage pool and we may substitute other mortgage loans for the mortgage loans we remove. ***The depositor believes that the information set forth herein with respect to the mortgage pool as presently constituted is representative of the characteristics of the mortgage pool as it will be constituted at the closing date***, although certain characteristics of the mortgage loans in the mortgage pool may vary. Unless we have otherwise indicated, the information we present below and in Schedule A is expressed as of the cut-off date….

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for Bear Stearns ABS Trust 2004-SD4 (Form 424B5), at S-31 (Nov. 19, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2006-IM1 (Form 424B5), at 28 (Apr. 25, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2004-HE1 (Form 424B5), at S-23   (Jan. 29, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2003-HE1 (Form 424B5), at S-23  (Dec. 30, 2003); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC3 (Form 424B5), at S-23   (May 28, 2004); Prospectus Supplement for Bear Stearns ABS I Trust 2004-AC5 (Form 424B5), at S-26  (Oct. 1, 2004).

> (e)    ***Washington Mutual Mortgage Securities Corp. believes that the information in this prospectus supplement for the mortgage pool is representative of the characteristics of the mortgage pool as it will actually be constituted when the certificates are issued***, although   the   range   of   mortgage   interest   rates   and   other

characteristics of the mortgage loans in the mortgage pool may vary.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WaMu Series 2003-AR1 (Form 424B5), at S-20 (Jan. 27, 2003); Prospectus Supplement for WaMu Series 2003-AR3 (Form 424B5), at S-19 (Feb. 24, 2003); Prospectus Supplement for WMALT Series 2006-9 (Form 424B5), at S-43 (Oct. 27, 2006); Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-85 (Mar. 27, 2007); Registration Statement (333-77026) filed by WaMu Mort. Sec. Corp. (Form S-3/A, Am. 1), at S-13 (Feb. 1, 2002); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-15 (Jan. 3, 2006).

> (f)      Each co-sponsor selected the mortgage loans it sold to the depositor from among its portfolio of mortgage loans held for sale based on a variety of considerations, including type of mortgage loan, geographic concentration, range of mortgage interest rates, principal balance, credit scores and other characteristics described in Appendix B to this prospectus supplement, and ***taking into account investor preferences*** and the depositor's objective of obtaining the most favorable combination of ratings on the certificates.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at S-103 (Mar. 27, 2007); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-19 (Jan. 3, 2006).

> (g)      ***[The sponsor] [The mortgage loan seller] used no adverse selection procedures in selecting the mortgage loans*** from among the outstanding adjustable rate conventional mortgage loans owned by it which were available for sale and as to which the representations and warranties in the mortgage loan sale agreement could be made….

The above misstatement was contained in the following Offering Document:   Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at S-18 (Jan. 3, 2006).

> (h)   The composition and characteristics of a mortgage pool containing revolving credit loans may change from time to time as a result of any draws made after the related cut-off date under the related credit line agreements.  If mortgage assets are transferred to or repurchased from the trust after the date of the related prospectus supplement other than as a result of any draws under credit line agreements relating to revolving credit loans, the addition or deletion will be noted in a Distribution Report on Form 10-D or a Current Report on Form 8-K, as appropriate.  ***In no event, however, will more than 5%, by principal balance at the cut-off date, of the mortgage assets deviate from the characteristics of the mortgage assets set forth in the related prospectus supplement*** other than as a result of any draws under credit line agreements relating to revolving credit loans.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for WMALT Series 2007-OA3 (Form 424B5), at 35 (Mar. 27, 2007); Registration Statement (333-130795) filed by WaMu Asset Acceptance Corp. (Form S-3/A, Am. 1), at 36 (Jan. 3, 2006).

> (i)   The sponsor selected the mortgage loans from among its portfolio of mortgage loans held for sale based on a variety of considerations, including type of mortgage loan, geographic concentration, range of mortgage interest rates, principal balance, credit scores and other characteristics described in Appendix B to this prospectus supplement, and ***taking into account investor preferences*** and the depositor's objective of obtaining the most favorable combination of ratings on the certificates.

The above misstatement was contained in the following Offering Document:   Prospectus Supplement for WMALT Series 2006-9 (Form 424B5), at S-47 (Oct. 27, 2006).

> (j)   Prior to the Closing Date, Mortgage Loans may be removed from the mortgage pool as a result of incomplete documentation, delinquency, payment in full, insufficient collateral value or otherwise if the Depositor deems such removal necessary or desirable, and may be prepaid at any time, and some Mortgage Loans may be added to the mortgage pool.  As a result, the

> characteristics of the Mortgage Loans on the Closing Date may differ from the characteristics presented in this prospectus supplement; *however, such differences are not expected to be material*.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-3 (Form 424B5), at S-21 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form 424B5), at S-20 (Feb. 4, 2004).

> (k)    If mortgage assets are added to or deleted from the trust fund after the date of the related prospectus supplement other than as a result of any draws under credit line agreements relating to revolving credit loans, the addition or deletion will be noted on the report on Form 8-K. *In no event, however, will more than 5%, by principal balance at the cut-off date, of the mortgage assets deviate from the characteristics of the mortgage assets set forth in the related prospectus supplement* other than as a result of any draws under credit line agreements relating to revolving credit loans. In addition, a report on Form 8-K will be filed within 15 days after the end of any pre-funding period containing information respecting the trust fund assets transferred to a trust fund after the date of issuance of the related securities as described in the following paragraph.

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Prospectus Supplement for Long Beach MLT 2004-3 (Form 424B5), at 15 (Jun. 4, 2004); Prospectus Supplement for Long Beach MLT 2004-1 (Form 424B5), at 15 (Feb. 4, 2004); Registration Statement (333-109318) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at 15 (Feb. 10, 2004); Registration Statement (333-90550) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at 14 (Jun. 25, 2002).

> (l)    The *depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the mortgage pool* as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary.

247

The above misstatement, in identical or substantially similar language, was contained in the following Offering Documents:  Registration Statement (333-109318) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at S-30 (Feb. 10, 2004); Registration Statement (333-90550) filed by Long Beach Sec. Corp. (Form S-3/A, Am.1), at S-30 (Jun. 25, 2002).

537.   These representations were false because Defendants were aware that the information provided in the Offering Documents did not accurately describe the characteristics of the underlying loans, even when taking into account their stated allowances for variance. Defendants were not concerned with investor preferences and instead included mortgage loans in the mortgage pools that were in fact the kinds of risky loans that conservative investors such as Plaintiffs avoided.  Indeed, Defendants did purposefully and intentionally use adverse selection procedures when choosing those risky and soon-to-fail mortgages to be securitized.

## XI.   DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS

538.   The allegations below are made in support of Plaintiffs' common-law fraud, fraudulent inducement and aiding and abetting claims, and not in support of its negligent misrepresentation claim and Securities Act claims, which are based solely on negligence.

539.   As set forth above, at all relevant times, Defendants knew that the Offering Documents contained material misstatements and omissions.   Defendants' knowledge is evidenced by, among other things, the following:

- Defendants' loan personnel, and loan personnel at Defendants' subsidiaries and affiliates, engaged in such practices as entering false information into underwriting programs, accepting false appraisals, not verifying borrower incomes, accepting unrealistic stated incomes, and altering loan documents.   These practices were put into place by management personnel seeking to maximize loan volume to fill the securitization pipeline.  Defendants were aware that their loan personnel were committing fraud and did nothing to remedy it or alert investors. *See* Sections IV.A-C.

- As the housing boom accelerated, Defendants relaxed their loan underwriting standards and purchased loans from third-party originators whom they knew to be unreliable. Defendants were aware that their underwriting processes were not adequate to assess the quality of the purchased loans, and that in some instances loans were securitized without ever having been cleared through due diligence. *See* Section IV.

- The limited due diligence that Defendants did perform on the mortgage loans being pooled for securitization demonstrated that there were significant and extensive defects in the mortgage loans. Defendants commissioned due diligence reports from various external parties which showed that a significant proportion of the sampled loans analyzed had defects, including breaches of the Originators' underwriting guidelines and improper appraisals. Despite this knowledge, Defendants waived the breaches and allowed large numbers of these defective mortgages to be included in the mortgage pools used to collateralize the Certificates sold to Plaintiffs. *See* Section IV.

- The Defendants also knew that those mortgages were being issued to borrowers that were likely to default, as evidenced by the high percentage of loans underlying the Certificates that are currently in foreclosure, as well as the percentage of loans underlying the Certificates that are currently delinquent by more than 90 days. *See* ¶747, *infra*.

- Defendants sought out the loans on their books that they considered most likely to default and rushed to securitize them before they could become unsalable, placing these adversely-selected assets into mortgage pools so as to offload the risks onto unsuspecting investors such as Plaintiffs. *See* Sections IV.A.3, IV.B.3, and IV.C.4.

- Defendants asserted billions of dollars in repurchase claims against third-party originators that sold them defective loans. However, rather than demand that the originators repurchase the loans, which would have required Defendants to repurchase the loans from the Issuing Trusts and replace them with higher-quality collateral, Defendants entered into settlements with the originators for their own benefit, thereby obtaining compensation for defects in assets that they no longer owned. Defendants did not inform their RMBS investors that they had identified defects in trust assets or recovered funds from the originators. *See* Section IV.B.3.

- Defendants knew that the mortgages they were acquiring from the various originators as quickly as possible and packaging into the Certificates sold to investors such as Plaintiffs were not worthy of their high credit ratings. The investment grade ratings of the Certificates at the time they were sold to the Plaintiffs have declined substantially to their current non-investment grade and/or junk ratings. *See* ¶¶639-747, *infra*.

## XII.   THE LIABILITY OF THE CONTROL PERSON DEFENDANTS

### A.   DEFENDANT JPMORGAN CHASE

540.    Defendant JPMorgan Chase was in a position to and in fact controlled each of Defendants JPM Acceptance, JPMM Acquisition, JPMS, Chase Home Finance, and Chase Mortgage Finance.   Defendant JPMorgan Chase operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for JPMorgan Chase.

541.    JPMorgan Chase encouraged and/or allowed its subsidiaries to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as Defendant JPM Acceptance, and the JPMorgan Trusts to serve as conduits for the mortgage loans.

542.    Unlike arm's-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the sponsor (JPMM Acquisition); the depositor (JPM Acceptance) and the JPMorgan Trusts were not arm's-length transactions at all, as JPMorgan Chase controlled every aspect of the securitization processes.   Furthermore, the JPMorgan Chase-controlled entity JPMS the underwriter for the securitizations.

543.    Some of the mortgage loans underlying the Certificates were originated by third party originators and acquired by the sponsor, JPMM Acquisition.   JPMorgan Chase created JPM Acceptance to acquire mortgage loans from JPMM Acquisition and to transfer the loans to the JPMorgan Trusts for sale to investors as RMBS.   As the depositor, JPM Acceptance was a shell corporation with no assets of its own, and had the same directors and officers as other JPMorgan entities.   Through these executives, JPMorgan Chase exercised actual day-to-day

control over JPM Acceptance.  Revenues flowing from the issuance and sale of the Certificates were passed through to JPMorgan Chase.

544.    JPM Acceptance in turn created the JPMorgan Trusts.  Like the Issuing Defendants, the JPMorgan Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by the Issuing Defendants, and issuing Certificates collateralized against these mortgage pools to underwriters for sale to the public. Through JPM Acceptance, JPMorgan Chase also exercised actual control over the JPMorgan Trusts.

545.    Once the JPMorgan Trusts issued the Certificates, the Certificates were purchased and resold by the JPMorgan entity JPMS, which acted as the underwriter for the Certificates.

546.    JPMorgan Chase also participated in creating the Offering Documents.  In sum, JPMorgan Chase maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to Plaintiffs.

547.    In its SEC filings, JPMorgan Chase discussed its practice of securitizing loans and underwriting securitizations by acting through its subsidiaries.  For example, JPMorgan Chase's 10-K Annual Report, filed on March 1, 2007 for the period ending December 31, 2006, states, *inter alia,* that:

- "[I]n 2006, the Firm securitized approximately $16.8 billion of residential mortgage loans and $9.7 billion of credit card loans, resulting in pretax gains on securitization of $85 million and $67 million, respectively."

- "JPMorgan Chase securitizes and sells a variety of its consumer and wholesale loans… JPMorgan Chase-sponsored securitizations utilize [special purpose entities] as part of the securitization process."

- "The Firm also conducts securities underwriting, dealing and brokerage activities through JPMorgan Securities and other broker-dealer subsidiaries[.]"

- "The following table summarizes new securitization transactions that were completed during 2006, 2005 and 2004; the resulting gains arising from

251

such securitizations; certain cash flows received from such securitizations; and the key economic assumptions used in measuring the retained interests, as of the date of such sales."

548.    JPMorgan Chase also touted its purported underwriting standards in its SEC filings, asserting that it followed established policies and procedures to ensure asset quality. JPMorgan Chase's 10-K Annual Report, filed on March 1, 2007 for the period ending December 31, 2006, states, *inter alia,* that:

> As part of the Firm's loan securitization activities,…the Firm provides representations and warranties that certain securitized loans meet specific requirements.  The Firm may be required to repurchase the loans and/or indemnify the purchaser of the loans against losses due to any breaches of such representations or warranties.  Generally, the maximum amount of future payments the Firm would be required to make under such repurchase and/or indemnification provisions would be equal to the current amount of assets held by such securitization-related SPEs as of December 31, 2006, plus, in certain circumstances, accrued and unpaid interest on such loans and certain expenses. ***The potential loss due to such repurchase and/or indemnity is mitigated by the due diligence the Firm performs before the sale to ensure that the assets comply with the requirements set forth in the representations and warranties.*** Historically, losses incurred on such repurchases and/or indemnifications have been insignificant, and therefore management expects the risk of material loss to be remote.

549.    Thus, according to JPMorgan Chase's own SEC filings, it was responsible for performing due diligence on the assets included in its subsidiaries' RMBS offerings.

550.    JPMorgan Chase culpably participated in the violations of its subsidiaries discussed above.  JPMorgan Chase approved the manner in which it sold the loans it elected to securitize and controlled the disclosures made in connection with those securitizations.  Among other misconduct, JPMorgan Chase oversaw the actions of its subsidiaries and allowed them, including Defendants JPMM Acquisition, JPM Acceptance, and JPMS, to misrepresent the mortgage loans' characteristics in the Offering Documents.

## B.    DEFENDANT JPMM ACQUISITION

551.    Defendant JPMM Acquisition was in a position to and in fact controlled Defendant JPM Acceptance.   JPMM Acquisition was one of the entities through which Defendant JPMorgan controlled the securitization process.   JPMM Acquisition acquired the mortgage loans underlying the Certificates from third party originators and transferred them to the Depositor Defendant JPM Acceptance for securitization.

552.    JPMM Acquisition also participated in creating the Offering Documents.   In the Offering Documents, JPMM Acquisition made statements regarding its responsibilities and controlling role in the securitizations, as well as the track records of prior securitizations for which it had served as a sponsor.   For example, the 424B5 Prospectus Supplement for J.P. Morgan Mortgage Acquisition Trust 2006-FRE2, filed on March 30, 2006, states that,

- "[JPMM Acquisition] will act as sponsor of the trust fund.  The Sponsor will sell the mortgage loans directly to the depositor for sale or transfer to a trust."

- "[JPMM Acquisition] has been engaged in the securitization of assets since its incorporation.  *In connection with these activities, [JPMM Acquisition] uses special purpose entities, such as the depositor,* primarily for (but not limited to) the securitization of commercial and residential mortgages and home equity loans."

- "During fiscal years 2004 and 2003, [JPMM Acquisition] securitized approximately  $275,299,016  and  $ 4,510,234,249 of residential mortgages, respectively.  During this period, no securitizations sponsored by [JPMM Acquisition] have defaulted or experienced an early amortization or trigger event."

- "In the normal course of its securitization program, [JPMM Acquisition] acquires loans from third party originators and through its affiliates. *Employees of [JPMM Acquisition] or its affiliates structure securitization transactions in which the loans are sold to the depositor.* In consideration for the Assets which [JPMM Acquisition] sells to the depositor, the depositor issues the securities supported by the cash flows generated by the Assets."

- "[JPMM Acquisition] has obtained appropriate representations and warranties from the originator upon the acquisition of the mortgage loans

and will assign its rights under these representations and warranties for the benefit of the depositor."

553.    Thus, in its role as a securitization sponsor, JPMM Acquisition had control over matters including the acquisition of mortgage loans, the selection of mortgage loans to be transferred into the Issuing Trusts, and the structuring of the securitizations.  JPMM Acquisition oversaw the actions of Defendant JPM Acceptance, and allowed it to misrepresent the mortgage loans' characteristics in the Offering Documents.

### C.    JPMORGAN INDIVIDUAL CONTROL PERSON DEFENDANTS

#### 1.    Barren

554.    As Treasurer and Chief Financial Officer of Defendant Chase Mortgage Finance Corporation, Defendant Barren had the power to direct Chase Mortgage Finance policies relating to securitization.  Barren aided and abetted the fraud by permitting Chase Mortgage Finance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  Barren personally participated in the fraud by, *inter alia*, signing the Chase Mortgage Finance Registration Statement dated March 21, 2006.

#### 2.    Bernard

555.    As President of Defendant JPM Acceptance, Defendant Bernard had the power to direct JPM Acceptance policies relating to securitization.  Bernard aided and abetted the fraud by permitting JPM Acceptance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  Bernard personally participated in the fraud by, *inter alia*, signing the JPM Registration Statement dated April 23, 2007.

#### 3.    Cipponeri

556.    As Director and President of Defendant Chase Mortgage Finance Corporation, Defendant Cipponeri had the power to direct Chase Mortgage Finance policies relating to securitization.  Cipponeri aided and abetted the fraud by permitting Chase Mortgage Finance to

purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  Cipponeri personally participated in the fraud by, *inter alia*, signing the Chase Mortgage Finance Registration Statement dated March 21, 2006.

### 4.    Cole

557.    As a Director of Defendant JPM Acceptance, Defendant Cole had the power to direct JPM Acceptance policies relating to securitization.  Cole aided and abetted the fraud by permitting JPM Acceptance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  Cole personally participated in the fraud by, *inter alia*, signing the JPMorgan Acceptance Registration Statements dated August 15, 2005, and March 31, 2006.

558.    In addition to serving as an officer of JPM Acceptance, Cole was also, at relevant times, a Managing Director of JPMorgan Chase, and a co-head of JPMorgan Chase's securitized products business.  Through this high-ranking position with JPMorgan Chase, the direct or indirect parent corporation of all of the Corporate Defendants in this action,  Cole was familiar with and participated in JPMorgan Chase's and its subsidiaries' RMBS operations.

### 5.    Duzyk

559.    As a President and a Director of Defendant JPM Acceptance, Defendant Duzyk had the power to direct JPM Acceptance policies relating to securitization.  Duzyk aided and abetted the fraud by permitting JPM Acceptance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  Duzyk personally participated in the fraud by, *inter alia*, signing the JPMorgan Acceptance Registration Statements dated August 15, 2005, and March 31, 2006.

560.    In addition to serving as an officer of JPM Acceptance, Duzyk was also, at relevant times, a Managing Director of JPMorgan Chase, and head of term asset-backed security

and mortgage-backed security origination at JPMorgan Chase.   Through this high-ranking position with JPMorgan Chase, the direct or indirect parent corporation of all of the Corporate Defendants in this action,  Duzyk was familiar with and participated in JPMorgan Chase's and its subsidiaries' RMBS operations.

### 6.    Katz

561.    As a Director, Senior Vice President, and Assistant Secretary of Defendant Chase Mortgage Finance Corporation, Defendant Katz had the power to direct Chase Mortgage Finance policies relating to securitization.   Katz aided and abetted the fraud by permitting Chase Mortgage Finance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  Katz personally participated in the fraud by, *inter alia*, signing the Chase Mortgage Finance Registration Statement dated March 21, 2006.

### 7.    King

562.    As a Director of Defendant JPM Acceptance, Defendant King had the power to direct JPM Acceptance policies relating to securitization.  King aided and abetted the fraud by permitting JPM Acceptance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  King personally participated in the fraud by, *inter alia*, signing the JPMorgan Acceptance Registration Statement dated August 15, 2005.

563.    In addition to serving as an officer of JPM Acceptance, King was also, at relevant times, a Managing Director of JPMorgan Chase, and co head of JPMorgan Chase's securitized products division.  Through these high-ranking positions with JPMorgan Chase, the direct or indirect parent corporation of all of the Corporate Defendants in this action,  King was familiar with and participated in JPMorgan Chase's and its subsidiaries' RMBS operations.

### 8. McMichael

564.    As a Director of Defendant JPM Acceptance, Defendant McMichael had the power to direct JPM Acceptance policies relating to securitization.  McMichael aided and abetted the fraud by permitting JPM Acceptance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.   McMichael personally participated in the fraud by, *inter alia*, signing the JPMorgan Acceptance Registration Statements dated August 15, 2005, and March 31, 2006.

### 9. Schioppo

565.    As Controller and Chief Financial Officer of Defendant JPM Acceptance, Defendant Schioppo had the power to direct JPM Acceptance policies relating to securitization. Schioppo aided and abetted the fraud by permitting JPM Acceptance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization. Schioppo personally participated in the fraud by, *inter alia*, signing the JPMorgan Acceptance Registration Statements dated August 15, 2005, and March 31, 2006.

566.    In addition to serving as an officer of JPM Acceptance, Schioppo was also, at relevant times, a Managing Director of JPMS and Chief Financial Officer of a risk unit within JPMS.  Through these high-ranking positions with JPMorgan Chase, the direct or indirect parent corporation of all of the Corporate Defendants in this action,  Schioppo was familiar with and participated in JPMorgan Chase's and its subsidiaries' RMBS operations.

### 10. Wind

567.    As a Director of Defendant Chase Mortgage Finance Corporation, Defendant Wind had the power to direct Chase Mortgage Finance policies relating to securitization.  Wind aided and abetted the fraud by permitting Chase Mortgage Finance to purchase low-quality, poorly-underwritten loans from subsidiary and/or third party originators for securitization.  Wind

personally participated in the fraud by, *inter alia*, signing the Chase Mortgage Finance Registration Statement dated March 21, 2006.

### D. NON-DEFENDANT BSCI

568.     Non-Defendant BSCI was in a position to and in fact controlled each of Defendants EMC, BSABS, SAMI, and Bear Stearns.   BSCI operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for BSCI.   As discussed in Section XV.A, below, JPMorgan Chase is the successor in liability to BSCI.

569.     Non-Defendant BSCI encouraged and/or allowed its subsidiaries to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as Defendants BSABS and SAMI, and the Bear Stearns Trusts to serve as conduits for the mortgage loans.

570.     Unlike arm's-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the sponsor (EMC); the depositor (BSABS or SAMI) and the Bear Stearns Trusts were not arm's-length transactions at all, as BSCI controlled every aspect of the securitization processes.   Furthermore, the BSCI-controlled entity Bear Stearns was the underwriter for the securitizations.

571.     The mortgage loans underlying the Certificates were originated by the Bear Stearns entities BSRMC and Encore, or by third party originators, and acquired by the sponsor, EMC.   BSCI created BSABS and SAMI to acquire mortgage loans from EMC and to transfer the loans to the Bear Stearns Trusts for sale to investors as RMBS.   As the depositors, BSABS and SAMI were shell corporations with no assets of their own, and had the same directors and officers as other Bear Stearns entities.   Through these executives, BSCI exercised actual day-to-

day control over BSABS and SAMI.  Revenues flowing from the issuance and sale of the Certificates were passed through to BSCI.

572.    BSABS and SAMI in turn created the Bear Stearns Trusts.  Like the Issuing Defendants, the Bear Stearns Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by the Issuing Defendants, and issuing Certificates collateralized against these mortgage pools to underwriters for sale to the public. Through BSABS and SAMI, BSCI also exercised actual control over the Bear Stearns Trusts.

573.    Once the Bear Stearns Trusts issued the Certificates, the Certificates were purchased and resold by Bear Stearns, which acted as the underwriter for the Certificates.

574.    BSCI also participated in creating the Offering Documents.  In sum, BSCI maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to Plaintiffs.

575.    In its SEC filings, BSCI discussed its practice of securitizing loans and underwriting securitizations by acting through its subsidiaries.  For example, BSCI's 10-K Annual Report, filed on January 29, 2008 for the period ending November 30, 2007, states, *inter alia,* that:

- "The business of the Company includes … engaging in commercial and residential mortgage loan origination and securitization activities[.]"

- "The Company purchases and originates commercial and residential mortgage loans through its subsidiaries in the U.S., Europe and Asia.  The Company is a leading underwriter or and market-maker in, residential and commercial mortgages, US agency-backed mortgage products, asset-backed securities, collateralized debt obligations and is active in all areas of secured lending, structured finance and securitization products."

- "The Company, in the normal course of business, may establish SPEs [special purpose entities], sell assets to SPEs, underwrite, distribute, and make a market in securities or other beneficial interests issued by SPEs, transact derivatives with SPEs, own securities or other beneficial interests, including residuals, in SPEs, and provide liquidity or other guarantees for SPEs."

- "The Company is a market leader in mortgage-backed securitizations and other structured financing arrangements. In the normal course of business, the Company regularly securitizes commercial and residential mortgages, consumer receivables, and other financial assets. Securitization transactions are generally treated as sales, provided that control has been relinquished. In connection with securitization transactions, the Company establishes special-purpose entities ("SPEs") in which transferred assets, including commercial and residential mortgages, consumer receivables and other financial assets are sold to an SPE and repackaged into securities or similar beneficial interests."

576. BSCI also touted its purported underwriting standards in its SEC filings, asserting that it followed established policies and procedures to ensure asset quality. BSCI's 10-K Annual Report, filed on January 29, 2008 for the period ending November 30, 2007, states, *inter alia,* that:

> The Company provides representations and warranties to counterparties in connection with a variety of commercial transactions, including certain asset sales and securitizations and occasionally indemnifies them against potential losses caused by the breach of those representations and warranties. To mitigate these risks with respect to assets being securitized that have been originated by third parties, the Company seeks to obtain appropriate representations and warranties from such third-party originators upon acquisition of such assets. ***The Company generally performs due diligence on assets purchased and maintains underwriting standards for assets originated.***

577. Thus, according to BSCI's own SEC filings, it was responsible for performing due diligence on the assets included in its subsidiaries' RMBS offerings.

578. BSCI culpably participated in the violations of its subsidiaries discussed above. BSCI approved the manner in which it sold the loans it elected to securitize and controlled the disclosures made in connection with those securitizations. Among other misconduct, BSCI oversaw the actions of its subsidiaries and allowed them, including Defendants EMC, BSABS, SAMI, and Bear Stearns, to misrepresent the mortgage loans' characteristics in the Offering Documents.

### E.   DEFENDANT EMC

579.   Defendant EMC was in a position to and in fact controlled each of Defendants BSABS and SAMI.   EMC was one of the entities through which Non-Defendant BSCI controlled the securitization process.   EMC acquired the mortgage loans underlying the Certificates from third party originators or originated them itself and transferred them to the Depositor Defendants BSABS and SAMI for securitization.

580.   EMC also participated in creating the Offering Documents.   In the Offering Documents, EMC made statements regarding its responsibilities and controlling role in the securitizations, as well as the number of prior securitizations for which it had served as a sponsor.   For example, the 424B5 Prospectus Supplement for Bear Stearns Asset Backed Securities I Trust 2007-HE2, filed on February 28, 2007, states that,

- "The sponsor [EMC] was established as a mortgage banking company to facilitate the purchase and servicing of whole loan portfolios containing various levels of quality[.]"

- "Since its inception in 1990, [EMC] has purchased over $100 billion in residential whole loans and servicing rights, which include the purchase of newly originated alternative A, jumbo (prime) and sub-prime loans… . [EMC] is one of the United States' largest purchasers of scratch and dent, sub-performing and non-performing residential mortgages and REO from various institutions, including banks, mortgage companies, thrifts and the U.S. government.   Loans are generally purchased with the ultimate strategy of securitization into an array of Bear Stearns' securitizations based upon product type and credit parameters, including those where the loan has become re-performing or cash-flowing."

- Performing loans acquired by the sponsor are subject to varying levels of due diligence prior to purchase.   Portfolios may be reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws.   Performing loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor.

- The sponsor has been securitizing residential mortgage loans since 1999. The following table describes size, composition and growth of the sponsor's total portfolio of assets it has securitized as of the dates indicated.

581.    Thus, in its role as a securitization sponsor, EMC had control over matters including the acquisition of mortgage loans, the due diligence and underwriting guidelines to be applied to those loans, and the selection of mortgage loans to be transferred to the Depositor Defendants and into the Issuing Trusts.  EMC oversaw the actions of Defendants BSABS and SAMI, and allowed them to misrepresent the mortgage loans' characteristics in the Offering Documents.

### F.    BEAR STEARNS INDIVIDUAL CONTROL PERSON DEFENDANTS

#### 1.    Bonesteel

582.    As senior managing director for Defendant Stearns' Financial Analytics and Structured Transactions Group, Defendant Bonesteel had the power to direct Defendant BSABS' and Defendant SAMI's policies relating to securitization.  Bonesteel aided and abetted the fraud by permitting BSABS to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Bonesteel personally participated in the fraud by, *inter alia*, signing the SAMI Registration Statement dated March 10, 2006.

#### 2.    Garniewski

583.    As an Independent Director for Defendant BSABS, Defendant Garniewski had the power to direct Defendant BSABS policies relating to securitization.  Garniewski aided and abetted the fraud by permitting BSABS to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Garniewski personally participated in the fraud by, *inter alia*, signing the BSABS  Registration Statements dated April 21, 2004, June 14, 2005, and March 31, 2006.

#### 3.    Jehle

584.    As President, Chief Executive Officer, and a Director for Defendant BSABS, Defendant Jehle had the power to direct Defendant BSABS policies relating to securitization.

According to an October 27, 2008 BLOOMBERG article, Jehle was the founder of Bear Stearns' asset-backed business.  Jehle aided and abetted the fraud by permitting BSABS to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Jehle personally participated in the fraud by, *inter alia*, signing the BSABS Registration Statement dated November 13, 2002.

### 4.   Johnson

585.   As a Director of Defendant BSABS, Defendant Johnson, an individual who resides in North Carolina, had the power to direct Defendant BSABS' policies relating to securitization.  Johnson aided and abetted the fraud by permitting BSABS to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Johnson personally participated in the fraud by, *inter alia*, signing the BSABS Registration Statement dated November 13, 2002.

### 5.   Jurkowski, Jr.

586.   As the Vice President of Defendant BSABS, Defendant Jurkowski had the power to direct Defendants BSABS and SAMI's policies relating to securitization.  Jurkowski aided and abetted the fraud by permitting BSABS and SAMI to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Jurkowski personally participated in the fraud by, *inter alia*, signing the BSABS Registration Statements dated November 13, 2002, April 21, 2004, June 14, 2005, and March 31, 2006.

### 6.   Lutthans

587.   As an Independent Director of Defendant BSABS, Defendant Lutthans had the power to direct Defendant BSABS policies relating to securitization.  Lutthans aided and abetted the fraud by permitting BSABS to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Lutthans personally participated in

the fraud by, *inter alia*, signing the BSABS Registration Statement dated April 21, 2004, June 14, 2005, and March 31, 2006.

### 7. Marano

588. As a Director for Defendant BSABS and SAMI, Defendant Marano had the power to direct Defendants BSABS and SAMI's policies relating to securitization. Marano aided and abetted the fraud by permitting BSABS and SAMI to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization. Marano personally participated in the fraud by, *inter alia*, signing the BSABS Registration Statement dated November 13, 2002, and June 14, 2005, the SAMI Registration Statement dated March 10, 2006, and the BSABS Registration Statement dated March 31, 2006.

589. Further, at relevant times, Marano was also a Senior Managing Director of Bear Stearns, and head of Bear Stearns' Mortgage-Backed Securities, Asset-Backed Securities and Commercial Mortgage-Backed Securities departments. Marano had control over Bear Stearns' relations with the rating agencies, and at one point ordered his underlings to suspend fees to the rating agencies in retaliation for a rating adjustment.

### 8. Mayer

590. As a Director of Defendant SAMI, Defendant Mayer had the power to direct Defendant SAMI's policies relating to securitization. Mayer was also, at relevant times, a Senior Managing Director of Bear Stearns and Bear Stearns' co-head of Fixed Income. Mayer aided and abetted the fraud by permitting SAMI to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization. Mayer personally participated in the fraud by, *inter alia*, signing the BSABS Registration Statements dated November 13, 2002, and April 21, 2004, and the SAMI Registration Statement dated March 10, 2006.

### 9. Molinaro

591.    As Treasurer and a Director of Defendant BSABS, Defendant Molinaro had the power to direct Defendant BSABS' policies relating to securitization.  Further, at relevant times, Molinaro was the Chief Financial Officer and a Senior Managing Director of Bear Stearns.  Molinaro aided and abetted the fraud by permitting BSABS to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Molinaro personally participated in the fraud by, *inter alia*, signing the BSABS Registration Statements dated November 13, 2002, April 21, 2004, June 14, 2005, and March 31, 2006.

### 10. Nierenberg

592.    As the Treasurer of Defendant SAMI, Defendant Nierenberg had the power to direct Defendant SAMI's policies relating to securitization.  Nierenberg aided and abetted the fraud by permitting SAMI to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Nierenberg personally participated in the fraud by, *inter alia*, signing the SAMI Registration Statement dated March 10, 2006.

### 11. Perkins

593.    As the President and a Director of Defendant BSABS, Defendant Perkins had the power to direct Defendant BSABS' policies relating to securitization.  Perkins was also, at relevant times, a Senior Managing Director of Bear Stearns, and the co-head of asset-based securities and RMBS banking at Bear Stearns.  Perkins aided and abetted the fraud by permitting BSABS to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Perkins personally participated in the fraud by, *inter alia*, signing the BSABS Registration Statements dated April 21, 2004, June 14, 2005, and March 31, 2006.

### 12.    Verschleiser

594.    As the President of Defendant SAMI, Defendant Verschleiser had the power to direct Defendant SAMI's policies relating to securitization.  Verschleiser aided and abetted the fraud by permitting SAMI to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Verschleiser personally participated in the fraud by, *inter alia*, signing the SAMI Registration Statement dated March 10, 2006.

### G.    DEFENDANT JPMORGAN BANK (AS SUCCESSOR TO WAMU BANK)

595.    Non-Defendant WaMu Bank was in a position to and in fact controlled each of Defendants WMMSC, WAAC, LBSC, and WaMu Capital.  WaMu Bank operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for WaMu Bank.  As discussed in Section XV.B below, Defendant JPMorgan Bank is the successor in liability to WaMu Bank.

596.    Non-Defendant WaMu Bank encouraged and/or allowed its subsidiaries to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as Defendants WAAC and LBSC, and the WaMu Trusts to serve as conduits for the mortgage loans.

597.    Unlike arm's-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the sponsor (WMMSC); the depositor (WAAC or LBSC) and the WaMu Trusts were not arm's-length transactions at all, as WaMu Bank controlled every aspect of the securitization processes. Furthermore, the WaMu Bank-controlled entity WaMu Capital was the underwriter for the securitizations.

598.    The mortgage loans underlying the Certificates were originated by WaMu Bank-controlled entities or third party originators and acquired by the sponsor, WMMSC.  WaMu Bank created WAAC and LBSC to acquire mortgage loans from WMMSC and to transfer the loans to the WaMu Trusts for sale to investors as RMBS.  As the depositors, WAAC and LBSC were shell corporations with no assets of their own, and had the same directors and officers as other WaMu Bank entities.  Through these executives, WaMu Bank exercised actual day-to-day control over WAAC and LBSC.  Revenues flowing from the issuance and sale of the Certificates were passed through to WaMu Bank.

599.    WAAC and LBSC in turn created the WaMu Trusts.   Like the Issuing Defendants, the WaMu Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by the Issuing Defendants, and issuing Certificates collateralized against these mortgage pools to underwriters for sale to the public. Through WAAC and LBSC, WaMu Bank also exercised actual control over the WaMu Trusts.

600.    Once the WaMu Trusts issued the Certificates, the Certificates were purchased and resold by the WaMu Bank-controlled entity WaMu Capital, which acted as the underwriter for the Certificates.

601.    WaMu Bank also participated in creating the Offering Documents.  In sum, WaMu Bank maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to Plaintiffs.

602.    The Levin Report discusses WaMu Bank's securitization activities and control over the securitization process at length.  It found that "[WaMu Bank and LBMC] securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss… At

times, [WaMu Bank] selected and securitized loans that it had identified as likely to go

delinquent, without disclosing its analysis to investors who bought securities, and also

securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that

was discovered."  Securitization was an integral component of WaMu Bank's business model,

specifically its High Risk Lending Strategy.

603.    Specifically regarding Defendants WaMu Capital, WMMSC, and WAAC, the

Levin Report further notes that:

> When [WaMu Bank] began securitizing its loans, it was dependent upon
> investment banks to help underwrite and sell its securitizations.  In order to have
> greater control of the securitization process and to keep securitization
> underwriting fees in house, rather than paying them to investment banks, [WaMu
> Bank] acquired a company able to handle securitizations and renamed it
> Washington Mutual Capital Corporation (WCC), which became a wholly-owned
> subsidiary of the bank.  WCC was a registered broker-dealer and began to act as
> an underwriter of WaMu and Long Beach securitizations.  WCC worked with two
> other bank subsidiaries, [WMMSC] and [WAAC], that provided warehousing for
> WaMu loans before they were securitized.  WCC helped to assemble RMBS
> pools and sell the resulting RMBS securities to investors.  At first it worked with
> other investment banks; later it became the sole underwriter of some WaMu
> securitizations.

604.    Defendant Beck testified before the PSI in a prepared statement that during the

period when he was the head of capital markets for WaMu Bank, the people who were

responsible for overseeing WMMSC and WAAC reported to him.

605.    WaMu Bank culpably participated in the violations of its subsidiaries discussed

above.  WaMu Bank approved the manner in which it sold the loans it elected to securitize and

controlled the disclosures made in connection with those securitizations.   Among other

misconduct, WaMu Bank oversaw the actions of its subsidiaries and allowed them, including

Defendants WMMSC, WAAC, LBSC, and WaMu Capital, to misrepresent the mortgage loans'

characteristics in the Offering Documents.

### H.   DEFENDANT WMMSC

606.   Defendant WMMSC was in a position to and in fact controlled each of Defendants WAAC and LBSC.   WMMSC was one of the entities through which Defendant WaMu Bank controlled the securitization process.   WMMSC acquired the mortgage loans underlying the Certificates from WaMu Bank-controlled entities or third party originators and either transferred them to the Depositor Defendants WAAC and LBSC for securitization, or acted as depositor and securitized them itself.

607.   WMMSC also participated in creating the Offering Documents.   In the Offering Documents, WMMSC made statements regarding its responsibilities and controlling role in the securitizations, the underwriting guidelines of the third party originators that it purchased loans from, and the number of prior securitizations for which it had served as a sponsor.   For example, the 424B5 Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA3, filed on January 30, 2006 states that:

- "Washington Mutual Mortgage Securities Corp. engages in the business of (i) purchasing mortgage loans on a servicing retained and servicing released basis, (ii) selling mortgage loans in whole loan transactions and securitizing mortgage loans through affiliated and unaffiliated depositors, (iii) master servicing mortgage loans, (iv) acting as administrative agent of Washington Mutual Bank and its affiliates with respect to mortgage loans serviced by Washington Mutual Bank and its affiliates and (v) providing securitization services. Washington Mutual Mortgage Securities Corp. generally acts as master servicer or administrative agent with respect to all mortgage loans securitized by Washington Mutual Mortgage Securities Crop."

- "Securitization of mortgage loans is an integral part of the sponsor's conduit program. It has engaged in securitizations of first lien single-family residential mortgage loans through WaMu Asset Acceptance Corp., as depositor, since 2005, and has acted as its own depositor from 1979 until 2005."

- "The following table shows, for each indicated period, the aggregate principal balance of prime first and second lien single-family residential mortgage loans purchased by the sponsor during that period (except mortgage loans purchased in its capacity as depositor from an affiliated

sponsor) and the portion of those mortgage loans securitized during that period in securitization transactions for which it or WaMu Asset Acceptance Corp. acted as depositor."

- "In initially approving a mortgage loan seller, Washington Mutual Securities Corp. takes into account the following: annual origination volume, tenure of business and key staff in originating loans, policies and procedures for originating loans including quality control and appraisal review, review audits performed on mortgage loan seller by rating agencies, regulatory agencies and government sponsored entities, the mortgage loan seller's financial statements, errors and omissions insurance coverage and fidelity bond and liability insurance coverage. Approved mortgage loan sellers' financial statements, insurance coverage and new review audits are reviewed on an annual basis. Additionally, Washington Mutual Mortgage Securities Corp. performs a monthly ongoing performance review of previously purchased mortgage loans for trends in delinquencies, losses and repurchases. The mortgage loan sellers' underwriting guidelines are reviewed for consistency with Washington Mutual Mortgage Securities Corp.'s credit parameters and conformity with the underwriting standards described under "Underwriting of the Mortgage Loans" below and are either approved or approved with exceptions. The mortgage loan sellers represent to Washington Mutual Mortgage Securities Corp. upon sale that the mortgage loans have been underwritten in accordance with the approved underwriting guidelines."

- "All of the mortgage loans owned by the Trust have been originated in accordance with the underwriting standards of Washington Mutual Mortgage Securities Corp. or the underwriting guidelines of Washington Mutual Bank as described in this section."

608.     Thus, in its role as a securitization sponsor and depositor, WMMSC had control over matters including the acquisition of mortgage loans and the approval of third party originators, the underwriting standards applied to the mortgages, the selection of mortgage loans to be transferred into the Issuing Trusts, and the structuring of the securitizations.  WMMSC oversaw the actions of Defendants WAAC and LBSC, and allowed them to misrepresent the mortgage loans' characteristics in the Offering Documents.

## I.   WAMU INDIVIDUAL CONTROL PERSON DEFENDANTS

### 1.   Beck

609.   Defendant Beck was, at relevant times, the President and a Director of Defendant WAAC.  Beck was also, at relevant times, the head of WaMu Bank's capital markets division. In testimony before the PSI, Beck stated that, during the time he was head of capital markets for WaMu Bank, he had authority over the officers responsible for overseeing the WaMu entities that purchased and held loans that were to be sold into the secondary market, including WAAC and WMMSC.

610.   By virtue of his senior management positions, Beck had the power to direct Defendants WAAC and WMMSC's policies relating to securitization.  Beck aided and abetted the fraud by permitting WAAC and WMMSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.   Beck personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated January 3, 2006.

### 2.   Borriello

611.   As a Director of Defendant LBSC, Defendant Borriello had the power to direct Defendant LBSC's policies relating to securitization.  Borriello aided and abetted the fraud by permitting LBSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Borriello personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statement dated June 25, 2002.

### 3.   Careaga

612.   Defendant Careaga was, at relevant times, the Vice President of Defendant WAAC.  Careaga was also, at relevant times, Senior Vice President and Associate General Counsel for WaMu Bank, where he was the principal in-house counsel responsible for asset

backed securities and secondary mortgage market transactions, securities underwriting and related home loan servicing matters.

613.   As Vice President of Defendant WAAC, Careaga had the power to direct WAAC's policies relating to securitization.  Careaga aided and abetted the fraud by permitting WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Careaga personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated January 3, 2006.

### 4.   Davidson

614.   As a Director and Senior Vice President of Defendant WMMSC, Davidson had the power to direct WAAC's policies relating to securitization.  Davidson aided and abetted the fraud by permitting WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Davidson personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated March 7, 2003.

### 5.   Davis

615.   As a Director of Defendant WMMSC, Defendant Davis had the power to direct Defendant WMMSC's policies relating to securitization.  Davis aided and abetted the fraud by permitting WMMSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Davis personally participated in the fraud by, *inter alia*, signing the WMMSC Registration Statement dated February 1, 2002, and the LBSC Registration Statements dated June 25, 2002 and February 10, 2004.

### 6.   Den-Heyer

616.   As Controller and Assistant Vice President of Defendant LBSC, Defendant Den-Heyer had the power to direct Defendant LBSC policies relating to securitization.  Den-Heyer aided and abetted the fraud by permitting LBSC to purchase low-quality, poorly-underwritten

loans from subsidiary and/or third-party originators for securitization.   Den-Heyer personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statements dated June 24, 2002 and February 10, 2004.

### 7.   Domingo

617.   As a Director of Defendant WMMSC,  Defendant Domingo had the power to direct Defendant WMMSC's policies relating to securitization.  Domingo aided and abetted the fraud by permitting WMMSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Domingo personally participated in the fraud by, *inter alia*, signing the WMMSC Registration Statement dated February 1, 2002, and the LBSC Registration Statements dated June 25, 2002 and February 10, 2004.

### 8.   Ferren

618.   Defendant Ferren was, at relevant times, the Controller of Defendant WAAC. Ferren was also, at relevant times, the Controller for WaMu's Home Loans Capital Markets business and held several finance roles within its servicing business.  By virtue of his senior management positions, Ferren had the power to control and influence, and did control and influence, Defendant WAAC.  Ferren aided and abetted the fraud by permitting WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Ferren personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated June 13, 2005.

### 9.   Fortunato

619.   Defendant Fortunato was, at relevant times, the Chief Financial Officer of Defendant WAAC.  Fortunato was also, at relevant times, the Chief Financial Officer of the Home Loans Group at WMI or WaMu Bank, and the Senior Vice President for Finance and Risk Management at WMI or WaMu Bank.  By virtue of his senior management positions, Fortunato

had the power to control and influence, and did control and influence, Defendant WAAC. Fortunato aided and abetted the fraud by permitting WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization. Fortunato personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated April 9, 2007.

### 10. Gotschall

620. As Chief Operations Officer and Executive Vice President of Defendant LBSC, Defendant Gotschall had the power to direct Defendant LBSC's policies relating to securitization. Gotschall aided and abetted the fraud by permitting LBSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization. Gotschall personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statements dated June 25, 2002 and February 10, 2004.

### 11. Jurgens

621. Defendant Jurgens was, at relevant times, Principal Accounting Officer of Defendants LBSC and WAAC. Jurgens was also, at relevant times, a Senior Vice President and Capital Markets Controller of WMI or WaMu Bank, where he was responsible for matters including capital markets accounting and loan sale and securitization accounting.

622. By virtue of his senior management positions, Jurgens had the power to direct Defendants LBSC and WAAC's policies relating to securitization. Jurgens aided and abetted the fraud by permitting LBSC and WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization. Jurgens personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated January 3, 2006

### 12.    Kittner

623.    As a Director of Defendant LBSC, Defendant Kittner had the power to direct Defendant LBSC's policies relating to securitization.  Kittner aided and abetted the fraud by permitting LBSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Kittner personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statement dated June 25, 2002.

### 13.    Kula

624.    As Senior Vice President, Chief Financial Officer, and a Director of Defendant WMMSC, Defendant Kula had the power to direct Defendant WMMSC's policies relating to securitization.  Kula aided and abetted the fraud by permitting WMMSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Kula personally participated in the fraud by, *inter alia*, signing the WMMSC Registration Statement dated February 1, 2002.

### 14.    Lehmann

625.    As the President and a Director of Defendant WAAC and First Vice President, Director and Senior Counsel of Defendant WMMSC, Defendant Lehmann had the power to direct Defendant's WAAC and WMMSC's policies relating to securitization.  Lehmann aided and abetted the fraud by permitting WAAC and WMMSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Lehmann personally participated in the fraud by, *inter alia*, signing the WMMSC Registration Statement dated February 1, 2002, and the LBSC Registration Statement dated June 25, 2002.

### 15.    Lobo

626.    As Treasurer and Senior Vice President of Defendant LBSC, Defendant Lobo had the power to direct Defendant LBSC's policies relating to securitization.  Lobo aided and abetted

the fraud by permitting LBSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Lobo personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statement dated February 10, 2004.

### 16.    Lodge

627.    As Treasurer and Senior Vice President of Defendant LBSC, Defendant Lodge had the power to direct Defendant LBSC's policies relating to securitization.  Lodge aided and abetted the fraud by permitting LBSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Lodge personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statement dated June 25, 2002.

### 17.    Malone

628.    As First Vice President and Controller (Principal Accounting Officer) of Defendant WMMSC, Defendant Malone had the power to direct Defendant WMMSC's policies relating to securitization.  Malone aided and abetted the fraud by permitting WMMSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Malone personally participated in the fraud by, *inter alia*, signing the WMMSC Registration Statement dated February 1, 2002.

### 18.    Novak

629.    As a Director of Defendant WAAC, Defendant Novak had the power to direct Defendant WAAC's policies relating to securitization.  Novak aided and abetted the fraud by permitting WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Novak personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated January 3, 2006.

### 19.  Parker

630.  As a Director and President of Defendant WMMSC, Defendant Parker had the power to direct Defendant WMMSC's policies relating to securitization.  Parker aided and abetted the fraud by permitting WMMSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Parker personally participated in the fraud by, *inter alia*, signing the WMMSC Registration Statement dated February 1, 2002.

### 20.  Sorensen

631.  As a Vice President of Defendant LBSC, Defendant Sorensen had the power to direct Defendant LBSC's policies relating to securitization.  Sorensen aided and abetted the fraud by permitting LBSC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Sorensen personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statement dated June 25, 2002.

### 21.  Wilhelm

632.  As Controller of Defendant WAAC, Defendant Wilhelm had the power to direct Defendant WAAC's policies relating to securitization.  Wilhelm aided and abetted the fraud by permitting WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.  Wilhelm personally participated in the fraud by, *inter alia*, signing the WAAC Registration Statement dated April 9, 2007.

### 22.  Zielke

633.  As First Vice President and Assistant General Counsel for Capital Markets of WaMu Bank, Defendant Zielke had the power to direct Defendant WAAC's policies relating to securitization.  Zielke aided and abetted the fraud by permitting WAAC to purchase low-quality, poorly-underwritten loans from subsidiary and/or third-party originators for securitization.

Zielke personally participated in the fraud by, *inter alia*, signing the LBSC Registration Statement dated February 10, 2004.

## XIII.   PLAINTIFFS RELIED ON DEFENDANTS' MISREPRESENTATIONS TO THEIR DETRIMENT

634.   Plaintiffs and/or their agents purchased the Certificates to generate income and ensure total return through safe investments.  The securities were purchased with the expectation that the investments could be—and indeed some would be and were—purchased and sold on the secondary market.

635.   In making the investments, Plaintiffs and/or their agents relied upon Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of the underwriting processes related to the underlying mortgage loans.  Plaintiffs and/or their agents received, reviewed, and relied upon the Offering Documents, which described in detail the mortgage loans underlying each offering.  Offering Documents containing the representations outlined above (or nearly identical, materially similar counterparts thereto) were obtained, reviewed, and relied upon before any purchase was made.

636.   In purchasing the Certificates, Plaintiffs and/or their agents justifiably relied on Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Documents.  These representations materially altered the total mix of information upon which Plaintiffs and/or their agents made its purchasing decisions.

637.   But for the misrepresentations and omissions in the Offering Documents, Plaintiffs and/or their agents would not have purchased or acquired the Certificates as it ultimately did, because those representations and omissions were material to its decision to acquire the Certificates, as described above.

638.    As discussed *supra*, Plaintiffs relied on Defendants' representations in the Offering Documents that the Certificates purchased by Plaintiffs were investment grade securities.  Because Plaintiffs did not have access to the loan files, appraisals or other supporting documentation for the loans underlying the Certificates, Plaintiffs had no reasonable means or ability to conduct its own due diligence regarding the quality of the mortgage pool.  As such, Plaintiffs and their agents were forced to and did rely on the representations made by Defendants in the Offering Documents, and it was because of those representations that Plaintiffs purchased the Certificates at issue in this Complaint.

## XIV.    PLAINTIFFS HAVE SUFFERED LOSSES AS A RESULT OF THEIR PURCHASES OF THE CERTIFICATES

639.    The false and misleading statements of material facts and omissions of material facts in the Offering Documents directly caused Plaintiffs damage, because the Certificates were in fact far riskier than Defendants had described them to be.  As set forth below, the loans underlying the Certificates experienced default and delinquency at very high rates due to Defendants' abandonment of their purported underwriting guidelines.  The resulting downgrades to the Certificates ratings made them unmarketable at anywhere near the prices Plaintiffs paid, causing losses to Plaintiffs when those Certificates were sold.

640.    Plaintiffs purchased Certificates issued by LBMLT 2004-3 on January 20, 2006, when they were rated A3 by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 34% of par.

641.    Plaintiffs purchased Certificates issued by LBMLT 2004-1 on January 20, 2006, when they were rated A3 by Moody's, but the Certificates have since been downgraded and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 49% of par.

642.    Plaintiffs purchased Certificates issued by BSABS 2004-HE1 on January 20, 2006, in the offering, when they were rated A3 by Moody's, but the Certificates have since been downgraded and are currently rated Ca.

643.    Plaintiffs purchased Certificates issued by BSABS 2003-HE1 on January 20, 2006, in the offering, when they were rated A2 by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 70% of par.

644.    Plaintiffs purchased Certificates issued by BSABS 2004-AC3 on January 20, 2006, when they were rated A3 by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 59% of par.

645.    Plaintiffs purchased Certificates issued by BSABS 2004-AC5 on January 20, 2006, when they were rated A3 by Moody's, but the Certificates have since been downgraded three times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 33% of par.

646.    Plaintiffs purchased Certificates issued by BSABS 2006-IM1 on February 14, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.  At the time of the filing of this complaint, the Certificates were trading at just approximately 44% of par.

647.    Plaintiffs purchased Certificates issued by BSABS 2004-SD4 on March 7, 2006, when they were rated Aaa by Moody's.  At the time of the filing of this complaint, the Certificates were trading at just approximately 72% of par.

648.    Plaintiffs purchased Certificates issued by JPMAC 2006-FRE2 on March 9, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been

downgraded three times, and are currently rated Ba3.  At the time of filing of this complaint, the Certificates were trading at just approximately 83% of par.

651.    Plaintiffs purchased Certificates issued by SACO 2006-5 Tranche 1A on April 25, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 46% of par.

650.    Plaintiffs purchased Certificates issued by SACO 2006-5 Tranche 2A3 on April 25, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 41% of par.

651.    Plaintiffs purchased Certificates issued by JPMMT 2005-A6 on April 27, 2006, when they were rated AAA by S&P, but the Certificates have since been downgraded three times and are currently rated CC.  At the time of filing of this complaint, the Certificates were trading at just approximately 74% of par.

652.    Plaintiffs purchased Certificates issued by CFLX 2006-1 on May 5, 2006, in the offering, when they were rated A2 by Moody's, but the Certificates have since been downgraded and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 1.5% of par.

653.    Plaintiffs purchased Certificates issued by WAMU 2003-AR3 on May 11, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 37% of par.

654.    Plaintiffs purchased Certificates issued by WAMU 2003-AR1 on May 11, 2006, when they were rated Aa2 by Moody's, but the Certificates have since been downgraded twice

and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 47% of par.

655.    Plaintiffs purchased Certificates issued by SACO 2006-6 on May 12, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 46% of par.

656.    Plaintiffs purchased Certificates issued by WMALT 2005-6 on May 23, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 80% of par.

657.    Plaintiffs purchased Certificates issued by WaMu 2005-AR17, Tranche A1A1 on May 24, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B2.  At the time of filing of this complaint, the Certificates were trading at just approximately 81% of par.

658.    Plaintiffs purchased Certificates issued by WaMu 2006-AR7 on June 9, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B2.  At the time of filing of this complaint, the Certificates were trading at just approximately 81% of par.

659.    Plaintiffs purchased Certificates issued by BSABS 2006-HE6 on June 9, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 67% of par.

660.    Plaintiffs purchased Certificates issued by JPALT 2006-S3, Tranche A4 on June 12, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since

been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 58% of par.

661.    Plaintiffs purchased Certificates issued by SACO 2006-7 on June 19, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 44% of par.

662.    Plaintiffs purchased Certificates issued by BALTA 2005-3 on June 21, 2006, when they were rated Aa2 by Moody's, but the Certificates have since been downgraded three times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 1.5% of par.

663.    Plaintiffs purchased Certificates issued by BSARM 2005-1, Tranche B2 on June 21, 2006, when they were rated Aa2 by Moody's, but the Certificates have since been downgraded twice and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 5% of par.

664.    Plaintiffs purchased Certificates issued by BSARM 2004-8, Tranche 11A1 on June 21, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B3.  At the time of filing of this complaint, the Certificates were trading at just approximately 88% of par.

665.    Plaintiffs purchased Certificates issued by BALTA 2006-6, Tranche 31A1 on July 26, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 61% of par.

666.    Plaintiffs purchased Certificates issued by JPALT 2006-A4 on July 27, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been

downgraded twice and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 40% of par.

667.    Plaintiffs purchased Certificates issued by LBMLT 2004-4 on July 27, 2006, when they were rated Aaa by Moody's.  At the time of filing of this complaint, the Certificates were trading at just approximately 74% of par.

668.    Plaintiffs purchased Certificates issued by BSALT 2004-11 on August 1, 2006 and July 25, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B3.  At the time of filing of this complaint, the Certificates were trading at just approximately 77% of par.

669.    Plaintiffs purchased Certificates issued by JPMMT 2005-S3 on August 16, 2006, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded twice and are currently rated CCC.  At the time of filing of this complaint, the Certificates were trading at just approximately 91% of par.

670.    Plaintiffs purchased Certificates issued by BSARM 2006-1 on August 17, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated B2.  At the time of filing of this complaint, the Certificates were trading at just approximately 82% of par.

671.    Plaintiffs purchased Certificates issued by BALTA 2006-6, Tranche 32A1 on August 23, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 58% of par.

672.    Plaintiffs purchased Certificates issued by BSARM 2006-4, on August 30, 2006, when they were rated AAA by S&P, but the Certificates have since been downgraded three times

and are currently rated CC.  At the time of filing of this complaint, the Certificates were trading at just approximately 61% of par.

673.    Plaintiffs purchased Certificates issued by WaMu 2005-AR19, Tranche A1A2 on September 13, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa1.  At the time of filing of this complaint, the Certificates were trading at just approximately 77% of par.

674.    Plaintiffs purchased Certificates issued by WaMu 2005-AR8, Tranche 2A1A  on September 13, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated B1.

675.    Plaintiffs purchased Certificates issued by WaMu 2006-AR15 on October 13, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa1.  At the time of filing of this complaint, the Certificates were trading at just approximately 68% of par.

676.    Plaintiffs purchased Certificates issued by WaMu 2005-AR13, Tranche A1B3 on July 25, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 67% of par.

677.    Plaintiffs purchased Certificates issued by WMALT 2006-9 on October 20, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa3. At the time of filing of this complaint, the Certificates were trading at just approximately 56.55% of par.

678.    Plaintiffs purchased Certificates issued by JPALT 2006-S3, Tranche A6 on October 25, 2006, when they were rated Aaa by Moody's, but the Certificates have since been

downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 82% of par.

679.   Plaintiffs purchased Certificates issued by BSMF 2006-AR4, Tranche 2A1 on October 27, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

680.   Plaintiffs purchased Certificates issued by BSMF 2006-AR4, Tranche A1 on October 27, 2006 in the offering, and on June 1, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

681.   Plaintiffs purchased Certificates issued by WaMu 2006-AR17 on October 31, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 64% of par.

682.   Plaintiffs purchased Certificates issued by WaMu 2002-AR17 on November 1, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B3.  At the time of filing of this complaint, the Certificates were trading at just approximately 65% of par.

683.   Plaintiffs purchased Certificates issued by JPALT 2006-A7 on November 9, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 66% of par.

684.   Plaintiffs purchased Certificates issued by JPMAC 2006-CH2, Tranche AV2, on November 21, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ba1.  At the time of filing of this complaint, the Certificates were trading at just approximately 100% of par.

685.    Plaintiffs purchased Certificates issued by JPMAC 2006-CH2, Tranche AV4, on November 21, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 47% of par.

686.    Plaintiffs purchased Certificates issued by JPMAC 2006-CH2, Tranche MV2, on November 21, 2006, in the offering, when they were rated Aa3 by Moody's, but the Certificates have since been downgraded three tines and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 1.4% of par.

687.    Plaintiffs purchased Certificates issued by WAMU 2006-AR3 on December 14, 2006,  when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 65% of par.

688.    Plaintiffs purchased Certificates issued by BSMF 2006-AR5 on December 15, 2006, in the offering, and on June 1, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.

689.    Plaintiffs purchased Certificates issued by BALTA 2006-8 on December 19, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated A2.  At the time of filing of this complaint, the Certificates were trading at just approximately 74% of par.

690.    Plaintiffs purchased Certificates issued by BSABS 2006-HE10 on December 19, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated B1.  At the time of filing of this complaint, the Certificates were trading at just approximately 93% of par.

691.    Plaintiffs purchased Certificates issued by SACO 2005-10 on December 20, 2006, when they were rated A by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 49% of par.

692.    Plaintiffs purchased Certificates issued by WaMu 2007-HY1, Tranche 1A1 on January 4, 2007, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded four times and are currently rated D.   At the time of filing of this complaint, the Certificates were trading at just approximately 64% of par.

693.    Plaintiffs purchased Certificates issued by WaMu 2007-HY1, Tranche 3A3 on January 4, 2007, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded twice and are currently rated CCC.   At the time of filing of this complaint, the Certificates were trading at just approximately 81% of par.

694.    Plaintiffs purchased Certificates issued by JPMMT 2007-A1, Tranche 3A3  on January 5, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ba3.  At the time of filing of this complaint, the Certificates were trading at just approximately 93% of par.

695.    Plaintiffs purchased Certificates issued by JPMMT 2007-A1, Tranche 5A5  on January 8, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Baa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 93% of par.

696.    Plaintiffs purchased Certificates issued by LBMLT 2002-2 on January 9, 2007, when they were rated A2 by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

697.    Plaintiffs purchased Certificates issued by WaMu 2007-HY1, Tranche LB1 on January 10, 2007, in the offering, when they were rated AA by S&P, but the Certificates have since been downgraded four times and are currently rated D.

698.    Plaintiffs purchased Certificates issued by BSABS 2007-SD1, Tranche 1A2A on January 11, 2007, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded twice and are currently rated CCC.   At the time of filing of this complaint, the Certificates were trading at just approximately 77% of par.

699.    Plaintiffs purchased Certificates issued by BSABS 2007-SD1, Tranche 1A3A on January 11, 2007, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded twice and are currently rated B-.   At the time of filing of this complaint, the Certificates were trading at just approximately 74% of par.

700.    Plaintiffs purchased Certificates issued by JPMMT 2006-A7, on January 18, 2007, in the offering, when they were rated Aa1 by Moody's, but the Certificates have since been downgraded three times and are currently rated C.

701.    Plaintiffs purchased Certificates issued by BSABS 2007-HE1 on January 23, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Ba1.   At the time of filing of this complaint, the Certificates were trading at just approximately 93% of par.

702.    Plaintiffs purchased Certificates issued by WMALT 2007-1 on February 7, 2007, in the offering, when they were rated AA by S&P, but the Certificates have since been downgraded four times and are currently rated D.

703.    Plaintiffs purchased Certificates issued by BSABS 2007-HE2 on February 14, 2007, in the offering, when they were rated Aa3 by Moody's, but the Certificates have since

been downgraded twice and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately .065% of par.

704.    Plaintiffs purchased Certificates issued by BSABS 2005-AC3 on March 6, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 84% of par.

705.    Plaintiffs purchased Certificates issued by WMALT 2006-AR8 on March 27, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Ca.

706.    Plaintiffs purchased Certificates issued by WaMu 2007-HE3, Tranche 2A2 on April 26, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 66% of par.

707.    Plaintiffs purchased Certificates issued by WaMu 2007-HE3, Tranche 2A4 on April 26, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 35% of par.

708.    Plaintiffs purchased Certificates issued by WaMu 2007-HY5 on May 2, 2007, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded twice and are currently rated CCC.  At the time of filing of this complaint, the Certificates were trading at just approximately 87% of par.

709.    Plaintiffs purchased Certificates issued by BALTA 2006-1 on May 24, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice

and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 44% of par.

710.    Plaintiffs purchased Certificates issued by JPMAC 2007-HE1 on June 12, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated Caa1.  At the time of filing of this complaint, the Certificates were trading at just approximately 87% of par.

711.    Plaintiffs purchased Certificates issued by WaMu 2006-AR9 on June 15, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 58% of par.

712.    Plaintiffs purchased Certificates issued by SACO 2006-5 Tranche 2A1 on June 28, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 48% of par.

713.    Plaintiffs purchased Certificates issued by WaMu 2005-AR11 on July 25, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 67% of par.

714.    Plaintiffs purchased Certificates issued by WaMu 2005-AR13, Tranche A1A1 on July 25, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B2.  At the time of filing of this complaint, the Certificates were trading at just approximately 82% of par.

715.    Plaintiffs purchased Certificates issued by WaMu 2005-AR6, Tranche 2A1A on July 25, 2007, when they were rated Aaa by Moody's, but the Certificates have since been

downgraded twice and are currently rated Caa1.  At the time of filing of this complaint, the Certificates were trading at just approximately 78% of par.

716.    Plaintiffs purchased Certificates issued by WaMu 2005-AR8, Tranche 1A1A  on July 25, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B1.  At the time of filing of this complaint, the Certificates were trading at just approximately 79% of par.

717.    Plaintiffs purchased Certificates issued by WaMu 2005-AR17 Tranche A1A2 on July 25, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa1.  At the time of filing of this complaint, the Certificates were trading at just approximately 81% of par.

718.    Plaintiffs purchased Certificates issued by BSARM 2005-2, Tranche A1 on August 7, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ba2.  At the time of filing of this complaint, the Certificates were trading at just approximately 81% of par.

719.    Plaintiffs purchased Certificates issued by BSARM 2005-5 Tranche A1 on August 7, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ba2.  At the time of filing of this complaint, the Certificates were trading at just approximately 91% of par.

720.    Plaintiffs purchased Certificates issued by BSARM 2005-5 Tranche A2 on August 7, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ba3.  At the time of filing of this complaint, the Certificates were trading at just approximately 85% of par.

721.    Plaintiffs purchased Certificates issued by BSARM 2005-2, Tranche A2 on August 10, 2007, when they were rated Aaa by Moody's, but the Certificates have since been

downgraded twice and are currently rated Baa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 92% of par.

722.    Plaintiffs purchased Certificates issued by BALTA 2005-7 on August 10, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 70% of par.

723.    Plaintiffs purchased Certificates issued by BSARM 2004-8, Tranche 2A1 on August 13, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B3.  At the time of filing of this complaint, the Certificates were trading at just approximately 86% of par.

724.    Plaintiffs purchased Certificates issued by BSARM 2004-9 on August 13, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated A2.  At the time of filing of this complaint, the Certificates were trading at just approximately 92% of par.

725.    Plaintiffs purchased Certificates issued by BSARM 2004-10 on August 13, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ba3.  At the time of filing of this complaint, the Certificates were trading at just approximately 87% of par.

726.    Plaintiffs purchased Certificates issued by BSARM 2004-2 on August 14, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B1.

727.    Plaintiffs purchased Certificates issued by BSARM 2005-1, Tranche 4A1 on August 14, 2007, when they were rated Aaa by Moody's, but the Certificates have since been

downgraded twice and are currently rated Caa1.  At the time of filing of this complaint, the Certificates were trading at just approximately 88% of par.

728.    Plaintiffs purchased Certificates issued by BSARM  2005-12 , Tranche 24A1 on August 17, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 77% of par.

729.    Plaintiffs purchased Certificates issued by BALTA 2005-10 on August 21, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 55% of par.

730.    Plaintiffs purchased Certificates issued by BSABS 2007-HE6 on August 23, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 67% of par.

731.    Plaintiffs purchased Certificates issued by BSABS 2007-HE7 on September 14, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 69% of par.

732.    Plaintiffs purchased Certificates issued by WMALT 2007-OA3 on October 15, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 48% of par.

733.    Plaintiffs purchased Certificates issued by JPALT 2006-A6 on March 18, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice

and are currently rated B3.  At the time of filing of this complaint, the Certificates were trading at just approximately 87% of par.

734.    Plaintiffs purchased Certificates issued by WMALT 2006-AR5 on March 19, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 37% of par.

735.    Plaintiffs purchased Certificates issued by WaMu 2005-AR19, Tranche A1B3 on March 25, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

736.    Plaintiffs purchased Certificates issued by WaMu 2006-AR4 on March 25, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 58% of par.

737.    Plaintiffs purchased Certificates issued by BALTA 2005-9 on March 26, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 58% of par.

738.    Plaintiffs purchased Certificates issued by WaMu 2006-AR19 on April 8, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 56% of par.

739.    Plaintiffs purchased Certificates issued by WaMu 2005-AR13, Tranche B1 on April 23, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated C.

740.    Plaintiffs purchased Certificates issued by WaMu 2005-AR6, Tranche B1 on May 6, 2008, when they were rated AA+ by S&P, but the Certificates have since been downgraded three times and are currently rated CC.

741.    Plaintiffs purchased Certificates issued by JPMMT 2005-A7 on May 12, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B2.  At the time of filing of this complaint, the Certificates were trading at just approximately 93% of par.

742.    Plaintiffs purchased Certificates issued by WaMu 2005-AR19, Tranche B1 on May 19, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

743.    Plaintiffs purchased Certificates issued by BSARM 2005-12, Tranche 23A1 on May 21, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 61% of par.

744.    Plaintiffs purchased Certificates issued by WMALT 2006-5 on May 21, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 52% of par.

745.    Plaintiffs purchased Certificates issued by WaMu 2006-AR12 on June 2, 2008, when they were rated AAA by S&P, but the Certificates have since been downgraded three times and are currently rated CCC.  At the time of filing of this complaint, the Certificates were trading at just approximately 69% of par.

746.    Plaintiffs purchased Certificates issued by WaMu 2003-AR9 on July 23, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are

currently rated A1.  At the time of filing of this complaint, the Certificates were trading at just approximately 90% of par.

747.    As a result of the multiple and material misrepresentations contained in the Offering Documents, Plaintiffs have suffered losses on its purchases of Certificates.  As of the filing of this Complaint, the mortgage loans in the pools held by the Issuing Trusts and underlying Plaintiffs' Certificates have suffered escalating default rates and mounting foreclosures, resulting in across-the-board ratings downgrades and other negative actions by the rating agencies, as described in the table below.

| Certificates Purchased by Plaintiffs | Percentage of Loans Underlying the Certificates Delinquent by More than 90 Days | Percentage of Loans Underlying the Certificates in Foreclosure | Current Moody's Ratings |
|---|---|---|---|
| BSARM 2004-8 2A1 | 12.34 | 7.75 | B3 |
| BSARM 2004-9 | 5.13 | 3.07 | A2 |
| BSARM 2004-10 | 5.75 | 2.38 | Ba3 |
| BSARM 2005-2 A1 | 5.66 | 2.11 | Ba2 |
| BSARM 2005-2 A2 | 2.15 | 0.27 | Baa3 |
| BSARM 2004-2 22A | 7.85 | 3.30 | B1 |
| BSARM 2004-8 11A1 | 9.99 | 7.26 | B3 |
| BALTA 2006-6 31A1 | 43.04 | 21.47 | Caa3 |
| BALTA 2006-6 32A1 | 42.69 | 19.50 | Caa3 |
| BALTA 2006-1 | 29.26 | 20.01 | Ca |
| BALTA 2004-11 | 37.11 | 6.33 | B3 |
| BALTA 2005-3 | 19.20 | 10.52 | C |
| BALTA 2005-7 | 24.07 | 10.81 | Caa3 |
| BALTA 2005-9 | 30.90 | 11.94 | Ca |
| BALTA 2005-10 | 43.15 | 27.89 | Ca |
| BSABS 2005-AC3 2A1 | 13.57 | 8.59 | Caa2 |
| BSARM 2005-1 4A1 | 14.57 | 0.00 | Caa1 |
| BSARM 2005-1 B2 | 19.63 | 8.09 | C |
| BSARM 2005-5 A1 | 2.46 | 0.79 | Ba2 |
| BSARM 2005-5 A2 | 6.49 | 5.07 | Ba3 |
| BSARM 2005-12 23A1 | 30.02 | 20.77 | Caa3 |
| BSARM 2005-12 24A1 | 7.10 | 7.10 | Caa2 |
| BALTA 2006-8 | 12.89 | 8.01 | A2 |
| BSABS 2007-HE7 1A1 | 42.07 | 28.11 | Caa2 |
| BSABS 2007-HE6 1A1 | 51.41 | 37.04 | Caa3 |
| BSABS 2006-HE6 | 51.86 | 29.10 | Caa2 |
| BSABS 2003-HE1 | 32.51 | 19.91 | Caa2 |

| Certificates Purchased by Plaintiffs | Percentage of Loans Underlying the Certificates Delinquent by More than 90 Days | Percentage of Loans Underlying the Certificates in Foreclosure | Current Moody's Ratings |
|---|---|---|---|
| BSABS 2004-AC3 | 12.62 | 5.76 | Caa2 |
| BSABS 2004-AC5 | 15.21 | 9.36 | C |
| BSABS 2004-HE1 | 30.74 | 27.74 | Ca |
| BSABS 2004-SD4 | 18.60 | 12.63 | Aaa |
| BSABS 2006-IM1 | 41.16 | 23.64 | Ca |
| BSABS 2007-HE2 | 55.14 | 35.37 | C |
| BSARM 2006-4 | 25.64 | 11.74 | CC (S&P) |
| BSARM 2006-1 | 9.69 | 6.46 | B2 |
| BSABS 2007-SD1 1A2A | 19.85 | 11.56 | CCC (S&P) |
| BSABS 2007-SD1 1A3A | 37.33 | 22.62 | B- (S&P) |
| BSABS 2006-HE10 | 53.53 | 34.36 | B1 |
| BSABS 2007-HE1 21A1 | 52.38 | 32.58 | Ba1 |
| BSMF 2006-AR4 A1 | 52.81 | 28.16 | Caa3 |
| BSMF 2006-AR4 2A1 | 57.30 | 27.96 | Caa3 |
| BSMF 2006-AR5 | 53.25 | 31.26 | Caa2 |
| JPMMT 2005-S3 | 11.90 | 3.13 | CCC (S&P) |
| CFLX 2006-1 | 26.89 | 19.64 | C |
| JPMMT 2005-A6 | 9.65 | 3.96 | CC (S&P) |
| JPMMT 2005-A7 | 6.87 | 4.39 | B2 |
| JPALT 2006-A6 2A1 | 26.53 | 15.54 | B3 |
| JPALT 2006-S3 A6 | 36.54 | 16.50 | Caa2 |
| JPMMT 2006-A7 2A5 | 22.20 | 11.03 | C |
| JPALT 2006-A4 | 35.31 | 13.01 | Ca |
| JPALT 2006-S3 A4 | 35.77 | 16.80 | Caa3 |
| JPALT 2006-A7 1A3 | 38.21 | 20.69 | Caa2 |
| JPMAC 2006-CH2 AV2 | 37.35 | 26.61 | Baa1 |
| JPMAC 2006-CH2 AV4 | 38.07 | 27.30 | Ca |
| JPMAC 2006-CH2 MV2 | 40.25 | 28.83 | C |
| JPMAC 2006-FRE2 A3 | 49.15 | 36.36 | Ba3 |
| JPMMT 2007-A1 3A3 | 8.23 | 3.48 | Ba3 |
| JPMMT 2007-A1 5A5 | 4.92 | 2.80 | Baa2 |
| JPMAC 2007-HE1 | 40.10 | 26.94 | Caa1 |
| LBMLT 2002-2 M2 | 33.27 | 15.66 | Caa3 |
| LBMLT 2004-1 | 21.68 | 4.82 | Ca |
| LBMLT 2004-3 | 26.50 | 7.23 | Ca |
| LBMLT 2004-4 | 27.58 | 11.96 | Aaa |
| SACO 2005-10 1A | 9.30 | 0.00 | Caa2 |
| SACO 2006-6 | 8.22 | 0.07 | C |
| SACO 2006-7 | 9.90 | 0.00 | C |
| SACO 2006-5 1A | 8.97 | 0.00 | C |
| SACO 2006-5 2A1 | 9.76 | 0.09 | C |
| SACO 2006-5 2A3 | 9.76 | 0.09 | C |
| WAMU 2002-AR17 1A | 11.76 | 10.81 | B3 |
| WAMU 2005-AR11 | 26.18 | 17.52 | Ca |

| Certificates Purchased by Plaintiffs | Percentage of Loans Underlying the Certificates Delinquent by More than 90 Days | Percentage of Loans Underlying the Certificates in Foreclosure | Current Moody's Ratings |
|---|---|---|---|
| WAMU 2005-AR13 A1A1 | 23.69 | 14.48 | B2 |
| WAMU 2005-AR13 A1B3 | 23.69 | 14.48 | Caa3 |
| WAMU 2005-AR13 B1 | 23.69 | 14.48 | C |
| WAMU 2005-AR17 A1A1 | 28.04 | 19.00 | B2 |
| WAMU 2005-AR17 A1A2 | 28.04 | 19.00 | Caa1 |
| WAMU 2003-AR1 B2 | 6.04 | 4.73 | Caa2 |
| WAMU 2003-AR3 B2 | 4.78 | 3.63 | Caa3 |
| WAMU 2003-AR9 1A6 | 4.97 | 3.31 | A1 |
| WAMU 2005-AR6 2A1A | 27.68 | 18.09 | Caa1 |
| WAMU 2005-AR6 B1 | 27.73 | 18.17 | CC (S&P) |
| WAMU 2005-AR8 1A1A | 32.70 | 22.13 | B1 |
| WAMU 2005-AR8 2A1A | 25.53 | 16.64 | B1 |
| WMALT 2005-6 | 17.31 | 13.03 | Caa3 |
| WAMU 2005-AR19 A1A2 | 21.55 | 13.54 | Caa1 |
| WAMU 2005-AR19 A1B3 | 21.55 | 13.54 | Caa3 |
| WAMU 2005-AR19 B1 | 21.55 | 13.54 | Caa3 |
| WAMU 2006-AR3 | 33.52 | 23.87 | Caa2 |
| WAMU 2006-AR17 | 34.52 | 25.32 | Caa2 |
| WAMU 2007-HY1 1A1 | 34.59 | 22.01 | D (S&P) |
| WAMU 2007-HY1 3A3 | 14.93 | 10.41 | CCC (S&P) |
| WAMU 2007-HY1 LB1 | 26.99 | 18.06 | D (S&P) |
| WAMU 2007-HY5 3A1 | 16.75 | 10.02 | CCC (S&P) |
| WAMU 2006-AR19 1A | 30.77 | 19.06 | Caa3 |
| WAMU 2006-AR7 | 23.69 | 12.99 | B2 |
| WAMU 2006-AR9 | 31.10 | 18.02 | Caa3 |
| WAMU 2006-AR12 | 23.33 | 15.66 | CCC (S&P) |
| WAMU 2006-AR15 | 35.40 | 20.60 | Caa1 |
| WMHE 2007-HE3 2A2 | 40.17 | 18.96 | Caa2 |
| WMHE 2007-HE3 2A4 | 40.17 | 18.96 | Ca |
| WAMU 2006-AR4 | 27.51 | 17.92 | Ca |
| WMALT 2006-AR5 3A | 43.16 | 31.98 | Ca |
| WMALT 2006-5 3A6 | 36.94 | 26.28 | Ca |
| WMALT 2006-AR8 | 43.64 | 26.63 | Ca |
| WMALT 2007-1 B1 | 16.23 | 10.80 | D (S&P) |
| WMALT 2006-9 | 28.96 | 19.82 | Caa3 |
| WMALT 2007-OA3 5A | 36.30 | 23.45 | Caa3 |

## XV.   JPMORGAN CHASE AND JPMORGAN BANK'S LIABILITY AS SUCCESSORS-IN-INTEREST

### A.   JPMORGAN IS LIABLE AS SUCCESSOR-IN-INTEREST TO THE BEAR STEARNS ENTITIES

748.   In addition to Plaintiffs' claims based on JPMorgan's own offers or sales of Certificates to Plaintiffs, Plaintiffs also bring claims against JPMorgan as successor-in-interest to the Bear Stearns entities.

749.   On March 16, 2008, BSCI entered into an Agreement and Plan of Merger with JPMorgan Chase for the purpose of consummating a "strategic business combination transaction" between the two entities (the "Merger").

750.   Pursuant to the Merger, BSCI merged with Bear Stearns Merger Corporation, a wholly-owned subsidiary of JPMorgan Chase, making BSCI a wholly-owned subsidiary of JPMorgan Chase.  As such, upon the May 30, 2008 effective date of the Merger, JPMorgan Chase became the ultimate corporate parent of BSCI's subsidiaries Bear Stearns, EMC, SAMI and BSABS.

751.   According to an April 6, 2008 NEW YORK TIMES article, "JPMorgan dominates management after Bear Stearns merger," JPMorgan took immediate control of Bear Stearns' business and personnel decisions.  Citing an internal JPMorgan memo, the article states that "JPMorgan Chase, which is taking over the rival investment bank Bear Stearns, will dominate the management ranks of the combined investment banking and trading businesses…  Of 26 executives named to executive positions in the [newly merged] investment banking and trading division … only five are from Bear Stearns."

752.   In a June 30, 2008 press release describing internal restructuring to be undertaken pursuant to the Merger, JPMorgan stated its intent to assume Bear Stearns and its debts, liabilities, and obligations as follows:

Following completion of this transaction, Bear Stearns plans to transfer its broker-dealer subsidiary Bear, Stearns & Co. Inc. to JPMorgan Chase, resulting in a transfer of substantially all of Bear Stearns' assets to JPMorgan Chase. In connection with such transfer, JPMorgan Chase will assume (1) all of Bear Stearns' then-outstanding registered U.S. debt securities; (2) Bear Stearns' obligations relating to trust preferred securities; (3) Bear Stearns' then outstanding foreign debt securities; and (4) Bear Stearns' guarantees of then-outstanding foreign debt securities issued by subsidiaries of Bear Stearns, in each case, in accordance with the agreements and indentures governing these securities.

753.     According to JPMorgan's 2008 Annual Report, the transaction was a merger: "On October 1, 2008, J.P. Morgan Securities Inc. merged with and into Bear, Stearns & Co. Inc., and the surviving entity changed its name to J.P. Morgan Securities Inc."

754.     Bear Stearns' former website, www.bearstearns.com, now redirects to the JPMS website, and the EMC website, www.emcmortgagecorp.com, now identifies EMC as a brand of JPMorgan Bank.

755.     JPMS was fully aware of the pending claims and potential claims against Bear Stearns when it consummated the merger and took steps to expressly and impliedly assume Bear Stearns' liabilities, for example by paying to defend and settle lawsuits brought against Bear Stearns.

756.     As a result of BSCI's acquisition, JPMorgan Chase's "transfer of substantially all of Bear Stearns' assets to JPMorgan Chase," and explicit assumption of Bear Stearns' debt, JPMorgan Chase is the successor-in-interest to BSCI and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of BSCI.

757.     As a result of its merger with Bear Stearns, JPMS is the successor-in-interest to Bear Stearns and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of Bear Stearns.

758.     Therefore, this action is brought against JPMorgan Chase as the successor to BSCI and JPMS as successor to Bear Stearns. BSCI is not a defendant in this action.

### B. JPMORGAN IS LIABLE AS SUCCESSOR-IN-INTEREST TO THE WAMU AND LONG BEACH ENTITIES

759.    In addition to Plaintiffs' claims based on JPMorgan's own offers or sales of Securities to Plaintiffs, Plaintiffs also bring claims against JPMorgan as successor-in-interest to WaMu and Long Beach.

760.    The Office of Thrift Supervision closed WaMu Bank on September 25, 2008, and named the FDIC as receiver.  Shortly thereafter, the FDIC and JPMorgan Bank entered into a Purchase and Assumption Agreement (the "PAA") for JPMorgan Bank to "purchase substantially all of the assets and assume all deposit and substantially all other liabilities of" WaMu Bank, including Long Beach Mortgage and Long Beach Securities.

761.    The PAA described the assets purchased by JPMorgan Bank as:

**3.1 Assets Purchased by Assuming Bank.**  Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) ***including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing.***  Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.  The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a.  Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

PAA § 3.1.

762.    Pursuant to the PAA, JPMorgan Bank purchased "all subsidiaries" of WaMu Bank, including WaMu Capital, WaMu Acceptance, WaMu Securities, and Long Beach Securities.  As such, WaMu Capital, WaMu Acceptance, WaMu Securities, and Long Beach Securities became wholly-owned subsidiaries of JPMorgan Bank.

763.   JPMorgan Bank also assumed nearly all the liabilities of WaMu Bank:

**2.1 Liabilities Assumed by Assuming Bank.**  Subject to Sections 2.5 [Borrower Claims] and 4.8 [Agreement with Respect to Certain Existing Agreements], the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) *and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing,* including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

PAA § 2.1.

764.   JPMorgan Bank thus assumed all liabilities relating to the WaMu Securitizations, as the WaMu Securitizations were "reflected on the Books and Records" of WaMu Bank as of the date of its closing, and were not expressly disclaimed by JPMorgan Bank in the PAA.

765.   The FDIC itself asserts that JPMorgan Bank assumed the liabilities associated with the securitization activities of WaMu Bank.  In a Reply Memorandum filed on February 11, 2011, in *Deutsche Bank Nat'l Trust Co. v. FDIC (as receiver for WaMu Bank) and JPMorgan Chase Bank, N.A.*, No. 09-1656 RMC (D.D.C.), concerning whether WaMu Bank or the FDIC retained the trust-related liabilities for WaMu Bank's securitization activities, the FDIC asserted that "the liabilities and obligations at issue were assumed in their entirety by [JPMorgan Bank] under the P&A Agreement, thereby extinguishing any potential liability by FDIC Receiver."

766.   The FDIC also stated, in a November 22, 2010 filing, that "FDIC Receiver's exercise of the transfer provision in this case is consistent with the general principle that when an entity purchases the assets of an ongoing business and expressly or impliedly assumes the related liabilities, the acquiring entity succeeds to the pre-sale debts and obligations of the business, thereby extinguishing the liability of the seller."  Moreover, "[i]n connection with that purchase, FDIC Receiver transferred to [JPMorgan Bank], and [JPMorgan Bank] expressly agreed to

'assume' and to 'pay, perform and discharge,' substantially all of [WaMu Bank's] liabilities."
*Id.* (citing PAA § 2.1).

767.    The Final Report of the Examiner ("Examiner's Report" or "Exam. Report"),
submitted by the court-appointed Examiner on November 1, 2010 during Washington Mutual,
Inc.'s bankruptcy, further supports FHFA's and the FDIC's assertion that all liabilities associated
with the WaMu Securitizations were transferred to JPMorgan Bank as a result of the PAA.  *In re*
*Washington Mutual, Inc.*, No. 08-12229 MFW (Bankr. D. Del. Nov. 1, 2010) (filed publicly with
exhibits on Nov. 22, 2010).

768.    Per the exhibits to the Examiner's Report, the FDIC offered five different
transaction structures to prospective bidders for the assets of WaMu Bank.  JPMorgan Bank
elected to bid on what was described as "Transaction #3":

> C. **Transaction #3 Whole Bank, All Deposits.**  Under this transaction, the
> Purchase and Assumption (Whole Bank), the Potential Acquirer whose Bid is
> accepted by the Corporation assumes the Assumed Deposits of the Bank and all
> other liabilities but specifically excluding the preferred stock, non-asset related
> defensive litigation, subordinated debt and senior debt, and purchases all of the
> assets of the Bank, excluding those assets identified as excluded assets in the
> Legal Documents and subject to the provisions thereof.

769.    Exam. Report Ex. JPMCD 000001550.00009 (Instructions for Potential
Acquirers); JPMCD_000002773.0001 (JPMorgan Bank Bid Form).  This is in contrast with
Transactions #4 and #5, which offered JPMorgan Bank the option of assuming "only certain
other liabilities."  Exam. Report Ex. JPMCD 000001550.00009.

770.    Additionally, during the drafting process, the FDIC posted a "FAQ" for potential
acquirers with respect to the WaMu Bank transaction.  The FDIC's unequivocal position was
that the mortgage securitization obligations passed to the acquirer:

> 9. Are the off-balance sheet credit card portfolio and mortgage securitizations
> included in the transaction?  Do you expect the acquirer to assume the servicing
> obligations?  If there are pricing issues associated with the contracts (e.g., the

pricing is disadvantageous to the assuming institution), can we take advantage of the FDIC's repudiation powers to effect a repricing?

Answer: The bank's interests and obligations associated with the off-balance sheet credit card portfolio and mortgage securitizations pass to the acquirer. Only contracts and obligations remaining in the receivership are subject to repudiation powers.

Examiner's Report Ex. JPMCD 000001550.00212 – JPMCD 000001550.00213.

771.    In fact, JPMorgan Bank knew and expressed concern that the PAA and Section 2.1, as drafted, included the transfer of liabilities relating to the WaMu securitizations from WaMu Bank to JPMorgan Bank.  On September 23, 2008, JPMorgan Bank wrote in an e-mail to the FDIC:

Let's say there is a contract between the thrift and the Parent and that is included in the Books and Records (not something like "accrued for on the books of the Failed Bank," which probably would fix the problem) of the thrift at the time of closing.  Any liability under that contract is then arguably a liability reflected in the Books and Records.  Therefore one would most likely conclude that liabilities under that contract are assumed under 2.1 … So the way that [indemnification provision] 12.1 reads is we are indemnified for a claim by Wamu (shareholder of Failed Bank) with respect to that contract only to the extent the liability was not assumed -- indeed they are free to sue us for a breach by the Failed Bank that occurred before the closing.  In a normal P&A between commercial parties this is not something a buyer would ever assume and it really doesn't make sense (nor frankly is it fair) here.

772.    Examiner's Report Ex. JPM_EX00034958, e-mail from Dan Cooney of JPMorgan Bank to David Gearin of the FDIC.  The language at issue was not altered, despite JPMorgan Bank's protests.

773.    The above-quoted passage—"indeed they are free to sue us for a breach by the Failed Bank that occurred before the closing"—also demonstrates that, under the language of the PAA, JPMorgan Bank knew that it would be the appropriate successor for all liabilities and obligations not disclaimed in the PAA.  *Id.*

774.    Further, JPMorgan Chase's SEC filings following its purchase and assumption of WaMu Bank accounted for the additional liability associated with the WaMu Securitizations.

For instance, in a Prospectus Supplement filed on December 12, 2009, JPMorgan Chase cautions that "repurchase and/or indemnity obligations arising in connection with the sale and securitization of loans … by us and certain of our subsidiaries, as well as entities acquired by us as part of the Bear Stearns, Washington Mutual and other transactions, could materially increase our costs and lower our profitability, and could materially and adversely impact our results of operations and financial condition."

775.    JPMorgan Bank was fully aware of the pending claims and potential claims against WaMu Bank when it purchased and assumed WaMu Bank's assets and liabilities. JPMorgan Bank has further evinced its intent to assume WaMu Banks' liabilities by paying to defend and settle lawsuits brought against WaMu Bank and its subsidiaries.

776.    Moreover, the former WaMu Bank website, www.wamu.com, redirects visitors to a JPMorgan Chase website proposing that visitors "update [their] favorites" to include www.chase.com.

777.    Similarly, the former WaMu Securities website, www.wamusecurities.com, redirects visitors to a JPMorgan Chase-branded website with the text "Washington Mutual Mortgage Securities Corp. (WMMSC), a wholly owned subsidiary of JPMorgan Chase Bank, National Association."

778.    As a result of the purchase and assumption of "substantially all of the assets and ... all deposit and substantially all other liabilities of" WaMu Bank, JPMorgan Bank is the successor-in-interest to WaMu Bank and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of WaMu Bank.

779.    Therefore, this action is brought against JPMorgan Bank as the successor to WaMu Bank.  WaMu Bank is not a defendant in this action.

## XVI. TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS

780.    The statutory claims raised by Plaintiffs herein are currently the subject of class action lawsuits.  Plaintiffs  are putative class members of two class action lawsuits (the "Class Actions") for its purchases of Certificates from the following trusts:

> JPALT 2006-A4; JPALT 2006-A7; JPALT 2006-S3; JPMAC 2006-CH2; JPALT 2007-A1; BALTA 2006-6; BSARM 2006-4; BSMFT 2006-AR4; BSMFT 2006-AR5; BSABS 2007-HE2; WAMU 2006-AR7; WAMU 2006-AR12; WAMU 2006-AR17; WAMU 2007-HY1

### A.    THE JPMORGAN CLASS ACTION

781.    On March 26, 2008, a class action was filed against several JPMorgan entities and certain former JPMorgan officers and directors on behalf of a class of investors who purchased or otherwise acquired specific certificates that JPMorgan issued, underwrote or sold.  *See Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, Case No. 5765/08 (Sup. Ct Nassau Co. 2008) (the "Plumbers' Class Action").  The case was later consolidated and removed to the United States District Court for the Eastern District of New York and assigned case number 2:08-cv-01713-ERK-GRB (E.D.N.Y.).  The Plumbers' Class Action complaint alleges claims under Sections 11, 12(a)(2) and 15 of the Securities Act.

782.    Plaintiffs were included in the defined class in the Plumbers' Class Action with respect to their investments in:  JPALT 2006-A4; JPALT 2006-A7; JPALT 2006-S3; JPMAC 2006-CH2; and JPALT 2007-A1.  On December 13, 2011, Judge Edward R. Korman dismissed certain certificates from this action, including JPALT 2006-A7 and JPALT 2006-S3.  Therefore, the statute of limitations as to these Certificates was tolled until this ruling.

783.    The following Defendants named in this Complaint are also defendants in the Plumbers' Class Action, for the same statutory causes of action asserted herein: JPMS, JPM Acceptance, JP Morgan Acquisition, Cole, Duzyk, McMichael and Schioppo.

### B.    THE BEAR STEARNS CLASS ACTION

784.    On August 20, 2008, a class action was filed against several Bear Stearns entities, and certain present and former Bear Stearns officers and directors on behalf of a class of investors who purchased or otherwise acquired specific certificates that Bear Stearns issued, underwrote or sold.  *See New Jersey Carpenters Health Fund v. Bear Stearns Mort. Funding Trust 2006-AR1, et al.*, Case No. 602426/08 (Sup. Ct. Nassau Co. 2008) (the "Bear Stearns Class Action").  The Bear Stearns Class Action was later removed and consolidated into *In re Bear Stearns Mort. Pass-Through Certificates Litig.,* S.D.N.Y. Master File No. 08-cv-8093 (LTS) (KNF).  The Bear Stearns Class Action complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

785.    Plaintiffs were  included in the defined class in the Bear Stearns Class Action with respect to its investments in: BALTA 2006-6; BSARM 2006-4; BSMFT 2006-AR4, BSMFT 2006-AR5, and BSABS 2007-HE2.

786.    The following Defendants named in this Complaint are also defendants in the Bear Stearns Class Action, for the same statutory causes of action asserted herein:  Bear Stearns, BSABS, JPMorgan Chase, JPMS, EMC, SAMI, Garniewski, Jurkowski, Lutthans, Marano, Mayer, Molinaro, Nierenberg, Perkins, and Verschleiser.

### C.    THE WAMU CLASS ACTION

787.    On August 4, 2008, a class action was filed against several WaMu entities, and certain present and former WaMu officers and directors on behalf of a class of investors who purchased or otherwise acquired specific certificates that WaMu issued, underwrote or sold.  *See New Orleans Employees' Ret. Sys. v. Washington Mutual Bank, et al.,* Case No. 08-2-26210-3 (Wash. Super. Ct. King Co. 2008) (the "WaMu Class Action").  The WaMu Class Action was later removed to the United States District Court for the Western District of Washington,

consolidated with *Boilermakers Nat'l Annuity Trust Fund v WaMu Mort. Pass Through Certificates et al.*, renamed *In re Washington Mutual Mortgage Backed Securities Litigation*, No. 09-cv-00037-MJP.

788.   The WaMu Class Action complaint alleges Sections 11, 12(a)(2), and 15 of the Securities Act.

789.   Plaintiffs were included in the defined class in the WaMu Class Action with respect to its investments in: WAMU 2006-AR7; WAMU 2006-AR12; WAMU 2006-AR17; WAMU 2007-HY1.

790.   Defendants WaMu, WAAC, WaMu Capital, Beck, Novak, Green, Jurgens, Fortunato, Lehmann, Wilhelm, and  Careaga in this Complaint are also defendants in the WaMu Class Action, for the same statutory causes of action asserted herein.

791.   Plaintiffs reasonably and justifiably relied on the class action tolling doctrines of *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) and *In re WorldCom Secs Litig.*, 496 F.3d 245, 256 (2d Cir. 2007) to toll the statute of limitations on its 1933 Act claims in both the Plumbers' Class Action and the Bear Stearns Class Action.  Under *American Pipe*, all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them.  *American Pipe*, 414 U.S. at 255.  As the Second Circuit stated in *WorldCom*, "because Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class." *WorldCom*, 496 F.3d at 256; see also *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS) (MHD), 2011 WL 4089580 (S.D.N.Y. Sept. 15, 2011) (rejecting defendants' argument that *American Pipe* tolling does not apply when the original Plaintiffs did not purchase the same

certificates as the new Plaintiffs and therefore did not have standing to bring the new Plaintiffs' claims).

792.    Plaintiffs have chosen to file this separate action and to assert their Securities Act claims, which have been tolled by the pendency of these Class Actions.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Common Law Fraud
### (Against the Corporate Defendants and the Underwriter Defendants)

793.    Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

794.    This claim is brought against the Corporate Defendants and the Underwriter Defendants.

795.    The Corporate Defendants and the Underwriter Defendants promoted and sold the Certificates purchased by Plaintiffs pursuant to the defective Offering Documents.  The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

796.    Each of the Corporate Defendants and the Underwriter Defendants knew their representations and omissions were false and/or misleading at the time they were made.  Each of the Corporate Defendants and the Underwriter Defendants made the misleading statements with an intent to defraud Plaintiffs.

797.    Each of the Corporate Defendants and the Underwriter Defendants knew that their representations and omissions were false and/or misleading at the time they were made or at the very least, recklessly made such representations and omissions without knowledge of their truth or falsity.

798.    Each of the Corporate Defendants and the Underwriter Defendants made the misleading statements and omissions with an intent to defraud Plaintiffs and to induce Plaintiffs into purchasing the Certificates.  Furthermore, these statements related to these Defendants' own acts and omissions.

799.    The Corporate Defendants and the Underwriter Defendants knew or recklessly disregarded that investors such as Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents and their public representations.  These Defendants knew or recklessly disregarded that investors such as Plaintiffs would rely upon their representations in connection their decision to purchase the Certificates.  These Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

800.    Plaintiffs reasonably, justifiably and foreseeably relied on the Corporate Defendants and the Underwriter Defendants' false representations and misleading omissions.

801.    It was only by making such representations that the Corporate Defendants and the Underwriter Defendants were able to induce Plaintiffs to buy the Certificates.  Plaintiffs would not have purchased or otherwise acquired the Certificates but for these Defendants' fraudulent representations and omissions about the quality of the Certificates.

802.    Had Plaintiffs known the true facts regarding the loans underlying the Certificates, including the Corporate Defendants' and the Originators' abandonment of their underwriting practices, the Corporate Defendants' and Originators' improper appraisal methods, the inaccuracy of the ratings assigned by the rating agencies, and the failure to convey to the Issuing Trusts legal title to the underlying mortgages, Plaintiffs would not have purchased the Certificates.

803.    As a result of the Corporate Defendants and the Underwriter Defendants' false and misleading statements and omissions, Plaintiffs suffered damages in connection with its purchase of the Certificates.

804.    Because the Corporate Defendants and the Underwriter Defendants committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of these acts knowingly affected the general public, including but not limited to all persons with interests in the RMBS, Plaintiffs are entitled to recover punitive damages.

805.    In the alternative, Plaintiffs hereby demand rescission and make any necessary tender of Certificates.

## SECOND CAUSE OF ACTION
### Fraudulent Inducement
### (Against the Corporate Defendants and the Underwriter Defendants)

806.    Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

807.    This is a claim for fraudulent inducement against the Corporate Defendants and the Underwriter Defendants.

808.    As alleged above, in the Offering Documents and in their public statements, the Corporate Defendants and the Underwriter Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

809.    The Issuing Defendants and the Underwriter Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false, or, at the very least, made recklessly, without any belief in the truth of the statements.

810.    The Corporate Defendants and the Underwriter Defendants made these materially misleading statements and omissions for the purpose of inducing Plaintiffs to purchase the Certificates.  Furthermore, these statements related to these Defendants' own acts and omissions.

811.    The Corporate Defendants and the Underwriter Defendants knew or recklessly disregarded that investors such as Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents and their public representations.  These Defendants knew or recklessly disregarded that investors such as Plaintiffs would rely upon their representations in connection with their decision to purchase the Certificates.  These Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

812.    It was only by making such representations that the Corporate Defendants and the Underwriter Defendants were able to induce Plaintiffs to buy the Certificates.  Plaintiffs would not have purchased or otherwise acquired the Certificates but for the Corporate Defendants and the Underwriter Defendants' fraudulent representations and omissions about the quality of the Certificates.

813.    Plaintiffs justifiably, reasonably and foreseeably relied on the Corporate Defendants' representations and false statements regarding the quality of the Certificates.

814.    By virtue of the Corporate Defendants and the Underwriter Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered substantial damages and are also entitled to rescission or rescissory damages.

### THRID CAUSE OF ACTION
### Aiding & Abetting Fraud
### (Against JPMorgan Chase and the JPMorgan Defendants)

815.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

816.    This is a claim against JPMorgan Chase and the JPMorgan Defendants for aiding and abetting the fraudulent and reckless misrepresentations by each other.  Each of JPMorgan Chase and the JPMorgan Defendants aided and abetted the fraud committed by JPMorgan Chase and all of the other JPMorgan Defendants.

817.    As alleged in detail above, JPMorgan Chase and the JPMorgan Defendants knowingly promoted and sold Certificates to Plaintiffs pursuant to materially misleading Offering Documents, thereby damaging Plaintiffs.  Each of the above-named Defendants knew of the fraud perpetrated on Plaintiffs by the other Defendants.  Indeed, each of these Defendants directed, supervised and otherwise knew of the abandonment of underwriting practices and the utilization of improper appraisal methods; the inaccuracy of the ratings assigned by the rating agencies; and the failure to convey to the Issuing Trusts legal title to the underlying mortgages.

818.    JPMorgan Chase and the JPMorgan Defendants provided each other with substantial assistance in perpetrating the fraud by participating in the violation of mortgage loan underwriting and appraisal standards; making false public statements about mortgage loan underwriting and appraisal standards; providing false information about the mortgage loans underlying the Certificates to the rating agencies; providing false information for use in the Offering Documents; and/or participating in the failure to properly endorse and deliver the mortgage notes and security documents to the Issuing Trusts.

819.    It was foreseeable to JPMorgan Chase and each JPMorgan Defendant at the time he, she or it actively assisted in the commission of the fraud that Plaintiffs would be harmed as a result of their assistance.

820.    As a direct and natural result of the fraud committed by JPMorgan Chase and the JPMorgan Defendants, and the knowing and active participation by these Defendants, Plaintiffs have suffered substantial damages.

### FOURTH CAUSE OF ACTION
### Aiding & Abetting Fraud
### (Against the Bear Stearns Defendants and Banc of America)

821.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

822.    This is a claim against the Bear Stearns Defendants and Banc of America for aiding and abetting the fraudulent and reckless misrepresentations by each other.  Each of the Bear Stearns Defendants and Banc of America aided and abetted the fraud committed by all of the other Bear Stearns Defendants.

823.    As alleged in detail above, the Bear Stearns Defendants and Banc of America knowingly promoted and sold Certificates to Plaintiffs pursuant to materially misleading Offering Documents, thereby damaging Plaintiffs.  Each of the Bear Stearns Defendants and Banc of America knew of the fraud perpetrated on Plaintiffs by the other Bear Stearns Defendants.  Indeed, each of these Defendants directed, supervised and otherwise knew of the abandonment of underwriting practices and the utilization of improper appraisal methods; the inaccuracy of the ratings assigned by the rating agencies; and the failure to convey to the Issuing Trusts legal title to the underlying mortgages.

824.    The Bear Stearns Defendants and Banc of America provided all of the other Bear Stearns Defendants with substantial assistance in perpetrating the fraud by participating in the violation of mortgage loan underwriting and appraisal standards; making false public statements about mortgage loan underwriting and appraisal standards; providing false information about the mortgage loans underlying the Certificates to the rating agencies; providing false information for use in the Offering Documents; and/or participating in the failure to properly endorse and deliver the mortgage notes and security documents to the Issuing Trusts.

825.   It was foreseeable to each Bear Stearns Defendant and Banc of America at the time he, she or it actively assisted in the commission of the fraud that Plaintiffs would be harmed as a result of their assistance.

826.   As a direct and natural result of the fraud committed by the Bear Stearns Defendants and Banc of America, and the knowing and active participation by these Defendants, Plaintiffs have suffered substantial damages.

## FIFTH CAUSE OF ACTION
### Aiding & Abetting Fraud
### (Against the WaMu Defendants, JPMorgan Bank, LBSC, Banc of America, Deutsche Bank, GCM, Merrill, and UBS)

827.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

828.   This is a claim against the WaMu Defendants, JPMorgan Bank (as successor in liability to WaMu Bank), LBSC, Banc of America, Deutsche Bank, GCM, Merrill, and UBS for aiding and abetting the fraudulent and reckless misrepresentations by each other.  Each of the WaMu Defendants, WaMu Bank, LBSC, Banc of America, Deutsche Bank, GCM, Merrill, and UBS aided and abetted the fraud committed by the WaMu Defendants, WaMu Bank, LBSC, Banc of America.

829.   As alleged in detail above, the WaMu Defendants, WaMu Bank, LBSC, Banc of America, Deutsche Bank, GCM, Merrill, and UBS knowingly promoted and sold Certificates to Plaintiffs pursuant to materially misleading Offering Documents, thereby damaging Plaintiffs. Each of the above-named Defendants knew of the fraud perpetrated on Plaintiffs by the other Defendants.  Indeed, each of these Defendants directed, supervised and otherwise knew of the abandonment of underwriting practices and the utilization of improper appraisal methods; the inaccuracy of the ratings assigned by the rating agencies; and the failure to convey to the Issuing Trusts legal title to the underlying mortgages.

830.    The WaMu Defendants, WaMu Bank, LBSC, Banc of America, Deutsche Bank, GCM, Merrill, and UBS provided each other with substantial assistance in perpetrating the fraud by participating in the violation of mortgage loan underwriting and appraisal standards; making false public statements about mortgage loan underwriting and appraisal standards; providing false information about the mortgage loans underlying the Certificates to the rating agencies; providing false information for use in the Offering Documents; and/or participating in the failure to properly endorse and deliver the mortgage notes and security documents to the Issuing Trusts.

831.    It was foreseeable to each of the WaMu Defendants, WaMu Bank, LBSC, Banc of America, Deutsche Bank, GCM, Merrill, and UBS at the time he, she or it actively assisted in the commission of the fraud that Plaintiffs would be harmed as a result of their assistance.

832.    As a direct and natural result of the fraud committed by the WaMu Defendants, WaMu Bank, LBSC, Banc of America, Deutsche Bank, GCM, Merrill, and UBS, and the knowing and active participation by these Defendants, Plaintiffs have suffered substantial damages.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against All Defendants)

833.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegations that the Defendants made any untrue statements and omissions intentionally or recklessly.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.

834.    Defendants originated or acquired all of the underlying mortgage loans and underwrote and sponsored the securitizations at issue.  Based on due diligence they conducted on the loan pools and the Originators, they had unique and special knowledge about underwriting

defects in the loans in the offerings.  Defendants were uniquely situated to evaluate the economics of each securitization.

835.    As the sponsors, underwriters and depositors of the Certificates, Defendants were uniquely situated to explain the details, attributes, and conditions of each security.  Defendants made the misrepresentations described above to induce Plaintiffs to purchase the Certificates.

836.    Plaintiffs did not possess the loan files for the mortgage loans underlying their Certificates and thus they could not conduct a loan-level analysis of the underwriting quality or servicing practices for the mortgage loans.

837.    Defendants were aware that Plaintiffs relied on Defendants' unique and special knowledge and experience and depended upon Defendants for accurate and truthful information regarding the quality of the underlying mortgage loans and their underwriting when determining whether to invest in the Certificates at issue in this action.  Defendants also knew that the facts regarding whether or not the Originators of the underlying loans complied with their stated underwriting standards and appraisal methods were exclusively within Defendants' knowledge and control.

838.    Plaintiffs relied on Defendants' unique and special knowledge regarding the quality of the underlying mortgage loans and their underwriting when determining whether to invest in the Certificates.  This longstanding relationship, coupled with the Defendants' unique and special knowledge about the underlying loans, created a special relationship of trust, confidence, and dependence between the Defendants and Plaintiffs.

839.    At the time it made these misrepresentations, Defendants knew, or at a minimum were negligent in not knowing, that these statements were false, misleading, and incorrect.  Such information was known to Defendants but not known to Plaintiffs, and Defendants knew that Plaintiffs were acting in reliance on mistaken information.

840.   Based on their expertise, superior knowledge, and relationship with Plaintiffs, Defendants had a duty to provide Plaintiffs with complete, accurate, and timely information regarding the underwriting standards and appraisal methods used.  Defendants breached their duty to provide such information to Plaintiffs.

841.   Plaintiffs reasonably relied on the information Defendants did provide which Defendants undertook no attempt to correct.  Without these material misrepresentations, Plaintiffs would not have bought the Certificates.

842.   Plaintiffs have suffered substantial damages as a result of Defendants' misrepresentations.

## SEVENTH CAUSE OF ACTION
### Violation of Section 11 of the Securities Act
### (Against All Defendants)

843.   Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

844.   This claim is brought pursuant to Section 11 of the Securities Act against all Defendants.  This claim is predicated upon Defendants' strict liability and/or negligence for making material untrue statements and omissions in the Offering Documents.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.

845.   The Registration Statements for the Certificate offerings were materially misleading, contained untrue statements of material fact, and omitted to state other facts necessary to make the statements not misleading.  Each Defendant issued and disseminated, caused to be issued or disseminated, and/or participated in the issuance and dissemination of the material statements and omissions that were contained in the Offering Documents.

846.   Defendants JPM Acceptance, BSABS, SAMI, WAAC, WMMSC and LBSC, as the depositors, were "issuers" within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), and are strictly liable to Plaintiffs for making the misstatements and omissions in issuing the Certificates.

847.   The Individual Defendants were executive officers and representatives of the respective companies responsible for the contents and dissemination of the Shelf Registration Statements.  Each of the Individual Defendants was a director of their respective companies at the time the Shelf Registration Statement became effective as to each Certificate.   Each Individual Defendant signed the relevant Registration Statements, or documents incorporated by reference, in their capacities as officers or directors of their respective companies, and caused and participated in the issuance of the Registration Statements.  By reasons of the conduct alleged herein, each of these Individual Defendants violated Section 11 of the Securities Act.

848.   The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

849.   The Sponsor Defendants and the Underwriter Defendants directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates, and therefore also acted as underwriters in the sale of Certificates issued by the Issuing Trusts.

850.   Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of

material facts required to be stated in order to make the statements contained therein not misleading.

851.    Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.  The facts misstated or omitted were material to a reasonable investor in the securities sold pursuant to the Offering Documents.

852.    By reason of the conduct alleged herein, each of the Defendants violated Section 11 of the Securities Act, and are liable to Plaintiffs.

853.    Plaintiffs acquired Certificates pursuant to the false and misleading Offering Documents, including the Registration Statements.  At the time Plaintiffs obtained the Certificates, it did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

854.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Documents, and brought within three years of the effective date of the Offering Documents, by virtue of the timely filing of the Class Actions and by the tolling of Plaintiffs' claims afforded by such filings.

855.    Plaintiffs have sustained damages measured by the difference between the price Plaintiffs paid for the Certificates and (1) the value of the Certificates at the time this suit is brought, or (2) the price at which Plaintiffs sold the Certificates in the market prior to the time suit is brought.  Plaintiffs' Certificates lost substantial market value subsequent to and due to the materially untrue statements of facts and omissions of material facts in the Offering Documents alleged herein.

856.    By virtue of the foregoing, Plaintiffs are entitled to damages, jointly and severally from each of the Defendants, as set forth in Section 11 of the Securities Act.

### EIGHTH CAUSE OF ACTION
### Violation of Section 12(a)(2) of the Securities Act
### (Against the Issuing Defendants and the Underwriter Defendants)

857.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

858.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Issuing Defendants and the Underwriter Defendants from whom Plaintiffs acquired the Certificates.  For purposes of this claim, Plaintiffs expressly exclude and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This claim is based solely on claims of strict liability and/or negligence under the Securities Act.

859.    The Issuing Defendants and the Underwriter Defendants offered, promoted, and/or sold the Certificates to Plaintiffs by means of the Offering Documents, including the Prospectuses and Prospectus Supplements, which contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

860.    Plaintiffs purchased Certificates directly from the Issuing Defendants and the Underwriter Defendants in the Offerings, pursuant to the Offering Documents, including the Prospectuses and Prospectus Supplements which contained untrue statements and omissions, as reflected in ¶121.  Defendants sold these Certificates for their own financial gain.

861.    The Issuing Defendants and the Underwriter Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, including the Prospectuses and Prospectus Supplements, to ensure that such

statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Issuing Defendants and the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, including the Prospectuses and Prospectus Supplements as set forth above.

862.    Each of the Issuing Defendants and the Underwriter Defendants actively participated in the solicitation of Plaintiffs' purchases of the Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Offering Documents, filing the Offering Documents, and assisting in marketing the Certificates.

863.    Plaintiffs purchased or otherwise acquired Certificates pursuant to the defective Offering Documents, including the Prospectuses and Prospectus Supplements.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents, including the Prospectuses and Prospectus Supplements.

864.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Documents, and brought within three years of the effective date of the Offering Documents, by virtue of the timely filing of the Class Actions and by the tolling of Plaintiffs' claims afforded by such filings.

865.    By reason of the conduct alleged herein, the Issuing Defendants and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs sustained material damages in connection with its purchases of the Certificates.  Plaintiffs have the right to rescind and recover the consideration paid for its Certificates, and hereby elects to rescind and tender its securities to the Issuing

Defendants and the Underwriter Defendants, except as to any Certificates that Plaintiffs have sold, as to which Plaintiffs seek damages to the extent permitted by law.

### NINTH CAUSE OF ACTION
### Violation of Section 15 of the Securities Act
**(Against JPMorgan Chase, JPMM Acquisition, EMC, WMMSC, JPMorgan Bank, and the Individual Defendants)**

866.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegations that the Defendants made any untrue statements and omissions intentionally or recklessly.   For the purposes of this claim, Plaintiffs expressly disclaim any claim of fraud or intentional misconduct.

867.   This claim is asserted against JPMorgan Chase (in its own capacity and as successor-in-interest to BSCI), JPMM Acquisition, EMC, WMMSC, JPMorgan Bank (as successor-in-interest to WaMu Bank) and the Individual Defendants under Section 15 of the Securities Act.

868.   Each of JPMorgan Chase (in its own capacity and as successor-in-interest to BSCI), JPMM Acquisition, EMC, WMMSC, JPMorgan Bank (as successor-in-interest to WaMu Bank) and the Individual Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act.   JPMorgan Chase (in its own capacity and as successor-in-interest to BSCI), JPMM Acquisition, EMC, WMMSC, JPMorgan Bank (as successor-in-interest to WaMu Bank)  and the Individual Defendants conducted and participated, directly and indirectly in the conduct of the Issuing Defendants' business affairs, and had the power and influence and exercised the same to cause the Issuing Defendants to engage in the acts described herein.

869.   JPMorgan Chase (in its own capacity and as successor-in-interest to BSCI), JPMM Acquisition, EMC, WMMSC, JPMorgan Bank (as successor-in-interest to WaMu Bank)

and the Individual Defendants' control, ownership and position made them privy to and provided them with knowledge of the material facts concealed from Plaintiffs.

870.    Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus Supplements, that each is associated with as set forth above.  These materials contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

871.    Defendants JPMorgan Chase (in its own capacity and as successor-in-interest to BSCI), and the Individual Defendants culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates purchased by Plaintiffs, by initiating these securitizations, purchasing the mortgage loans to be securitized, determining the structure of the securitizations, selecting the entities to issue the Certificates, and selecting the underwriters.  In these roles, these Defendants knew and intended that the mortgage loans they purchased would be sold in connection with the securitization process, and that the Certificates would be issued by the relevant trusts.

872.    Defendant JPMM Acquisition was the sponsor for six  Securitizations carried out under the two Registration Statements filed by Defendant JPMM Acquisition, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates purchased by Plaintiffs, by initiating these securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, and selecting the underwriters.  In its role as sponsor, JPMM Acquisition knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing ownership interests of investors in the cashflows would be issued by the relevant trusts.

873.    Defendant EMC was the sponsor for 17 Securitizations carried out under the 6 Registration Statements filed by Defendants BSABS and SAMI and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates purchased by Plaintiffs, by initiating these securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, and selecting the underwriters.  In its role as sponsor, EMC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing ownership interests of investors in the cashflows would be issued by the relevant trusts.

874.    Defendant WMMSC was the sponsor for seven Securitizations carried out under two Registration Statements filed by Defendants WAAC and WMMSC, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates purchased by Plaintiffs, by initiating these securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, and selecting the underwriters.  In its role as sponsor, WMMSC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing ownership interests of investors in the cashflows would be issued by the relevant trusts.

875.    Defendant JPMorgan Bank (as successor-in-interest to WaMu Bank) was the sponsor for three Securitizations carried out under two Registration Statements filed by Defendants WMMSC and WAAC, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates purchased by Plaintiffs, by initiating these securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, and selecting the underwriters.  In its role as sponsor, JPMorgan

Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing ownership interests of investors in the cashflows would be issued by the relevant trusts.

876.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Documents, and brought within three years of the effective date of the Offering Documents, by virtue of the timely filing of the Class Actions and by the tolling of Plaintiffs' claims afforded by such filings.

877.    By virtue of the conduct alleged herein, JPMorgan Chase (in its own capacity and as successor-in-interest to BSCI), JPMM Acquisition, EMC, WMMSC, JPMorgan Bank (as successor-in-interest to WaMu Bank) and the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs for damages suffered as a result.

**TENTH CAUSE OF ACTION**
**Successor and Vicarious Liability**
**(Against JPMorgan Chase, JPMS, and JPMorgan Bank)**

878.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

879.    Defendant JPMorgan Chase is the successor to BSCI, pursuant to the Merger. JPMorgan Chase is liable for BSCI's wrongdoing, in its entirety, under common law, because BSCI merged and consolidated with JPMorgan Chase, because JPMorgan Chase has expressly or impliedly assumed BSCI's tort liabilities, and because JPMorgan Chase is a mere continuation of BSCI.  This action is thus brought against JPMorgan Chase both in its own capacity and as successor to BSCI.

880.    Defendant JPMS is the successor to Bear Stearns, pursuant to the Merger.  JPMS is liable for Bear Stearns's wrongdoing, in its entirety, under common law, because Bear Stearns merged and consolidated with JPMS, because JPMS has expressly or impliedly assumed Bear

Stearns's tort liabilities, and because JPMS is a mere continuation of Bear Stearns.  This action is thus brought against JPMS both in its own capacity and as successor to Bear Stearns.

881.     Defendant JPMorgan Bank succeeded to WaMu Bank's liabilities pursuant to the PAA.  JPMorgan Bank is liable for WaMu Bank's wrongdoing, in its entirety, under common law, because WaMu Bank merged and consolidated with JPMorgan Bank, because JPMorgan Bank has expressly or impliedly assumed WaMu Bank's tort liabilities, and because JPMorgan Bank is a mere continuation of WaMu Bank.  This action is thus brought against JPMorgan Bank both in its own capacity and as successor to WaMu Bank.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

An award in favor of Plaintiffs against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

1.     Plaintiffs' monetary losses, including loss of market value and loss of principal and interest payments;

2.     Rescission and recovery of the consideration paid for the Certificates at issue herein, with interest thereon;

3.     Plaintiffs' costs and disbursements in this suit, including reasonable attorneys' fees and expert fees;

4.     Prejudgment interest at the maximum legal rate; and

5.     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: March 2, 2012

Respectfully submitted,

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Geoffrey C. Jarvis
Deborah A. Elman
Robert D. Gerson
485 Lexington Ave., 29th Floor
New York, NY  10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Counsel for Plaintiffs John Hancock Life
Insurance Company (U.S.A.); John Hancock Life
Insurance Company (U.S.A.) Separate Account
6A; John Hancock Life Insurance Company
(U.S.A.) Separate Account 131; John Hancock
Funds II; John Hancock Variable Insurance Trust;
John Hancock Sovereign Bond Fund; John
Hancock Bond Trust; John Hancock Strategic
Series; and John Hancock Income Securities Trust*